**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-3555-3JP |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.1 of the U.S. Court of International Trade, Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC respectfully move for judgment on the agency record on each of their claims.

A proposed order is enclosed.

Dated: August 24, 2026

Respectfully submitted,

*/s/* Pratik A. Shah

Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Kristen E. Loveland (*admission application pending*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-3555-3JP |

**ORDER**

This matter is before the Court on Plaintiffs' Motion for Judgment On The Agency Record. Upon consideration of the Motion and record thereon, and for the reasons set forth in Plaintiffs' Memorandum of Law, it is hereby

**ORDERED** that the Motion for Judgment On The Agency Record is **GRANTED** and the Final Determination is **VACATED**.

A judgment for Plaintiffs will enter accordingly.

______________________________
JUDGE

Dated: __________________
New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-3555-3JP |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ADMINISTRATIVE DETERMINATION UNDER REVIEW ........ 3

ISSUES PRESENTED ........ 4

JURISDICTION ........ 4

BACKGROUND ........ 4

A. Legal Framework ........ 4

B. Defendants Impose Global Tariffs Under IEEPA ........ 5

C. Defendants Announce Their Intention To Reimpose Global Tariffs Under Sections 122 And 301 Of The Trade Act ........ 7

D. Defendants Recreate Global Tariffs Under Section 122 Of The Trade Act ........ 9

E. Defendants Recreate Global Tariffs For The Third Time Under Section 301 Of The Trade Act ........ 10

*1. USTR's Section 301 Investigations* ........ 10

*2. USTR's Global Section 301 Tariffs Report and Notice of Determination* ........ 12

*3. USTR's Final Determination* ........ 14

F. Plaintiffs Bring This Action ........ 16

LEGAL STANDARD ........ 16

SUMMARY OF ARGUMENT ........ 17

ARGUMENT ........ 19

I. THE SECTION 301 TARIFFS WERE PROMULGATED IN EXCESS OF STATUTORY AUTHORITY ........ 19

A. Section 301 Requires Fact-Based Country-By-Country Findings ........ 20

B. USTR Failed To Make Section 301's Mandatory Country-Specific Findings ........ 23

*1. Burden on U.S. Commerce* ........ 24

*2. Unreasonable Practice* ........ 27

*3. Appropriate Action* ........ 29

II. THE GLOBAL SECTION 301 TARIFFS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT IN ADDITIONAL WAYS ........ 32

A. USTR's Unmoored Conclusions Are Arbitrary, Capricious, And Unsupported By Substantial Evidence ........ 32

1. *Burden on U.S. Commerce*....................32
2. *Unreasonable Practice*....................41
3. *Appropriate Action*....................44

B. USTR's Sudden Concern With Forced-Labor Imports Is A Pretext To "Ensure Continuity" With The Baseline Global IEEPA Tariffs....................48

CONCLUSION....................51

STATUTORY ADDENDUM

19 U.S.C. § 2411(b)-(d)....................Add. 1
19 U.S.C. § 2412(b)....................Add. 7
19 U.S.C. § 2413(a)....................Add. 9
19 U.S.C. § 2414....................Add. 10
19 U.S.C. § 2417....................Add. 13

## TABLE OF AUTHORITIES

**CASES:**

*Arizona Pub. Serv. Co. v. United States*,
742 F.2d 644 (D.C. Cir. 1984) ........................................................................41

*Biden v. Nebraska*,
600 U.S. 477 (2023)........................................................................................22

*Campos-Chaves v. Garland*,
602 U.S. 447 (2024)........................................................................................21

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)........................................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)........................................................................................44

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
587 U.S. 262 (2019)........................................................................................21

*Consolidated Rail Corp. v. Surface Transp. Bd.*,
93 F.3d 793 (D.C. Cir. 1996) ....................................................................32, 40

*Crowell v. Benson*,
285 U.S. 22 (1932)..........................................................................................23

*Department of Com. v. New York*,
588 U.S. 752 (2019)...........................................................................17, 48, 49, 51

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)........................................................................................23

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................47

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976)........................................................................................23

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ........................................................................38

*Gilda Indus. Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010)........................................................................51

*Henry Hous. Ltd. P'ship v. United States*,
121 Fed. Cl. 537 (Fed. Cl. 2015) ....................................................................20

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025) ........................................................................... *passim*

*In re Section 301 Cases*,
570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ..........................................................31, 48

*In re Section 301 Cases*,
No. 21-00052, 2021 WL 2799979 (Ct. Int'l Trade July 6, 2021)............................................4

*Illich v. Merit Sys. Prot. Bd.*,
104 F. App'x 171 (Fed. Cir. 2004) .........................................................................................20

*Jennings v. Merit Sys. Prot. Bd.*,
59 F.3d 159 (Fed. Cir. 1995)......................................................................................................51

*Jennings v. Rodriguez*,
583 U.S. 281 (2018).....................................................................................................................23

*Kiakombua v. Wolf*,
498 F. Supp. 3d 1 (D.C. Cir. 2020)..........................................................................................51

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026)............................................................................................... *passim*

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).....................................................................................................................21

*Merritt v. Welsh*,
104 U.S. 694 (1882).....................................................................................................................19

*Michigan Consol. Gas Co. v. Federal Power Comm'n*,
283 F.2d 204 (D.C. Cir. 1960) ....................................................................................................32

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983)...................................................................................................37, 42, 44

*National Ass'n of Mfrs. v. Department of Def.*,
583 U.S. 109 (2018).....................................................................................................................20

*Natural Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) ....................................................................................................38

*NLRB v. Noel Canning*,
573 U.S. 513 (2014).....................................................................................................................21

*Ohio v. EPA*,
603 U.S. 279 (2024).....................................................................................................................44

*Oregon v. Trump*,
Nos. 2026-1804, 2026-1805, 2026 WL 1702442 (Fed. Cir. June 11, 2026) ....................10

*Oregon v. United States*,
Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026) ....................9, 10

*People Who Care v. Rockford Bd. of Educ.*,
111 F.3d 528 (7th Cir. 1997) ....................34, 39, 41

*Pepper v. United States*,
562 U.S. 476 (2011)....................44

*Petroleum Commc'ns, Inc. v. FCC*,
22 F.3d 1164 (D.C. Cir. 1994) ....................32

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004)....................21

*Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*,
104 F.3d 1309 (Fed. Cir. 1997)....................16

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001)....................23

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) ....................33

*U.S. Commodity Futures Trading Comm'n v. Southern Tr. Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018) ....................34, 41

*United States v. Schmidt Pritchard & Co.*,
47 C.C.P.A. 152 (C.C.P.A. 1960) ....................19

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977)....................51

*United States v. Wilson*,
503 U.S. 329 (1992)....................27

*West Deptford Energy, LLC v. FERC*,
766 F.3d 10 (D.C. Cir. 2014) ....................44

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................22

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001)....................23

**CONSTITUTION AND STATUTES:**

U.S. CONST. art. I, § 8,
cl. 1 ....................................................................................................................4
cl. 3 ....................................................................................................................4

5 U.S.C.
§ 706(2)(A) ..........................................................................................................17
§ 706(2)(E)......................................................................................................17, 32

19 U.S.C.
§ 2132(a) ..............................................................................................................50
§ 2155....................................................................................................................5
§ 2411(b)...................................................................................................17, 19, 20, 31
§ 2411(b)(1) ....................................................................................................... *passim*
§ 2411(b)(2) .......................................................................................5, 29, 44, 48
§ 2411(c)(1)(B) ........................................................................................................20
§ 2411(c)(1)(D)(ii) ....................................................................................................21
§ 2411(d)(2) ......................................................................................................20, 21
§ 2411(d)(3) ............................................................................................................21
§ 2411(d)(3)(B)(i) ....................................................................................................21
§ 2411(d)(3)(C)........................................................................................................29
§ 2411(d)(3)(C)(i)(II)...............................................................................................43
§ 2411(d)(7) .............................................................................................................11
§ 2412......................................................................................................................5
§ 2412(b)(1)(B).........................................................................................................5
§ 2413......................................................................................................................5
§ 2414(a)(1)(B) ....................................................................................................5, 29
§ 2414(a)(2)(B) ........................................................................................................5
§ 2414(c) ........................................................................................................ *passim*
§ 2417(a)(1)(C) ........................................................................................................22

28 U.S.C.
§ 1581(i)..................................................................................................................16
§ 1581(i)(1)(B)...........................................................................................................4
§ 2640(e) .................................................................................................................16

50 U.S.C.
§ 1701.....................................................................................................................50

**OTHER AUTHORITIES:**

82 Fed. Reg. 40,213 (Aug. 24, 2017)..........................................................................12

83 Fed. Reg. 14,906 (Apr. 6, 2018) ..........................................................................12

85 Fed. Reg. 43,292 (Jul. 16, 2020)...........................................................................46

86 Fed. Reg. 30,350 (June 7, 2021) ....................46

86 Fed. Reg. 30,353 (June 7, 2021) ....................46

86 Fed. Reg. 30,356 (June 7, 2021) ....................46

86 Fed. Reg. 30,358 (June 7, 2021) ....................46

86 Fed. Reg. 30,361 (June 7, 2021) ....................46

86 Fed. Reg. 30,364 (June 7, 2021) ....................46

91 Fed. Reg. 9,339 (Feb. 25, 2026) ....................49

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 14, 2017) ....................46

Angeles, Fiama & Johannes Fritz, *From IEEPA To Section 122: What Changed on 20 February 2026,* GLOBAL TRADE ALERT (Feb. 21, 2026) ....................9

Bickerton, James, *Donald Trump's Tariff Proposal Sparks Warning From Economists*, NEWSWEEK (Aug. 19, 2024) ....................5

CIT R. 56.1 ....................17

CNBC TELEVISION, *USTR Jamieson Greer on EU Tech Fines: Number of Investigations We Could Conduct to Take Action* (YOUTUBE, Dec. 18, 2025) ....................7

CNBC TELEVISION, *Watch CNBC's Full Interview with Commerce Secretary Howard Lutnick* (YOUTUBE, Sep. 5, 2025) ....................7

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ....................6, 9, 49

*Fact Sheet: President Donald J. Trump Bolsters National Security and Strengthens U.S. Supply Chains by Imposing Tariffs on Polysilicon and its Derivatives*, THE WHITE HOUSE (Aug. 6, 2026) ....................40

*Fact Sheet: President Donald J. Trump Imposes a Temporary Import Duty to Address Fundamental International Payment Problems*, THE WHITE HOUSE (Feb. 20, 2026) ....................9

*Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China*, THE WHITE HOUSE (Feb. 1, 2025) ....................6

*Fact Sheet: USTR Initiates 60 Section 301 Investigations Relating to Failures to Take Action on Forced Labor*, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE (Mar. 12, 2026) ....................40

FOX & FRIENDS, *Trump Says Tariffs Have Made the U.S. 'A Fortune'* (Fox News, July 28, 2026)....................................................................................................50

H. Rep. No. 100-576 (1988) ....................................................................................27, 31

*Hearing on the President's 2026 Trade Policy Agenda Before the S. Comm. on Fin.*, 119th119th Cong. (2026) (statement of Jamieson Greer, U.S. Trade Representative) ....................................................................................................8

*Initiation of Section 301 Investigations of Digital Service Taxes*, 85 Fed. Reg. 34,709 (June 5, 2020)....................................................................................................46

Kendall, Tyler & Courtney Subramanian, *US Trade Probes Will Conclude Within Five Months, Greer Says*, BLOOMBERG LAW (Mar. 3, 2026) ..............................................10

Lincicome, Scott, *Here Comes Another Round of Sham Tariffs*, THE DISPATCH (July 23, 2026) ....................................................................................................33

Lu, Sheng, *The State of U.S. Textile and Apparel Manufacturing, Employment, and Trade*, U.S. FASHION INDUS. ASS'N (Apr. 10, 2025) ...........................................40

MORNINGS WITH MARIA, *Trump Economist Kevin Hassett: 'We're Looking at One of the Best Years We've Ever Seen'* (FOX BUSINESS, Jan. 16, 2026) ................................7

NEW YORK TIMES EVENTS AND THE NEW YORK TIMES, *Treasury Secretary Scott Bessent Says He's 'Evolved' on Tariffs: Dealbook Summit 2025* (YOUTUBE, Dec. 3, 2025)....................................................................................................7

*Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823 (Aug. 16, 2018).........................46

PR-1, Decision Memorandum on Initiating Section 301 Investigations Into the Failure of Various Economies to Impose and Effectively Enforce Forced Labor Import Bans from Deputy General Counsel Juan Millán to USTR Jamieson Greer (Mar. 12, 2026) ....................................................................................29

PR-6, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (June 2, 2026) .............................. *passim*

PR-8, Press Release, Office of the United States Trade Representative, USTR Initiates 60 Section 301 Investigations Relating to Failures to Take Action on Forced Labor (Mar. 12, 2026)....................................................................................10

PR-9, *Initiation of Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 12,884 (Mar. 17, 2026)..................................................................11, 12, 13

PR-11, *Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 34,272 (June 5, 2026) ........ *passim*

PR-71, *Section 301 Investigation on Forced Labor Import Prohibitions, Questions for Consultations* ........ 28

PR-76, *Section 301 Investigation on Forced Labor Import Prohibitions Questions for Consultations with Countries with Forced Labor Import Prohibitions* ........ 28

PR-116, Laura Murphy, *An International Blueprint for Forced Labor Import Bans*, CARR-RYAN CTR. FOR HUM. RTS., HARV. KENNEDY SCH., Issue 2026-08 (Apr. 28, 2026) ........ 43

PR-132, Press Release, Office of the United States Trade Representative, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026) ........ 1, 7, 8, 16

PR-549, Letter from Government of Costa Rica to United States Trade Representative, Re: Comments of the Government of Costa Rica for the Section 301 Investigation into the Acts, Policies and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (Apr. 15, 2026) ........ 13

PR-575, Public Comment of George Hermina, USTR-2026-0133-00127111 (Apr. 15, 2026) ........ 42

PR-763, Decision Memorandum on Actions in Section 301 Investigations of Acts, Policies, and Practices of Sixty Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor from Deputy General Counsel Juan Millán to USTR Jamieson Greer (July 23, 2026) ........ 47

PR-768, *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) ........ *passim*

PR-1807, Letter from Twenty-Two Attorneys General to Ambassador Greer, Re: *Notice of Determinations, Request For Comments, And Notice Of Public Hearings* Re: *Notice of Determinations, Request For Comments, And Notice Of Public Hearings* (July 6, 2026) ........ 45

PR-2008, Letter from the Forced Labor Working Group to Ambassador Greer, Re: Comments of the Forced Labor Working Group in Response to the Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations (July 6, 2026) ....................14, 45

PR-2287, Indonesia Comments on the Findings of the Section 301 Investigation on Forced Labor Import Prohibition (July 6, 2026) ....................45

PR-2312, Letter from the Human Trafficking Legal Center to Ambassador Greer, Re: USTR's Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor (July 6, 2026) ....................45

PR-2437, Supplementary Post-Hearing Submission of the Government of the Republic of South Africa (July 16, 2026) ....................45

Press Release, Office of the United States Trade Representative, USTR Initiates Section 301 Investigations Relating to Structural Excess Capacity and Production in Manufacturing Sectors (Mar. 11, 2026) ....................10

Press Release, U.S. Department of the Treasury, Secretary of the Treasury Scott Bessent's Remarks Before the Economic Club of Dallas - Economic Security First (Feb. 20, 2026) ....................8

Proclamation No. 11012 (Feb. 20, 2026) ....................9, 13

SCHWARZENBERG, ANDRES B., CONG. RSCH. SERV., R46604, SECTION 301 OF THE TRADE ACT OF 1974: ORIGIN, EVOLUTION, AND USE (2020) ....................11

Senate Democrats, *TRANSCRIPT: President Trump Holds a Bilat with Friedrich Merz of Germany* (Mar. 3, 2026) ....................8

*Termination of the Section 301 Digital Services Tax Investigations of Brazil, the Czech Republic, the European Union, and Indonesia*, 86 Fed. Reg. 16,828 (Mar. 31, 2021) ....................47

THE FEDERALIST NO. 33 (Alexander Hamilton) (C. Rossiter ed. 1961) ....................4

## INTRODUCTION

This action challenges the Administration's third attempt—under a third proffered statutory authority, after the first two attempts were held invalid—to impose a set of sweeping global tariffs on virtually all imports into the United States. But the Administration's last-choice backup plan does not offer the *carte blanche* global tariff authority it seeks.

Plan A, announced in April 2025, involved the imposition under the International Emergency Economic Powers Act ("IEEPA") of baseline reciprocal tariffs on nearly every U.S. trading partner (the "Global IEEPA Tariffs"). This Court found those tariffs unlawful, and the U.S. Supreme Court agreed in February 2026. *See Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). The very same day the Supreme Court invalidated Plan A, the Administration announced Plan B: the temporary imposition of similar global tariffs, predicated on a different economic emergency, under Section 122 of the Trade Act of 1974 (the "Trade Act"). That action was again challenged—and again deemed unlawful by this Court—in May 2026 (the "Global Section 122 Tariffs").

Given those court challenges, as well as Section 122's 150-day limit on tariff actions, the Administration wasted no time in concocting Plan C (the action challenged here): a reincarnated global tariff regime imposed under Section 301 of the Trade Act on more than $1 trillion in goods (the "Global Section 301 Tariffs").

Defendants made no bones about the fact that they intended to use Section 301 as an "alternative tool[]" to "address many of the issues at the heart of the President's reciprocal [IEEPA] tariff program." PR-132, Press Release, Office of the United States Trade Representative, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026) ("*USTR*

*Statement on IEEPA Decision*").[1] The U.S. Trade Representative ("USTR") thus launched a highly truncated investigation—or, as Defendants contend, 60 highly truncated investigations—into the forced-labor importation laws and enforcement practices of 60 diverse economies comprising 86 countries (the "Targeted Economies") and their purported burden on U.S. commerce. Following that rushed two-month investigation and perfunctory public comment periods, USTR pinned its execution down to the minute to keep its existing global tariff wall intact as promised. With just seven hours' notice, USTR decreed that the Global Section 301 Tariffs would take effect—imposing 10% or 12.5% duties on all 60 Targeted Economies, which account for 99.4% of U.S. imports—at 12:01 a.m. on July 24, the very moment the Global Section 122 Tariffs lapsed.

In short, Defendants have now tried to re-create materially the same global tariff regime under three disparate statutes. But there is a reason they did not begin with Section 301 and are instead turning to it now only as a last resort. Section 301's "demanding procedural prerequisites," *Learning Resources*, 607 U.S. at 244 (Opinion of Roberts, C.J.), require USTR to determine, on a country-by-country basis, that *each* of the 60 Targeted Economies has practices that are unreasonable, burden U.S. commerce, and can be "appropriately" addressed by the tariffs USTR imposes. The collective tariff action challenged here falls woefully short—and makes a mockery of Section 301's reticulated regime. USTR asserts, in generic boilerplate language, that all 60 economies have unreasonable and burdensome practices that fail to impose and effectively enforce a prohibition on the importation of goods made with forced labor. Yet as its single investigative report makes clear, USTR relies on just a handful of country- and product-specific descriptions, none of which satisfy USTR's obligations to make the requisite findings specific as to each and

[1] https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision.

every investigated economy. Defendants' loosely extrapolated determinations, moreover, are speculative on their face and lack a causal nexus. They conclude only that the practices of all 60 economies "may" "potentially" burden U.S. commerce in basically identical ways—despite the manifold differences in those economies' commercial and enforcement regimes—that justify nearly uniform across-the-board tariffs (*e.g.*, treating China and Costa Rica or Argentina and Trinidad and Tobago alike). And to the extent such findings even qualify as proper statutory determinations, they are arbitrary and insufficient, as the underlying record fails to support the conclusions that USTR draws. This Court should not countenance such an unprecedented, unsupported, and indiscriminate abuse of Section 301 to levy billions of dollars of taxes on Americans, including Plaintiffs' family-owned businesses and their customers.

To be clear, Plaintiffs do not condone reliance on forced labor or forced-labor imports. But that is not the real issue here. Defendants' pretextual and preordained determinations do not satisfy the statutory requirements of Section 301 or the applicable Administrative Procedure Act ("APA") standards. The charade must stop. This Court should rein in this Executive Branch overreach, declare the Global Section 301 Tariffs unlawful, and vacate them forthwith.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiffs challenge USTR's promulgation of the Global Section 301 Tariffs. *See* PR-768, *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) (the "Final Determination"); PR-11, *Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the*

*Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 34,272 (June 5, 2026) (the "Notice").

## ISSUES PRESENTED

1. Whether the Global Section 301 Tariffs action exceeds Defendants' authority under the Trade Act.

2. Whether the Global Section 301 Tariffs action violates the Administrative Procedure Act.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1581(i)(1)(B), which grants the Court "exclusive jurisdiction of any civil action commenced against the United States *** that arises out of any law of the United States providing for *** tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." *In re Section 301 Cases*, No. 21-00052, 2021 WL 2799979, at *4 (Ct. Int'l Trade July 6, 2021) (ellipses in original).

## BACKGROUND

### A. Legal Framework

The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises," as well as to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8, cls. 1, 3. "The power to tax was, Alexander Hamilton explained, 'the most important of the authorities proposed to be conferred upon the Union.'" *Learning Resources*, 607 U.S. at 240 (quoting THE FEDERALIST NO. 33, at 202-203 (Alexander Hamilton) (C. Rossiter ed. 1961)). The Framers thus gave Congress alone the power to tax and "did not vest any part of the taxing power in the Executive Branch." *Id.* at 241.

In the Trade Act, Congress delegated to USTR the power to exercise some of that authority, but only within specified constraints. This case involves tariffs imposed pursuant to Section 301(b)

of the Trade Act, under which USTR may take "appropriate" action, "subject to the specific direction, if any, of the President," "to obtain the elimination of" a foreign country's practice if an investigation reveals that the practice is both "unreasonable or discriminatory" and "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1), (2). In addition to those substantive conditions, Congress imposed strict procedural requirements before USTR is permitted to take action: USTR must conduct an investigation into the allegedly unreasonable activities, *id.* § 2412; consult with committees representing the private sector and state and local governments, *id.* §§ 2412(b)(1)(B), 2155; consult with the investigated foreign country, *id.* § 2413; and publish its determinations and the factual basis for them in the Federal Register, *id.* § 2414(c). Section 304 of the Trade Act gives USTR twelve months after the initiation of the underlying investigation to determine what action, if any, to take against the investigated country. *Id.* § 2414(a)(1)(B), (2)(B).

### B. Defendants Impose Global Tariffs Under IEEPA

Sweeping global tariffs were a central feature of President Trump's 2024 Presidential campaign, in which he repeatedly promised to impose "10 percent to 20 percent tariffs on foreign countries that have been ripping us off for years." James Bickerton, *Donald Trump's Tariff Proposal Sparks Warning From Economists*, NEWSWEEK (Aug. 19, 2024).[2] Shortly after taking office in 2025, President Trump tried to make good on that promise despite the "strict limits" that Congress has placed on the delegation of its tax and tariff powers. *Learning Resources*, 607 U.S. at 243 (Roberts, C.J.). To do so, the President issued a series of executive orders imposing broad

[2] https://www.newsweek.com/donald-trumps-tariff-proposal-sparks-warning-economists-1940395.

global tariffs under IEEPA. *See Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China*, THE WHITE HOUSE (Feb. 1, 2025).[3]

The Global IEEPA Tariffs, President Trump's widest-ranging IEEPA tariff action, imposed a baseline reciprocal tariff "on all imports from all trading partners," starting at 10% and later increasing for certain trading partners after implementation. Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,045 (Apr. 2, 2025). The President explained that the Global IEEPA Tariffs were intended to rectify "[l]arge and persistent annual U.S. goods trade deficits" that, in his view, had "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id*. at 15,041. Other countries' importation of products made with forced labor was not among the list of grievances identified by the Administration, nor was ending such practices among the Administration's stated goals in imposing the Global IEEPA Tariffs.

Shortly after imposition of the Global IEEPA Tariffs, several private businesses (including Plaintiffs Learning Resources and hand2mind) and a group of states filed multiple suits challenging President Trump's IEEPA tariffs on the ground that IEEPA does not authorize any tariffs at all, much less the President's unbounded ones. The Supreme Court agreed and, on February 20, 2026, struck down the IEEPA tariffs. *See Learning Resources*, 607 U.S. at 229 (affirming the judgment of the Federal Circuit and this Court). In so doing, the Supreme Court

[3] https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/.

rejected the government's contention that IEEPA authorized the President to "impose tariffs on imports from any country, of any product, at any rate, for any amount of time." *Id*. at 240.

### C. Defendants Announce Their Intention To Reimpose Global Tariffs Under Sections 122 And 301 Of The Trade Act

Anticipating a loss at the Supreme Court, Defendants had a fallback plan to allow the President to continue imposing his global tariffs. Even before the Supreme Court's decision, USTR's Ambassador Jamieson Greer (and other members of the Administration) outlined an intent to rely on other authority—namely, Sections 122 and 301 of the Trade Act—to replicate the Global IEEPA Tariffs.[4]

Once the Supreme Court issued its decision in *Learning Resources*, USTR promptly confirmed its plan. USTR announced that "alternative tools would be implemented to address many of the issues at the heart of the President's reciprocal tariff program." PR-132, *USTR Statement on IEEPA Decision, supra*. USTR then expressly identified Sections 122 and 301 of the Trade Act as mechanisms the Administration would use "to ensure continuity in reaching" President Trump's goals of "reducing the U.S. global trade deficit in goods, reversing the lack of reciprocity by our foreign trading partners, and incentivizing the reshoring of production to the United States." *Id.* Specifically, and as detailed below, USTR explained that it would "[i]mmediately impose a temporary 10 percent surcharge on articles imported into the United

[4] *See, e.g.*, CNBC TELEVISION, *USTR Jamieson Greer on EU Tech Fines: Number of Investigations We Could Conduct to Take Action*, at 04:21 (YOUTUBE, Dec. 18, 2025), https://www.youtube.com/watch?v=zEto_G57irI; CNBC TELEVISION, *Watch CNBC's Full Interview with Commerce Secretary Howard Lutnick*, at 06:33 (YOUTUBE, Sep. 5, 2025), https://www.youtube.com/watch?v=gx24QIEqbS0&t=371s; NEW YORK TIMES EVENTS AND THE NEW YORK TIMES, *Treasury Secretary Scott Bessent Says He's 'Evolved' on Tariffs: Dealbook Summit 2025*, at 10:24 (YOUTUBE, Dec. 3, 2025), https://www.youtube.com/watch?v=x_kUqOifBnc&t=624s; MORNINGS WITH MARIA, *Trump Economist Kevin Hassett: 'We're Looking at One of the Best Years We've Ever Seen'*, at 11:30 (FOX BUSINESS, Jan. 16, 2026), https://www.foxbusiness.com/video/6387812560112.

States, pursuant to Section 122 of the Trade Act of 1974," while it conducted Section 301 investigations into "most major trading partners *** on an accelerated timeframe." *Id.* (emphasis omitted).

Other high-ranking officials reaffirmed the Administration's commitment to using new authorities to reinstate the prior tariffs. For example, Treasury Secretary Scott Bessent outlined the Administration's plan to reconstruct the prior tariffs: "Treasury's estimates show that the use of Section 122 authority, combined with potentially enhanced Section 232 and Section 301 tariffs will result in virtually unchanged tariff revenue in 2026."[5] Similarly, President Trump explained that "[w]e have a five-month period—up to five months, where we can go at 15 percent [under Section 122].[6] And while we're doing that, as you know, we're doing the various studies and things and we'll be coming out with tariffs, different tariffs on different countries. You want to talk about that?"[7] To which Ambassador Greer responded, "Yes, sir. By the time the five-month period has elapsed, we'll have completed investigations under Section 301 that Secretary Bessent talked about."[8] As Ambassador Greer would later confirm: "The specific authorities this Administration is using have changed, but the trade strategy has not. Specifically, we are continuing to impose tariffs *** to support the reindustrialization of our economy, protect American workers and increase their wages, and shrink our trade deficit." *Hearing on the*

[5] Press Release, U.S. Department of the Treasury, Secretary of the Treasury Scott Bessent's Remarks Before the Economic Club of Dallas - Economic Security First (Feb. 20, 2026), https://home.treasury.gov/news/press-releases/sb0403.

[6] After imposing 10% tariffs under Section 122, President Trump announced that he would raise the Section 122 tariffs to 15% but never formally put that announced raise into effect.

[7] Senate Democrats, *TRANSCRIPT: President Trump Holds a Bilat with Friedrich Merz of Germany* (Mar. 3, 2026), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-holds-a-bilat-with-friedrich-merz-of-germany-3326.

[8] *Id.*

*President's 2026 Trade Policy Agenda Before the S. Comm. on Fin.*, 119th Cong. (2026) (statement of Jamieson Greer, U.S. Trade Representative).[9]

**D. Defendants Recreate Global Tariffs Under Section 122 Of The Trade Act**

As promised, the same day as the Supreme Court's *Learning Resources* decision, Defendants announced a temporary 10% worldwide tariff pursuant to Section 122 of the Trade Act. *Fact Sheet: President Donald J. Trump Imposes a Temporary Import Duty to Address Fundamental International Payment Problems*, THE WHITE HOUSE (Feb. 20, 2026).[10] The Global Section 122 Tariffs applied to virtually all articles imported into the United States, subject to narrow exemptions that substantially tracked the exemptions under the Global IEEPA Tariffs. *Compare* Annexes II & III, 90 Fed. Reg. at 15,049-15,109, *with* Proclamation No. 11012, Annexes I & II (Feb. 20, 2026); *see also* Fiama Angeles & Johannes Fritz*, From IEEPA To Section 122: What Changed on 20 February 2026,* GLOBAL TRADE ALERT (Feb. 21, 2026).[11] The Section 122 tariffs were based on an asserted emergency involving fundamental international payment problems—namely, a large and serious "balance-of-payments deficit"—not forced-labor importation practices.[12]

On May 7, 2026, this Court held that the Global Section 122 Tariffs exceeded the President's statutory authority and enjoined the federal government from imposing the tariffs on the parties before it. *Oregon v. United States*, Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669, at *13 (Ct. Int'l Trade May 7, 2026). On June 11, 2026, the Federal Circuit stayed this

---

[9] https://www.finance.senate.gov/hearings/rescheduled-the-presidents-2026-trade-policy-agenda.

[10] https://www.whitehouse.gov/fact-sheets/2026/02/fact-sheet-president-donald-j-trump-imposes-a-temporary-import-duty-to-address-fundamental-international-payment-problems/.

[11] https://globaltradealert.org/blog/from-ieepa-to-section-122.

[12] Fact Sheet, *supra* note 10.

Court's injunction pending appeal. *Oregon v. Trump*, Nos. 2026-1804, 2026-1805, 2026 WL 1702442, at *1 (Fed. Cir. June 11, 2026).

Regardless of the ultimate outcome of that challenge, because Section 122 empowers the President to impose temporary import duties for no more than 150 days, the Global Section 122 Tariffs expired on July 24, 2026. *Oregon*, 2026 WL 1257669, at *4.

### E. Defendants Recreate Global Tariffs For The Third Time Under Section 301 Of The Trade Act

Shortly after imposing time-limited tariffs under Section 122, USTR announced a plan to continue its worldwide tariffs under new authority. Using Section 122's 150-day window as a bridge to its imposition of tariffs under Section 301, USTR and President Trump explained that the agency would complete the required Section 301 investigations and impose new tariffs when the Global Section 122 Tariffs expired. Tyler Kendall & Courtney Subramanian, *US Trade Probes Will Conclude Within Five Months, Greer Says*, BLOOMBERG LAW (Mar. 3, 2026).[13] In so doing, USTR would avoid any interruption in the President's promised global tariff program.

#### ***1. USTR's Section 301 Investigations***

In the span of just two days in early March 2026, USTR initiated 76 Section 301 investigations—an unprecedented number—including 60 on other economies' practices regarding imports of goods produced with forced labor. *See* Press Release, Office of the United States Trade Representative, USTR Initiates Section 301 Investigations Relating to Structural Excess Capacity and Production in Manufacturing Sectors (Mar. 11, 2026)[14]; PR-8, Press Release, Office of the United States Trade Representative, USTR Initiates 60 Section 301 Investigations Relating to

[13] https://www.bloomberg.com/news/articles/2026-03-03/us-trade-probes-will-conclude-within-five-months-greer-says.

[14] https://ustr.gov/about/policy-offices/press-office/press-releases/2026/march/ustr-initiates-section-301-investigations-relating-structural-excess-capacity-and-production.

Failures to Take Action on Forced Labor (Mar. 12, 2026).[15] By comparison, the federal government had initiated just 130 Section 301 investigations *in total* during the Trade Act's first 46 years (and ultimately imposed tariffs in just a fraction). *See* ANDRES B. SCHWARZENBERG, CONG. RSCH. SERV., R46604, SECTION 301 OF THE TRADE ACT OF 1974: ORIGIN, EVOLUTION, AND USE 26 (2020).[16]

As relevant here, Defendants targeted 60 economies—accounting for 99.4% of all U.S. imports—each purportedly subject to a separate investigation but based on the same practices "related to the failure to impose and effectively enforce a prohibition on the importation of goods produced with forced labor." PR-9, *Initiation of Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 12,884, 12,884 (Mar. 17, 2026) (the "Global Section 301 Tariffs Investigation"). One of those investigated "economies," the European Union, comprises 27 countries, bringing the total number of countries investigated to 86. *See* 19 U.S.C. § 2411(d)(7) (defining "foreign country" to include "any foreign instrumentality" and "[a]ny possession or territory of a foreign country that is administered separately for customs purposes").

USTR solicited comments on its Global Section 301 Tariffs Investigation and held public hearings on April 28 and 29, 2026. USTR received over 450 initial comments and more than 40 post-hearing rebuttal comments, many of which expressed concerns with the Administration's approach. *See* PR-6, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure*

[15] https://ustr.gov/about/policy-offices/press-office/press-releases/2026/march/ustr-initiates-60-section-301-investigations-relating-failures-take-action-forced-labor.

[16] https://www.everycrsreport.com/reports/R46604.html.

*to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 7 (June 2, 2026) (the "Global Section 301 Tariffs Report" or "Report").

#### *2. USTR's Global Section 301 Tariffs Report and Notice of Determination*

On June 2, 2026, USTR published the results of its investigations in the single Global Section 301 Tariffs Report. Despite its breadth and unlike prior Section 301 investigations—which have typically taken more than six months to complete—the 60 supposedly separate Global Section 301 Tariffs investigations concluded in just two-and-a-half months.[17] Reflecting the truncated nature of the investigations, the Report offered only conclusory findings at best—and, in many instances, no findings at all—with respect to the statutory requirements that the practices of each of the 60 Targeted Economies were both "unreasonable or discriminatory" *and* "burden[] or restrict[] U.S. commerce." 19 U.S.C. § 2411(b)(1).

Three days after releasing its Report, USTR published a notice of its determinations and proposed tariff actions in the Federal Register. *See* PR-11, Notice, 91 Fed. Reg. 34,272. The Notice incorporated the Report by reference and formally proposed "to determine that *** appropriate action to obtain the elimination of the [targeted] acts, policies, and practices would include the imposition of ad valorem duties on all products of the" 60 Targeted Economies, subject to exemptions. *Id*. at 34,274.

Specifically, USTR proposed a 10% tariff on six economies that currently have (but allegedly fail to effectively enforce) forced-labor import prohibitions, seven additional economies that have undertaken forced-labor related import commitments in Agreements on Reciprocal Trade

[17] By way of example, USTR's 2018 Section 301 investigation into Chinese intellectual property theft required seven months to examine a single country, generated a 215-page evidence-based report, and resulted in duties calibrated to the estimated commercial harm. *See* 82 Fed. Reg. 40,213 (Aug. 24, 2017); 83 Fed. Reg. 14,906, 14,907-14,908 (Apr. 6, 2018).

with the United States, and one economy that has imposed a partial regime prohibiting the import of certain forced-labor goods. The remaining 46 Targeted Economies would be subject to a 12.5% tariff. PR-11, Notice, 91 Fed. Reg. at 34,274. The Notice provided no explanation as to why tariffs in general, let alone tariffs of those magnitudes, were "appropriate" to obtain the elimination of the 60 Targeted Economies' purported failure to prohibit importation of forced-labor goods. Not coincidentally, however, the proposed Global Section 301 Tariffs would closely track the baseline Global IEEPA and Section 122 Tariffs in rate (between 10% and 15%), scope (nearly all U.S. imports), and exemptions. *Compare* Proclamation No. 11012, Annexes I & II (Feb. 20, 2026), *with* PR-11, Notice, 91 Fed. Reg. at 34,277-34,344. Indeed, despite insisting that frozen beef from Brazil was a prime example of an import at risk of being produced with forced labor, USTR proposed to exempt that product from the Global Section 301 Tariffs, just as it had under the Global IEEPA and Section 122 Tariffs. *Compare* PR-6, Report at 45-47, *with* PR-11, Notice, 91 Fed. Reg. at 34,278.

USTR dedicated less than a page of its Notice to the nearly 500 comments it received related to its initiation of the Global Section 301 Tariffs Investigation. PR-11, Notice, 91 Fed. Reg. at 34,275. Its response addressed narrow aspects of whether the investigated practices were "unreasonable" and deferred consideration of objections to the agency's use of tariffs. *Id.* at 34,274-34,275. It conspicuously ignored the many commenters who argued the agency lacked evidence that each Targeted Economy's practices burden U.S. commerce.[18]

[18] *See, e.g.*, PR-549, Letter from Government of Costa Rica to United States Trade Representative, Re: Comments of the Government of Costa Rica for the Section 301 Investigation into the Acts, Policies and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (Apr. 15, 2026), https://comments.ustr.gov/s/commentdetails?rid=H6FWBDVBG2.

USTR then solicited another round of public comments due July 6, 2026, and announced that it would convene public hearings beginning on July 7, 2026. PR-11, Notice, 91 Fed. Reg. at 34,275. During the second public comment period, USTR received over 1,600 comments. It also held three days of public hearings, during which it announced that it would accept post-hearing rebuttal comments until July 16, 2026. Commenters and witnesses once again expressed concern (among other objections) that USTR's Report lacked country-specific findings and relied on inconclusive data.[19]

### *3. USTR's Final Determination*

On July 23, 2026, just seven days after the comment submission period had closed, USTR published notice of its final determination that 10% and 12.5% Global Section 301 Tariffs are "appropriate" to address each of the 60 Targeted Economies' failure to effectively enforce a prohibition on forced-labor imports. *See* PR-768, Final Determination, 91 Fed. Reg. at 47,318. USTR also announced that the Global Section 301 Tariffs would take effect seven hours later at 12:01 a.m. eastern time on July 24—the exact minute the Global Section 122 Tariffs lapsed.

With some minor modifications, USTR's Final Determination adopted the sweeping tariff actions contemplated in the agency's June 5 Notice. The agency recognized that, subsequent to its June 5 Notice, four Targeted Economies had adopted forced-labor import prohibitions, and a fifth signed an Agreement on Reciprocal Trade with the United States. As a result, those five Targeted Economies were shifted from a proposed 12.5% tariff in the Notice to a 10% tariff in the Final Determination. *See* PR-768, Final Determination, 91 Fed. Reg. at 47,324, 47,327.

---

[19] *See, e.g.*, PR-2008, Letter from the Forced Labor Working Group to Ambassador Greer, Re: Comments of the Forced Labor Working Group in Response to the Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=GR7KFP3QDP.

In addition, USTR made the Global Section 301 duty rates for five economies—the European Union, Taiwan, Japan, South Korea, and Switzerland—net of the "most favored nation" or "MFN" rates that apply to those economies' products, meaning that the composite Section 301 and MFN rate on those economies' products generally would not exceed either 10% or 12.5%.[20] PR-768, Final Determination, 91 Fed. Reg. at 47,320. USTR attributed this accommodation to reciprocal trade agreements the Administration had negotiated with all five economies while the IEEPA tariffs were in effect, and before the Section 301 investigations were initiated, to modify the IEEPA duty rates so that the composite IEEPA duty rate and MFN rate generally would not exceed 15%. *Id.*

USTR also exempted some additional, discrete categories of goods from its otherwise sweeping tariffs. PR-768, Final Determination, 91 Fed. Reg. at 47,320. Ultimately, though, the tariffs imposed by the Final Determination retain the same core characteristics as the baseline Global IEEPA and Section 122 Tariffs they replaced: 10-12.5% taxes on the vast bulk of products that enter this country.

In the Final Determination, USTR also engaged with some comments questioning whether the Global Section 301 Tariffs were appropriate and requesting that certain goods be exempted or included therein. *See* PR-768, Final Determination, 91 Fed. Reg. at 47,328. Even so, the agency declined to confront arguments that USTR "failed to substantiate the existence of unreasonable acts, policies, or practices in each investigation, or *** failed to demonstrate a burden or restriction imposed by the acts, policies, and practices of each economy." *Id.*

---

[20] The exception would be if the MFN rate already exceeds the composite Section 301 and MFN rate, in which case only the MFN rate would apply.

Finally, despite USTR's acknowledgment that Section 301 was one of the "alternative tools" it would use "to ensure continuity" with the goals of the Global IEEPA Tariffs, PR-132, *USTR Statement on IEEPA Decision, supra*, the Final Determination insisted that each of its 60 Global Section 301 Tariff actions "[wa]s only for the purpose of obtaining the elimination" of a Targeted Economy's forced-labor import practices "and not for any other purpose." PR-768, Final Determination, 91 Fed. Reg. at 47,335.

### F. Plaintiffs Bring This Action

On July 24, the day after USTR issued its Final Determination, Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC—all family-owned businesses that directly import goods subject to the challenged Global Section 301 Tariffs—filed suit in this Court. Compl. ¶¶ 8-9, No. 1:26-cv-03347. Two other groups of challengers, comprising small businesses and 25 states, filed similar suits. *See Burlap & Barrel, Inc. v. Greer*, No. 1:26-cv-03345; *State of Oregon v. Trump*, No. 1:26-cv-03467. This Court selected *Learning Resources, Inc. v. United States*, No. 1:26-cv-03347-3JP as "the sample case for purposes of the Court's initial consideration and resolution of the plaintiffs' claims" on a Rule 56.1 motion for judgment on the agency record and stayed the parallel cases. ECF No. 15.

## LEGAL STANDARD

Because this case arises under 28 U.S.C. § 1581(i), the "Administrative Procedure Act standard of review applies." *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997); *see* 28 U.S.C. § 2640(e) ("In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in section 706 of title 5."). Under the APA standard, this Court must "hold unlawful and set aside agency action, findings, and conclusions found to be *** arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law[,]" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). In addition, vacatur is independently warranted where an agency's "sole stated reason" for acting is pretextual. *Department of Com. v. New York*, 588 U.S. 752, 784 (2019).

USTR's promulgation of tariffs under the Trade Act is agency action subject to the APA. *See HMTX Indus. LLC v. United States,* 156 F.4th 1236, 1249-1250 (Fed. Cir. 2025). This Court may grant judgment on the agency record if, after reviewing the issues of law in conjunction with the record, the Court concludes that USTR violated the APA standard. *See* CIT R. 56.1.

## SUMMARY OF ARGUMENT

**I.** Defendants' actions are *ultra vires* and contrary to law. Far from a blunderbuss tool to justify the imposition of global tariffs in one fell swoop, Section 301's plain text confirms that Congress intended to facilitate targeted country-specific trade actions addressing discrete concerns, subject to meaningful constraints on the Executive Branch's tariffing authority. That is why, before USTR can take action, Section 301 requires it to determine whether the act, policy, or practice of a particular "foreign country" is "unreasonable," "burdens *** United States commerce," and is "appropriate[ly]" addressed through tariffs. 19 U.S.C. § 2411(b). And it requires USTR to publish "a description of the facts on which such determination is based." *Id.* § 2414(c). At every turn, Section 301 makes clear that each required fact-based determination must be made with respect to every individual economy USTR seeks to target.

In the face of those requirements, USTR has offered only cursory copy-and-pasted recitations that the practices of each of the 60 Targeted Economies meets Section 301's criteria for action; a handful of country-specific anecdotes that cannot be extrapolated to the dozens of remaining Targeted Economies that USTR never addresses; and conclusory assertions that sweeping global tariffs within a range not-so-coincidentally replicating the IEEPA and Section 122

tariffs will appropriately address conditions in each of 60 economies (ranging from Trinidad and Tobago to Kazakhstan to Japan to the United Kingdom). USTR's utterly deficient Report and Final Determination come nowhere close to meeting Section 301's demands.

**II.** To the extent USTR's parroting of Section 301's language can be deemed a determination that each individual Targeted Economy's actions meet the statutory criteria, those "determinations" are divorced from the record, contradictory, or missing—and thus the Final Determination is arbitrary and capricious. Rather than asking whether countries effectively prohibit the import of forced-labor goods, the agency zeroes in on whether those countries have an expressly written ban alone to reach the foreordained conclusion that the rest of the world is acting unreasonably. Further, USTR states outright that it cannot isolate forced-labor imports as the cause of any of the purported burdens it identifies. And even in the few instances the agency provides country-specific anecdotes relating to its hypothesized burdens, the supplemental appendix data it provides undercut any chance of generalizing them to the Targeted Economies writ large. Nor does USTR even try to provide country-specific explanations on why its generic tariff action will appropriately address the practices of dozens of economies that vary along numerous axes or their impact on U.S. commerce. USTR's failure to connect the facts the agency found to the choices it made violates the APA.

Beyond its arbitrary factfinding and reasoning, the Report, Notice, and Final Determination violate the APA in a more pervasive way. Consistent with the Administration's statements in less-guarded moments, the record makes clear that USTR's flimsy "findings" regarding forced-labor imports (including whether *each* country's practice individually burdens U.S. commerce) were reverse engineered to resurrect the global tariff wall this Court and the Supreme Court tore down in *Learning Resources*. In twice insisting that each of its 60 Global Section 301 Tariff actions "is

only for the purpose of obtaining the elimination" of a Targeted Economy's forced-labor import practices, "and not for any other purpose," USTR mocks the record-based agency decisionmaking the APA requires. PR-768, Final Determination, 91 Fed. Reg. at 47,335. Such preordained and pretextual actions cannot stand.

## ARGUMENT

### I. THE SECTION 301 TARIFFS WERE PROMULGATED IN EXCESS OF STATUTORY AUTHORITY

The tariffing power is constitutionally committed to Congress "alone." *Learning Resources*, 607 U.S. at 248 (Roberts, C.J.) (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1882)). Because "the President enjoys no inherent authority to impose tariffs during peacetime," *id.* at 241, USTR may exercise delegated authority only "subject to limitations which [Congress] imposes," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see United States v. Schmidt Pritchard & Co.,* 47 C.C.P.A. 152, 162 (C.C.P.A. 1960) ("It requires no elaborate argument to support the proposition that Congress in so delegating its powers may prescribe whatever procedures and limitations it sees fit to enact for limiting the exercise by its agents of such delegated powers.").

Congress has narrowly circumscribed USTR's tariff authority under Section 301, such that USTR must comply with the Trade Act's substantive conditions and "demanding procedural prerequisites" before acting. *Learning Resources*, 607 U.S. at 244 (Roberts, C.J.). In particular, USTR must "determine[]" that a Targeted Economy (i) engages in an "unreasonable" practice that (ii) "burdens" U.S. commerce and (iii) is "appropriate[ly]" addressed through a particular action.[21] 19 U.S.C. § 2411(b). And those determinations must be made separately for each country against

[21] Section 301 also allows USTR to act if it finds a targeted country's practice is "discriminatory." 19 U.S.C. § 2411(b)(1). USTR made no such finding in imposing the Global Section 301 Tariffs.

which USTR acts and must be grounded in "a description of the facts on which such determination is based." *Id.* §§ 2411(b)(1), 2414(c). Despite appearing to acknowledge that Section 301 requires country-by-country findings with a country-specific factual basis, USTR's generic conclusions and sparse anecdotes fail to supply those findings.

### A. Section 301 Requires Fact-Based Country-By-Country Findings

Interpretation of a statute "begins with the statutory text, and ends there as well" if the text is "unambiguous." *National Ass'n of Mfrs. v. Department of Def.*, 583 U.S. 109, 127 (2018) (citation omitted). Section 301's text is unambiguous. It requires USTR to determine whether the act, policy, or practice of a particular "foreign country" is "unreasonable," "burdens *** United States commerce," and is "appropriate[ly]" addressed through tariffs. 19 U.S.C. § 2411(b). And it requires USTR to provide "a description of the facts on which such determination is based." *Id.* § 2414(c). The statute thus requires a country-specific, fact-based determination that each challenged practice satisfies those requirements.

The statutory text and context repeatedly confirm that conclusion. Throughout Section 301, Congress treats a single foreign country as the relevant unit of analysis. Most obviously, the operative provision conditions action on findings concerning the "unreasonable" and "burden[some]" conduct of "*a foreign country*," 19 U.S.C. § 2411(b) (emphasis added), with both the article and noun appearing in the singular. *See Henry Hous. Ltd. P'ship v. United States*, 121 Fed. Cl. 537, 542 n.5 (Fed. Cl. 2015) ("The indefinite article 'a' usually refers to a singular noun."); *Illich v. Merit Sys. Prot. Bd.*, 104 F. App'x 171, 173 (Fed. Cir. 2004) (concluding that statutory phrase "*an* Executive agency" refers to "only one Executive agency" (emphasis added)). The statute's repeated references to "*the* foreign country," "*that* foreign country," and "*such* foreign country" reinforce that singular focus. *See, e.g.*, 19 U.S.C. § 2411(c)(1)(B) (authorizing duties on goods of "*such* foreign country" identified in subsection (b) (emphasis added)); *id.* § 2411(d)(2)

(defining burdens to include subsidies provided "by *that* foreign country" (emphasis added)); *id.* § 2411(d)(3) (specifying when conduct of "*the* foreign country" is "unreasonable" (emphasis added)); *cf. Campos-Chaves v. Garland*, 602 U.S. 447, 458 (2024) (explaining that a statutory reference to "the written notice" denotes a single notice); *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (explaining that a statutory reference to "'the' official charged with responsibility to act" "indicates that there is generally only one person covered" (internal quotation marks omitted) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004))). Where Section 301 discusses groups of countries, it uses the plural. *See* 19 U.S.C. § 2411(d)(2) (discussing transportation between "*foreign countries* and the United States" (emphasis added)).

Other features of Section 301 underscore that USTR's unreasonableness, burdensomeness, and appropriateness findings must be country specific. For example, the statute's illustrative list of "unreasonable" acts is tethered to the features of a particular market and legal system: the denial of "opportunities for the establishment of an enterprise," of "adequate and effective protection of intellectual property rights," and of "market access opportunities," including toleration "by *a* foreign government of systematic anticompetitive activities by enterprises *** in *the* foreign country." 19 U.S.C. § 2411(d)(3)(B)(i) (emphases added). And Section 301 authorizes USTR to "enter into binding agreements with *such foreign country*" to "eliminate any burden *** on United States commerce." *Id.* § 2411(c)(1)(D)(ii) (emphasis added). Finally, USTR's uniform past practice with respect to Section 301 investigations confirms that the agency has always understood Section 301 to require country-specific findings. *See* pp. 46-47, *infra*; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (The "longstanding 'practice of the government' *** 'can inform [a court's] determination of 'what the law is.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)) (alteration in original)).

Were there any doubt, the "major questions" doctrine would dispel it. Where "the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority," "something more than a merely plausible textual basis for the agency action is necessary." *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (internal quotation marks omitted) (alteration in original). In that circumstance, "[t]he agency *** must point to clear congressional authorization for the power it claims." *Id*. at 723 (internal quotation marks omitted). That need for clear authorization applies "with particular force where, as here, the purported delegation involves the core congressional power of the purse." *Learning Resources*, 607 U.S. at 243 (Opinion of Roberts, C.J.); *see id.* at 246 (Opinion of Roberts, C.J.) (noting that Global IEEPA Tariff action carried "astonishing" "economic and political consequences"). Covering trading partners that account for 99.4% of U.S. imports across an import base of over $3.3 trillion, the 10-to-12.5% duties represent an annual tax increase of hundreds of billions of dollars on American commerce—vastly exceeding the economic thresholds that trigger the major questions doctrine. *See Biden v. Nebraska*, 600 U.S. 477, 502 (2023). Yet Section 301 supplies no such "clear congressional authorization" for USTR to impose a global tariff regime without making the country-specific findings that circumscribe USTR's authority. Such agency "power to unilaterally impose unbounded tariffs *** unconstrained by *** significant procedural limitations," *Learning Resources*, 607 U.S. at 244 (Opinion of Roberts, C.J.), lacks any basis in the statute, court precedent, or historical practice.[22]

[22] That danger is heightened because, under Federal Circuit precedent, Section 307's "modification" authority lets USTR "escalat[e]" an initial Section 301 tariff by any amount without clearing Section 301's procedural hurdles. *HMTX Indus.*, 156 F.4th at 1251-1253; *see* 19 U.S.C. § 2417(a)(1)(C). USTR would thus have plenary power to ratchet those tariffs up or down at will,

Finally, the canon of constitutional avoidance reinforces the need to hew to Section 301's limiting requirements. Under that canon, "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). As relevant here, the Supreme Court has long required Congress to "set out an 'intelligible principle' to guide what it has given the agency to do"—and more so "when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue[.]" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475 (2001)). Reading Section 301 to permit USTR to dispense with country-specific findings while imposing global tariffs would lift meaningful "boundaries" from which courts could "ascertain whether the agency has followed the law." *Id.* at 673 (internal quotation marks omitted); *cf. Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559-560 (1976) (upholding trade statute against nondelegation challenge where the statute "establishe[d] clear preconditions to Presidential action"). Such an interpretation raising "serious doubt[s]" about a statute's constitutionality must be avoided. *Crowell v. Benson*, 285 U.S. 22, 62 (1932); *see also Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-173 (2001) (avoidance canon applies to an "administrative interpretation of a statute [that] invokes the outer limits of Congress' power" without "a clear indication that Congress intended that result").

**B. USTR Failed To Make Section 301's Mandatory Country-Specific Findings**

Over 20 pages, USTR repeats the same formulaic conclusion again and again: Each economy's purported practices "related to the failure to impose and effectively enforce a forced

---

subject only to an appropriateness determination the Government has "assert[ed] is unreviewable." *Learning Resources*, 607 U.S. at 244 (Roberts, C.J.); *see* United States Br. 44 n.5, *HMTX Indus., LLC v. United States*, No. 23-1891 (Fed. Cir. Dec. 21, 2023), ECF No. 42.

labor import prohibition are unreasonable and burden or restrict U.S. commerce." PR-6, Report at 59-79. USTR did the same with respect to whether the tariff rate was "appropriate": For each of the 60 economies, comprising 99.4% of all U.S. imports, USTR mechanically recited that it had "determined, in accordance with the specific direction of the President, that the tariff rate to be applied, and the scope of tariffs and exemptions are appropriate to obtain the elimination of the [investigated] acts, policies, and practices[.]" PR-768, Final Determination, 91 Fed. Reg. at 47,321-47,328. Sixty times over, USTR failed to make the fact-based, country-specific determinations that Section 301 demands.

### *1. Burden on U.S. Commerce*

Look no further than USTR's purported determination that each Targeted Economy's alleged failure to effectively enforce a forced-labor import ban "burdens" U.S. commerce. USTR reached that conclusion without making individualized findings as to each—or really any, *see* pp. 32-41, *infra*—of the 60 Targeted Economies. *See* PR-6, Report at 34-35. Rather than identify facts showing how each Targeted Economy's practices burden U.S. commerce, USTR relied on a few anecdotes that purport to illustrate three mechanisms by which forced-labor imports can cause harm: (1) forcing U.S. exports to compete against lower-priced goods produced with forced labor; (2) enabling circumvention of U.S. import controls; and (3) displacing fairly produced goods in the U.S. market. *See id.* at 35. But those few snippets, insufficient on their own terms and lacking a causal nexus, provide no "description of the facts" supporting USTR's blanket burden determination for the Targeted Economies. 19 U.S.C. § 2414(c).

USTR's first theory is that competition from forced-labor goods impedes U.S. exports. But USTR relied on just three "case studies": Poland's importation of tobacco from Malawi, Spain's importation of rice from Burma, and China's importation of beef from Brazil. PR-6, Report at 38-47. Stumbling out of the gate, Spain and Poland are members of the European Union, which USTR

treated as a single Targeted Economy for purposes of its investigation and tariffs. *See id.* at 28, 66. Given that the European Union consists of 27 member states, USTR cannot plausibly infer a burden arising from the European Union *as a whole* based on a discussion drawn from just two constituent countries. More fundamentally, USTR cannot extrapolate the alleged (and ultimately lacking, *see* pp. 32-41, *infra*) burden from three purported case studies to the scores of Targeted Economies that USTR never analyzed.[23]

USTR's second theory—that the Targeted Economies' practices allow forced-labor goods to circumvent U.S. import controls—fares no better. To support its circumvention rationale, USTR identified two products—polysilicon and cotton—that may enter the United States through third-country processing. But USTR never determined that any particular country's failure to police those supply chains has actually resulted in unfair competition in the U.S. market. To the contrary, the Report musters only speculation: that available data "suggest" downstream products containing forced-labor polysilicon inputs from China "may" be entering the United States through manufacturing in third economies, and that "the United States would likely have experienced

[23] The Report's Appendix charts cannot satisfy the Trade Act's country-specific requirements, either. *See* PR-6, Report at 80-92. USTR's presentation of those charts, without any commentary on the data therein for the vast majority of Targeted Economies—indeed, without even a reference to them in the body of the Report itself—cannot substitute for the mandated "publish[ed] *** description of the facts on which [USTR's] determination is based." 19 U.S.C. § 2414(c).

greater sales, revenues, and exports of cotton and textiles, all else equal" were it not for "the prevalence of [forced-labor] goods in global apparel supply chains[.]" PR-6, Report at 50, 54.

As to USTR's third theory—the purported displacement of fairly produced goods in the United States—USTR offered no country-specific evidence at all. *See* PR-6, Report at 55.

None of USTR's theories or conjectural case studies thus establishes the requisite burden on U.S. commerce for any of the 60 Targeted Economies. Moreover, the Report does not even mention many countries in its discussion of how forced-labor imports purportedly burden U.S. commerce: Algeria, Angola, the Bahamas, Bahrain, El Salvador, Guatemala, Guyana, Honduras, Iraq, Kuwait, Libya, New Zealand, Oman, Qatar, Saudi Arabia, Trinidad and Tobago, United Arab Emirates, Uruguay, and Venezuela. *See* PR-6, Report at 34-58. Even treating the European Union as a single economy, USTR thus made no attempt whatsoever to provide the statutory "description of the facts" supporting its burden determination for nearly one-third of the Targeted Economies. 19 U.S.C. § 2414(c).

Nor are the Report's passing references to particular countries in its burden analysis sufficient. Consider Japan. USTR mentions Japan three times in that analysis, yet nowhere identifies facts showing that Japan's alleged failure to enforce a forced-labor import prohibition burdens U.S. commerce. USTR asserts that Japan is "a top exporter of at least one good for which forced labor has been found as an input[]" and imports "tobacco from both the United States and Malawi." PR-6, Report at 37-38 & nn.134, 142. But it points to no facts indicating that those exports or imports adversely impacted U.S. exports. USTR also notes that Japan imports cotton from China. *Id.* at 51. Yet it again fails to identify anything suggesting that Japan's importation of Chinese cotton has led to circumvention of U.S. forced-labor restrictions through imports of Japanese manufactured goods. *See id.* at 51-54. In short, USTR describes general trade patterns,

not specific burdens on U.S. commerce. The same basic defect applies to every other Targeted Economy. Any suggestion that USTR actually made the mandatory country-by-country burden determinations is fanciful.

Finally, USTR makes a damning admission: USTR repeatedly acknowledges that it cannot attribute any particular burden on U.S. commerce to forced-labor imports from any particular investigated economy, even with respect to the limited evidence it discloses in the Report. *See, e.g.*, PR-6, Report at 36 (stating that forced labor "may" be one of several factors "artificially reducing the price of" goods produced with forced labor); *id.* at 38 (explaining that its case studies merely illustrate the "potential" effects of competition from forced-labor goods and show only that U.S. exports have "possibly" been adversely affected). But Section 301 requires a determination that a country's practices presently "burden[]" U.S. commerce. 19 U.S.C. § 2411(b)(1); *see also* H. Rep. No. 100-576, at 566 (1988) (rejecting amendment to Section 301 that would have "[m]a[de] any unfair act, policy, or practice actionable if it 'threaten[ed]' to burden or restrict U.S. commerce"). And "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). Speculation about "potential" or "possible" harms, PR-6, Report at 38, cannot substitute for a record-based determination that a particular country's practices in fact burden U.S. commerce.

### *2. Unreasonable Practice*

USTR's "determination" that every Targeted Economy's practices are "unreasonable" is similarly deficient. USTR began with the proposition that "it is unreasonable for economies to fail to take action to prohibit trade in forced labor goods." PR-6, Report at 32. Having identified a standard, however, USTR failed to determine whether any Targeted Economy actually violated it. Rather than assess whether each Targeted Economy's legal regime effectively prohibits trade in forced-labor goods, USTR focused on a far narrower question: whether the economy maintained

an "*express* prohibition on the importation of goods produced with forced labor." *Id*. at 25 (emphasis added). If no such express prohibition existed, USTR automatically deemed the economy's conduct unreasonable—despite the protests of individual countries that their laws, "taken together, amount to a forced labor import prohibition." *Id.*

That approach cuts short the relevant inquiry. As USTR itself acknowledged, it never addressed whether the laws of a Targeted Economy "taken together" effectively (even if not expressly) prohibit trade in forced-labor goods. PR-6, Report at 24-25. USTR failed to do so despite asking in its consultation questionnaires whether countries without an express prohibition nonetheless had "the legal authority to deny the entry of goods made *** by forced labor" into their territories. PR-71, *Section 301 Investigation on Forced Labor Import Prohibitions, Questions for Consultations*.[24] By treating the absence of an express prohibition as dispositive, USTR failed to determine whether a particular economy had, in fact, failed "to impose and effectively enforce a prohibition on the importation of goods produced wholly or in part with forced labor." PR-6, Report at 19. Instead of a fact-based determination that a particular economy acted unreasonably, USTR categorically assumed that the absence of a particular legal mechanism proves the absence of an effective prohibition on forced-labor imports. And whether or not a Targeted Economy had an explicit ban, the Report's conclusion that every single country (essentially the entire world

[24] The perfunctory nature of USTR's process is encapsulated by the agency's consultation questionnaire to Mexico, in which USTR copied and pasted so hastily that it left multiple questions still asking about enforcement in "Canada." PR-76, *Section 301 Investigation on Forced Labor Import Prohibitions Questions for Consultations with Countries with Forced Labor Import Prohibitions*.

except the United States) engages in "unreasonable" forced-labor import practices itself gives lie to the reasonableness inquiry.

A separate statutory omission compounds the problem. Although USTR invoked Section 301(d)'s recognition that a "persistent pattern of conduct that *** permits any form of forced or compulsory labor" is unreasonable, PR-6, Report at 5 (ellipsis in original), USTR failed to "determine[]" whether any such practice is also "inconsistent with the level of economic development of [each targeted] foreign country," 19 U.S.C. § 2411(d)(3)(C). That is so even after a member of USTR's own Advisory Committee "suggested that USTR consider the developmental status of economies when considering potential responsive action[.]" PR-1, Decision Memorandum on Initiating Section 301 Investigations Into the Failure of Various Economies to Impose and Effectively Enforce Forced Labor Import Bans from Deputy General Counsel Juan Millán to USTR Jamieson Greer 5 (Mar. 12, 2026). The Report in fact never once referenced the level of economic development in any of the 60 Targeted Economies, including the likes of Angola, Bangladesh, and Guyana. The agency thus cannot have "determined" that the statutorily required inconsistency exists.

***3. Appropriate Action***

Section 301 imposes a third, independent requirement that USTR likewise failed to satisfy. Before acting, USTR had to provide a country-specific "description of the facts" supporting its "determin[ation]" as to whether "action by the United States is appropriate," and if so, "what action, if any, [USTR] should take" that would be "appropriate and feasible *** to obtain the elimination of [a country's] act, policy, or practice." 19 U.S.C. §§ 2411(b)(2); 2414(a)(1)(B), (c). USTR did not even attempt to make that showing for any, let alone all, of the investigated economies.

Nowhere does the Report describe country-specific facts explaining why any tariff action—much less a 10-12.5% tariff on virtually every product entering the United States—"is one that can end or reverse" a particular economy's forced-labor import practices. *See HMTX Indus.*, 156 F.4th at 1252. Every one of the 86 targeted countries faces either a 10 or 12.5% tariff regardless of its size, the amount or mix of exports to the United States, or any other differentiating factor. Instead, the Notice offers only a generic proposal "to determine that *** appropriate action to obtain the elimination of the [targeted] acts, policies, and practices would include the imposition of ad valorem duties on all products of the" 60 Targeted Economies, subject to exemptions. *See* PR-11, Notice, 91 Fed. Reg. at 34,274. That is a description of the remedy USTR selected, not of any facts justifying it.

The Final Determination added some window dressing but no country-specific analysis. USTR explained that it "ha[d] determined to impose tariffs as a means to encourage the investigated economies to impose and effectively enforce a forced labor import ban." PR-768, Final Determination, 91 Fed. Reg. at 47,329. And it "observe[d] that since the initiation of the investigations and the announcement of the proposed tariff actions, various economies have imposed or are taking steps toward imposing a forced labor import prohibition"—something that, in USTR's view, "confirm[ed] that tariff action can help obtain the elimination of the investigated acts, policies, and practices." *Id.* But those generalized observations say nothing about each particular economy. Section 301 required USTR to determine that tariffs were an appropriate response to *each* Targeted Economy's conduct—and to describe the facts supporting that determination. USTR did neither.

USTR's repeated reliance on the Presidential memorandum directing the tariffs, *see* 91 Fed. Reg. at 47,319-47,320, 47,335, does not satisfy its independent obligation to make the

required statutory assessments and ensure the statutory conditions are not rendered a dead letter. As the Federal Circuit has explained, Section 301(b) requires two separate determinations of "appropriate[ness]": first, whether *any* "action by the United States is appropriate," and then, "[i]f so," *what* action would be "appropriate" to "obtain the elimination" of the targeted practices. *HMTX Indus.*, 156 F.4th at 1251-1252 (first alteration in original). The "President's direction" plays no role at all in the first appropriateness determination. *See id.*; 19 U.S.C. § 2411(b). And even as to the second appropriateness determination, Section 301 delegates "authority to take final action" to USTR, not the President. *HMTX Indus.*, 156 F.4th at 1250; *see also* H. Rep. No. 100-576, at 551 (1988) (explaining that 1988 amendment to Section 301 "transfer[red] to the USTR the authority to decide and implement any section 301 action," and rejecting language that would have had the President "retain[] the authority to decide and implement action"). Accordingly, the "statutory factors relevant to USTR's determination" include not only "the President's specific direction," but also "ensuring that appropriate action is taken to eliminate discriminatory and burdensome acts." *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1339 (Ct. Int'l Trade 2022).

***

In turning to Section 301 to largely recreate the baseline Global IEEPA Tariffs, USTR set itself a formidable task: assembling the "fact[ual] *** bas[is]," 19 U.S.C. § 2414(c), needed to support determinations that each of 60 Targeted Economies—essentially the entire global trade community—fails to effectively enforce forced-labor import prohibitions in a manner that (i) is unreasonable, (ii) burdens U.S. commerce, and (iii) can appropriately be eliminated by either a 10 or 12.5% global tariff. USTR never carried that burden. It failed to make the three required country-specific determinations for even a single Targeted Economy, let alone all 60. To sustain worldwide tariffs on that record would reduce Congress's substantive conditions and "demanding

procedural prerequisites," *Learning Resources,* 607 U.S. at 244 (Roberts, C.J.), to meaningless suggestions.

## II. THE GLOBAL SECTION 301 TARIFFS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT IN ADDITIONAL WAYS

The Global Section 301 Tariffs not only exceed the bounds of Section 301, but also rest on arbitrary decisionmaking and a record devoid of substantial evidence.

### A. USTR's Unmoored Conclusions Are Arbitrary, Capricious, And Unsupported By Substantial Evidence

Even if USTR's burdensomeness, unreasonableness, and appropriateness determinations satisfy Section 301's requirements, they still fail the APA's requirement of reasoned decisionmaking. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be *** unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). "[F]actual conclusions" lack "substantial evidence" when the agency "draw[s] inferences that are 'arbitrary' in relation to the facts found." *Consolidated Rail Corp. v. Surface Transp. Bd.*, 93 F.3d 793, 799 (D.C. Cir. 1996); *see also Michigan Consol. Gas Co. v. Federal Power Comm'n*, 283 F.2d 204, 218 n.41 (D.C. Cir. 1960) ("It is elementary that the ruling of an administrative agency cannot stand if the conclusion or an ultimate fact does not follow rationally from subsidiary facts."). Because "the record belies the agency's conclusion," this Court "must undo [USTR's] action." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).

#### *1. Burden on U.S. Commerce*

As previewed (pp. 24-27, *supra*), USTR's sparse country- and product-specific anecdotes do not establish for any country investigated—let alone the dozens the Report ignores or mentions only in passing—that forced-labor import practices burden U.S. commerce. A deeper dive into the agency record confirms that fundamental failure. USTR is therefore left with a handful of generic, unsubstantiated theories about how such practices *might* burden commerce in the abstract. But

agency action must rest "on some logic and evidence, not sheer speculation" or "common sense alone." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

Theory 1: Competition with U.S. Exports

USTR's leading theory is a price-undercutting theory: When Targeted Economies import goods made with forced labor alongside equivalent U.S.-produced goods, the cheaper forced-labor goods undercut their costlier American counterparts. PR-6, Report at 37. USTR further suggests that an offending economy might fold lower-cost forced-labor inputs into its own downstream exports, which could then outcompete higher-priced downstream goods made in the United States. *Id.* at 36-37. Putting aside equally plausible theories—including that the producer of the forced-labor goods might sell them at market prices and pocket the profits for itself[25]—USTR offers just three country-specific "case studies" as support: tobacco from Malawi to Poland, rice from Burma to Spain, and frozen beef from Brazil to China. *Id.* at 38-47. Far from supporting any conclusion about how the import practices of the other 83 countries burden U.S. commerce, each fails on its own terms.

*Tobacco from Malawi to Poland.* USTR alleges that Poland's conduct burdens U.S. commerce because Poland imports Malawian tobacco—a good designated at-risk of being produced with forced labor—alongside fairly produced U.S. tobacco, causing the United States to lose market share. *See* PR-6, Report at 38-39 & nn.140-141. That conclusion rests on just four data points: (1) Poland imports tobacco from both Malawi and the United States, providing the predicate competition between U.S. goods and possibly tainted imports; (2) from 2015 to 2025, Poland's imports of Malawian tobacco increased, while its imports of U.S. tobacco decreased;

[25] *See* Scott Lincicome, *Here Comes Another Round of Sham Tariffs*, THE DISPATCH (July 23, 2026), https://thedispatch.com/newsletter/dispatch-markets/trump-tariffs-section-301-forced-labor-pretext/.

(3) the Average Unit Value, or cost of a single unit of tobacco, imported into Poland was significantly lower for Malawian tobacco than U.S. tobacco; and (4) Poland's exports of downstream tobacco products like cigars and cigarettes have increased at the same time that U.S. exports of equivalent downstream products have decreased. *See id.* at 38-41. From that, USTR speculates that, "[w]ith a forced labor import prohibition that is effectively enforced, the United States would likely have experienced greater sales, revenues, and exports of tobacco to Poland *** [and] greater sales, revenues, and exports of downstream tobacco products, all else equal." *Id*. at 41.

That "reasoning, without more, conflates correlation with causation." *U.S. Commodity Futures Trading Comm'n v. Southern Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018). That rising Polish imports of Malawian tobacco coincided with falling Polish imports of U.S. tobacco says little, if anything, about what *caused* American tobacco's decline—and nothing that points, in any non-speculative way, to Poland's failure to effectively bar forced-labor imports. That is especially so given USTR's own concession that "not all of Poland's imports of tobacco from Malawi were necessarily produced using forced labor." PR-6, Report at 41. Even more fatal: USTR never tried to rule out confounding variables. Its refusal to reckon with the commonsense possibilities that production inputs—lawful labor included—cost more in the United States than in Malawi, or that U.S. producers shifted their own industrial priorities, drains its correlation data of any explanatory force. *Cf. People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation[.]").

Even setting all that aside, Poland was not among the "economies" USTR investigated or tariffed. Instead, USTR investigated the European Union, a common market subject to a single

set of forced-labor import restrictions binding on every member. And based on USTR's own data, across the European Union as a whole, the value of imports of U.S. tobacco actually grew more (by roughly 2.5x) than imports from Malawi (by less than 2x) over the period USTR identified (2021-2025). *See* PR-6, Report at 86 (Appendix A). That data set forecloses, even by USTR's own logic, any conclusion that the 10% tariff on the European Union is justified by that single economy's burden on U.S. commerce.

Weak as USTR's correlation-only data is for Poland and the European Union, it is weaker still for the rest of the world. The Report's Appendix A shows Malawian tobacco trending better than U.S. tobacco in only eight Targeted Economies.[26] In the remaining 52 Targeted Economies, USTR's data show no clear winner (2),[27] U.S. tobacco trending better than its Malawian competition (17),[28] or no predicate competition at all (33).[29] *See* PR-6, Report at 84-86. As for its downstream-export theory, USTR supplied no data by which that theory could be tested for even a single Targeted Economy. In short, USTR lacks the data to support even its own cherry-picked example.

*Rice from Burma to Spain.* USTR's parallel discussion of Spain's importation of Burmese rice fails in nearly all the same ways. Once again, USTR (i) conflates correlation with causation; (ii) imputes the burden it attributes to Spain's practices to the European Union as a whole, even as

---

[26] *See* Appendix A, PR-6, Report at 84-86 (Canada, Israel, Kazakhstan, Nigeria, Singapore, South Korea, Switzerland and Türkiye).

[27] *See id.* (Indonesia and Russia).

[28] *See id.* (Argentina, Brazil, Cambodia, China, Dominican Republic, Egypt, Japan, Jordan, Malaysia, Morocco, Philippines, South Africa, Sri Lanka, Taiwan, Uruguay, Vietnam, and the European Union).

[29] *See id.* (Algeria, Angola, Australia, Bahamas, Bahrain, Bangladesh, Chile, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Guyana, Honduras, Hong Kong, India, Iraq, Kuwait, Libya, Mexico, New Zealand, Nicaragua, Norway, Oman, Pakistan, Peru, Qatar, Saudi Arabia, Thailand, Trinidad and Tobago, United Arab Emirates, United Kingdom, Venezuela).

U.S. rice trended better than its Burmese competition in other major EU economies like Germany; (iii) provides Appendix data showing that imports of Burmese rice trended better than imports of U.S. rice in only 12 (of 60) Targeted Economies[30]; and (iv) provides no data at all on downstream exports outside Spain and the United States. *See* PR-6, Report at 41-44; Appendix A, PR-6, Report at 82-84.

*Frozen beef from Brazil to China.* USTR's reliance on China's imports of Brazilian frozen beef—a product highlighted despite being *exempted* from the Global Section 301 Tariffs, *see* p. 13, *supra*—is, if anything, even weaker. First, the China-specific data that USTR provides once again mistakes correlation for causation. *See* PR-6, Report at 45-47. What's more, USTR is forced to acknowledge that the relationship it identifies might be explained by "other factors, such as the size of the U.S. beef herd," along with certain issues unique to China, such as "China's ban on beef from the United States prior to 2017" or "the retaliatory tariffs [China] imposed in 2019." *Id.* at 46-47 & n.153. All USTR offers is bald supposition that "these other factors do not eliminate competition from forced labor goods as a material factor affecting U.S. commerce." *Id.* at 47 n.153. And USTR readily admits that "not all of China's imports of frozen beef from Brazil are necessarily produced using forced labor"; its data can only "strongly suggest[]" that "at least some of China's imports were produced wholly or in part with forced labor." *Id*. at 46.

---

[30] *See* Appendix A, PR-6, Report at 82-84 (Australia, Hong Kong, Jordan, Kuwait, New Zealand, Norway, Philippines, Saudi Arabia, Türkiye, United Arab Emirates, the United Kingdom, and the European Union). In contrast, U.S. rice trended better than Burmese rice in 16 Targeted Economies. *See id.* (Bahrain, Bangladesh, Cambodia, Canada, China, Indonesia, Japan, Malaysia, Pakistan, Singapore, South Africa, Sri Lanka, Switzerland, Taiwan, Thailand, and Vietnam). Imports of rice from each country performed about the same in two Targeted Economies. *See id.* (Angola and Russia). And in 30 Targeted Economies, USTR failed to show any predicate competition at all. *See id.* (Algeria, Argentina, Bahamas, Brazil, Chile, Colombia, Costa Rica, Dominican Republic, Ecuador, Egypt, El Salvador, Guatemala, Guyana, Honduras, India, Iraq, Israel, Kazakhstan, Libya, Mexico, Morocco, Nicaragua, Nigeria, Oman, Peru, Qatar, South Korea, Trinidad and Tobago, Uruguay, and Venezuela).

Reviewing courts (and the reviewing public) should not have to accept the agency's guesses as proof. That falls well short of the "rational connection between the facts found and the choice made" that the APA demands. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). In any event, this "case study" is limited to China alone; USTR has failed to provide even a chart detailing individualized data on frozen beef imports by the remaining 59 Targeted Economies, or to explain why conclusions regarding China and its unique issues should be extrapolated worldwide.

<u>Theory 2: Circumvention of U.S. Import Controls</u>

USTR fares no better with its second theory. As USTR sees it, Targeted Economies allow forced-labor inputs to "be commingled with legitimate goods" in downstream products. PR-6, Report at 47. When those products reach the United States, U.S. Customs and Border Protection ("CBP") apparently has greater difficulty detecting the underlying forced labor, and the presumably cheaper forced-labor goods enter the U.S. market and undercut fairly produced goods. *Id*. As with its prior case studies, the two examples USTR offers to illustrate this theory neither withstand scrutiny on their own terms nor support extrapolation to all 60 Targeted Economies.

*Polysilicon from China.* USTR reasons that polysilicon from China is "at high-risk for forced labor," so "a substantial proportion of China's exports of downstream solar wafers, ingots, cells, and modules may be produced using polysilicon that is the product of forced labor." PR-6, Report at 48. It adds that Chinese polysilicon has been incorporated into derivative solar products to which CBP has frequently denied entry over forced-labor concerns. *Id*. at 49-50.

USTR concedes that "not all of China's exports of polysilicon to third-economy markets and U.S. imports of downstream products are necessarily the product of forced labor." PR-6, Report at 50. It nonetheless attempts to bridge circumvention risk and harm to the U.S. economy

by relying on "[w]itness testimony indicat[ing] that Chinese polysilicon prices are well below those from other sources and that forced labor enables these lower prices." *Id.* From there, USTR stacks speculation upon speculation: With forced-labor import prohibitions, "at least some" volume of China's polysilicon exports "*would likely*" have been barred from Targeted Economies; "non-forced labor inputs *would likely* have been priced higher"; the volume of downstream products exported to the United States "*would likely*" have been lower; and those imports "*would likely* have been" priced higher. *Id*. at 50-51 (emphases added). And so, "all else equal," the U.S. economy "would *likely*" have benefited. *Id*. at 51 (emphasis added). Such speculative logic does not satisfy the APA's requirement of reasoned decisionmaking. *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) ("mere speculation" is "not adequate grounds upon which to sustain an agency's action").

Moreover, that causal chain is missing a critical link. Any harm to the U.S. economy depends on forced-labor polysilicon products evading U.S. border controls. Yet USTR offers no evidence that polysilicon derivatives made with forced-labor inputs have in fact "successfully evade[d] U.S. enforcement and enter[ed] the U.S. market." PR-6, Report at 50. The only evidence it cites shows the opposite: CBP regularly intercepts at-risk polysilicon products. *See id*. USTR never explains why that fact does not defeat its premise that these products reach the U.S. market in volumes sufficient to undercut the domestic solar industry. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence contradicting its position."). And in attributing the downsizing and closure of American polysilicon plants to these imports,

USTR again fails to account for "salient explanatory variables" that could equally explain that decline. *People Who Care*, 111 F.3d at 537.

USTR's data are in any event both contradictory and incapable of extrapolation consistent with the requirements of Section 301. USTR identifies only three Targeted Economies—Cambodia, Thailand, and Vietnam—where "five companies" have attempted the circumvention on which its theory depends. But the circumvention at issue was of the "antidumping and countervailing dut[y]" laws, not the circumvention of forced-labor import laws. PR-6, Report at 49-50. USTR separately states that Chinese polysilicon wafers go to "cell manufacturers in the Asia pacific region, primarily Korea, Thailand, and Vietnam." *Id.* at 48. Yet puzzlingly, of those four countries, the Report's Appendix C lists just one—Cambodia—as having imported Chinese polysilicon and exported its derivatives to the United States in USTR's chosen period (2021-2025). *See id.* at 90-91. That same data show that only 26 Targeted Economies (and only ten in the "Asia pacific" region) both import Chinese polysilicon and export downstream products to the United States—leaving USTR's theory without even a theoretical foothold as to the remaining 34 Targeted Economies.[31] *Id.* at 90-92. Given those contradictions, USTR's conclusion—that "[t]he failure of the investigated economies to impose and effectively enforce forced labor import prohibitions afford[s] a cost advantage to Chinese polysilicon," *id.* at 50—is hard to read as anything but an

[31] The 26 identified Targeted Economies include Australia, the Bahamas, Bangladesh, Brazil, Cambodia, Canada, Chile, China, Colombia, Costa Rica, Dominican Republic, Egypt, Hong Kong, Israel, Kazakhstan, Morocco, New Zealand, Norway, Pakistan, Russia, Saudi Arabia, South Africa, Sri Lanka, United Arab Emirates, the United Kingdom, and the European Union. Suffice to say, however, USTR's theory of circumvention—which turns on the idea that third countries are covering the Chinese origin of polysilicon products—does not hold with respect to China itself.

"inference[]" that is "'arbitrary' in relation to the facts found," *Consolidated Rail Corp.*, 93 F.3d at 799.[32]

*Cotton from Xinjiang.* USTR next claims that the same circumvention-based burden arises from cotton produced in Xinjiang, China, and incorporated into derivative exports to the United States. Unsurprisingly, that analysis suffers from the same flaws identified above. Although USTR invokes the United States Fashion Industry Association's "observ[ation]" that "textile and apparel manufacturing in the United States has significantly declined over the past decades, in part, due to changing U.S. comparative advantages," the Association never attributed that decline to competition with forced-labor imports (and USTR never suggests otherwise). *See* PR-6, Report at 54 (citing Sheng Lu, *The State of U.S. Textile and Apparel Manufacturing, Employment, and Trade*, U.S. FASHION INDUS. ASS'N (Apr. 10, 2025)[33]). If anything, the timelines cut the other way: USTR claims forced-labor inputs increased between 2016 and 2021, *see id.* at 11, yet the decline in textile and apparel manufacturing has concededly unfolded over "decades," *id*. at 54. Once

[32] To the extent polysilicon imports have successfully undercut the U.S. market, the proper response would be a product-specific and country-specific approach, not undifferentiated global tariffs. Indeed, just two weeks after the Final Determination here, the Administration announced polysilicon-specific tariffs under Section 232 of the Trade Expansion Act of 1962—treating certain of the offending third-party countries the same as non-offending ones. *See Fact Sheet: President Donald J. Trump Bolsters National Security and Strengthens U.S. Supply Chains by Imposing Tariffs on Polysilicon and its Derivatives*, THE WHITE HOUSE (Aug. 6, 2026), https://www.whitehouse.gov/fact-sheets/2026/08/fact-sheet-president-donald-j-trump-bolsters-national-security-and-strengthens-u-s-supply-chains-by-imposing-tariffs-on-polysilicon-and-its-derivatives/. Tellingly, the new Section 232 action nowhere mentions "forced labor" concerns, even though USTR has elsewhere noted that "[e]nding forced labor is a key priority and an economic and *national security imperative* of the United States." *Fact Sheet: USTR Initiates 60 Section 301 Investigations Relating to Failures to Take Action on Forced Labor*, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE (Mar. 12, 2026) (emphasis added), https://ustr.gov/about/policy-offices/press-office/fact-sheets/2026/march/fact-sheet-ustr-initiates-60-section-301-investigations-relating-failures-take-action-forced-labor.

[33] https://www.usfashionindustry.com/news/fashion-intel-analysis/the-state-of-u-s-textile-and-apparel-manufacturing-employment-and-trade.

again, USTR "conflates correlation with causation," *Southern Tr. Metals, Inc.*, 894 F.3d at 1330, and ignores "salient explanatory variables" that could equally explain the decline, *People Who Care*, 111 F.3d at 537.

Even if USTR had substantiated its cotton-circumvention theory, it would prove little about the vast majority of Targeted Economies. USTR's data implicate at most a handful of countries—India, Indonesia, Jordan, Mexico, Pakistan, Sri Lanka, and Vietnam—that pose any risk of circumventing American import controls on cotton products. PR-6, Report at 53. Whatever those seven countries' practices show, they cannot reasonably be extrapolated to all 60 Targeted Economies under investigation.

Theory 3: Displacement of U.S. Goods in the U.S. Market

USTR's final theory rests on no evidence at all. Its conclusion turns instead on surmise that fairly produced goods from Targeted Economies could displace goods produced in the United States and thereby "may adversely affect U.S. producers in the U.S. market, resulting in a burden or restriction on U.S. commerce." PR-6, Report at 55. But "mere conjecture and abstract theorizing offered in a vacuum are inadequate to satisfy [a court] that the agency has engaged in reasoned decisionmaking." *Arizona Pub. Serv. Co. v. United States*, 742 F.2d 644, 649 n.2 (D.C. Cir. 1984).

***2. Unreasonable Practice***

USTR also concludes that all 60 Targeted Economies have unreasonably failed either to impose or to enforce a prohibition on forced-labor imports. PR-6, Report at 31-32. The agency's Report undermines that undifferentiated conclusion in at least three ways.

*First*, USTR reasons that permitting imports of forced-labor goods (1) incentivizes forced labor by supplying a market for tainted goods, Report at 32; (2) distorts markets by forcing more expensive, fairly produced goods to compete with cheaper, tainted ones, *id*. at 32-33; (3) erodes

the profitability of legitimate businesses, *id*. at 33; and (4) contributes to circumvention of existing forced-labor import prohibitions, *id*. Each rationale hinges on an alleged practical effect of allowing forced-labor goods into a Targeted Economy.

If what matters is the *practical effect* of allowing the import of forced-labor goods, USTR's approach is difficult to square with that focus. It brands as unreasonable every country lacking an express ban, without ever asking whether the country has in fact successfully eliminated such imports—and thus avoided the above consequences—by other means. Consider just those countries whose laws "when taken together, amount to a forced labor import prohibition." PR-6, Report at 25. USTR never disputes Brazil's showing that it "prohibit[s] imports produced with forced labor through the implementation of its commitments in investment agreements and free trade agreements." *Id*. at 61. Nor does it contest Egypt's assertion that "a number of its laws operate to impose what should be considered the 'functional equivalent of an import ban.'" *Id*. at 64 (quoting PR-575, Public Comment of George Hermina, USTR-2026-0133-00127111 (Apr. 15, 2026)). USTR nonetheless faults both countries for lacking an "express prohibition on the importation of goods produced with forced labor." *Id*. at 25. If an express prohibition is necessarily more effective than its "functional equivalent," *id*. at 64, USTR never says why—presumably because no reasoned basis exists. *See State Farm*, 463 U.S. at 43 (reviewing court cannot "supply a reasoned basis for the agency's action that the agency itself has not given").

*Second*, as to the handful of Targeted Economies that USTR credited with express prohibitions, the agency marched to the preordained conclusion that they failed to "effectively enforce" them. PR-6, Report at 25-31. That reasoning is deficient too. With respect to Ecuador, Indonesia, and Pakistan, USTR acknowledged that each "ha[d] only recently imposed its forced labor prohibition." *Id*. at 28-30. It nonetheless faulted all three for producing no "evidence of any

investigations, seizures, or other enforcement actions that have taken place to date." *Id*. But given how recently each prohibition took effect,[34] the absence of enforcement actions "to date" cannot show a failure to "effectively enforce." And USTR's lingering "concerns" over whether each measure "can be effectively enforced," *id*. at 28; *see also id*. at 29-30, are a perilously thin reed on which to hang its definitive judgment that 60 Targeted Economies all acted unreasonably.

In addition, USTR evaluated all 60 economies against an external eight-element framework imported from an academic working paper published weeks after USTR initiated its investigation. *See* PR-116, Laura Murphy, *An International Blueprint for Forced Labor Import Bans*, CARR-RYAN CTR. FOR HUM. RTS., HARV. KENNEDY SCH., Issue 2026-08 (Apr. 28, 2026); PR-6, Report at 26-31. But USTR never explained why the absence of any specific element from an economy's legal system renders its trade practices "unreasonable" or causes an identifiable burden on U.S. commerce. Instead, USTR initiated 60 investigations without published criteria, adopted the working paper's checklist mid-stream without notice, and applied it categorically to impose across-the-board tariffs. Substituting an unannounced academic blueprint for the statutory inquiry required by Congress is the essence of arbitrary and capricious agency action.

*Third*, as explained above, *see* p. 29, *supra*, USTR made no factual findings whatsoever on the level of economic development in each Targeted Economy—despite Section 301's command that development is a critical element in determining whether a country's forced-labor practices are "unreasonable." *See* 19 U.S.C. § 2411(d)(3)(C)(i)(II). If an agency's failure to connect the facts it found to the choice it made is arbitrary and capricious, its failure to find any facts at all is *a fortiori* a fatal defect.

---

[34] Both Ecuador's and Pakistan's prohibitions were enacted April 29, 2026, *see* PR-6, Report at 22, 24, and Indonesia's was promulgated on April 14, 2026, *id.* at 23.

### *3. Appropriate Action*

An agency may not disregard "an important aspect of the problem." *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (agency action is arbitrary and capricious where the agency fails to consider "the relevant factors"). Yet that is what USTR did when it glossed over substantial differences among the 60 Targeted Economies to conclude—once more in only hollow terms, *see* PR-768, Final Determination, 91 Fed. Reg. at 47,321-47,328—both that action was "appropriate" and either a 10% or 12.5% baseline tariff rate was "appropriate *** to obtain the elimination of" each country's forced-labor importation practices. 19 U.S.C. § 2411(b)(2). Just as an agency acts arbitrarily and capriciously when it "treat[s] similar situations differently" without a reasoned explanation, *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014), it does the same when it treats different situations alike. *Cf. Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("A just legal system seeks *** to treat different cases differently.").

The 60 Targeted Economies are not interchangeable. They are distinguished by numerous features bearing on both the appropriateness and the magnitude of any particular tariff action: the degree of economic development of each Targeted Economy (which range from Trinidad and Tobago to Kazakhstan to Japan to the United Kingdom); its ability to enforce a ban on forced-labor imports; the extent to which it exports goods to the United States and the related burden its forced-labor import practices actually impose on U.S. commerce; and whether it has already committed to eliminating the practices in question. Those differences demand some reasoned basis—wholly missing here—for why USTR has nonetheless chosen to treat the 60 Targeted Economies essentially the same, with either a 10% or 12.5% tariff levied on essentially all their exported goods.

Consider first a Targeted Economy's ability to enforce a ban on forced-labor imports. As several commenters explained, certain Targeted Economies are simply incapable of meeting USTR's narrow definition of effective enforcement—whether due to resource constraints, underdeveloped infrastructure, or limited economic development. USTR's decision that such countries should bear the same tariff rate—or any tariff at all—as countries fully equipped to enforce such a ban is arbitrary twice over. A tariff is hardly likely to "end or reverse *** investigated conduct" where the country lacks the resources to do so.[35] *HMTX Indus*., 156 F.4th at 1252. And, in such circumstances, tariffs are just as likely to aggravate a developing economy's enforcement problems as to resolve them.[36] As commenters emphasized, eliminating forced-labor imports from developing economies calls instead for technical assistance and bilateral cooperation, not punitive tariffs.[37]

---

[35] *See, e.g.,* PR-2437, Supplementary Post-Hearing Submission of the Government of the Republic of South Africa 10 (July 16, 2026), https://comments.ustr.gov/s/commentdetails?rid=Q44PQYTTHV ("South Africa is a developing economy. Its unemployment rate exceeds 32 per cent. Its fiscal resources are finite, and its enforcement demands compete. Such an economy cannot reasonably be judged by the mere absence of a domestic replica of the United States model.").

[36] *See, e.g.,* PR-1807, Letter from Twenty-Two Attorneys General to Ambassador Greer, Re: *Notice of Determinations, Request For Comments, And Notice Of Public Hearings* (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=YGT6M24T8H; PR-2312, Letter from the Human Trafficking Legal Center to Ambassador Greer, Re: USTR's Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=P46Y4D6H8R.

[37] *See, e.g.,* PR-2287, Indonesia Comments on the Findings of the Section 301 Investigation on Forced Labor Import Prohibition 2 (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=M7MWJP4XVX ("[Additional tariffs] would divert resources that are essential to strengthening Indonesia's enforcement framework and further operationalizing its recently adopted legal regime. A cooperative approach—through continued technical dialogue, information sharing, and capacity-building—would be more effective in achieving the shared objective of preventing goods produced with forced labor from entering international supply chains than the imposition of additional trade restrictions."); *see also* PR-2008, Letter from Forced Labor Working Group to Ambassador Greer, *supra* note 19.

Consider next USTR's failure to tailor its findings or its remedy to the burdens allegedly imposed by an individual country's practices, instead identically determining that either a 10% or 12.5% rate was "appropriate to obtain the elimination of the [investigated] acts, policies, and practices" for all 60 Targeted Economies. PR-768, Final Determination, 91 Fed. Reg. at 47,321-47,328. That approach stands in stark contrast to the one USTR has historically taken. When prior administrations invoked Section 301, they typically proceeded against a single country.[38] Even on the rare occasions USTR pursued multi-country actions, it satisfied Section 301's requirements by issuing detailed country-by-country reports explaining each targeted economy's practices and their consequent effects on U.S. commerce. Thus, when USTR initiated an investigation into ten countries and the European Union in 2019 and 2020 regarding their adopted or proposed digital services taxes, USTR issued seven different country-specific reports, each about six months after initiation. Roughly six months later, it then announced seven different country-specific actions—each with tailored remedies taking into account the relative burden on U.S. commerce caused by each country's taxes.[39] And for those countries that responded to USTR's action (*e.g.*, by declining to adopt or implement digital services taxes during the investigation period), USTR terminated the

---

[38] *See, e.g., Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (Aug. 14, 2017); *Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823 (Aug. 16, 2018).

[39] *See, e.g.*, 85 Fed. Reg. 43,292, 43,293 (Jul. 16, 2020) (imposing tariffs on $1.3 billion of French imports after calculating the magnitude of France's actions and determining that the proposed tariffs would "result in the collection of tariffs on goods of France at comparable, though somewhat lower amounts"); 86 Fed. Reg. 30,361, 30,362 (June 7, 2021) ($65 million in Austrian goods); 86 Fed. Reg. 30,356, 30,357 (June 7, 2021) ($119 million in Indian goods); 86 Fed. Reg. 30,350, 30,350 (June 7, 2021) ($386 million in Italian goods); 86 Fed. Reg. 30,358, 30,359 (June 7, 2021) ($155 million in Spanish goods); 86 Fed. Reg. 30,353, 30,354 (June 7, 2021) ($310 million in Turkish goods); 86 Fed. Reg. 30,364, 30,365 (June 7, 2021) ($887 million in goods from the United Kingdom); *see also Initiation of Section 301 Investigations of Digital Service Taxes*, 85 Fed. Reg. 34,709 (June 5, 2020).

investigations; it did not simply move them to the lower of two tariff groupings.[40] The "lack of historical precedent" for imposing global tariffs under Section 301 is a "telling indication" that USTR's omnibus approach "extend[s] beyond the [agency's] legitimate reach." *Learning Resources*, 607 U.S. at 245-246 (Opinion of Roberts, C.J.) (internal quotation marks omitted). At a minimum, USTR's decision to "depart *** *sub silentio*" from its calibrated historical practice is arbitrary and capricious. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

On top of all that, USTR failed to disclose any standard to determine what actions a country must take for the tariffs to be reduced or removed. Following USTR's Global Section 301 Tariffs Report, six targeted economies—Cambodia, Guatemala, Honduras, India, Sri Lanka, and Trinidad and Tobago—enacted forced-labor import prohibitions. PR-763, Decision Memorandum on Actions in Section 301 Investigations of Acts, Policies, and Practices of Sixty Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor from Deputy General Counsel Juan Millán to USTR Jamieson Greer 4 (July 23, 2026) ("Final Decision Memorandum"). If the tariffs were genuinely designed to induce foreign governments to adopt import prohibitions, the prompt enactment of those exact prohibitions should have resulted in relief from the tariff regime. Instead, USTR subjected all six reforming economies to a 10% tariff in the Final Determination. PR-768, 91 Fed. Reg. at 47,318; PR-763, Final Decision Memorandum at 12, 15-16, 21-22. USTR nowhere explained why these newly enacted prohibitions were inadequate, what additional statutory benchmarks were missing, or what specific compliance standard would ever result in the removal of the tariffs. USTR's imposition of severe punitive duties regardless of whether a foreign government complied with the

---

[40] *See Termination of the Section 301 Digital Services Tax Investigations of Brazil, the Czech Republic, the European Union, and Indonesia*, 86 Fed. Reg. 16,828 (Mar. 31, 2021).

agency's demands undermines any claim that the Global Section 301 Tariffs were designed to "obtain the elimination" of the targeted forced-labor import practices. 19 U.S.C. § 2411(b)(2).

That leaves only USTR's invocation of the Presidential memorandum directing the tariffs. But, as discussed above (pp. 30-31, *supra*), such bare reliance does not satisfy USTR's independent obligation to avoid arbitrary-and-capricious decisionmaking. *See In re Section 301 Cases*, 570 F. Supp. 3d at 1339.

### B. USTR's Sudden Concern With Forced-Labor Imports Is A Pretext To "Ensure Continuity" With The Baseline Global IEEPA Tariffs

Although USTR's arbitrary and capricious factfinding and reasoning are alone grounds for vacatur, the pretextual nature of the entire endeavor both confirms its unlawfulness and provides an independent basis for vacatur under the APA. *See Department of Com.*, 588 U.S. at 784-785. The APA's requirement of reasoned decisionmaking exists to prevent exactly the sort of preordained agency action USTR undertook here. That requirement "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785. "Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* The record leaves little doubt that the justification USTR offers for the Global Section 301 Tariffs is precisely the kind of pretext the Supreme Court warned against.

In its Final Determination, USTR twice asserted that each of its 60 Global Section 301 Tariff actions exists "*only* for the purpose of obtaining the elimination" of the Targeted Economies' forced-labor import practices "and not for any other purpose." PR-768, Final Determination, 91 Fed. Reg. at 47,335 (emphasis added). Yet that explanation is "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Department of Com.*, 588 U.S. at 785. Just compare USTR's heavy reliance on the prevalence of forced labor in Brazilian beef exports (to China) with USTR's concurrent exemption from tariffs for Brazilian beef exports (to

the United States): Such an exemption is simply incompatible with a singular focus on stopping trade in forced-labor products.

Indeed, the sudden emergence of forced-labor import practices as the sole justification for a global tariff regime—imposed only after USTR's reliance on IEEPA failed and Section 122 expired—mirrors the sequence of events the Supreme Court found indicative of pretext in *Department of Commerce*. *See* 588 U.S. at 783. There, the Secretary of Commerce "was determined to reinstate a citizenship question [on the census] from the time he entered office." *Id.* at 782-783. The Secretary attempted to justify the question a few different ways, all of which failed, before he alighted on a Voting Rights Act rationale that had never been previously connected to the citizenship question. *Id.* That evidence thus told "a story that does not match the explanation the Secretary gave for his decision." *Id.* at 784.

All the same factors are present here. USTR's statements reveal that it was "determined" to impose sweeping global tariffs "from the time [President Trump] entered office" in his second term. *Department of Com.,* 588 U.S. at 782-783. There was "no hint" that concerns about forced-labor importation were connected to that effort. *Id.* at 783. Rather, USTR first sought to establish a broad global tariff regime under IEEPA based on the President's proclamation identifying "a national emergency arising from conditions reflected in large and persistent annual U.S. goods trade deficits[.]" 90 Fed. Reg. at 15,044. Only "[a]fter [that] attempt[] failed" did the Administration pivot to other means. *See Department of Com.*, 588 U.S. at 783-784. The Administration turned to Section 122 as fallback number one. To justify the Global Section 122 Tariffs, the President proclaimed the existence of "fundamental international payments problems within the meaning of section 122." 91 Fed. Reg. 9,339, 9,341 (Feb. 25, 2026). The justifications

for both the IEEPA and Section 122 tariffs mimic the wording of the statutory prerequisites to take action. *See* 50 U.S.C. § 1701; 19 U.S.C. § 2132(a).

Then the Administration turned to Section 301—once again attempting to justify the old tariff strategy under a new law. The President himself recently admitted that the Global Section 301 Tariffs are just a more "cumbersome" way of doing the "same thing" as the Global IEEPA Tariffs. FOX & FRIENDS, *Trump Says Tariffs Have Made the U.S. 'A Fortune,'* at 1:05 (Fox News, July 28, 2026) ("Now, I have other ways of doing the same thing, but it's a *** more cumbersome, *** way of doing it.").[41] He added that he was only forced to go this "harder way for the tariffs because the Supreme Court, in a very close decision, you know, ruled against me." *Id.* at 0:59. Other Administration officials, including USTR, have consistently echoed that sentiment, reiterating that the Global Section 301 Tariffs are a mere replacement for the former baseline global tariffs. *See* pp. 7-9, *supra* (collecting statements).

The investigation also shows that USTR worked backward from a predetermined outcome. The goals USTR initially identified—reducing trade deficits, promoting reciprocity, and reshoring production—bear little relation to the inquiry ultimately conducted. Section 301 required USTR to identify practices that were "unreasonable" and that "burden[ed]" U.S. commerce. 19 U.S.C. § 2411(b)(1). To construct a tariff regime covering 60 economies responsible for 99.4% of all U.S. imports, USTR needed a theory capable of applying virtually everywhere. It settled on the proposition that each targeted economy had failed to do enough to prevent the importation of forced-labor goods. Because every jurisdiction could theoretically do more, the rationale proved infinitely expandable. Armed with that theory, USTR conducted a rushed investigation spanning 60 economies and stitched together isolated examples, anecdotal evidence, and broad

[41] https://www.foxnews.com/video/6402337800112.

generalizations and suppositions to support a conclusion it had already reached. And USTR then copied and pasted that conclusion 60 times to cover all 60 investigated economies. *See* PR-6, Report at 59-79. The agency's findings were not the product of an open-minded evaluation of evidence on a country-by-country basis. Rather, they were reverse engineered to recreate through Section 301 the global tariff wall that *Learning Resources* had dismantled.

Courts "are 'not required to exhibit a naïveté from which ordinary citizens are free.'" *Department of Com.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Here, USTR announced its true objective on the very day the Supreme Court invalidated the Global IEEPA Tariffs. Because its subsequent insistence that the Global Section 301 Tariffs exist "only" to eliminate forced-labor import practices is plainly pretextual, that tariff action must be vacated. *See id*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for judgment on the agency record. As relief, Plaintiffs are entitled to vacatur of the Final Determination. *See Gilda Indus. Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010); *see also Jennings v. Merit Sys. Prot. Bd.*, 59 F.3d 159, 160 (Fed. Cir. 1995) (court must "hold unlawful and set aside" agency action that is arbitrary, capricious, procedurally defective, unsupported by substantial evidence, or otherwise contrary to law).[42] The Court should also order Defendants to refund, with interest, any duties paid by Plaintiffs pursuant to the Global Section 301 Tariffs.

[42] Vacatur would "[i]n essence" take the Global Section 301 Tariffs "'off the books,'" *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 50 (D.C. Cir. 2020), obviating the need for any injunction. To the extent Defendants take a different view, Plaintiffs reserve the right to address the issue on reply.

Dated: August 24, 2026

Respectfully submitted,

*/s/* Pratik A. Shah

Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Kristen E. Loveland (*admission application pending*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*

# STATUTORY ADDENDUM

## STATUTORY ADDENDUM

## TABLE OF CONTENTS

19 U.S.C. § 2411(b)-(d) .......... Add. 1

19 U.S.C. § 2412(b) .......... Add. 7

19 U.S.C. § 2413(a) .......... Add. 9

19 U.S.C. § 2414 .......... Add. 10

19 U.S.C. § 2417 .......... Add. 13

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2411. Actions by United States Trade Representative**

* * * * *

(b) Discretionary action

If the Trade Representative determines under section 2414(a)(1) of this title that--

(1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and

(2) action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

(c) Scope of authority

(1) For purposes of carrying out the provisions of subsection (a) or (b) or section 2416(c) of this title, the Trade Representative is authorized to--

(A) suspend, withdraw, or prevent the application of, benefits of trade agreement concessions to carry out a trade agreement with the foreign country referred to in such subsection;

(B) impose duties or other import restrictions on the goods of, and, notwithstanding any other provision of law, fees or restrictions on the services of, such foreign country for such time as the Trade Representative determines appropriate;

(C) in a case in which the act, policy, or practice also fails to meet the eligibility criteria for receiving duty-free treatment under subsections (b) and (c) of section 2462 of this title, subsections (b) and (c) of section 2702 of this title, or subsections (c) and (d) of section 3202 of this title, withdraw, limit, or suspend such treatment under such provisions, notwithstanding the provisions of subsection (a)(3) of this section; or

(D) enter into binding agreements with such foreign country that commit such foreign country to--

(i) eliminate, or phase out, the act, policy, or practice that is the subject of the action to be taken under subsection (a) or (b),

(ii) eliminate any burden or restriction on United States commerce resulting from such act, policy, or practice, or

(iii) provide the United States with compensatory trade benefits that--

(I) are satisfactory to the Trade Representative, and

(II) meet the requirements of paragraph (4).

(2)(A) Notwithstanding any other provision of law governing any service sector access authorization, and in addition to the authority conferred in paragraph (1), the Trade Representative may, for purposes of carrying out the provisions of subsection (a) or (b)--

(i) restrict, in the manner and to the extent the Trade Representative determines appropriate, the terms and conditions of any such authorization, or

(ii) deny the issuance of any such authorization.

(B) Actions described in subparagraph (A) may only be taken under this section with respect to service sector access authorizations granted, or applications therefor pending, on or after the date on which--

(i) a petition is filed under section 2412(a) of this title, or

(ii) a determination to initiate an investigation is made by the Trade Representative under section 2412(b) of this title.

(C) Before the Trade Representative takes any action under this section involving the imposition of fees or other restrictions on the services of a foreign country, the Trade Representative shall, if the services involved are subject to regulation by any agency of the Federal Government or of any State, consult, as appropriate, with the head of the agency concerned.

(3) The actions the Trade Representative is authorized to take under subsection (a) or (b) may be taken against any goods or economic sector--

(A) on a nondiscriminatory basis or solely against the foreign country described in such subsection, and

(B) without regard to whether or not such goods or economic sector were involved in the act, policy, or practice that is the subject of such action.

(4) Any trade agreement described in paragraph (1)(D)(iii) shall provide compensatory trade benefits that benefit the economic sector which includes the domestic industry that would benefit from the elimination of the act, policy, or practice that is the subject of the action to be taken under subsection (a) or (b), or benefit the economic sector as closely related as possible to such economic sector, unless--

(A) the provision of such trade benefits is not feasible, or

(B) trade benefits that benefit any other economic sector would be more satisfactory than such trade benefits.

(5) If the Trade Representative determines that actions to be taken under subsection (a) or (b) are to be in the form of import restrictions, the Trade Representative shall--

(A) give preference to the imposition of duties over the imposition of other import restrictions, and

(B) if an import restriction other than a duty is imposed, consider substituting, on an incremental basis, an equivalent duty for such other import restriction.

(6) Any action taken by the Trade Representative under this section with respect to export targeting shall, to the extent possible, reflect the full benefit level of the export targeting to the beneficiary over the period during which the action taken has an effect.

(d) Definitions and special rules

For purposes of this subchapter--

(1) The term "commerce" includes, but is not limited to--

(A) services (including transfers of information) associated with international trade, whether or not such services are related to specific goods, and

(B) foreign direct investment by United States persons with implications for trade in goods or services.

(2) An act, policy, or practice of a foreign country that burdens or restricts United States commerce may include the provision, directly or indirectly, by that foreign country of subsidies for the construction of vessels used in the commercial transportation by water of goods between foreign countries and the United States.

(3)(A) An act, policy, or practice is unreasonable if the act, policy, or practice, while not necessarily in violation of, or inconsistent with, the international legal rights of the United States, is otherwise unfair and inequitable.

(B) Acts, policies, and practices that are unreasonable include, but are not limited to, any act, policy, or practice, or any combination of acts, policies, or practices, which--

(i) denies fair and equitable--

(I) opportunities for the establishment of an enterprise,

(II) provision of adequate and effective protection of intellectual property rights notwithstanding the fact that the foreign country may be in compliance with the specific obligations of the Agreement on Trade-Related Aspects of Intellectual Property Rights referred to in section 3511(d)(15) of this title,

(III) nondiscriminatory market access opportunities for United States persons that rely upon intellectual property protection, or

(IV) market opportunities, including the toleration by a foreign government of systematic anticompetitive activities by enterprises or among enterprises in the foreign country that have the effect of restricting, on a basis that is inconsistent with commercial considerations, access of United States goods or services to a foreign market,

(ii) constitutes export targeting,

(iii) constitutes a persistent pattern of conduct that--

(I) denies workers the right of association,

(II) denies workers the right to organize and bargain collectively,

(III) permits any form of forced or compulsory labor,

(IV) fails to provide a minimum age for the employment of children, or

(V) fails to provide standards for minimum wages, hours of work, and occupational safety and health of workers, or

(iv) constitutes a persistent pattern of conduct by the government of a foreign country under which that government fails to effectively enforce commitments under agreements to which the foreign country and the United States are parties, including with respect to trade in goods, trade in services, trade in agriculture, foreign investment, intellectual property, digital trade in goods and services and cross-border data flows, regulatory practices, state-owned and state-controlled enterprises, localization barriers to trade, labor and the environment, anticorruption, trade remedy laws, textiles, and commercial partnerships.

(C)(i) Acts, policies, and practices of a foreign country described in subparagraph (B)(iii) shall not be treated as being unreasonable if the Trade Representative determines that--

(I) the foreign country has taken, or is taking, actions that demonstrate a significant and tangible overall advancement in providing throughout the foreign country (including any designated zone within the foreign country) the rights and other standards described in the subclauses of subparagraph (B)(iii), or

(II) such acts, policies, and practices are not inconsistent with the level of economic development of the foreign country.

(ii) The Trade Representative shall publish in the Federal Register any determination made under clause (i), together with a description of the facts on which such determination is based.

(D) For purposes of determining whether any act, policy, or practice is unreasonable, reciprocal opportunities in the United States for foreign nationals and firms shall be taken into account, to the extent appropriate.

(E) The term "export targeting" means any government plan or scheme consisting of a combination of coordinated actions (whether carried out severally or jointly) that are bestowed on a specific enterprise, industry, or group thereof, the effect of which is to assist the enterprise, industry, or group to become more competitive in the export of a class or kind of merchandise.

(F)(i) For the purposes of subparagraph (B)(i)(II), adequate and effective protection of intellectual property rights includes adequate and effective means under the laws of the foreign country for persons who are not citizens or nationals of such country to secure, exercise, and enforce rights and enjoy commercial benefits relating to patents, trademarks, copyrights and related rights, mask works, trade secrets, and plant breeder's rights.

(ii) For purposes of subparagraph (B)(i)(IV), the denial of fair and equitable nondiscriminatory market access opportunities includes restrictions on market access related to the use, exploitation, or enjoyment of commercial benefits derived from exercising intellectual property rights in protected works or fixations or products embodying protected works.

(4)(A) An act, policy, or practice is unjustifiable if the act, policy, or practice is in violation of, or inconsistent with, the international legal rights of the United States.

(B) Acts, policies, and practices that are unjustifiable include, but are not limited to, any act, policy, or practice described in subparagraph (A) which denies national or most-favored-nation treatment or the right of establishment or protection of intellectual property rights.

(5) Acts, policies, and practices that are discriminatory include, when appropriate, any act, policy, and practice which denies national or most-favored-nation treatment to United States goods, services, or investment.

(6) The term "service sector access authorization" means any license, permit, order, or other authorization, issued under the authority of Federal law, that permits a foreign supplier of services access to the United States market in a service sector concerned.

(7) The term "foreign country" includes any foreign instrumentality. Any possession or territory of a foreign country that is administered separately for customs purposes shall be treated as a separate foreign country.

(8) The term "Trade Representative" means the United States Trade Representative.

(9) The term "interested persons", only for purposes of sections 2412(a)(4)(B), 2414(b)(1)(A), 2416(c)(2),[1] and 2417(a)(2) of this title, includes, but is not limited to, domestic firms and workers, representatives of consumer interests, United States product exporters, and any industrial user of any goods or services that may be affected by actions taken under subsection (a) or (b).

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2412. Initiation of investigations**

* * * * *

(b) Initiation of investigation by means other than petition

(1)(A) If the Trade Representative determines that an investigation should be initiated under this subchapter with respect to any matter in order to determine whether the matter is actionable under section 2411 of this title, the Trade Representative shall publish such determination in the Federal Register and shall initiate such investigation.

(B) The Trade Representative shall, before making any determination under subparagraph (A), consult with appropriate committees established pursuant to section 2155 of this title.

(2)(A) By no later than the date that is 30 days after the date on which a country is identified under section 2242(a)(2) of this title, the Trade Representative shall initiate an investigation under this subchapter with respect to any act, policy, or practice of that country that--

(i) was the basis for such identification, and

(ii) is not at that time the subject of any other investigation or action under this subchapter.

(B) The Trade Representative is not required under subparagraph (A) to initiate an investigation under this subchapter with respect to any act, policy, or practice of a foreign country if the Trade Representative determines that the initiation of the investigation would be detrimental to United States economic interests.

(C) If the Trade Representative makes a determination under subparagraph (B) not to initiate an investigation, the Trade Representative shall submit to the Congress a written report setting forth, in detail--

(i) the reasons for the determination, and

(ii) the United States economic interests that would be adversely affected by the investigation.

(D) The Trade Representative shall, from time to time, consult with the Register of Copyrights, the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and other appropriate officers of the Federal Government, during any investigation initiated under this subchapter by reason of subparagraph (A).

* * * * *

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2413. Consultation upon initiation of investigation**

(a) In general

(1) On the date on which an investigation is initiated under section 2412 of this title, the Trade Representative, on behalf of the United States, shall request consultations with the foreign country concerned regarding the issues involved in such investigation.

(2) If the investigation initiated under section 2412 of this title involves a trade agreement and a mutually acceptable resolution is not reached before the earlier of--

(A) the close of the consultation period, if any, specified in the trade agreement, or

(B) the 150th day after the day on which consultation was commenced,

the Trade Representative shall promptly request proceedings on the matter under the formal dispute settlement procedures provided under such agreement.

(3) The Trade Representative shall seek information and advice from the petitioner (if any) and the appropriate committees established pursuant to section 2155 of this title in preparing United States presentations for consultations and dispute settlement proceedings.

* * * * *

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2414. Determinations by Trade Representative**

(a) In general

(1) On the basis of the investigation initiated under section 2412 of this title and the consultations (and the proceedings, if applicable) under section 2413 of this title, the Trade Representative shall--

(A) determine whether--

(i) the rights to which the United States is entitled under any trade agreement are being denied, or

(ii) any act, policy, or practice described in subsection (a)(1)(B) or (b)(1) of section 2411 of this title exists, and

(B) if the determination made under subparagraph (A) is affirmative, determine what action, if any, the Trade Representative should take under subsection (a) or (b) of section 2411 of this title.

(2) The Trade Representative shall make the determinations required under paragraph (1) on or before--

(A) in the case of an investigation involving a trade agreement, except an investigation initiated pursuant to section 2412(b)(2)(A) of this title involving rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights (referred to in section 3511(d)(15) of this title) or the GATT 1994 (as defined in section 3501(1)(B) of this title) relating to products subject to intellectual property protection, the earlier of--

(i) the date that is 30 days after the date on which the dispute settlement procedure is concluded, or

(ii) the date that is 18 months after the date on which the investigation is initiated, or

(B) in all cases not described in subparagraph (A) or paragraph (3), the date that is 12 months after the date on which the investigation is initiated.

(3)(A) If an investigation is initiated under this subchapter by reason of section 2412(b)(2) of this title and--

(i) the Trade Representative considers that rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights or the GATT 1994 relating to products subject to intellectual property protection are involved, the Trade Representative shall make the determination required under paragraph (1) not later than 30 days after the date on which the dispute settlement procedure is concluded; or

(ii) the Trade Representative does not consider that a trade agreement, including the Agreement on Trade-Related Aspects of Intellectual Property Rights, is involved or does not make a determination described in subparagraph (B) with respect to such investigation, the Trade Representative shall make the determinations required under paragraph (1) with respect to such investigation not later than the date that is 6 months after the date on which such investigation is initiated.

(B) If the Trade Representative determines with respect to an investigation initiated by reason of section 2412(b)(2) of this title (other than an investigation involving a trade agreement) that--

(i) complex or complicated issues are involved in the investigation that require additional time,

(ii) the foreign country involved in the investigation is making substantial progress in drafting or implementing legislative or administrative measures that will provide adequate and effective protection of intellectual property rights, or

(iii) such foreign country is undertaking enforcement measures to provide adequate and effective protection of intellectual property rights,

the Trade Representative shall publish in the Federal Register notice of such determination and shall make the determinations required under paragraph (1) with respect to such investigation by no later than the date that is 9 months after the date on which such investigation is initiated.

(4) In any case in which a dispute is not resolved before the close of the minimum dispute settlement period provided for in a trade agreement, the Trade Representative, within 15 days after the close of such dispute settlement period, shall submit a report to Congress setting forth the reasons why the dispute was not resolved within the minimum dispute settlement period, the status of the case at the close of the period, and the prospects for resolution. For purposes of this paragraph, the minimum dispute settlement period provided for under any such trade agreement is the total period of time that results if all stages of the formal dispute settlement procedures are carried out within the time limitations specified in the agreement, but computed without regard to any extension authorized under the agreement at any stage.

(b) Consultation before determinations

(1) Before making the determinations required under subsection (a)(1), the Trade Representative, unless expeditious action is required--

(A) shall provide an opportunity (after giving not less than 30 days notice thereof) for the presentation of views by interested persons, including a public hearing if requested by any interested person,

(B) shall obtain advice from the appropriate committees established pursuant to section 2155 of this title, and

(C) may request the views of the United States International Trade Commission regarding the probable impact on the economy of the United States of the taking of action with respect to any goods or service.

(2) If the Trade Representative does not comply with the requirements of subparagraphs (A) and (B) of paragraph (1) because expeditious action is required, the Trade Representative shall, after making the determinations under subsection (a)(1), comply with such subparagraphs.

(c) Publication

The Trade Representative shall publish in the Federal Register any determination made under subsection (a)(1), together with a description of the facts on which such determination is based.

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2417. Modification and termination of actions**

(a) In general

(1) The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if--

(A) any of the conditions described in section 2411(a)(2) of this title exist,

(B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or

(C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

(2) Before taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title, the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate.

(b) Notice; report to Congress

The Trade Representative shall promptly publish in the Federal Register notice of, and report in writing to the Congress with respect to, any modification or termination of any action taken under section 2411 of this title and the reasons therefor.

(c) Review of necessity

(1) If--

(A) a particular action has been taken under section 2411 of this title during any 4-year period, and

(B) neither the petitioner nor any representative of the domestic industry which benefits from such action has submitted to the Trade Representative during the last 60 days of such 4-year period a written request for the continuation of such action,

such action shall terminate at the close of such 4-year period.

(2) The Trade Representative shall notify by mail the petitioner and representatives of the domestic industry described in paragraph (1)(B) of any termination of action by reason of paragraph (1) at least 60 days before the date of such termination.

(3) If a request is submitted to the Trade Representative under paragraph (1)(B) to continue taking a particular action under section 2411 of this title, or if a request is submitted to the Trade Representative under section 2416(c)(2) of this title to reinstate action, the Trade Representative shall conduct a review of--

(A) the effectiveness in achieving the objectives of section 2411 of this title of--

(i) such action, and

(ii) other actions that could be taken (including actions against other products or services), and

(B) the effects of such actions on the United States economy, including consumers.

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1) and Standard Procedural and Scheduling Order No. 26-01, I certify that this Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Agency Record, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, counsel's signature blocks, this certificate, and the proposed order) complies with the word limitation requirement set forth in Standard Procedural and Scheduling Order No. 26-01. The word count for this submission, as computed by the word processing system used to prepare the brief, is 15,680 words.

*/s/* Pratik A. Shah
Pratik A. Shah

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*