**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE LISA W. WANG, JUDGE

| | | |
|---|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | ) | Court No. 1:26-cv-03555-3JP |

**DEFENDANT'S RESPONSE IN OPPOSITION TO RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

DOUGLAS G. EDELSCHICK
Senior Trial Counsel

DANIEL D. FALKNOR
BRENDAN D. JORDAN
OLIVER J. McDONALD
ANNA D. WALKER
Trial Attorneys

Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendants

Of Counsel:

JUAN A. MILLÁN
Deputy General Counsel

MEGAN M. GRIMBALL
Chief Counsel for Negotiations,
Legislation and Administrative Law

BENJAMIN L. ALLEN
Associate General Counsel

GRACE M. YANAGAWA
Assistant General Counsel

Office of the U.S. Trade Representative
600 17th Street, NW
Washington, DC 20508

September 4, 2026

## TABLE OF CONTENTS

INTRODUCTION ..... 1

STATEMENT PURSUANT TO RULE 56.1 ..... 7

I. The Administrative Determinations Under Review ..... 7

II. Statement of the Issues ..... 7

STATEMENT OF FACTS ..... 8

I. USTR's Discretionary Authority to Impose Duties Under Section 301(b) ..... 8

II. USTR Initiates Section 301 Investigations Concerning Forced Labor Import Prohibitions ..... 10

III. USTR's Section 301(b) Actionability Determinations ..... 11

IV. The President's Direction ..... 15

V. USTR's Final Actions ..... 16

SUMMARY OF ARGUMENT ..... 16

ARGUMENT ..... 19

I. Standard of Review ..... 19

II. Plaintiffs Have Not Demonstrated Article III Standing ..... 20

III. Section 301(b) Authorizes The Challenged Tariffs ..... 20

A. USTR Complied With The Statutory Scheme ..... 21

B. Plaintiffs' Strained Arguments Are Inconsistent With The Statute, The Record, And The Highly Discretionary Nature Of The Findings At Issue ..... 23

C. The Major-Questions And Nondelegation Doctrines Are Not Implicated ..... 32

IV. Plaintiffs' APA Challenges Are Meritless ..... 36

A. Plaintiffs Fail to Show Irrationality in Any Aspect of USTR's Finding That Certain Trade Practices Are "Unreasonable" .......... 36

B. Plaintiffs' "Burden" Arguments Misconstrue and Second-Guess USTR's Rational Findings In Contravention of the Controlling Standard of Review ....... 38

C. Plaintiffs' Arguments Challenging What Actions Are "Appropriate" Fail to Demonstrate Any Error Regardless .......... 45

V. Plaintiffs' Pretext Argument Is Meritless .......... 50

VI. The Court Should Not Order Universal Vacatur .......... 54

A. The Court Should Consider Remand Without Vacatur, If Necessary .......... 55

B. The APA Does Not Authorize Vacatur As A Remedy .......... 56

C. The Request for Universal Vacatur is Improper .......... 58

VII. Plaintiffs Cannot Satisfy The Equitable Requirements For The Relief They Seek .......... 60

VIII. At A Minimum, Any Relief Should Not Disrupt The Normal Operation Of The Trade Laws .......... 63

CONCLUSION .......... 64

# TABLE OF AUTHORITIES

## CASES

*27-35 Jackson Ave LLC v. United States*, 127 F.4th 1314 (Fed. Cir. 2025) ................................ 50

*Altx, Inc. v. United States*, 26 C.I.T. 709, 2002 WL 1560884 (2002) ........................................ 42

*Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90 (1946)....................................... 35

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252 (Fed. Cir. 2024)................................................................................................... 27

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) ............................................. 59

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................................................................... 34

*Butte Cty. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)..................................................................... 29

*CAADES v. United States*, 32 F.4th 1130 (Fed. Cir. 2022) ........................................................ 52

*Camp v. Pitts*, 411 U.S. 138 (1973) .............................................................................................. 51

*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008).......................... 20

*Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382 (1813) ........................... 5, 34

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948).................... 34

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 19

*COALITION v. Fontaine, Inc.*, 535 F. Supp. 3d 1336 (Ct. Int'l. Trade 2020) ............................ 57

*Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018) ..................................... 61-62

*Department of Commerce v. New York*, 588 U.S. 752 (2019)...................................................... 25

*DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............................................. 51, 55

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).................................................... 61, 62

*Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F. Supp. 3d 1364 (Ct. Int'l Trade 2017).......................................................................................................... 20, 62

*Fed. Comm'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021) ....................... *passim*

*Fed. Comm'ns Comm'n v. Consumers' Research*, 606 U.S. 656 (2025) ..................................... 33

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025) ...................... 52

*Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) ... 34

*Fla. E. Coast Ry. LLC v. FRA*, No. 24-11076, --- F.4th ----, 2026 WL 2321640 (11th Cir. Aug. 11, 2026). ... 44

*Florsheim Shoe Co. v. United States*, 744 F.2d 787 (Fed. Cir. 1984) ... 33

*Fogo De Chao (Holdings), Inc. v. DHS*, 769 F.3d 1127 (D.C. Cir. 2014) ... 37, 44

*Frizelle v. Slater*, 111 F.3d 172 (D.C. Cir. 1997) ... 29

*Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) ... 51

*Gemtron Corp. v. Saint-Grobain Corp.*, 572 F.3d 1371 (Fed. Cir. 2009) ... 20, 62

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256 (Fed. Cir. 1986) ... 63

*Gilda Indus., Inc. v. United States*, 625 F. Supp. 3d 1377 (Ct. Int'l Trade 2009) ... 57

*Gilda Indus., Inc. v. United States*, 622 F.3d 1358 (Fed. Cir. 2010) ... 19, 57

*Gill v. Whitford*, 585 U.S. 48 (2018) ... 59

*Gundy v. United States*, 588 U.S. 128 (2019). ... 35

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ... 58

*HMTX Indus. LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025) ... *passim*

*In re Cree, Inc.*, 818 F.3d 694 (Fed. Cir. 2016) ... 23, 38, 40

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000) ... 19

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) ... 60

*In re Section 301 Cases*, 628 F. Supp. 3d 1235, 1248 (Ct. Int'l Trade 2023) ... 24

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ... 5, 34

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ... 29

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 145 F.4th 1308 (Fed. Cir. 2025) ... 40

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) ... 57

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ... 48

*Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026) ... *passim*

*Loper Bright Enters v. Raimondo*, 603 U.S. 369 (2024) .......................................... 4, 27, 28, 31

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......................................................... 20

*Magnesium Corp. of Am. v. United States*, 166 F.3d 1364 (Fed. Cir. 1999) .............................. 28

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ..................................... 50

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) .................................................. 5, 34

*McKinney v. Sec'y of Veterans Affairs*, 164 F.4th 884 (Fed. Cir. 2026) .................................. 29

*MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ............................................ 59

*Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211 (1991) ........... 25

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................................... 28, 46, 49

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365 (Fed. Cir. 2001) .......................................................... 55, 56, 58

*Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328 (Fed. Cir. 2017) .................................. 62

*Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ........................ 56

*Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) ............... 42, 44

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................... 62

*Nucor Corp. v. United States*, 675 F. Supp. 2d 1340 (Ct. Int'l Trade 2010) ............................. 42

*Oregon v. United States*, No. 26-01472-3JP, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026) ....................................................................... 59

*PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004) ........................................... 61

*Qingdao Taifa Grp. Co. v. United States,* 581 F.3d 1375 (Fed. Cir. 2009) ............................... 62

*Reno v. Flores*, 507 U.S. 292 (1993) .................................................................... 33

*Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011) .................................. 62

*Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ..................... 62

*Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168 (2025) ................................. 24

*SmithKline Beecham Corp. v. Apotex*, 439 F.3d 1312 (Fed. Cir. 2006) .................................... 62

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024) .......... 58

*Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) .......... 51

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .......... 60

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) .......... *passim*

*Trump v. Hawaii*, 585 U.S. 667 (2018) .......... 33, 52

*Trump v. Orr*, 146 S. Ct. 44 (2025) .......... 6, 20, 46, 47

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) .......... 34

*United States v. Texas*, 599 U.S. 670 (2023) .......... 57

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir.) .......... 60, 61

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519 (1978) .......... 4, 29

*W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991) .......... 4

*West Va. v. EPA*, 597 U.S. 697 (2022) .......... 5, 34

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222 (Ct. Int'l Trade 1993) .......... 44

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) .......... 55, 56

**STATUTES**

5 U.S.C. § 551 .......... 25

5 U.S.C. § 555 .......... 29

5 U.S.C. § 703 .......... 57

5 U.S.C. § 706 .......... *passim*

19 U.S.C. § 1307 .......... 2, 6, 8, 63

19 U.S.C. § 1504 .......... 64

19 U.S.C. § 1514 .......... 64

19 U.S.C. § 1516a .......... 64

19 U.S.C. § 1675 .......... 64

19 U.S.C. § 2411 .......... *passim*

19 U.S.C. § 2412........................................................................................................ 8, 21, 36

19 U.S.C. § 2413.............................................................................................................. 21

19 U.S.C. § 2414........................................................................... 8, 10, 21, 22, 29, 36, 53

19 U.S.C. § 2417.................................................................................................... 32, 38

19 U.S.C § 4681............................................................................................................... 63

22 U.S.C. § 211a.............................................................................................................. 46

28 U.S.C. § 2640(e) ......................................................................................................... 19

Omnibus Trade and Competitiveness Act, Pub. L. 100-418, 102 Stat. 1164 (1988) ..................... 9

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125, 130 Stat. 239 (2016) .. 8

Uyghur Forced Labor Prevention Act (UFLPA), Pub. L. 117-78, 135 Stat. 1525 (2021) ....... 8, 63

H.R. Rep. No. 100-40 (1987)..................................................................................... 10, 40

S. Rep. No. 100-71 (1987) ........................................................................................... 9, 48

**REGULATIONS**

15 C.F.R. § 2006.0 ........................................................................................................... 39

**ADMINISTRATIVE DECISIONS**

*Initiation of Section 301 Investigations of Digital Services Taxes*, 85 Fed. Reg. 34,709 (June 5, 2020). ............................................................................................................................. 26

*Initiation of Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 12,884 (Mar. 17, 2026).................... *passim*

*Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) ............................................................................................... *passim*

*Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Polices, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg 34,272 (June 5, 2026)......................................................... *passim*

*Notice of Determination and Action Pursuant to Section 301: Enforcement of U.S. WTO Rights in Large Civil Aircraft Dispute*, 84 Fed. Reg. 54,245 (Oct. 9, 2019). ..................................... 25

## RULES

USCIT R. 56.1. .......................................................................................................... 19, 54

## OTHER AUTHORITIES

Andres B. Schwarzenberg, Section 301 of the Trade Act of 1974: Origin, Evolution, and Use, Cong. Rsch. Serv., R46604 (Dec. 14, 2020)................................................................. 4, 25, 26

Samuel L. Bray, *Multiple Chancellors*, 131 Harv. L. Rev. 417 (2017)................................. 58-59

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE LISA W. WANG, JUDGE

| | | |
|---|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | ) | Court No. 1:26-cv-03555-3JP |

**DEFENDANT'S RESPONSE IN OPPOSITION TO RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.1 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record (MJAR) filed by seven plaintiffs. Pls. MJAR, Aug. 24, 2026, ECF No. 16. Plaintiffs challenge determinations by the U.S. Trade Representative (USTR) in Section 301 investigations related to the failures of 60 economies to impose and effectively enforce a forced labor import prohibition. USTR's determinations are rational and lawful. We respectfully request that the Court deny plaintiffs' motion and enter judgment in favor of the United States.

**INTRODUCTION**

For almost 100 years, the United States has prohibited the importation of goods produced with forced labor under a variety of authorities because our Nation maintains a public policy that forced labor is abhorrent, and goods produced using forced labor should not be tolerated or permitted to alter the conditions of competition in international trade. This is a moral and economic imperative.

There is universal international consensus regarding the necessity of eliminating all forms of forced labor. PR-6 at 9. Yet, the International Labor Organization (ILO) reports that the number of persons forced to work against their will has increased in recent years. PR-6 at 11-12;

PR-97 at 22-29. Under U.S. law, Section 307 of the Tariff Act of 1930 prohibits importation of goods that are mined, produced, or manufactured in whole or in part in any foreign country by "forced labor." 19 U.S.C. § 1307. The statute defines "forced labor" as "all work or service which is exacted from any person under menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily." *Id.* "Forced labor" also includes "indentured child labor." *Id.* Despite years of engagement by the United States, very few trading partners had even imposed a prohibition on the importation of forced labor goods (much less effectively enforced a prohibition) until now.

In Section 301 of the Trade Act of 1974, Congress authorized USTR to take all "appropriate and feasible action" authorized under the statute to obtain the elimination of *any* unreasonable or discriminatory act, policy, or practice that burdens or restricts U.S. commerce, including those related to unfair labor practices, because Congress wished to further empower the Executive Branch to prevent the scourge of forced labor from burdening or restricting U.S. commerce. *See* 19 U.S.C. § 2411(a), (b), (d)(3)(A); *see also id.* § 2411(d)(3)(B)(iii)(III).

In March 2026, USTR initiated 60 investigations into the acts, policies, and practices of 60 economies. PR-9. In announcing the investigations, USTR denounced the "scourge of forced labor" and observed that "[f]or too long, American workers and firms have been forced to compete against foreign producers who may have an artificial cost advantage" by using it. PR-8. USTR announced that the investigations would determine whether other governments had "taken sufficient steps to prohibit the importation of goods produced with forced labor" and the impact of "these abhorrent practices" on American workers and businesses. *Id.*

After the investigations, foreign country consultations, and a public comment process, USTR made findings regarding *each* of the 60 economies investigated. *See* 91 Fed. Reg. 34,272,

34,273 (June 5, 2026) (notice of determinations incorporating PR-6 by reference). Although Section 301 does not require a report, USTR issued a lengthy report determining that: (1) each of the 60 investigated economies had failed to impose and effectively enforce a forced labor import prohibition, PR-6 at 19-31; (2) each of these failures is an unreasonable act, policy, or practice, *id.* at 31-34; (3) each of these failures burdens or restricts U.S. commerce, *id.* at 34-58; and (4) action is appropriate to address each of these failures, *id.* at 58-79. USTR explained that the failures to impose and effectively enforce forced labor import prohibitions: (1) create unfair competition with U.S. exports; (2) create unfair competition within the U.S. market through forced labor products circumventing U.S. forced labor import prohibitions; and (3) displace fairly produced goods made by U.S. manufacturers. *See id.* at 34-58 (Section V); *see also id.* at 59-79 (incorporating Section V findings into discussion of individual economies). After considering additional public comments, and following the specific direction of the President, USTR imposed the challenged Section 301 tariffs as "appropriate" responsive actions for these failures. 91 Fed. Reg. 47,318, 47,321-28 (July 28, 2026).

The actions that USTR has taken at the direction of the President in this case are consistent with the text, object, and purpose of the Section 301 statute, as well as with the President's firm commitment to create a level playing field for U.S. workers, producers, and exporters by conditioning access to the U.S. market on concrete action to prohibit international trade in forced labor goods. The investigations and responsive actions under Section 301 are the culmination of decades of efforts by the U.S. Government to eradicate forced labor from international supply chains. USTR followed Section 301's "demanding procedural prerequisites" when taking those actions. *See Learning Resources, Inc. v. Trump*, 607 U.S. 229, 244 (2026) (opinion of Roberts, C.J.).

Plaintiffs, however, demand more. They take issue with each one of USTR's determinations and actions, from the substantive decisions to their paper form. Plaintiffs are wrong across the board.

*First*, plaintiffs argue that USTR exceeded his statutory authority when issuing notices, reports, and findings for 60 foreign economies in a single document, as opposed to five dozen. As plaintiffs see it, USTR should have proven that he took 60 separate actions by multiplying the paper trail. But that defies both law and common sense. It defies the law, because plaintiffs cannot point to anywhere in the statute that mandates their invented paperwork requirement. It takes more than what plaintiffs have shown to "overturn[] agency action because of a failure to employ procedures beyond those required by the statute." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). It defies not only common sense but historical practice. Under plaintiffs' theory, if USTR wanted to investigate a policy adopted by the European Union (EU), it would have to initiate 27 separate investigations into each member state even though each would have *the same exact* policy. The court's "role [is] to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 101 (1991). Plaintiffs' theory does the exact opposite. Thirty times since Section 301's enactment—including four times in 1975 and four times in 1976—has USTR investigated the EU (or the previous European Communities (EC) that included numerous European member states) as a whole. *See* Andres B. Schwarzenberg, Section 301 of the Trade Act of 1974: Origin, Evolution, and Use, at 1, Cong. Rsch. Serv., R46604 (Dec. 14, 2020), Appendix A at Table A-2 (listing 30 different Section 301 investigations of the EU or EC between 1975 and 2020). That longstanding and roughly contemporaneous historical practice confirms that USTR acted well within its discretion here. *See Loper Bright Enters v. Raimondo*, 603 U.S. 369, 386 (2024).

Plaintiffs stretch even farther, asking this Court to hold that the major-questions doctrine or nondelegation doctrine supports their gloss on Section 301. But the Federal Circuit held in *HMTX* that the major-questions and nondelegation doctrines were not implicated by Section 301. *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1254-55 (Fed. Cir. 2025). But the major-questions doctrine, under which courts are "reluctant to read into ambiguous statutory text [a] delegation claimed to be lurking there," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted), is inapplicable here because Section 301 is not ambiguous: it *expressly* authorizes USTR to take the actions that it did here. The nondelegation doctrine does not prohibit Congress from delegating to the Executive Branch the authority to impose duties under specific conditions, as Congress has done since the Founding. *See*, *e.g.*, *Cargo of Brig Aurora v. United States*, 7 Cranch 382 (1813); *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928).

*Second*, plaintiffs fare no better on their Administrative Procedure Act (APA) claims. Armed with arguments better suited for an academic forum than a challenge to agency action, plaintiffs contend that USTR wrongly determined that each economy's failure to impose and effectively enforce a forced labor import prohibition is an "act, policy, or practice of a foreign country [that] is unreasonable … and burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). But these are discretionary calls for USTR—not plaintiffs, and not this Court—to make. USTR's determinations on that score were reasonable and reasonably explained. Plaintiffs do not deny that allowing the importation of goods produced by forced labor is unreasonable—indeed, immoral—and burdens the commerce of economies that prohibit producing and importing forced labor goods. Nor do plaintiffs deny that the United States prohibits and effectively enforces its prohibition on importation of goods produced by forced

labor—and does so far more than any economy in the world. 19 U.S.C. § 1307. USTR is entirely within his discretion to acknowledge this reality.

Plaintiffs also argue that USTR acted arbitrarily and capriciously by implementing the actions the President specifically directed. Plaintiffs' position is squarely foreclosed by *Trump v. Orr*, 146 S. Ct. 44, 46 (2025), which rejected the idea that an agency acts "arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." USTR's decision to follow "the specific direction of the President" is not just reasonable; it is expressly required by Section 301. That cannot be arbitrary or capricious. Because USTR is legally bound to follow that Presidential direction in any event—plaintiffs cannot show "prejudicial error" under the APA either, 5 U.S.C. § 706.

*Third*, plaintiffs accuse the United States of acting pretextually, as if stray comments and speed of action can render a straightforward and well-explained tariffs into something nefarious. Plaintiffs cannot surmount the high bar against looking behind facially valid government action. Nor can they explain why the Trump Administration's consistent policy goals should somehow be held against it, let alone be called "pretext."

All these problems with plaintiffs' theories are exacerbated by the extraordinary relief they seek. Despite not having demonstrated standing to challenge *any* of the severable final actions at issue, plaintiffs ask this Court to enter a universal vacatur. That is improper. Remedies must be limited to the parties and to cases and controversies before the Court. At most, plaintiffs' claims—even if meritorious—would entitle them to remand without vacatur, not complete evisceration of the Trump Administration's attempt to eliminate the burden or restriction on U.S. commerce from the unreasonableness of not imposing and effectively enforcing a forced labor import prohibition.

USTR's determinations and actions are reasonable and reasonably explained. USTR followed Congress's enacted procedures in doing so. This Court should deny plaintiffs' motion and sustain USTR's determinations and actions.

## STATEMENT PURSUANT TO RULE 56.1

### I. The Administrative Determinations Under Review

The administrative determinations under review are USTR's final determinations and actions in Section 301 investigations into the failures of 60 economies to impose and effectively enforce a forced labor import prohibition. *Notice of Actions*, 91 Fed. Reg. 47,318 (July 28, 2026); *Notice of Determinations and Request for Comments*, 91 Fed. Reg 34,272 (June 5, 2026); *see also Initiation of Section 301 Investigations*, 91 Fed. Reg. 12,884 (Mar. 17, 2026).

### II. Statement of the Issues

1. Whether plaintiffs have adequately demonstrated standing as to any final action, let alone all of them.

2. Whether USTR made determinations that an act, policy, or practice of each investigated economy is unreasonable and burdens or restricts U.S. commerce such that action is appropriate.

3. Whether USTR articulated a rational connection between the actions taken and his factual determinations.

4. Whether plaintiffs' sprawling and unsupported request for universal vacatur of the tariffs as to all parties and nonparties should be denied.

## STATEMENT OF FACTS

### I. USTR's Discretionary Authority to Impose Duties Under Section 301(b)

For the past century, the policy of the United States has been to combat the use of forced labor in international trade. To effectuate this longstanding policy, Congress has authorized the Executive Branch to use a variety of tools.

Section 307 of the Tariff Act prohibits the importation of goods produced with forced labor. 19 U.S.C. § 1307. Congress has strengthened this forced labor import prohibition over the years. *E.g.*, Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125, § 910(a)(1), 130 Stat. 239 (2016); *see also* Uyghur Forced Labor Prevention Act (UFLPA), Pub. L. 117-78, § 1, 135 Stat. 1525 (2021). U.S. Customs and Border Protection (CBP) effectively enforces this forced labor import prohibition. In the solar sector alone, CBP has denied entry to about 2,000 shipments over the past four years valued at about $3.36 billion. PR-130. USTR also has required countries to prohibit the importation of forced labor goods in trade agreements such as the 2020 United States-Mexico-Canada Agreement, and Agreements on Reciprocal Trade (ARTs) concluded over the past year.

Sections 301(a) and (b) authorize, and sometimes require, USTR to respond to certain foreign trade practices, "subject to the specific direction, if any, of the President." 19 U.S.C. § 2411(a)-(b). Before taking action under Section 301, USTR is required to investigate and allow for public input. *Id.* §§ 2412-14. Of relevance here under Section 301(b), if upon investigation, USTR determines (1) that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce" and (2) that "action by the United States is appropriate," USTR "shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the

President may direct [USTR] to take under this subsection, to obtain the elimination of that act, policy, or practice." *Id.* § 2411(b)(1)-(2). USTR imposed the challenged tariffs pursuant to Section 301(b) ("Discretionary Action"), not Section 301(a) ("Mandatory Action"). 91 Fed. Reg. at 47,319-20.

Section 301(c) authorizes USTR to "impose duties or other import restrictions on the goods of, and, notwithstanding any other provision of law, fees or restrictions on the services of, such foreign country for such time as [USTR] determines appropriate." 19 U.S.C. § 2411(c)(1)(B). Congress directed that USTR "shall … give preference to the imposition of duties over the imposition of other import restrictions." *Id.* § 2411(c)(5)(A). Such duties may be imposed "against the foreign country … without regard to whether or not such goods or economic sector were involved in the act, policy, or practice that is the subject of such action." *Id.* § 2411(c)(3). Section 301(c) also authorizes USTR to "enter into binding agreements with such foreign country" to "eliminate, or phase out, the act, policy, or practice that is the subject of the action to be taken." *Id.* § 2411(c)(1)(D). The term "foreign country" includes "any foreign instrumentality." *Id.* § 2411(d)(7). Further, "[a]ny possession or territory of a foreign country that is administered separately for customs purposes shall be treated as a separate foreign country." *Id.*

In the 1980s, Congress was frustrated by previous Presidential inaction. S. Rep. No. 100-71, at 73-74 (1987) ("Too often U.S. Presidents have opted to do nothing in the face of provocative foreign trade barriers and trade-distorting practices."). Congress amended the Trade Act to enhance USTR's authority. Omnibus Trade and Competitiveness Act, Pub. L. 100-418, § 1301, 102 Stat. 1164-67 (1988). Congress broadly defined any trade practice as "unreasonable" if it is "unfair and inequitable," even if it is "not necessarily in violation of, or

inconsistent with, the international legal rights of the United States." 19 U.S.C. § 2411(d)(3)(A). Congress also enumerated a non-exhaustive list of "unreasonable" acts, policies, or practices as including, "but not limited to," any act, policy, or practice or combination of those that "constitutes a persistent pattern of conduct that … permits any form of forced or compulsory labor." *Id.* § 2411(d)(3)(B)(iii)(III). Consistent with this broad delegation of authority to redress all sorts of unreasonable trade practices, including those related to forced labor, Congress intended "that the United States exercise [S]ection 301 authority vigorously in pursuit of its international trade interests." H.R. Rep. No. 100-40, pt. 1, at 60-62 (1987).[1] Congress also requires that any responsive action be determined within 12 months of initiation. 19 U.S.C. § 2414(a)(2)(B).

Effective enforcement has been a work in progress. All free trade agreements since 1993 have included provisions either encouraging or requiring the exporting country to maintain a law prohibiting all domestic forms of forced labor, and to effectively enforce it. *See* PR-6 at 8 & n.26. But until recently, no Administration has taken action to address the insidious problem of how international trade permits and incentivizes forced labor in global supply chains and burdens U.S. commerce. Over the past year, the Trump Administration has negotiated ARTs that include commitments on forced labor import prohibitions. The Trump Administration has now taken the strongest step in this series of actions by initiating the 60 investigations at issue.

## II. USTR Initiates Section 301 Investigations Concerning Forced Labor Import Prohibitions

In March 2026, USTR initiated 60 investigations into the acts, policies, and practices of 60 economies. 91 Fed. Reg. at 12,885-86. Although forced labor import prohibitions and their

[1] The Department of Labor maintains a list of goods that it has reason to believe are produced by forced labor or child labor in violation of international standards (TVPRA List). *See* 22 U.S.C. § 7112(b)(2)(C).

effective enforcement are of global concern, the investigated economies collectively account for 99.4% of U.S. imports. PR-6 at 1. Announcing the investigations, USTR denounced the "scourge of forced labor" and observed that "[f]or too long, American workers and firms have been forced to compete against foreign producers who may have an artificial cost advantage" by using it. PR-8. USTR announced that the investigations would determine whether the investigated economies had "taken sufficient steps to prohibit the importation of goods produced with forced labor" and the impact of "these abhorrent practices" on American workers and businesses. *Id.*

The accompanying Federal Register notice announced the initiation of the investigations, invited public comments, and solicited requests to participate in public hearings. 91 Fed. Reg. at 12,884. USTR requested consultations with each of the 60 economies, seeking information about their legal authority to deny entry of goods made with forced labor, details about the enforcement of such laws, and other topics related to measures designed to prohibit the importation of goods made using forced labor. PR-71. Forty-six investigated economies agreed to government-to-government consultations; the balance either did not accept the invitation to confer with USTR or were otherwise unable to do so. *See* PR-6 at 4. USTR received over 450 comments and held a two-day hearing during which nearly 60 witnesses testified. *See* 91 Fed. Reg. at 34,273.

## III. USTR's Section 301(b) Actionability Determinations

After consultations with all willing economies under investigation and considering the comments and hearing testimony, USTR issued actionability determinations on June 2, 2026. 91 Fed. Reg 34,272; PR-6. USTR found, consistent with the ILO's assessment, that the use of forced labor in commerce was globally prevalent—leading to $63.9 billion in profits in 2024 alone—and worsening. PR-6 at 11-12. USTR also evaluated the effects of trade in goods made

with forced labor on the United States' export competitiveness. *Id.* at 12-13. USTR found that, because forced labor by its nature is not fairly compensated, it artificially lowers the costs of goods in international commerce compared to otherwise comparable goods that are not produced with forced labor. *Id.* USTR also found that costs are significantly lowered in economies that do not impose or enforce forced labor import prohibitions because those producers "do not have to undertake due diligence to ensure that their goods are produced free of forced labor inputs." *Id.* at 13. USTR cited a RAND Research Report that found that costs associated "with the UFLPA are equivalent to a 2.5 percent tariff on goods at risk of being produced with forced labor from China." *Id.* at 13-14. Testimony suggested that the compliance costs of ensuring that industries' supply chains were free of forced labor were "in the billions of dollars." *Id.* at 14. USTR found that American producers required to perform costly due diligence are at a substantial disadvantage compared to producers in economies without similar legal requirements. *Id.* at 13-15.

Based on available data, USTR found that economies with lower labor standards "can increase their competitiveness" which, in turn, causes other economies "to lower their standards to remain competitive" and "race to the bottom" undermining labor standards worldwide. PR-6 at 15-16. Relying on CBP enforcement statistics and independent reports, USTR found that goods produced with forced labor "permeate global supply chains." *Id.* at 16-17. The result, USTR found, was a distorted global market that rewards tolerating forced labor. *Id.* at 18-19.

USTR then examined the acts, policies, and practices of *each* of the 60 economies under investigation to determine whether each one had sufficient safeguards in place to address the problems posed to commerce by goods made through forced labor. *See* PR-6 at 25-31. USTR found that *each* of the 60 investigated economies either lacked a prohibition on the importation

of goods produced with forced labor—that is, "a legal measure that *forbids* bringing goods or other articles produced wholly or in party by forced labor from another economy into the domestic market for sale," *id.* at 20—or failed to adequately enforce prohibitions in place. *Id.* at 25-31. USTR found that 54 countries lacked forced labor import prohibitions altogether. *Id.* at 31. EU's forced labor import prohibition does not enter into application until December 2027. *Id.* at 28. Other countries with forced labor import prohibitions failed to effectively enforce them. Ecuador, Pakistan, and Indonesia recently enacted prohibitions but had not yet taken steps to enforce them. *Id.* at 28-30. USTR also noted that Pakistan's prohibition did not appear to define "forced labor." *Id.* at 30 n.120. Canada and Mexico—two countries with more established prohibitions—similarly failed to enforce them effectively. USTR observed that the Canadian government had denied entry to only two shipments in the prior six years based on forced labor concerns and had taken "minimal action to investigate" imports of goods with known risks of forced labor. *Id.* at 27. USTR also noted there was virtually no evidence that Mexico had taken any enforcement action to prohibit the importation of forced labor goods since Mexico's measure came into effect in 2023. *Id.* at 29.

By failing to impose and effectively enforce a forced labor import prohibition, USTR concluded that *each* of the 60 investigated economies "permits or creates an incentive" for international trade in goods made with forced labor, "penalize[s]" producers in economies that impose and effectively enforce a forced labor import prohibition, artificially lowers prices which undermine profitability of firms not using forced labor, and facilitates the circumvention of existing forced labor import prohibitions by clouding a product's true country of origin. PR-6 at 31-34. USTR found that the unreasonable acts, policies, and practices of *each* investigated economy burdened and restricted U.S. commerce by: incentivizing unfair competition in their

markets; permitting unfair competition in American markets by commingling forced labor and non-forced labor goods, allowing forced labor goods to be used in downstream products and permitting transit of forced labor goods; and permitting fairly produced goods to be displaced, adversely affecting American producers. *Id.* at 34-55. USTR's report surveyed the evidence collected in the investigations to support his conclusions that each investigated economy's unreasonable acts, policies, or practices burdened or restricted U.S. commerce. *Id.* at 56-58.

Specifically, hearing testimony and public comments addressed the burden or restriction on U.S. commerce resulting from the failure to impose and effectively enforce a forced labor import prohibition, showing that: (1) forced labor goods distort markets or compete at an unfair competitive advantage, such as by artificially lowering wages or suppressing prices; (2) competition from forced labor goods leads to lower U.S. export volumes; (3) forced labor goods circumvent Section 307 of the Tariff Act through third economies, affecting competition in the U.S. market; (4) competition from forced labor goods results in investments being curtailed; (5) the loss of U.S. production to forced labor goods can be permanent; and (6) firms spend significant sums of money to ensure they comply with Section 307 of the Tariff Act. PR-6 at 56-58 & n.199-205 (extensively citing and summarizing witness testimony and written comments).

Accordingly, USTR announced that each investigated economy's acts, policies, and practices were actionable under Section 301(b) of the Trade Act and proposed to impose *ad valorem* duties on all products from each economy depending on the investigation findings, subject to certain exceptions. 91 Fed. Reg. at 34,274. Specifically, USTR proposed a 10% duty for certain economies that impose a forced labor import prohibition, have taken on commitments related to forced labor import prohibitions through an ART, or had imposed a partial regime with

the effect of preventing the importation of certain forced labor goods. *Id*. For all other economies under investigation, USTR proposed an *ad valorem* duty of 12.5%. *Id.*

After issuing the actionability determinations, USTR received and considered over 1,600 comments and heard three days of testimony. 91 Fed. Reg. at 47,319. Thereafter, USTR consulted with the President, who, in turn, directed him to take certain actions.

## IV. The President's Direction

After "considering the relevant issues and factors and weighing the relevant considerations," the President directed USTR to take several steps. PR-764. First, the President instructed that USTR "shall" impose: a 10% tariff on certain economies that had imposed a forced labor import prohibition but had not effectively enforced it, signed an ART, or imposed a partial regime; a 10% or 12.5% tariff net of the Most-Favored Nation (MFN) rate for certain other economies,[2] consistent with ARTs or similar arrangements; a 12.5% tariff on certain economies that have no forced labor import prohibition; certain tariff-rate quotas (TRQs) to apply when feasible; and certain exemptions that apply to the imposed tariffs. *Id.* at 4-7. The President stated that he had "considered alternatives" to the selected responsive actions including lower tariff rates; additional or fewer exemptions; and other options including combinations of approaches. *Id.* at 8. The President "determine[d] that alternatives" to the tariffs and TRQs "would be less effective and less preferable" and, in his "judgment," the tariffs and TRQs were "more appropriate" to "obtain the elimination" of the economies' unreasonable policies and practices. *Id.*

Finally, the President made clear that, if any individual investigation were held invalid, the remainder of the investigations "shall not be affected." PR-764 at 8-9. Each action was

[2] MFN generally refers to a status conferred by a clause in which a country promises that it will treat another country as well as it treats any other country.

taken "separately from every other and imposed for the distinct purpose of obtaining the elimination of the specific economy's act, policy, or practice found actionable under section 301." *Id.* at 9. Reiterating that point, the President stated that each action was to obtain the elimination of the "specific economy's" unreasonable act, policy, or practice, "and not for any other purpose." *Id.*

**V. USTR's Final Actions**

In July 2026, and as specifically directed by the President, USTR took final actions in the investigations. 91 Fed. Reg. at 47,318-28. In addition to the comments considered and addressed previously during the actionability determinations phase, USTR further addressed at great length numerous comments regarding the chosen tariff rates, proposed alternatives, and the products excluded from the tariffs, among other topics. *Id.* at 47,328-35. In addition to providing reasoned responses to those comments, USTR noted that many of the comments suggested actions that would be "inconsistent with the specific direction of the President" and therefore could not be accommodated. *See id.* at 47,329, 47,330, 47,334.

**SUMMARY OF ARGUMENT**

Plaintiffs do not challenge USTR's authority under Section 301 to investigate unreasonable trade practices of foreign countries and to impose tariffs to eliminate unreasonable trade practices. Plaintiffs also do not seriously question that the 60 investigated economies have failed to impose and effectively enforce forced labor import prohibitions. Rather, plaintiffs argue that USTR was required to make certain actionability findings under Section 301(b)—in particular, (1) that an act, policy, or practice of a foreign country is "unreasonable or discriminatory" and "burdens or restricts" U.S. commerce, and (2) that action "is appropriate"—with respect to *each* of the investigated economies. USTR did exactly that. 91 Fed. Reg. at 34,273 (notice of determinations, incorporating PR-6 by reference); PR-6 at 19-31 (making

separate findings regarding each of the 60 investigated economies determining that each one failed to impose and effectively enforce a forced labor import prohibition); *id.* at 31-34 (determining "that the acts, policies, and practices of *each of the investigated economies* related to the failure to impose and effectively enforce a forced labor import prohibition are unreasonable") (emphasis added); *id.* at 34-58 (determining that "the failure of *each of the 60 economies subject to these investigations* to impose and effectively enforce a forced labor import prohibition burdens or restricts U.S. commerce") (emphasis added); 91 Fed. Reg. at 47,321-28 (separate determinations with respect to each of the 60 investigated economies that action by the United States is appropriate). To the extent that plaintiffs argue that Section 301 required USTR to express the same reasons supporting each determination 60 times over, rather than succinctly articulate the determinations with respect to "each of the 60 investigated economies," plaintiffs elevate form over substance, and their argument finds no support in the statute.

Plaintiffs also incorrectly argue that USTR's determinations are arbitrary and capricious. In all respects, USTR articulated a rational connection between the actionability determinations that he made and the extensive record of evidence, testimony, and analysis in the investigations. Plaintiffs' arguments to the contrary mischaracterize the record and second-guess USTR's detailed findings and explanations. But it is not for the Court to re-weigh the record evidence or to demand exacting proof that far exceeds what Section 301 or the APA requires. The Court should decline plaintiffs' invitation to invent requirements that Congress did not impose.

Plaintiffs' last argument asks the Court to ignore that agency record altogether because, they contend, USTR's actions are just a pretext for imposing tariffs for a second time under the International Emergency Economic Powers Act (IEEPA). This argument is baseless. Plaintiffs concede that the imposed tariffs differ from those imposed under IEEPA. *Compare* Pls. MJAR

6, *with id.* at 12-13. In any event, it should come as no surprise that the Section 301 actions at issue in this case are consistent with the Trump Administration's trade policies and priorities. Public statements made by various officials saying so do not vitiate the contemporaneously documented rationale for USTR's actions to address the scourge of unreasonable and widespread trade practices relating to forced labor import prohibitions. Furthermore, the Section 301 tariffs at issue differ significantly from the IEEPA tariffs in terms of the scope of the economies covered, the tariff rates applied, product exemptions, and the TRQ mechanism.

Plaintiffs also request staggeringly overbroad relief. At most, remand without vacatur would be the appropriate course should the Court agree with any of plaintiffs' APA arguments about USTR's factual determinations. But even if the Court were to consider vacatur, the *universal* vacatur requested by plaintiffs (applicable to countless nonparties worldwide and imports from 60 economies) is the equivalent of an improper universal injunction and is unauthorized by the APA.

Any relief should be narrowly tailored to any parties who demonstrate that they possess standing. Plaintiffs have not yet demonstrated that they possess standing to challenge *any* of the final actions, much less *all* of them. Even if plaintiffs were to prove the allegation that they import merchandise subject to some final actions, each final action is severable from one another. Should plaintiffs demonstrate standing as to any final actions, and should any relief be necessary, it would be sufficient for the Court to order that plaintiffs' entries of merchandise from specific economies be liquidated in due course without regard for the tariffs imposed by the final actions that cover those economies.

## ARGUMENT

### I. Standard of Review

This Court decides a Rule 56.1 motion "solely on the basis of the record made before an agency" and may grant judgment in favor of the nonmovant. USCIT R. 56.1.

Plaintiffs' challenges are to USTR's actions pursuant to congressionally delegated authority. For those, the applicable standard of review is established by the APA. *HMTX*, 156 F.4th at 1249-50; 28 U.S.C. § 2640(e). Under the APA, the Court analyzes whether agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (cleaned up). That is "the most deferential of the APA standards of review," under which a court "analyzes only whether a rational connection exists between the agency's factfindings and its ultimate action." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). The Court "affords substantial deference to decisions of [USTR] implicating the discretionary authority of the President in matters of foreign relations." *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (citation omitted).

Although plaintiffs suggest that the substantial evidence standard applies, Pls. MJAR 17, 32, 51, that standard applies only to formal agency proceedings, 5 U.S.C. § 706(2)(E), not to USTR's informal rulemakings at issue. The "more lenient" arbitrary-and-capricious standard applies here. *Gartside*, 203 F.3d at 1312 (quoting *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 412-13 n.7 (1983)). As a practical matter, a plaintiff is unlikely "to prevail in arguing that [an agency] acted arbitrarily and capriciously by declining to depart from

Presidential [direction] that Congress expressly required [the agency] to follow." *Orr*, 146 S. Ct. at 46 (citation omitted).

## II. Plaintiffs Have Not Demonstrated Article III Standing

Plaintiffs have not established that they possess standing to bring their claims. To be sure, Plaintiffs *allege* that they import merchandise from seven of the investigated economies (China, Taiwan, South Korea, Vietnam, Thailand, India, and Mexico). *See* Pls. Compl. ¶¶ 8, 9, *Learning Resources v. United States*, Court No. 26-03347 (July 24, 2026) ECF No. 4. But "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof" at successive stages of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs, who bear the burden of establishing federal jurisdiction, are seeking a judgment, where mere allegations are insufficient. *See Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008) ("Allegations alone may suffice to establish standing at the pleading stage, but must be supported with evidence at later stages of the litigation.") (citing *Lujan*, 504 U.S. at 561); *see also Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2017) ("[I]t is well-settled that arguments made by counsel are not evidence") (citing *Gemtron Corp. v. Saint-Grobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009)). Yet plaintiffs did not submit any evidence—not even a declaration—to establish that they in fact import goods from those seven countries. Accordingly, they have not established standing consistent with the requisite burden of proof, and this Court should dismiss for lack of jurisdiction.

## III. Section 301(b) Authorizes The Challenged Tariffs

USTR complied with Section 301's procedures when determining that 60 economies had unreasonable acts, policies, or practices that burden or restrict U.S. commerce, and lawfully imposing import duties in response. Plaintiffs fail to show otherwise.

### A. USTR Complied With The Statutory Scheme

Section 301 imposes certain "procedural prerequisites," including an "investigation by [USTR]," "consultation with relevant country and interested parties," and "publication of findings." *Learning Resources*, 607 U.S. at 244. USTR adhered to each one.

Before initiating an investigation, USTR must "consult with appropriate committees." 19 U.S.C. § 2412(b)(1)(B). USTR did that when he consulted with the appropriate advisory committees as well as the inter-agency Section 301 Committee. 91 Fed. Reg. at 12,885. A determination to initiate an investigation also must be published in the Federal Register. 19 U.S.C. § 2412(b)(1)(A). USTR did that as well. 91 Fed. Reg. at 12,884. Next, USTR must "request consultations with the foreign countr[ies]" that are the subjects of investigations. 19 U.S.C. § 2413(a)(1). Again, USTR complied. *See* PR-12-70. USTR invited all 60 investigated economies to participate in consultations: 46 of these economies accepted invitations and participated in bilateral consultations, the rest did not. PR-6 at 4.

Further, consistent with 19 U.S.C. § 2414(b)(1), USTR published in the Federal Register a notice of an opportunity for interested persons to present their views at a public hearing, *see* 91 Fed. Reg. at 12,885-86. USTR held two days of hearings and nearly 60 witnesses provided testimony. PR-261, PR-262. USTR also consulted with the appropriate committees regarding the probable impacts on the U.S. economy from taking action. PR-202, PR-206; *see also* 19 U.S.C. § 2414(b)(1)(B). Following the investigations and consultations with the appropriate committees and interested members of the public, USTR issued his actionability determinations that each economy's failure to impose and effectively enforce a forced labor import prohibition is unreasonable for four distinct reasons. PR-6 at 31-33; *see also* 19 U.S.C. § 2414(a)(1)(A)(ii). USTR further found that 54 investigated economies failed to impose a forced labor import prohibition and that the remaining six investigated economies failed to effectively enforce their

forced labor prohibitions. PR-6 at 20-31. Finally, USTR found that, as to "each" economy, the failure to impose and effectively enforce a forced-labor import prohibition burdened or restricted U.S. commerce in three distinct ways. *Id.* at 34-55.

USTR next considered whether action under Section 301(b) would be appropriate and proposed actions that would be appropriate and feasible. Consistent with 19 U.S.C. § 2414(b)(1), USTR published proposed actions in the Federal Register, invited written comments from the public, and provided interested members of the public an opportunity to provide oral comments at public hearings. 91 Fed. Reg. at 34,274-76. USTR held three days of hearings and over 100 interested persons testified. PR-905-907. Finally, USTR consulted with the President. *See* PR-764 at 3-4.

The President provided USTR with specific direction on what actions were appropriate under Section 301 to obtain the elimination of each investigated economy's acts, policies, and practices, PR-764—just as the statute authorized, 19 U.S.C. § 2411(b)(2). The President's direction set out, in great detail, the investigated economies to which tariffs should be applied, the products of that investigated economy to which tariffs should be applied, and the tariff rate to apply to each product subject to tariffs. PR-764. Given the specific direction of the President and Section 301's command to follow the specific direction of the President, and in light of the serious acts, policies, and practices of the investigated economies, USTR published its final actions imposing import duties on merchandise from each of the investigated economies as directed by the President. 91 Fed. Reg. at 47,318. Thus, USTR faithfully and timely complied with the procedures prescribed by Congress for Section 301(b) investigations and actions.

### B. Plaintiffs' Strained Arguments Are Inconsistent With The Statute, The Record, And The Highly Discretionary Nature Of The Findings At Issue

USTR's actions were by Section 301's book. Nonetheless, plaintiffs take issue with his actions on both procedural and substantive grounds. Pls. MJAR 19-31. Each of plaintiffs' objections are either wrong, irrelevant, or an attempt to substitute their own judgment for that of USTR. Whether considered under the heading of plaintiffs' statutory arguments or as part of plaintiffs' APA challenge, they cannot succeed.

**1.** The central refrain of plaintiffs' motion is that USTR failed to make statutory findings regarding whether there was an "unreasonable" trade practice that "burdened or restricted" U.S. commerce and whether action is "appropriate" for *each* economy. Plaintiffs are wrong: USTR made findings regarding *each* of the 60 economies investigated. 91 Fed. Reg. 34,272, 34,273 (June 5, 2026) (notice of determinations incorporating PR-6 by reference); PR-6 at 19-31 (making 60 separate findings that each investigated economy failed to impose and effectively enforce a forced labor import prohibition); *id.* at 31-34 (determining "that the acts, policies, and practices of each of the investigated economies … are unreasonable"); *id.* at 34-58 (determining that "the failure of each of the 60 economies … burdens or restricts U.S. commerce"); 91 Fed. Reg. 47,318, 47,321-28 (60 separate determinations regarding appropriate action); *see also In re Cree, Inc.*, 818 F.3d 694, 698 n.2 (Fed. Cir. 2016) (incorporating findings by reference is proper under the APA).

Plaintiffs also fault USTR for repeating the same language for economies with the same deficiencies and contend that the use of the singular phrase "a foreign country" in Section 301 requires a repetitive—and magnitudes larger—agency publication. Pls. MJAR 2, 18, 20, 41. But there is no formalistic requirement that USTR redundantly articulate findings differently for each economy when the findings were consistent with a widespread practice of failing to impose and

effectively enforce forced labor import prohibitions. That Plaintiffs "[m]ere[ly] disagree with" USTR's conclusions with respect to each economy or a particular one "is not a basis for the court to overturn them." *See In re Section 301 Cases*, 628 F. Supp. 3d 1235, 1248 (Ct. Int'l Trade 2023), *aff'd sub nom. HMTX v. United States*, 156 F.4th 1236 (Fed. Cir. 2025).

Plaintiffs insist that USTR should have been more verbose in his findings. But "courts should not insist on length as a prerequisite"—rather, a "relatively brief agency explanation" is sufficient so long as it is rational. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 181 (2025). Plaintiffs' subjective criticisms about the form of USTR's findings as to each economy are insufficient under the arbitrary and capricious standard of review—and nowhere do they point to any *statutory* reason to require a more searching standard. The straightforward nature of the investigated acts, policies, and practices—whether an economy imposes and effectively enforces a legal prohibition on the importation of forced-labor goods—lends itself to an equally straightforward determination. In other words, it does not require a lengthy treatise to observe whether an economy has legal prohibition on importing forced-labor goods or to articulate an economy's failure to effectively enforce such a ban. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (absent statutory mandate, an agency need not "conduct its own empirical or statistical studies before exercising its discretion"). Notably, plaintiffs do not dispute any of USTR's ultimate determinations that 54 economies did not impose a forced labor import prohibition and that 6 economies failed to effectively enforce their prohibitions.

To the extent that plaintiffs argue that USTR violated Section 301 by taking a single action rather than 60, they are mistaken. It has always been made clear that "[e]ach tariff action … is separate from every other and imposed for the distinct purpose of obtaining the elimination of the specific economy's act, policy, or practice found actionable under section 301." PR-764 at

9. It is irrelevant that each of USTR's determinations and actions were published in the same documents because a single document can obviously contain more than one agency action. Under the APA, "'agency action' includes the whole *or a part* of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) (emphasis added). Contrary to plaintiffs' contention—agencies "enjoy[] broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities." *Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 214 (1991) (citations omitted). The Supreme Court rejected an argument similar to plaintiffs' in *Department of Commerce v. New York*, 588 U.S. 752 (2019), where the Court held that an agency did not violate a statute requiring two reports by submitting all of the information in a single document. *Id.* at 780 ("Nothing in [the statute] suggests that the same report cannot simultaneously fulfill the requirements of paragraphs (2) and (3)."). Here, too, plaintiffs identify no statutory text requiring USTR to make findings about 60 economies in 60 separate documents rather than in one.

Indeed, past investigations conducted under Section 301 have looked at multiple countries in parallel. *See* Andres B. Schwarzenberg, Section 301 of the Trade Act of 1974, Appendix A (listing 130 different Section 301 investigations between 1975 and 2020). Specifically, as noted, USTR has conducted 30 investigations concerning the EU or EC over the years. *Id.* at Appendix A at Table A-2. For example, in 2019, USTR imposed duties on all EU member countries following an investigation regarding large civil aircraft. *See Notice of Determination and Action Pursuant to Section 301: Enforcement of U.S. WTO Rights in Large Civil Aircraft Dispute*, 84 Fed. Reg. 54,245 (Oct. 9, 2019). No rule of law or logic required USTR to multiply these. Likewise, recent investigations have focused on digital services taxes

in 10 economies. *See Initiation of Section 301 Investigations of Digital Services Taxes*, 85 Fed. Reg. 34,709 (June 5, 2020). Plaintiffs fail to make any argument that would contravene a well-established practice of USTR investigating multiple countries in parallel that dates back to shortly after the Trade Act of 1974 was passed. *See* Schwarzenberg, Section 301 of the Trade Act of 1974, Appendix A (showing several multiple country investigations in the 1970s).

Here, USTR also looked at multiple economies in parallel and made the necessary determinations for each one. USTR found that *each* investigated economy had an unreasonable trade practice. He made separate findings regarding each of the 60 investigated economies, determined that each one failed to impose and effectively enforce a forced labor import prohibition, PR-6 at 19-31, and then determined "that the acts, policies, and practices of *each of the investigated economies* related to the failure to impose and effectively enforce a forced labor import prohibition are unreasonable," *id.* at 31-34; *see also* 91 Fed. Reg. at 34,273 (final determinations incorporating PR-6 by reference). He determined that *each* of the 60 investigated economies' practices burdened or restricted U.S. commerce—in particular, that: (1) the lack of an import prohibition in "*each economy*" meant that there was unfair competition from an "increased availability of such goods in its market," meaning "U.S. exports compete under unfair market conditions"; (2) "*each economy* permits forced labor goods" to be transited through its market and commingled with legitimate goods or used in manufacturing, resulting in those goods "undermining sales of legitimately produced goods in the United States" and adversely impacting U.S. producers; and (3) "*each economy*" permits forced-labor goods to displace domestically produced goods, leading legitimate producers to seek to export their goods to the less-distorted market in the United States, whose producers therefore suffer unfairly increased competition. PR-6 at 34-35 (emphases added). He determined that action was appropriate for

*each* of those economies. 91 Fed. Reg. at 47,320 ("Considering the public comments and testimony and the advice of the Section 301 Committee, as well as the advice of advisory committees, and pursuant to Sections 301(b) and 304(a) of the Trade Act, [USTR] has determined that action is appropriate in each investigation."). That is completely in line with both statute and past practice.

**2.** Without their 60-separate-documents theory, plaintiffs are left arguing that USTR "failed to make the fact-based, country-specific determinations that Section 301 demands." Pls. MJAR 24. According to plaintiffs, USTR violated Section 301 by failing to make the requisite factual findings to determine that a particular practice "burdens U.S. commerce," is "unreasonable," or justifies "appropriate" action. *Id.* at 23-32. Their objections include that USTR used case studies, or that USTR should have had more variance in the amount of tariffs imposed. *E.g.*, *id.* at 24-26, 30.

Plaintiffs are incorrect to frame those arguments as involving USTR's statutory authority under Section 301. As challenges to whether USTR made the right determination based on the facts before it, they are appropriately considered under APA arbitrary-and-capricious review. Plaintiffs' nitpicking scrutiny finds no basis in Section 301(b)'s "general" language itself, which instead demonstrates "that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements" to USTR. *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024). Under Section 301, it is USTR who must "determine[]" whether an act, policy, or practice is "unreasonable" (that is, "otherwise unfair and inequitable," even if "not necessarily" in violation of the United States' international legal rights), whether it "burdens or restricts United States commerce," and whether "action" is "appropriate." 19 U.S.C. § 2411; *see also Loper Bright*, 603 U.S. at 395 (terms such

as "appropriate" and "reasonable" "leave[] agencies with flexibility"). That "broad statutory mandate" gives USTR "broad discretion" in determining whether a practice is *unreasonable*, whether a *burden* exists, and whether action is *appropriate*. *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1372 (Fed. Cir. 1999). To the extent plaintiffs argue over whether there is a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), the relevant statute is the APA, not Section 301, and those arguments are addressed later in this brief.

Section 301 provides no basis for plaintiffs to disparage USTR's careful and detailed findings of a burden or restriction on U.S. commerce, the unreasonableness of a particular economy's practices, or whether and what action is appropriate.

***Burden and Appropriate Action.*** Plaintiffs argue that USTR violated Section 301 by not quantifying the burden each economy's practice had on U.S. commerce. That failure, says plaintiffs, also means that USTR did not connect the tariff rates to each economy's practice when determining appropriate action. Pls. MJAR 24-27, 29-32. But Section 301 provides no basis for requiring USTR to do *either* of those things. Plaintiffs confuse *mandatory* action under Section 301(a) with *discretionary* action under Section 301(b). While Section 301(a) requires U.S. actions to "affect goods or services of [a] foreign country in an amount that is equivalent in value to the burden or restriction" on U.S. commerce, Section 301(b) is silent on the matter, and thus discretionary actions "are not subject to the same restriction." *HMTX*, 156 F.4th at 1243 (quoting 19 U.S.C. § 2411(a)(3)). Without that restriction, the term "appropriate" leaves USTR with significant "flexibility." *Loper Bright*, 603 U.S. at 395.

Nor is there any reason to infer a new and highly onerous statutory requirement to minutely quantify burdens on U.S. commerce when Section 301(b) says only that a "burden or

restriction" must exist. 19 U.S.C. § 2411(b); *see also JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (declining to interpret a statute in a way that "would create a tremendous burden on [the agency] that is not required or suggested by the statute."). The procedural requirements Congress imposes on an agency are a ceiling, not a floor, and courts are not free to add to them. *Vermont Yankee Nuclear Power*, 435 U.S. at 524. Section 301 is no exception to that rule against judicial invention. Plaintiffs' related argument that USTR should have even further quantified "particular" burdens from the acts, policies, or practices of "particular investigated econom[ies]" similarly falls flat. Pls. MJAR 27. USTR found that each of the 60 economies that failed to impose and effectively enforce a forced labor import prohibition would—as a matter of basic economics, data, case studies, and common sense, *see infra* at 38-45"burden or restrict" U.S. commerce. Section 301 requires nothing more.

Plaintiffs' argument that USTR's determinations as to appropriateness were too "generic" is similarly unavailing. *See* Pls. MJAR 30. Nothing in Section 301 requires a particular level of specificity. Neither does the APA. USTR need provide only a "brief statement" of reasons for his decisions, *see* 5 U.S.C. § 555(e), and a "description of the facts" on which they were based, *see* 19 U.S.C. § 2414(c). This is a "minimal" requirement, *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and an agency decision must "minimally contain a rational connection between the facts found and the choice made," *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997); *see also McKinney v. Sec'y of Veterans Affairs*, 164 F.4th 884, 890 (Fed. Cir. 2026) (same). USTR made all required determinations under Section 301(b) and, as demonstrated below, its cogently and copiously explained decisions readily clear that low bar.

In the end, USTR did exactly what the statute requires. Under Section 301, USTR must "determine[] … that" a foreign country's unreasonable act, policy, or practice "burdens or

restricts" U.S. commerce. 19 U.S.C. § 2411(b)(1). He did so. *See supra* at 13-14. Plaintiffs belittle that effort as "snippets," Pls. MJAR 24, but they disregard the 20 pages of meticulously footnoted explanations that immediately follow, *see* PR-6 at 35-55 (expounding on why the absence of an enforced prohibition on forced labor imports in *each economy* burdens or restricts U.S. commerce in three ways).

Contrary to plaintiffs' arguments, USTR *did* determine whether action was appropriate and, if so, the "appropriate and feasible action" he would take. 19 U.S.C. § 2411(b)(2). The record shows that USTR determined that action was appropriate in each investigation. 91 Fed. Reg. at 47,320. USTR, at the President's specific direction, made individualized determinations as to the *action* taken in each investigation as well. He did so in a section captioned: "*Specific Determinations* of Action in *Each* Investigation." 91 Fed. Reg. at 47,321-28 (emphases added). Each determination was tied to the factual findings made during the investigation. Indeed, the adjustments made to the proposed actions leave no question that the final actions were based on those facts. While USTR initially proposed a rate of 12.5% for certain economies (Cambodia, Guatemala, Honduras, India, Jordan, Sri Lanka, and Trinidad and Tobago), he ultimately adjusted the rate to 10% to recognize that, in the interim, those economies had imposed or taken steps towards imposing a forced labor import prohibition. *Compare*, 91 Fed. Reg. at 34,274 *with*, 91 Fed. Reg. at 47,329 (explaining that, as those economies' changes demonstrated, the 2.5% difference is sufficient to encourage economies to take steps towards imposing a forced-labor import prohibition).

***Unreasonableness.*** Plaintiffs also contend that USTR's determinations are deficient because he did not determine that the economies' practices were inconsistent with their level of economic development. Pls. MJAR 29 (citing 19 U.S.C. § 2411(d)(3)(C)). Rather than identify

a statutory violation, plaintiffs misread Section 301 entirely. Section 301 makes level of economic development relevant only for practices "described in subparagraph (B)(iii)." 19 U.S.C. § 2411(d)(3)(C)(i)(II). But USTR never found any of the 60 economies in these actions to have engaged in such practices. USTR relied on the more general definition of "unreasonable" in section 2411(d)(3)(A), not one of the non-exhaustive examples in section 2411(d)(3)(B)(iii). PR-6 at 1-3. That subsection (B)(iii) practices might be excused based on level of economic development is simply irrelevant here, where USTR made no finding that a (B)(iii) practice exists.

Plaintiffs also fault USTR for asking whether the economy had an "express" prohibition on forced labor imports. Pls. MJAR 27. Instead, say plaintiffs, USTR's "standard" should have been a more ethereal one: whether the economy "effectively prohibits trade in forced labor goods." *Id.* But there is no warrant for imposing plaintiffs' own view of what is "unreasonable" on USTR. Terms such as "reasonable" are designed to "leave[] agencies with flexibility." *Loper Bright*, 603 U.S. at 395. USTR does not violate Section 301 by exercising the discretion Congress granted him.

To the extent that plaintiffs point to certain economies arguing that they do in fact effectively prohibit forced labor imports without a separate specific ban, plaintiffs' arguments still fail. Even jumping ahead to APA review, this Court's role is limited to ensuring that an agency's decision is both "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423. Here, Congress delegated the task of determining what practices were "unreasonable" to USTR, not to plaintiffs, and USTR reasonably exercised that discretion by focusing on whether each economy legally forbids the importation of forced-labor goods, not whether an economy supposedly "effectively" banned them by a more subjective metric. As evidenced by the record,

USTR also reviewed and considered whether any economy prohibited trade in forced labor goods by other measures. PR-6 at 61, 64 (Brazil and Egypt); PR 71 (consultation questions 1-3, 5); *see also* PR-6 at 30. Plaintiffs' mere disagreement on this point is irrelevant to whether USTR made rational determinations. Regardless, plaintiffs do not argue, much less demonstrate, that they import merchandise from an economy that effectively imposes a forced labor import prohibition notwithstanding the absence of an express prohibition.

**C. The Major-Questions And Nondelegation Doctrines Are Not Implicated**

Plaintiffs invoke the major-questions and nondelegation doctrines at the end of their argument that Section 301(b)(1) requires findings with respect to each investigated country. Pls. MJAR 22-23. In particular, they claim that the major-questions doctrine requires a "clear congressional authorization" for USTR to "impose a global tariff regime *without* making the country-specific findings," and that "*dispens[ing]* with country-specific findings," would raise nondelegation concerns. *See* Pls. MJAR 22-23 (emphasis added). These arguments are irrelevant because USTR *did* make country-specific findings as demonstrated above. These arguments also have an incorrect premise: USTR's actions do not constitute a "global tariff regime," as the tariffs cover only certain products from 60 investigated economies, not all products from nearly 200 countries in the world.

Above all, those arguments are legally foreclosed by the Federal Circuit's recent decision in *HMTX*. In that case, the court of appeals considered whether Section 307—which authorizes USTR to "modify or terminate" any Section 301(b) action that "is no longer appropriate," 19 U.S.C. § 2417(a)(1)(C)—violates the nondelegation doctrine. 156 F.4th at 1254. The court held that it did not because Section 307 does not place "fewer boundaries on USTR's authority than Section 301(b) itself." *Id.* The court denied that Section 307 "implicate[s] the major questions

doctrine" for "similar reasons." *Id.* Section 307 merely permitted modification of an "unchallenged and statutorily permissible original action" under Section 301(b). *Id.* at 1255.

In short, *HMTX* held just last year that Section 307 could not violate the nondelegation doctrine or implicate the major-questions doctrine because *Section 301* does neither. Plaintiffs' silence on that score—relegating *HMTX* to a footnote in the discussion, and ironically to show that Section 307 contains the discretion which plaintiffs argue Section 301 lacks, Pls. MJAR 22—is deafening. *HMTX*'s square holding sounds the death knell for plaintiffs' invocation of the doctrine of constitutional avoidance, which comes into play only "to avoid *serious* constitutional doubts." *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993). *HMTX* shows there are none.

Even were this Court to find that *HMTX* does not control, it should reach the same conclusion. To begin, the major-questions doctrine does not apply to Section 301 because it is a statute that "is intimately involved with foreign affairs"—that is, "an area in which congressional authorizations of presidential power should be given a broad construction."[3] *See Florsheim Shoe Co. v. United States*, 744 F.2d 787, 792-93 (Fed. Cir. 1984); *accord Trump v. Hawaii*, 585 U.S. 667, 686 (2018). To the extent the major-questions doctrine is a proxy for congressional intent, "the usual understanding is that Congress intends to give the President substantial authority and flexibility" in the foreign affairs context. *Fed. Comm'ns Comm'n v. Consumers' Research*, 606 U.S. 656, 706-07 (2025) (Kavanaugh, J., concurring). Section 301's role in foreign affairs also means that the nondelegation doctrine "play[s] an even more limited role" in assessing constitutionality. *See id.* at 706. Even a "challenged delegation" that would be invalid" if

---

[3] Six Justices declined to apply the major-questions doctrine to IEEPA in *Learning Resources*. *See* 607 U.S. at 384 n.24 (Kavanaugh, J., dissenting).

"confined to internal affairs" may be constitutional if it operates in the foreign affairs arena. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315 (1936); *see also Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("Congress may of course delegate very large grants of its power over foreign commerce to the President."). It is thus little wonder that there is a long history of cases approving broad delegations of authority to regulate international trade, including through tariffs. *See, e.g.*, *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-60 (1976); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 690-94 (1892); *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 384-88 (1813).

Even if applicable, those doctrines are satisfied here in any event. Where it applies, the major-questions doctrine requires "clear congressional authorization" before concluding that Congress delegated a certain power to an agency. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Section 301 clears that bar. The challenged tariffs are not a "transformative expansion" of USTR's authority under some vague language in a long-extant, but rarely used, statute. *See id.* at 724-25; *HMTX*, 156 F.4th 1255. In contrast to IEEPA, Section 301 provides a "clear and limited delegation," *see Learning Resources*, 607 U.S. at 244 (opinion of Roberts, C.J.), because it expressly authorizes USTR to impose duties and even expresses a preference for imposing duties over other import restrictions, 19 U.S.C. §§ 2411(c). Indeed, even the Justices in *Learning Resources* who thought that the major-questions doctrine applied in that case used Section 301 as an *example* of Congress using "explicit terms" to delegate the tariffing authority and "subject[ing]" that authority "to strict limits." *Learning Res.*, 607 U.S. at 243 (opinion of Roberts, C.J.). Nothing more is required. *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not

require "an 'unequivocal declaration' from Congress authorizing the precise agency action under review").

As for the nondelegation doctrine, the requisite "standard for 'intelligible principle' is 'not demanding.'" *HMTX*, 156 F.4th at 1254 (citing *Gundy v. United States*, 588 U.S. 128, 145-46 (2019)). Especially so here, where the delegation takes place in the foreign affairs context. *See supra* at 8-10. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Gundy*, 588 U.S. 146. Congress must only delineate "the general policy, the public agency which is to apply it, and the boundaries of [the] delegated authority." *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946). Plaintiffs do not seriously argue that the detailed provisions of Section 301 violate this standard. For good reason—the Federal Circuit has *already* explained that duties under Section 301(b) satisfy the nondelegation doctrine. *HMTX*, 156 F.4th at 1254 (holding that USTR's "mandate to take 'all appropriate action' to end or reverse the investigated conduct under Section 301(b) does not raise a non-delegation problem" either), *cert. denied,* No. 25-1012, 2026 WL 1718004 (U.S. June 15, 2026). In fact, some of the plaintiffs here—and the very same counsel as here—"concede[d]" before the Federal Circuit "that USTR's mandate to take "all appropriate action" to end or reverse the investigated conduct under Section 301(b) does not raise a non-delegation problem." *HMTX*, 156 F.4th at 1254. The Supreme Court even called Section 301 a "clear and limited delegation[]." *Learning Res.*, 607 U.S. at 244.

Section 301 sets forth a clear general policy: "obtain the elimination of" the "act, policy, or practice of a foreign country" that "is unreasonable or discriminatory and burdens or restricts United States commerce." 19 U.S.C. § 2411(b). It provides details on the meaning of "unreasonable" and "discriminatory." *Id.* § 2411(d)(3)(A), (3)(B), (5). It sets clear boundaries

on USTR's authority—namely, his actions must be "appropriate and feasible," are restricted to certain tools, and must follow detailed procedural steps. *Id.* §§ 2412-14. Plaintiffs' half-hearted nondelegation challenge to Section 301 is meritless.

## IV. Plaintiffs' APA Challenges Are Meritless

During the investigations, USTR considered a voluminous record, addressed significant comments, and proposed reasonable actions to combat the investigated economies' failure to impose and effectively enforce forced labor import prohibitions. USTR then faithfully imposed import duties on each investigated economy at the rate and as to products as directed by the President. This Court should sustain USTR's determinations as a rational exercise of his congressionally authorized function to investigate and determine whether each of the investigated economies had an "act, policy, or practice" that is "unreasonable" and "burdens or restricts" U.S. commerce. *See* 19 U.S.C. § 2411(b)(1). Plaintiffs' further challenges to the appropriateness of specific tariff actions taken at the specific direction of the President similarly fail to demonstrate any error.

### A. Plaintiffs Fail to Show Irrationality in Any Aspect of USTR's Finding That Certain Trade Practices Are "Unreasonable"

Plaintiffs argue that USTR's findings are wrong on the merits. But neither plaintiffs nor this Court can "substitute [their] own policy judgment for that of the agency." *Prometheus*, 592 U.S. at 423. "The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Id.* at 427. USTR's findings are "reasonable and reasonably explained," *id.*, so there is no occasion for this Court to second-guess them.

Plaintiffs unconvincingly swim against that tide. Citing Brazil and Egypt, plaintiffs suggest that USTR erred because an economy should be excused for lacking forced labor import prohibitions so long as it has alternative, indirect legal provisions that may address forced labor

imports. Pls. MJAR 42. But USTR rationally rejected this argument. As USTR found, both Egypt and Brazil import goods at risk of being produced with forced labor. *See* PR-6 at 37 n.134 ("Each of the following [economies] is a top exporter of at least one good for which forced labor has been found as an input: … Brazil … Egypt …"); Appendices A-C (showing that Brazil and Egypt import goods at risk of forced labor). USTR explained why Egypt's and Brazil's indirect measures do not effectively or directly target forced labor imports. *Id.* at 61, 64. He further elaborated on why indirect prohibitions such as domestic forced labor prohibitions or prohibitions in supply chains have been ineffective. *Id.* at 31-34. Moreover, given the continued existence of forced labor goods in international commerce, USTR rationally identified the failure of these economies to impose measures that legally prohibit forced labor imports in express written terms as an "unreasonable" practice.

Plaintiffs also quibble with USTR's reliance on a Harvard Kennedy School publication that discusses an eight-element framework for identifying whether a forced labor import prohibition will be effective. Pls. MJAR 43. USTR explained that a forced labor import prohibition without these elements is less likely to be effective than one that possesses all these elements. This rational explanation suffices. *Prometheus*, 592 U.S. at 414. Regardless, USTR did not solely rely on that framework to find any particular economy's forced labor import prohibition ineffective. *See Fogo De Chao (Holdings), Inc. v. DHS*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (holding that where an agency decision is based on multiple independent grounds a court can affirm under the APA "so long as any one of the grounds is valid").

Plaintiffs further argue that USTR irrationally determined that Ecuador's, Indonesia's, and Pakistan's failures to enforce prohibitions were unreasonable because their prohibitions were only recently instituted and there was insufficient time for those economies' enforcement

measures to show up in the data. Pls. MJAR 42-43. But the fact remains that plaintiffs cannot point to *any* evidence of *any* enforcement measure taken by *any* of these economies, and USTR was not required to make excuses for them. Plaintiffs' argument makes no logical sense: the very recent adoption of these measures would suggest that they have *not* taken enforcement actions, and not the other way around. To the extent that Ecuador, Indonesia, Pakistan, or any other economy may take corrective actions in response to USTR's final actions, they are free to present the evidence for additional review. *See* 19 U.S.C. § 2417; *see also* 15 C.F.R. § 2006.0.

### B. Plaintiffs' "Burden" Arguments Misconstrue and Second-Guess USTR's Rational Findings In Contravention of the Controlling Standard of Review

USTR rationally determined that that *each* economy's unreasonable trade practices burdened or restricted U.S. commerce in three separate ways. Specifically, he found that each economy's failure to have, or failure to enforce, forced labor import prohibitions (1) creates unfair competition with U.S. exports in the market of the investigated economy, (2) creates unfair competition within the U.S. market through forced labor products circumventing the United States' forced labor import prohibitions, and (3) displaces fairly produced goods made by the investigated economy's manufacturers exported to the less-distorted U.S. market. PR-6 at 34-55 (Section V of USTR Report addressing burdens or restrictions to U.S. commerce); *see also* PR-6 at 59-79 (incorporating Section V findings into USTR's discussion of each economy); *see also In re Cree*, 818 F.3d at 698 n.2.

**1.** Plaintiffs denigrate USTR's lengthy, 21-page analysis of the burdens or restrictions on U.S. commerce as "generic." Pls. MJAR 32. However, USTR explained at length how the failure of each economy to impose and effectively enforce a forced labor import prohibition burdens or restricts U.S. commerce in three separate ways: (1) "incentiviz[ing]

unfair competition" with U.S. exports, (2) "permit[ting] unfair competition in the U.S. market," and (3) "permit[ting] displacement of fairly produced goods to the U.S. market." PR-6 at 35.

USTR elaborated on this explanation for how the burden or restriction manifests using trade data, economic principles, and case studies. For example, USTR explained that the very nature of forced labor artificially reduces the prices of goods compared to comparable goods that are fairly manufactured—such as U.S. exports. PR-6 at 36. USTR provided an analysis showing that the investigated economies in 2025 "import[ed] substantial quantities of products at risk of forced labor" identified by the Department of Labor in its TVPRA List. *Id.* at 36-37, Appendix B. For six specific products on the TVPRA List, there was overlap between such imported goods and imports of the same product from the United States for *each* investigated economy, spanning four or more products. *Id.* USTR also considered trade value data for three specific goods on the TVPRA List, showing that *each* investigated economy imported at least one at-risk good and the same product from the United States. *Id*. at 36, Appendix A, Tables 1-3 (official import statistics for harmonized system chapter 52 for Chinese cotton, chapter 24 for Malawian tobacco, and code 1006 for Burmese rice, demonstrating that each economy imported one or more of these goods at risk of forced labor and the same good from the United States). USTR then discussed the adverse economic effects of unfair competition from forced labor imports in export markets and provided three case studies (Burmese rice, Malawian tobacco, and Brazilian beef) as examples. *Id.* at 38-47.

USTR found, and the tables in the appendices to his report show, that *each* of the investigated countries imported forced labor goods alongside U.S. goods. PR-6 at 36-48, 80-86, Appendix A, Tables 1-3, Appendix B. USTR explained how forced labor imports create unfair competition against U.S. exports, which are not produced using forced labor, and then showed

with data that this unfair competition with U.S. goods was occurring within each investigated economy. *Id*. USTR rationally explained the competitive burden or restriction on U.S. commerce in Section V of his report and then incorporated that discussion by reference in his findings as to each economy. Try as plaintiffs might, there is "no force" to the argument that such incorporation is improper. *In re Cree*, 818 F.3d at 698 n.2.

Glossing over USTR's detailed and cogent analysis in the report and supporting appendices, which are sufficient to support the actionability determinations standing alone, plaintiffs purport to slice and dice USTR's citation to three case studies. This approach misses the forest for the trees. USTR used sample case studies to *illustrate* generally applicable economic principles and common sense. Forced labor imports artificially lower prices relative to fairly produced goods universally. Plaintiffs fail to seriously dispute USTR's reasoning that failures to impose and effectively enforce prohibitions on forced labor imports would result in artificially cheaper goods, cheaper forced labor goods create conditions of unfair competition, and that such conditions would negatively affect U.S. producers and exporters. Plaintiffs cite no authority for their dubious suggestion that generally applicable economic principles must be supported by data from every product from every economy to be sustained. Such an approach would make Section 301 impossible to enforce and undermine the intent of Congress that USTR "vigorously" enforce it. *See* H.R. Rep. No. 100-40, pt. 1, at 60-62.

Moreover, it is utterly commonplace for the Government to use economic logic and record evidence to make findings with respect to similarly situated entities in the course of a trade investigation. *E.g.*, *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 145 F.4th 1308, 1315 (Fed. Cir. 2025) (holding Department of Commerce may apply country-wide rate to individual firms within non-market economy as rebuttable evidentiary presumption given

economic logic of how non-market economies operate). Plaintiffs do not point to any record evidence that forced labor goods do not result in artificially lower prices, and do not dispute the sound economic logic on which USTR relied. Nor do they cite any authority suggesting that USTR must use a different analysis for economies engaged in the same unreasonable trade practices. USTR rationally reached similar determinations with respect to investigated economies with similar unreasonable trade practices. By criticizing USTR for doing so, plaintiffs set themselves against not just the APA, but inductive reasoning itself.

**2.** Next, plaintiffs nitpick USTR's cited examples of tobacco trade between Malawi and Poland, rice trade from Burma to Spain, and frozen beef trade from Brazil to China, because plaintiffs contend that they show correlation as opposed to causation, do not account for confounding variables, and extrapolate conclusions to the investigated economies. *See* Pls. MJAR 33-37. But neither Section 301 nor the APA invite plaintiffs to engage in a battle of statistical minutiae. The Court's only role here is to "ensure[] that the agency has acted within a zone of reasonableness," has "reasonably considered the relevant issues," and "reasonably explained the decision." *Prometheus*, 592 U.S. at 423. USTR did so.

In any event, plaintiffs' gripes with USTR's case studies are wrong in the particulars. USTR showed that Malawian tobacco was a forced labor import given its status on the TVPRA List and CBP's imposition of a country-wide withhold release order (WRO). PR-6 at 38. USTR then compared the trends of Polish imports of Malawian tobacco and American tobacco, which showed American tobacco losing relative market share overtime. *See* PR-6 at 39-40. USTR explained that this trend was especially notable after CBP imposed an WRO on Malawian tobacco in 2019. *Id*. at 40. This provides *an example* of trends in a country's import behavior that is consistent with what economic theory would predict regarding the competitive harms

posed by forced labor. Plaintiffs assert that this merely shows correlation and does not account for confounding variables. Pls. MJAR 33-35. However, the correlation is consistent with economic theory, and USTR rationally cited evidence showing that forced labor imports likely impaired the relative competitiveness of American tobacco. USTR was not required to show that forced labor imports were the *only cause* of declining market share of American tobacco relative to Malawian tobacco in Poland; he simply explained how the trends support his findings regard competitive harm.

Indeed, this Court has sustained agency findings relying on correlations in other contexts. *See Altx, Inc. v. United States*, 26 C.I.T. 709, 734-35 (2002) ("A close correlation between non-subject import volume and the performance of the domestic industry could support a determination that non-subject imports were a predominant factor in causing injury to the domestic" industry), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004); *Nucor Corp. v. United States*, 675 F. Supp. 2d 1340, 1352 (Ct. Int'l Trade 2010) ("The Court finds that a reasonable mind would accept the high level of correlation between regional prices as adequate support for this conclusion."). The fact that trends may not be monotonic or the correlation may not be consistent over time does not render USTR's conclusion irrational. Even absent "an *exact* correlation" and even with some "inconsistencies," the "overall trend analysis of the data" can support USTR's conclusions. *See Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1339 (Ct. Int'l Trade 2001). Regardless, the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" *at all*. *Prometheus*, 592 U.S. at 427. It certainly does not require USTR to perform a study that meets plaintiffs' idiosyncratic preferences.

There is no serious dispute that producing goods without having to pay for labor harms those who compete fairly and pay their workers. Even where American tobacco outsells Malawian tobacco, it is likely that without forced labor being used for making Malawian tobacco, American tobacco would have outperformed Malawian tobacco to an even greater degree. This is because forced labor unfairly puts a thumb on the scale in favor of those who exploit forced labor; it does not guarantee outselling all those who do not engage in such exploitation. USTR provided a detailed explanation of all this, and plaintiffs do not seriously contest the distortive effects of forced labor in international supply chains.

Contrary to plaintiffs' assertion, USTR did not extrapolate three case studies to 60 investigated economies. Rather, USTR rationally determined what was "likely" based on available information concerning at risk goods. PR-6 at 37 ("In light of the foregoing, the information available indicates that U.S. exports likely compete with goods produced wholly or in part with forced labor in each of the economies that are subject to these investigations.") (citing PR-6 at 87-97). USTR further determined that any imports of goods at risk of being produced with forced labor create unfair competition for U.S. goods—and thus burden or restrict U.S. commerce—under conditions analogous to those described in the case studies. PR-6 at 38-47.

**3.** Splitting hairs further, plaintiffs complain that USTR found that certain products were only "likely" forced labor imports. But they ignore USTR's finding that "[d]ata regarding forced labor goods is difficult to acquire, in part, because of the illicit nature of forced labor." PR-6 at 35 & n.128; *see also id.* at 13, 15 & n. 56. Agencies are entitled to make reasonable predictive judgments based on available evidence and have no obligation to conduct studies before taking action. *Prometheus*, 592 U.S. at 427-28. Likewise, absolute certitude is not a

requirement for an agency's decision to be sustained under the APA standard. *Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222, 1235 (Ct. Int'l Trade 1993) (recognizing "the difficulty, if not impossibility, of determining with absolute certainty some of the figures needed for the complex antidumping calculations"). Indeed, agencies are frequently called upon to make predictive judgments that are necessarily uncertain, and receive *more* deference, not less, when they do. *Fla. E. Coast Ry. LLC v. FRA*, No. 24-11076, --- F.4th ----, 2026 WL 2321640, at *12-13 (11th Cir. Aug. 11, 2026).

Plaintiffs' argument that USTR failed to show that component parts of products such as solar cells are derived from forced labor is similarly unavailing. USTR showed in Appendix C that each economy imports inputs at risk of forced labor and exports downstream products to the United States; given the use of forced labor goods as inputs in other goods, such as polysilicon for solar cells, they are more likely to circumvent U.S. import controls. As discussed, USTR's finding that this is "likely" rather than a certainty does not make his reasoning irrational. *See Nippon Steel*, 182 F. Supp. 2d at 1339. Moreover, because USTR demonstrated harm to U.S. exports, any alleged flaws (there are none) in USTR's circumvention analysis are of no moment. *See Fogo De Chao*, 769 F.3d at 1149; *see also* 5 U.S.C. § 706 (requiring reviewing court to take "due account" of "the rule of prejudicial error").

**4.** Plaintiffs further argue that USTR cites no evidence that products made with forced-labor inputs have in fact successfully evaded U.S. enforcement and entered the U.S. market and that USTR's data are contradictory and incapable of extrapolation. Pls. MJAR 37-41. Wrong again. USTR demonstrated that unfair competition from forced labor goods can negatively affect U.S. commerce domestically by permitting circumvention of the U.S. forced labor import prohibition. PR-6 at 47-55. USTR examined whether an investigated economy

imported inputs at risk of being produced with forced labor, as identified in the TVPRA List, and also exported downstream products to the United States. *Id*. at 90-92. In particular, he showed in Appendix C that each investigated economy imported inputs that are at risk of being produced with forced labor and exported to the United States a downstream product from such inputs. *Id*. USTR explained that where forced labor inputs are used to produce downstream goods exported to the United States, it is more difficult for the United States to prohibit the importation of forced labor goods. *Id.* at 47. USTR further cited case studies involving polysilicon and cotton from China to show that goods that are downstream of other imported goods, such as solar cells and clothing, circumvent U.S. import controls and are made from at-risk forced labor goods. PR-6 at 48-54. Though they (again) insist on limiting the polysilicon and cotton case studies to their facts, Pls. MJAR 37-40, this Court should not share plaintiffs' myopia. As with all the other case studies, these illustrate a generally applicable economic principle. *See* PR-6 at 47-54. USTR explained that the circumvention problem similarly extends to steel and aluminum; automobiles and auto parts; electronics; and agriculture. *Id*. at 54-55.

### C. Plaintiffs' Arguments Challenging What Actions Are "Appropriate" Fail to Demonstrate Any Error Regardless

Under Section 301(b), once USTR makes the necessary determinations, he "shall take all appropriate and feasible action … subject to the specific direction, if any, of the President." 19 U.S.C. § 2411(b)(2). Congress thus recognized that the President may have the final word on what actions are "appropriate and feasible" under Section 301(b). *See id.* In this case, the President did have the final word, providing specific direction to USTR on what tariff actions are appropriate for each investigated economy. PR-764 at 9 ("In my judgment, each tariff action directed in this memorandum is feasible and appropriate to obtain the elimination of the applicable economy's act, practice, or policy found actionable under section 301."). When

interested parties expressed their views on whether the proposed tariffs were appropriate, USTR explained in detail why he believed they were appropriate in his judgment, but ultimately, USTR explained that he "cannot" take "alternative actions that are inconsistent with the specific direction of the President." 91 Fed. Reg. at 47,329-30.

The Supreme Court's decision in *Trump v. Orr* squarely forecloses plaintiffs' challenge here. There, the Passport Act directed the Secretary of State to judge passports "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. The President in an executive order required the Secretary of State to make certain changes to passports, and the Secretary made the changes the President ordered without any additional explanation. The Supreme Court rejected the argument made by plaintiffs in that case "that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." 146 S. Ct. at 46 (citing 22 U.S.C. § 211a).

Like in *Orr*, Section 301(b) directs USTR to take action "subject to the specific direction … of the President." 19 U.S.C. § 2411(b)(2). Just as in *Orr*, USTR followed the statute, and complied with the President's orders. So, just like in *Orr*, plaintiffs cannot demonstrate that USTR's actions as arbitrary and capricious when it did what Congress "expressly required" him to do. 146 S. Ct. at 46.

That conclusion makes sense. USTR's "path" was not just "reasonably … discern[ible]"; it was obvious and mandatory. *State Farm*, 463 U.S. at 43. Far from "entirely fail[ing] to consider an important aspect of the problem," *id.*, USTR followed the President's specific direction, just as Section 301 requires, 19 U.S.C. § 2411(b). In short, because Congress instructed USTR to follow the President's specific direction, which, in turn, is not subject to APA review, it could not have been arbitrary and capricious for USTR to follow the President's

specific direction here. Indeed, USTR would have violated Section 301—and thus be "not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A)—if it did otherwise.

Plaintiffs' only response to the above is to suggest that *HMTX* somehow held that USTR could have acted arbitrarily and capriciously by doing exactly what the President directed. Pls. MJAR 30-31. *HMTX* held no such thing. The court in that case never addressed whether the President's specific direction narrowed the scope of arbitrary or capricious review. Nor did the court have occasion to, as the specific direction in *HMTX* was far more general than the granular directions here. Nor did the court address the Supreme Court's decision in *Trump v. Orr*, which was issued after *HMTX*.

But plaintiffs' arguments run aground on traditional APA review as well. They accuse USTR of not considering a variety of factors they deem relevant. Again, under Section 301(b), the *only controlling* factor in these circumstances is the President's direction. But USTR was not required to consider plaintiffs' desired factors in any event. Many of plaintiffs' factors concern *mandatory* actions under Section 301(a), not the *discretionary* actions under Section 301(b) at issue in this case. *See* Pls. MJAR 44-48; *HMTX*, 156 F.4th at 1243 ("Mandatory actions are subject to a proportionality requirement," but "[d]iscretionary actions are not subject to the same restriction.") (discussing 19 U.S.C. § 2411(a)(3)). Nor are USTR's discretionary actions in this case based on acts, policies, or practices defined, specifically, under subsection (d)(3), which, when USTR determines a foreign country is meeting certain standards of conduct, may not be considered unreasonable. 19 U.S.C. § 2411(d)(3)(C). Plaintiffs' invocation of that part of the statute is accordingly misplaced as well. *See* Pls. MJAR 47-48.

Nor can plaintiffs show USTR's determination to impose tariffs on all 60 investigated economies was arbitrary and capricious. USTR imposed a 10% and 12.5% tariff for some

investigated economies—and even less or a zero-duty tariff applicable to certain products for other investigated economies with MFN tariffs already in place that are equal or greater than 10% and 12.5%—depending on the circumstances. 91 Fed. Reg. at 47,321-28. USTR imposed tariffs on certain products of each investigated economy with the goal of eliminating the unreasonable act, policy, and practice of that economy that USTR identified, consistent with the specific direction of the President. *See* S. Rep. No. 100-71, at 73 (describing Section 301 as a "negotiating tool to ensure that foreign countries adhere to their trade agreement obligations benefiting the United States and to obtain the elimination of other unjustifiable, unreasonable, or discriminatory foreign practices."); *see also* 19 U.S.C. § 2411(b)(2). As the record shows and by plaintiffs' own admission, not all tariffs applied to all 60 different economies were the same. *See* Pls. MJAR 44. USTR did not treat all the economies alike; instead, he followed the specific direction of the President, separating the investigated economies into those that failed to legally prohibit forced labor imports, those that had legal measures to prohibit or had the effect of prohibiting forced labor imports but where enforcement was insufficient, and those economies who made a commitment to the United States to do so.

For example, USTR explained that the lowest duty rate of 10%, or 10% net MFN, was still necessary to incentivize economies with a forced labor import prohibition or a relevant commitment to effectively enforce such a prohibition. *See* PR-5 at 8-9; PR-6 at 25-26, 31; *see also*, *generally*, *KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010) (recognizing that the purpose of an agency assigning a higher import duty, based on adverse facts available, is to incentivize future cooperative behavior). Likewise, USTR explained that even the small difference between a duty rate of 10% and 12.5%, or 10% and 12.5% net MFN for economies that had and did not have any prohibition on forced labor imports in place, respectively, was

"enough to spur action by investigated economies," to put legal prohibitions against forced labor imports in place, as demonstrated by several economies that did just that following the publication of the proposed actions in USTR's investigations. 91 Fed. Reg. at 47,329-30. In addition, for certain investigated economies that entered into an ART or similar arrangement, USTR deemed that capping total duties on those economies at either 10% or 12.5% by imposing duties equal to 10% or 12.5% net of MFN, was appropriate "to encourage an economy to fulfill commitments regarding forced labor import prohibitions or to enact and effectively enforce a prohibition," while acting consistent with the economies' ART or similar arrangement. *Id.* at 47,321. Finally, USTR explained that any tariff amounts less than 10% or lower than 10% net of MFN duties, would not be sufficient "at this time … to achieve the elimination of the investigated acts, policies and practices," for various reasons, including (1) recognition that the mere adoption of a prohibition against forced labor imports does not, without enforcement, achieve the elimination of such imports, (2) recognition that improving domestic efforts related to forced labor does not change the incentives to trade in products made with forced labor, and (3) further variation of tariffs among investigated economies would not achieve the elimination of the investigated acts, policies, and practices any more than the variations in tariffs already decided. *Id.* at 47,329-30.

Accordingly, the duty rates imposed by USTR are rationally connected to the identified problems that he found in each separate investigation into the 60 different economies. *See* 19 U.S.C. § 2411; *State Farm*, 463 U.S. at 43. Further, USTR's proposal for, and the President's specific direction of, what duty rates are appropriate is a highly discretionary determination that this Court cannot second-guess, even if it were reviewable, and even if in the first instance this Court might have assigned different rates to deter the unreasonable trade practices that USTR

sought to curb. *See* 91 Fed. Reg. at 47,329 ("The specific action and level of duty that will obtain the elimination of an act, policy, or practice is a matter of judgment, to be exercised by [USTR], subject to any specific direction of the President"). Finally, the rates of 10% and 12.5% are modest and, standing alone, raise no questions as to any abuse of discretion. *Compare HMTX*, 156 F.4th at 1236 (sustaining modifications of Section 301(b) tariffs of up to 25%). If plaintiffs cannot even show that these actions are arbitrary and capricious, they also cannot satisfy the much higher bar of challenging Presidential action directly. *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89-90 (Fed. Cir. 1985).

## V. Plaintiffs' Pretext Argument Is Meritless

At the end of their motion, plaintiffs make an incongruous argument that invites the Court to disregard the record altogether even though they are requesting judgment *on* the agency record. Specifically, plaintiffs argue that the Court should invalidate the final actions because they are a pretext to replace the IEEPA tariffs that the Supreme Court held unlawful in *Learning Resources*.[4] *See* Pls. MJAR 48-51.

That claim is wrong. As discussed, USTR's actions are reasonable and reasonably explained. The bar for second-guessing stated reasons for an agency's decision is high. "[F]urther judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce*, 588 U.S. at 781 (cleaned up). Indeed, allegations that an agency has acted "pretextually" sound in *bad faith*, which is subjected to a heightened evidentiary standard. *See 27-35 Jackson Ave LLC v. United States*, 127 F.4th 1314, 1323-24 (Fed. Cir. 2025) (finding that a

[4] The Section 301 tariffs materially differ from the IEEPA tariffs in many ways that plaintiffs ignore, including the number of economies (60 versus 192), the rates (10-12% versus 10-49%), and different product exclusions.

claim that an agency's rationale for a lease termination was pretextual could not be distinguished from a claim of bad faith). Agencies are entitled to a presumption that they act in *good faith*, and plaintiffs seeking to overcome that presumption is required to show by "clear and convincing evidence" akin to a "specific intent to injure the plaintiff[s]." *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Under those principles, plaintiffs' pretextual challenge must be rejected. As the President explained: "Each tariff action directed in this memorandum is only for the purpose of obtaining the elimination of the specific economy's act, policy, or practice found actionable under section 301 and not for any other purpose." PR-764 at 9. As USTR explained: "Each tariff action on an economy taken by [USTR] in this Notice in one investigation is only for the purpose of obtaining the elimination of the applicable economy's acts, policies, and practices found actionable under section 301 in that investigation and not for any other purpose." 91 Fed. Reg. at 47,335.

Plaintiffs, by contrast, merely point to fragments of public statements from government officials (some of which had no role in these Section 301 actions) that are too "remote in time and made in unrelated contexts" from the challenged actions. *See, e.g.*, *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1335 (Fed. Cir. 2021) (quoting *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020)). Plaintiffs point to various statements by the President, the Trade Representative, and other Government officials observing that the Section 301 tariffs at issue here serve a similar policy, may have similar percentages (which ultimately they did not), or would have a similar effect, as the IEEPA tariffs. Pls. MJAR 7-8, 50. Most of those extra-record statements are not properly before the Court. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Even if they could be considered, the

cited statements would merely reflect that the Trump Administration believes that tariffs are an effective tool for protecting American businesses against unfair trade practices. This is no revelation. Policymaking "is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power,'" and is "routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *CAADES v. United States*, 32 F.4th 1130, 1142 (Fed. Cir. 2022) (quoting *Dep't of Commerce*, 588 U.S. at 78). USTR's final actions are "expressly premised on legitimate purposes" and the extra-record statements fail to undermine the legitimacy of those purposes. *See Hawaii*, 585 U.S. at 706. Plaintiffs fall far short of the "strong showing of bad faith or improper behavior" that warrants the "substantial intrusion" of "peel[ing] back the curtain" on the President's and USTR's representations. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577-78 (2025).

*Department of Commerce* is not to the contrary, notwithstanding plaintiffs' copious citations to that case. Indeed, the Federal Circuit has explained that *Department of Commerce* "expressly forecloses" challenges to an agency decision based on improper influence where "the face of the agency decision does not identify that it was" so "motivated." *See CAADES*, 32 F.4th at 1142. In *Department of Commerce*, the Supreme Court invalidated the agency action because the "administrative record" directly contradicted the rationale the agency provided. *Dep't of Commerce*, 588 U.S. at 783. By contrast, when there was "*nothing* on the face of the agency decision to suggest that it was based on any impropriety," the Federal Circuit rejected a challenge to the agency action based on pretext, explaining that "[s]peculation as to improper motive provides no basis to look behind [the agency's] stated reason" for the challenged action. *CAADES*, 32 F.4th at 1142-43 (emphasis added).

Plaintiffs have little else to offer in support of their pretext claim. They suggest that USTR's actions were "preordained" and "reverse engineered." Pls. MJAR 50-51. The contemporaneous record shows that not to be true. But it is also irrelevant. The Supreme Court has been crystal clear: There is nothing "improper [about] an agency head … com[ing] into office with policy preferences and ideas … and work[ing] with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce*, 588 U.S. at 783. Agencies are allowed (and indeed required) to act based on Presidential policy priorities, so long as they ultimately take actions grounded in legitimate rationales that are reasonably supported. Here, USTR did so.

Plaintiffs also attempt to discover something nefarious in the four-and-a-half month duration of the trade investigations. Pls. MJAR 50. While the investigations were conducted within the one-year maximum established by statute, *see* 19 U.S.C. § 2414(a)(2)(B), that merely shows that the investigations were high priority and efficient. The relative proximity of the imposition of Section 301 tariffs with the expiration of Section 122 tariffs shows, at most, that the Trump Administration continues to maintain that tariffs are beneficial to the American economy. It is entirely permissible that the timing of an agency's policymaking actions may be informed by Administration priorities.

Plaintiffs argue further that certain language in the "Severability" section of the President's memorandum to USTR and USTR's recitation of that language is "incongruent" with the decision itself. *See* Pls. MJAR 48. Just the opposite. The President directed that each action was to obtain the elimination of a "specific economy's" unreasonable practice "and not for any other purpose," such that any invalidation of one action should not invalidate all of them. *See* PR-764 at 9. That routine statement on severability is fully consistent with the stated rationale for the final actions, and indeed proves that these are multiple separate actions.

Finally, plaintiffs reach to argue that an exemption for Brazilian beef somehow shows that USTR does not genuinely care about forced labor import prohibitions at all or with respect to other products from Brazil. Pls. MJAR 48-49. But as USTR explained in response to public comments on this very issue, the exemption for Brazilian beef was in the United States' economic interest, whereas the tariff otherwise remained generally applicable to imports of Brazil and appropriately addressed Brazil's unreasonable trade practice. *See* 91 Fed. Reg at 47,330-31. Nothing required USTR to take further actions that would harm U.S. interests when other actions in USTR's and the President's judgment are appropriate to create leverage and thus obtain the elimination of the unfair trade practices at issue. *See id.*

Plaintiffs' pretext argument is long on rhetoric and devoid of evidence of bad faith. There is no basis for this Court to inquire into executive motivations or disregard the record. *See* USCIT R. 56.1(a) ("the determination of the court is to be made solely on the basis of the record made before an agency").

## VI. The Court Should Not Order Universal Vacatur

Even if this Court accepts plaintiffs' arguments on the merits, plaintiffs are not entitled to the universal relief they seek. Plaintiffs request vacatur of the 60 final actions in their entirety—a remedy that would provide relief to countless non-parties and go well beyond any relief needed to redress their own alleged harms—yet fail to develop any meaningful argument supporting that sweeping request. *See* Pls. MJAR 48, 51 n.42. Plaintiffs' conclusory request appears to be grounded in section 706(2) of the APA, *see* Pls. MJAR 48, which authorizes a reviewing court to "hold unlawful and set aside" agency actions that are arbitrary and capricious or contrary to law, 5 U.S.C. § 706(2). But the APA does not authorize courts to vacate agency actions. Moreover, plaintiffs' expansive request to vacate the final actions as to parties and non-parties is tantamount to a universal injunction, which is inconsistent with the Supreme Court's decision in *Trump v.*

*CASA, Inc.*, 606 U.S. 831 (2025) (*CASA*). To avoid perpetuating and compounding the problems with universal injunctions, the Court should leave the tariffs in place and grant only party-specific relief, if necessary. If the Court determines that any aspect of the final determinations is arbitrary or capricious in light of plaintiffs' highly fact-intensive challenges, the Court should remand without vacatur for further explanation. Such narrowly tailored relief is consistent with the Supreme Court's guidance in *CASA* and would minimize disruptions to USTR's important efforts to eradicate forced labor from global supply chains.

**A. The Court Should Consider Remand Without Vacatur, If Necessary**

Even if the Court holds that any aspect of the final determinations is arbitrary or capricious, the Court should order a remand without vacatur. "If the record before the agency does not support the agency action," the "proper course" almost always is "to remand to the agency for additional investigation or explanation." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) (citations omitted); *see also Regents of the Univ. of Cal.*, 591 U.S. at 20-21 (on remand an agency may "offer a fuller explanation of the agency's reasoning at the time of the agency action," or can "deal with the problem afresh by taking new agency action") (cleaned up). Remand *without vacatur* is particularly appropriate when the Court remands for an agency to provide additional explanation. *See HMTX*, 156 F.4th at 1258 ("[V]acatur is not always required when an agency has provided inadequate reasoning for its actions."); *see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (*NOVA*) (holding that when deciding whether to vacate an agency's decision pending further explanation, a court considers the seriousness of the order's deficiencies and the disruptive consequences of an interim change that may itself be changed).

Here, plaintiffs' main arguments in this case—that USTR's findings lack support in the record and that certain mandatory findings are missing altogether—are factual in nature. *See* Pls.

MJAR 23-48. That means remand without vacatur would be the "proper course" if the Court were to conclude that any aspect of the final determinations is arbitrary and capricious. *See Yangzhou*, 716 F.3d at 1380; *see also HMTX*, 156 F.4th at 1258 (holding that "the trial court lawfully remanded [without vacatur] for USTR to contextualize the reasons for its modified action in view of significant public comments"); *NOVA*, 260 F.3d at 1380 (remanding because it "may be that the agency can provide a reasonable explanation for its decision").

Here, the equities would militate in favor of doing so *without* vacatur. Remand without vacatur is "well suited to preserve, rather than disrupt, Congress's weighty humanitarian, economic, and foreign policy concerns." *Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1337 n.25 (Ct. Int'l Trade 2024) (citations omitted). A wholesale vacatur of USTR's final actions in this case "would risk severe disruption of Congress's forced labor priorities." *Id.* at 1337 n.25; *see also id.* at 1343-44 (denying injunction because prohibitions on importing certain goods ensured that American companies are not complicit in forced labor); *NOVA*, 260 F.3d at 1380 (remanding without vacatur to avoid "disruptive consequences" of vacatur). Vacatur also would risk severe disruption of USTR's priorities regarding forced labor in global supply chains. Six countries imposed new forced labor import prohibitions since USTR proposed the tariffs in June 2026. 91 Fed. Reg. at 47,319. These recently announced actions underscore the importance and effectiveness of the final actions in combating forced labor in global supply chains. Accordingly, the Court should not order a remand with vacatur that would disrupt the Government's ongoing and productive efforts to eradicate the widespread problem of forced labor in global supply chains.

**B. The APA Does Not Authorize Vacatur As A Remedy**

Plaintiffs incorrectly assume that section 706(2) of the APA authorizes vacatur of the final actions. In *CASA*, the Supreme Court declined to resolve this unsettled question. 606 U.S.

at 847 n.10. Section 706(2) does not authorize a vacatur *remedy*; it directs a reviewing court to disregard unlawful agency actions when resolving the *merits* of the case. *See United States v. Texas*, 599 U.S. 670, 695-98 (2023) (Gorsuch, J., concurring); *see also* 5 U.S.C. §§ 703 (authorizing remedies that do not include vacatur), 706(2) (supplying standard of review).

Nevertheless, plaintiffs cite two Federal Circuit decisions that merely recite the text of the APA in the *standard of review*—without discussing vacatur as a remedy, without using the words “vacate” or “vacatur,” and without vacating anything. *See* Pls. MJAR 51 (citing *Gilda*, 622 F.3d at 1363; *Jennings v. MSPB*, 59 F.3d 159, 160 (Fed. Cir. 1995)). In *Gilda*, this Court did *not* vacate USTR’s notice of actions that imposed the challenged duties. *Gilda Indus. Inc. v. United States*, 625 F. Supp. 2d 1377, 1385 (Ct. Int’l Trade 2009). Rather, this Court explicitly ordered only party-specific relief; namely, that CBP liquidate the *plaintiff’s* entries “without” the challenged duties and that CBP refund to the *plaintiff* the previously collected duties. *Id.* The Federal Circuit affirmed the award of this party-specific remedy. *Gilda*, 622 F.3d at 1360.

The only other decision cited by plaintiffs on the vacatur issue is *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 50 (D.D.C. 2020) (Jackson, J.), which plaintiffs mischaracterize as a decision of the D.C. Circuit, rather than a decision of a U.S. District Court. Pls. MJAR 51 n.42. This Court has relied on *Kiakombua* only once, and the Federal Circuit reversed. *COALITION v. Fontaine, Inc.*, 535 F. Supp. 3d 1336 (Ct. Int’l. Trade 2020), *rev’d on other grounds*, 66 F.4th 968 (Fed. Cir. 2023). *Kiakombua* is not consistent with *CASA*, which repudiated the “extreme” view that “any court order demands ‘universal adherence,’ at least where the Executive is concerned,” such that “the Executive must conform to that view, ceasing its enforcement of the law against anyone, anywhere.” *CASA*, 606 U.S. at 857-58. The Court should decline to follow *Kiakombua*, which espoused this now-repudiated view.

The Federal Circuit has discussed vacatur without squarely deciding whether the APA authorizes such relief. *See HMTX*, 156 F.4th at 1258; *NOVA*, 260 F.3d at 1380. Because the law is unsettled, *CASA*, 606 U.S. at 847 n.10, defendants respectfully request that the Court undertake a renewed and careful examination of the issue.

**C. The Request for Universal Vacatur is Improper**

Even if the Court were to determine that vacatur is warranted, it should not order the universal vacatur that plaintiffs request. Their request for universal vacatur as to all parties and non-parties is, in substance, the same as a universal injunction with just another label, and this equitable relief is improper under *CASA*. *See* 606 U.S. at 861-62. *CASA* held that courts do not possess the power to issue universal injunctions because, *inter alia*, "federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." *Id.* at 861. The Court should not circumvent *CASA*'s prohibition on universal injunctions by vacating the final actions as to all parties and non-parties.

Even vacatur must be party-specific. *CASA* makes clear that the district courts' equitable powers do not include the authority to grant universal equitable relief. Instead, courts must adhere to the traditional equitable principle that remedies "should be no more burdensome to the defendant than necessary to provide complete relief to *the plaintiffs*." 606 U.S. at 852. The same rule should apply to vacatur under the APA. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (holding that statutes are presumed to adhere to equitable traditions "absent a clear command" to the contrary). Those traditions include the principle of party-specific relief. *CASA*, 606 U.S. at 841-847; *see* Samuel L. Bray, *Multiple Chancellors*, 131

Harv. L. Rev. 417, 438 n.121 (2017). Accordingly, any vacatur in this case must be limited to the plaintiffs' own entries.

In addition, Article III itself requires that a "plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (cleaned up); see *CASA*, 606 U.S. at 863 (Thomas, J., concurring). So even if APA vacatur were viewed as a remedy unconstrained by traditional equitable principles, it still must be limited to the parties before the court. Plaintiffs have not explained why they need universal (as opposed to party-specific) vacatur to fully redress their claimed injuries. Plaintiffs have alleged that they import goods from only seven of the investigated economies (China, Taiwan, South Korea, Vietnam, Thailand, India, and Mexico). Pls. Compl. ¶¶ 8, 9. However, plaintiffs do not even allege that they import merchandise from the 53 remaining economies that were the subject of the final actions. *See* Compl. ¶¶ 8, 9. So at most they would be entitled to vacatur of USTR's actions with respect to those seven economies—not the remaining fifty-three. *See Oregon v. United States*, No. 26-01472-3JP, 2026 WL 1257669, at *10 (Ct. Int'l Trade May 7, 2026) (holding non-importer plaintiffs "fail to demonstrate an injury-in-fact, and therefore, lack Article III standing").

That is especially true given that tariffs on each of the investigated economies are severable. Severability depends "upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis omitted). Here, USTR expressly provided for the severability of each final action with respect to each tariff for each economy in each investigation. 91 Fed. Reg. at 47,335; *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020) (noting that, "absent extraordinary circumstances, the Court should adhere

to the text of [a] severability" clause). It is abundantly clear from their express language that USTR (and the President) intended each action to be independent and severable. That makes plaintiffs' quest for universal relief that much harder. Because "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a "court must analyze [p]laintiffs' standing to challenge each provision of law at issue," *In re Gee*, 941 F.3d 153, 162 (5th Cir. 2019). Whatever action plaintiffs have standing to challenge, they can challenge *only* those provisions under the APA. *See* 5 U.S.C. § 706(2).

In sum, universal vacatur here would perpetuate and exacerbate the problems with universal injunctions that *CASA* identified with universal injunctions, and violate Article III to boot. Universal equitable remedies—no matter what form they take—provide relief to potentially millions of non-parties to the litigation, undermining traditional principles of standing that limit relief to the parties involved in a case or controversy. Should the Court find any aspect of USTR's determinations to be arbitrary and capricious, any equitable relief must be limited to plaintiffs to avoid perpetuating or exacerbating the problems with universal injunctions. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1340 (Fed. Cir. 2025) (vacating universal injunction), *aff'd on other grounds sub nom. Learning Resources*, 607 U.S. 229.

Consistent with these standing and severability principles, any equitable relief must be limited to the final actions as to which plaintiffs demonstrate standing. They have not yet done so with respect to *any* final action.

## VII. Plaintiffs Cannot Satisfy The Equitable Requirements For The Relief They Seek

Because vacatur must comply with traditional equitable requirements, plaintiffs are required to demonstrate not just success on the merits, but the traditional equitable factors for relief: irreparable injury, inadequate remedy at law, a favorable balance of harms, and the public interest. That is especially obvious here, where plaintiffs' request for vacatur is tantamount to a

permanent injunction because they essentially seek a coercive order that would prevent CBP from assessing the challenged duties.

In an apparent attempt to evade the four equitable factors, plaintiffs do *not* request injunctive relief in their MJAR. *See* Pls. MJAR 51 n.42 (arguing that vacatur obviates "the need for any injunction"). But their request for universal vacatur is in effect a request for universal injunctive relief. In *PGBA*, the Federal Circuit instructed lower courts to examine the *substance* of the requested equitable relief to determine whether it constitutes an injunction. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004). In that case, the Federal Circuit held that a request for declaratory relief seeking to "*set[] aside* the [contract] award and thereby stop[] performance" was properly viewed "as an action for injunctive relief." *See id*. (emphasis added). Because the requested relief was tantamount to an injunction, the Federal Circuit held that a trial court must, and in that case properly did, examine the "traditional equitable factors in determining whether to *set aside* award of the contract." *Id.* (emphasis added). Applying these principles here, plaintiffs' request that the Court "set aside" the final actions by vacating them as to all parties and non-parties is a request for a universal injunction in substance.

"Under 'well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.'" *V.O.S. Selections*, 149 F.4th at 1339 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The four factors a plaintiff must establish to secure a permanent injunction are: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Id.* Plaintiffs also must succeed on the merits. *Dell Fed.*

*Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) ("proving success on the merits is a necessary element for a permanent injunction").

Plaintiffs have not demonstrated irreparable harm, and the public interest strongly favors denying an injunction to allow the Government to continue its efforts to eliminate forced labor from global supply chains. That failure is fatal to a request for injunctive relief. *See Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017) ("The movant must prove that it meets all four equitable factors."); *see also Qingdao Taifa Grp. Co. v. United States,* 581 F.3d 1375, 1382 (Fed. Cir. 2009). Moreover, courts cannot *presume* irreparable harm exists; rather the movant "must demonstrate" it. *eBay*, 547 U.S. at 391-93; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) ("*eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief").

Here, plaintiffs fail to *demonstrate* irreparable harm for two independent reasons. First, they have not filed a declaration and, instead, rely solely upon arguments of counsel, which are not evidence. *See Evonik Rexim*, 253 F. Supp. 3d at 1374 (citing *Gemtron*, 572 F.3d at 1380). Second, plaintiffs' arguments fail to mention, much less develop any meaningful argument regarding irreparable harm anywhere in their entire brief. *See* Pls. MJAR 1-51. Aware of this glaring omission, plaintiffs include a footnote on the last page of their brief that purports to "reserve the right" to address "the need for any injunction" in their reply brief. *Id.* at 51 n.42. They have no such right, because they waived it. *E.g.*, *SmithKline Beecham Corp. v. Apotex*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (holding that undeveloped arguments and arguments raised in footnotes are waived, collecting cases); *Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2015) (holding that a plaintiff may not raise new arguments in its reply). Nor do they explain why a court-ordered refund, if in a final and unappealable judgment

the tariffs in question are held to be unlawful and refundable, would be inadequate to redress their injuries.

The remaining factors—the balance of hardships and public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—likewise favor the Government. Plaintiffs' purported harm is far outweighed by the public interest in taking steps to eradicate forced labor from global supply chains. Unlike scores of economies investigated by USTR, in the United States, Congress has passed legislation prohibiting the import of merchandise produced by forced labor. 19 U.S.C. § 1307; *see also* 19 U.S.C §§ 2411(d)(3)(B)(iii)(III), 4681(a). Congress has further declared that the policies of the United States include "strengthen[ing] the prohibition against the importation of goods made with forced labor," and "lead[ing] the international community in ending forced labor practices … through all means available to the United States Government, including by stopping the importation of any goods made with forced labor." UFLPA § 1. Consistent with the public interest, USTR's actions already have led six economies to impose new forced labor import prohibitions since June 2026. 91 Fed. Reg. at 47,319.

Thus, the Court should deny plaintiffs' request for equitable relief—whether in the form of vacatur, an injunction, or any other form.

## VIII. At A Minimum, Any Relief Should Not Disrupt The Normal Operation Of The Trade Laws

Equitable relief must be narrowly tailored and limited to the harm shown. *See Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986). If the Court determines that plaintiffs have succeeded on the merits and does not remand, there are several ways to narrowly tailor relief in this case to avoid substantial harm to the Government and the national interest:

(1) The Court should limit relief to plaintiffs with standing to challenge tariffs on imports from particular countries. *See Gemveto*, 800 F.2d at 259. Any judgment should provide narrowly tailored, party-specific relief as to tariffs on merchandise from particular countries, while also allowing the Government to continue its efforts to induce trading partners to adopt and effectively enforce forced labor import prohibitions.

(2) If the Court finds it necessary to grant any further equitable relief, any order should be limited to directing that plaintiffs' entries be liquidated in due course consistent with the Tariff Act and without regard for the final actions. The Court should be mindful not to disturb a complex web of provisions in the trade laws that may apply to particular entries. For example, a given entry may be subject to assessment of other duties under (1) the Harmonized Tariff Schedule of the United States (HTSUS), (2) one of hundreds of antidumping duty (AD) orders, and/or (3) one of hundreds of countervailing duty (CVD) orders. Furthermore, prior to liquidation in due course, entries that are potentially subject to AD or CVD orders may be suspended, may be covered by administrative reviews by the Department of Commerce, and may become the subject of a judicial challenge in this Court. *See* 19 U.S.C. §§ 1516a(c)(1), 1516a(e), 1675(a)(3)(B); *see also id.* §§ 1504(a), 1514. If the Court decides that relief is necessary, at most, the Court should order that plaintiffs' entries be liquidated in due course consistent with the Tariff Act and without regard for the final actions. No party in this case has advocated for the liquidation of entries without regard for the normal operation of the Tariff Act. The normal operation of the trade laws serves the public interest.

## CONCLUSION

Defendants respectfully request that this Court deny plaintiffs' MJAR and sustain USTR's final determinations and actions.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel

DANIEL D. FALKNOR
BRENDAN D. JORDAN
OLIVER J. McDONALD
ANNA D. WALKER
Trial Attorneys

Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendants

Of Counsel:

JUAN A. MILLÁN
Deputy General Counsel

MEGAN M. GRIMBALL
Chief Counsel for Negotiations,
Legislation and Administrative Law

BENJAMIN L. ALLEN
Associate General Counsel

GRACE M. YANAGAWA
Assistant General Counsel

Office of the U.S. Trade Representative
600 17th Street, NW
Washington, DC 20508

September 4, 2026

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of set forth in the Court's Court of International Trade Standard Chambers Procedures § 2(B)(1), as modified by the Court's Standard Procedural and Scheduling Order in this case dated August 13, 2026 (ECF No. 1), and contains 19,968 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Douglas G. Edelschick