**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **IN RE SECTION 301 FORCED LABOR CASES** | **Before: Honorable Jennifer Choe-Groves, Judge**<br>**Honorable Timothy M. Reif, Judge**<br>**Honorable Lisa W. Wang, Judge**<br><br>**Court No. 26-cv-03555-3JP**<br>**and all underlying cases** |

***AMICI CURIAE*** **BRIEF OF FORMER U.S. TRADE OFFICIALS**
**IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS


**Page #**

**INTEREST OF AMICI CURIAE ........ 1**

**SUMMARY OF ARGUMENT ........ 2**

**ARGUMENT ........ 3**

A. THE CONSTITUTION BARS THE EXECUTIVE FROM EXERCISING THE COMPLETE TARIFF POWER OF THE UNITED STATES ........ 3

B. THE PRESIDENT'S TARIFF AUTHORITIES ARE LIMITED BY THE CONSTITUTION AND U.S. STATUTES ........ 4

C. SECTION 301'S TEXT AND LEGISLATIVE HISTORY INDICATE THAT IT CONVEYS ONLY SELECTIVE, NOT GLOBAL, AUTHORITY ........ 5

D. A HALF-CENTURY OF CONSISTENT PRACTICE BY PAST ADMINISTRATIONS REGARDING SECTION 301 SHOWS THAT IT HAS ONLY BEEN USED SELECTIVELY ........ 9

E. USTR'S INVESTIGATORY PROCESS AND THE REMEDIES PROVIDED WERE ARBITRARY AND CAPRICIOUS AND WENT BEYOND ITS STATUTORY AUTHORITY UNDER SECTION 301 AND THE APA ........ 11

1. The Text of Section 301 Makes Clear USTR's Tariffs Are a Misuse of its Statutory Authority ........ 11

2. USTR's Justifications for Imposing Tariffs Are Contradictory and Incoherent, Fail to Meet the APA's Arbitrary and Capricious Standard, and Represent an Abuse of Discretion ........ 13

**CONCLUSION ........ 17**

# TABLE OF AUTHORITIES

## Cases

*Burlap & Barrel, Inc. v. United States*, Ct. No. 26-1606, Slip Op. 26-47 (Ct. Int'l Trade May 7, 2026) ........ 11

*Gilda Industries, Inc. v. United States*, 622 F. 3d 1358 (Fed. Cir. 2010) ........ 11

*Hampton & Co. v. United States*, 276 U.S. 394 (1928) ........ 4

*HTMX Industries LLC v. United States*, 156 F. 4th 1236 (Fed. Cir 2025) ........ 14

*In re Section 301 Cases*, 570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ........ 11, 14

*In re Section 301 Cases*, 628 F. Supp. 3d 1235 (Ct. Int'l Trade 2023) ........ 14

*Learning Resources, Inc. v. Trump*, 146 S.Ct. 628 (2026) ........ 5

*Pulsifer v. United States*, 601 U.S. 124 (2024) ........ 7

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........ 5

## Statutory Provisions

19 U.S.C. § 1307 ........ 13

19 U.S.C. § 1413(c) ........ 14

19 U.S.C. § 2411(b) ........ 12

19 U.S.C. § 2411(b)(2) ........ 13

19 U.S.C. § 2411(c)(1)(D) ........ 12

19 U.S.C. § 2413 ........ 12

19 U.S.C. § 2416(a) ........ 12

## Other Authorities

Appellate Body, EC Measures Concerning Meat and Meat Products (Hormones), AB-1997-4, WT/DS26/AB/R, WT/DS48/AB/R (Jan. 16, 1998) ........ 14

*GATT Report of the Working Party on the U.S. Temporary Import Surcharge* (Sep. 1971) ........ 4

Report of the House Ways and Means Committee on Trade Reform Act of 1974, House Report No. 93-571, 93d Cong., 1st Sess., p. 66 (Oct. 10, 1973) ........ 9

Senate Finance Committee Report, Omnibus Trade Act of 1987, 100th Cong., 1st Sess., Report No. 100-71, p. 73 (June 12, 1987) ........ 9

Senate Finance Committee Report, Trade Reform Act of 1974, Report No. 93-1298, 93rd Congress, 2nd Session (Nov. 1974) ........ 9

Pursuant to USCIT Rule 76, and with leave of this Court, *amici curiae* Carla A. Hills, Alan Wm. Wolff, and Warren H. Maruyama submit this brief in support of Plaintiffs in this case.

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are three former senior U.S. trade officials whose combined experience spans more than a century in the development, negotiation, implementation, and enforcement of U.S. trade policy. Their direct involvement with Section 301 and the Trade Act of 1974 provides the Court with unique insight into the statute's origins, purpose, and historical application.

**Ambassador Carla A. Hills,** United States Trade Representative from 1989 to 1993, served as President George H.W. Bush's principal trade advisor and chief negotiator. She oversaw the implementation of Section 301 and Super 301, negotiated the North American Free Trade Agreement, led U.S. participation in the Uruguay Round negotiations that created the World Trade Organization, and personally supervised significant Section 301 actions, including the U.S.-Japan Semiconductor Agreements and the lifting of Section 301 retaliation following negotiated resolutions.

**Ambassador Alan Wm. Wolff** played a central role in creating Section 301. As Treasury's lead international trade lawyer and later Deputy General Counsel and General Counsel of the Office of the Special Representative for Trade Negotiations, he originated the Administration's proposal that became Section 301 and served as the principal Administration draftsman of the Trade Act of 1974 during congressional consideration. As such, he attended all House Ways and Means and Senate Finance Committee mark-up sessions on the legislation and later served as Deputy U.S. Trade Representative and Deputy Director-General of the WTO.

**Warren H. Maruyama,** former USTR General Counsel, helped shape and implement U.S. trade policy across multiple administrations. He participated in drafting major trade legislation, including the 1984 and 1988 trade acts, and was involved in significant Section 301 actions and

enforcement efforts involving Japan, the European Communities, Korea, Brazil, and the WTO Hormones dispute.

## SUMMARY OF ARGUMENT

Section 301 authorizes the U.S. Trade Representative to take action to eliminate unfair foreign acts, policies, and practices that burden U.S. commerce. This has always been taken by USTRs to indicate negotiation of a solution if possible, and where in that official's discretion it is appropriate, to impose duties or other import restrictions against the trade of that country if it fails to remove the measure at issue. This case concerns the Executive Branch's attempt to transform that targeted authority into a sweeping power to impose broad, economy-wide tariffs untethered from the statute Congress enacted.

The text, structure, and history of Section 301 demonstrate that Congress intended the provision to address specific foreign acts, policies, or practices identified through a meaningful investigation and supported by findings of harm to U.S. commerce. Nothing in the statute authorizes USTR to aggregate dozens of separate investigations and set a novel standard that foreign countries have not in the judgment of the USTR met, in order to justify tariffs of unprecedented breadth against multiple countries. Such an approach finds no support in the statutory text, legislative history, or the consistent practice under Section 301 during the more than fifty years since its enactment.

The Trade Act of 1974 was the product of intense congressional scrutiny, particularly regarding the extent to which trade authority could be delegated to the Executive. Throughout the Act, Congress imposed clear substantive and procedural limits on each tariff authority it delegates to the President. It is not at all credible that Congress simultaneously conferred, by implication, an

unlimited tariff power through Section 301, administered by a cabinet official, without any indication in the statute or legislative history that it intended to do so.

USTR's interpretation also raises serious constitutional concerns. Article I vests tariff authority in Congress, and delegations of that authority have historically been specific and constrained. By asserting an effectively boundless Section 301 authority through the aggregation of numerous investigations, USTR exceeds the limits established by Congress and upsets the constitutional allocation of trade powers. In addition, as the alleged cause of the tariffs is spurious, the investigations inadequate if carried out at all, the remedy not calibrated to obtain the relief said to be sought, the resulting tariffs should be set aside as contrary to law and arbitrary and capricious under the Administrative Procedure Act.

## ARGUMENT

### A. THE CONSTITUTION BARS THE EXECUTIVE FROM EXERCISING THE COMPLETE TARIFF POWER OF THE UNITED STATES

Reflecting President Trump's belief in tariffs as a means to raise tax revenue, revive American manufacturing, and force other countries to submit to asymmetrical U.S. demands, the Trump Administration has: (1) imposed tariffs under IEEPA, by declaring longstanding U.S. trade deficits constitute an emergency, (2) negotiated "reciprocal trade deals" with America's chief trading partners to displace tariff levels and market access commitments approved by Congress with no negotiation implementing authority, (3) imposed tariffs to deal with a purported balance of payments problem under Section 122, (4) at the expiration of the 150 day limit contained in Section 122, turned to USTR's retaliatory authority under Section 301 to apply virtually identical tariffs to nearly all U.S. trade (less exemptions), and (5) resurrected a long-forgotten anti-discrimination provision of U.S. trade law, Section 338, to impose steep tariffs on Canada. What

the Trump Administration's blanket tariff measures have in common is that not one of them is supported by a delegation from Congress.

The Constitution is clear—the power to impose taxes and tariffs resides solely with Congress. The Executive only has such tariff power as Congress delegates. As the Supreme Court held in *Hampton & Co. v. United States*, 276 U.S. 394, 409 (1928), specific delegations of its tariff authority are only permissible if "Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such [customs] rates is directed to conform." Delegations must be limited to comply with the Supreme Court's nondelegation and major question doctrines. As administrators of most of the nation's principal trade authorities during over a quarter century, we were clear in understanding that we had to act within the clear statutory authorities Congress had provided. In 1971, a time of a true international economic emergency, the U.S. representative defending the U.S. import surcharge to our trading partners made clear that the President could not exceed the statutory (column 2) rates set by Congress.[1]

While there is no question that Section 301 authorizes tariffs to retaliate against a foreign country, the Administration now claims tariffs can be reset against all countries in one sweeping action. This would shift the exercise of core tariff authority from Congress to the Executive Branch and is impermissible under the Constitution and U.S. trade law.

## B. THE PRESIDENT'S TARIFF AUTHORITIES ARE LIMITED BY THE CONSTITUTION AND U.S. STATUTES

Under Article I, Section 8, of the Constitution, Congress has the exclusive power "to lay and collect Taxes, Duties, Imposts and Excises." The President does not have any inherent authority to impose tariffs and instead must turn to a specific delegation by Congress.

---

[1] *See* GATT Report of the Working Party on the U.S. Temporary Import Surcharge (Sep. 1971) at 19, at https://www.wto.org/gatt_docs/English/SULPDF/90850025.pdf.

While agencies have the power to interpret their governing statutes, the Supreme Court has been "reluctant to read into ambiguous statutory text" extraordinary delegations of Congress's powers on issues of major economic or political importance under the "major questions" doctrine. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). These considerations apply with particular force where, as here, the purported delegation involves a core congressional power like tariffs or taxes.[2]

In practice, Congress has zealously guarded its tariff and tax authority. As the Supreme Court noted in *Learning Resources*: "When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits."[3] Given the care with which Congress has approached delegations of its tariff authority in U.S. trade laws like Sections 101, 102, 122, 201, 232, 337, 701, and 731, it strains credulity that Congress would have transferred blanket tariff authority in Section 301.

## C. <u>SECTION 301'S TEXT AND LEGISLATIVE HISTORY INDICATE THAT IT CONVEYS ONLY SELECTIVE, NOT GLOBAL, AUTHORITY</u>

The two years when the Trade Act of 1974 was being considered by the Nixon and Ford Administrations and Congress was a time of highly contentious trade relations between the United States and some of its largest trading partners, particularly the European Communities, Japan, and Canada. Trade relations with the European Communities ("EC" – now the European Union or "EU") were strained over the common agricultural policy ("CAP") and European agricultural subsidies, leading to a series of heated confrontations over agricultural trade and U.S. trade

[2] *See Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) ("*Learning Resources*").
[3] *Id.*

retaliation against the EC under Section 301's predecessor, Section 252 of the Trade Expansion Act of 1962, in the so-called "Chicken War."

America's other main antagonist in trade was Japan. The United States experienced what was generally seen as too much competition from Japanese textiles, apparel, and consumer electronics. At the same time, U.S. producers had difficulties exporting to Japan beef, autos, cigarettes, skis, chewing gum, computers, ketchup, and thousands of other products. The Nixon Administration saw Section 252 as too limited, as it was confined to reacting to foreign restrictions on agricultural products, and it stressed seeking to have the U.S. live within international rules at a time when many Japanese non-tariff barriers did not fit neatly within the rules established by the General Agreement on Tariffs and Trade ("GATT").

Accordingly, when President Nixon transmitted the Trade Reform Act of 1973,[4] on April 10, 1973, it included a new Section 301 to provide broad authority to deal with specific barriers in a "foreign country or instrumentality." This provision,[5] with minor changes, became Section 301 of the Trade Act of 1974. Importantly, it was not limited to foreign measures affecting U.S. agricultural trade and was not confined to violations of U.S. trade agreement rights.

The proposed 1973 Act revised Section 252 to make it more useable, and the provision was given greater prominence as one of seven stand-alone titles in the draft bill. With a few refinements, Section 301 was approved by the House Ways and Means and Senate Finance Committees, adopted by Congress, and signed into law by President Gerald R. Ford, as the Trade Act of 1974.

---

[4] H.R. 6767.

[5] *See* https://www.govinfo.gov/content/pkg/CPRT-93HPRT95146O/pdf/CPRT-93HPRT95146O.pdf at page 38.

The problems were with specific measures of individual trading partners, particularly the EC's CAP and Japanese non-tariff barriers. There is nothing in the legislative record to suggest that a global tariff was needed or contemplated, nor was it suggested in Committee mark-up sessions. Section 301 was enacted to address specific unfair trade practices by individual U.S. trading partners.

Congress clearly understood that "foreign country" meant an individual U.S. trading partner which was maintaining specific unfair barriers to U.S. goods, services, IPR, or investments. The use of the singular, a "foreign country," was deliberate. Congress instead used the term "countries" in the plural when it authorized other actions involving multiple countries such a multilateral tariff and nontariff negotiations under Sections 101 and 102 of the 1974 Act), dealing with severe balance of payments problems under Section 122), and granting tariff preferences to developing countries under Section 501. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings").

As the Supreme Court stated in *Learning Resources*, under the "major questions" doctrine it has "long expressed 'reluctance to read into ambiguous statutory text' extraordinary delegations of Congress's powers.'" The Court noted: "These considerations apply with particular force where, as here, the purported delegation involves the core congressional power of the purse."[6] Not surprisingly, the Court also observed: "When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits."[7]

---

[6] *146 S. Ct. at 631.*

[7] *Id.*

Far from being ambiguous, Section 301 is clear that USTR's investigations should target individual countries and their specific unfair practices with an overarching goal of securing a negotiated solution that eliminates such practices and restores fair trade and the proverbial level playing field. While the statute permits the imposition of tariffs, these must be "appropriate and feasible," *i.e.,* calibrated to the individual circumstances of the foreign country involved to increase the political pressure on it to address U.S. trade demands, while minimizing costs to U.S. stakeholders.

Imputing to Congress an intention to provide a massive transfer of authority to the executive branch to set all tariffs would have effectively enabled the President to nullify tariff levels authorized by Congress over seven decades in multiple delegations of tariff negotiating authority and in trade acts approved by Congress under the TPA procedures in the 1974 Act, including the Trump Administration's negotiation of the USMCA, the North American Free Trade Agreement ("NAFTA") -- exactly what President Trump attempted to use IEEPA to accomplish. Moreover, it would allow the Administration to impose tariffs in a manner unlimited in duration, scope, height and country coverage, with profound and unpredictable consequences for U.S. importers and exporters, manufacturers, farmers, businesses, the U.S. economy, and tens of millions of households. This is nothing short of seeking a transfer of all of Congress' tariff authority to the Executive Branch through section 301.

Section 301 cannot be reasonably be read to permit the current subterfuge of the USTR's adopting a subjective standard that no nation has been judged to have met, using that failure as a cause for retaliatory action, and then, through bundling of sixty disparate "investigations," retaliating against nearly all countries which are the source of U.S. trade, effecting the transfer of the complete tariff power of Congress to the Executive Branch.

## D. A HALF-CENTURY OF CONSISTENT PRACTICE BY PAST ADMINISTRATIONS REGARDING SECTION 301 SHOWS THAT IT HAS ONLY BEEN USED SELECTIVELY

Congress has always regarded Section 301 as a negotiating tool to address unfair barriers in a specific "foreign country or instrumentality." The Senate Finance Committee Report for the 1974 Act explains: "The Committee feels that the authorities contained in this provision will serve as negotiating leverage to eliminate those barriers to, and other distortions of trade which Title I of the bill gives the President broad authority to harmonize, reduce or eliminate on a reciprocal basis."[8] Likewise, the House Ways and Means Committee stated: "In the view of the Committee, this revision of Section 252 of the Trade Expansion Act of 1962 will strengthen the hand of the administration in resolving through negotiation disputes which arise by reason of these [unfair foreign] practices."[9]

While Section 301 since has been amended on several occasions, Congress has maintained its overarching focus on negotiations with individual countries to address specific unfair barriers. In the Omnibus Trade and Competitiveness Act of 1988, the Senate Finance Committee explained: "In large measure, Section 301 is intended to be a negotiating tool to ensure that foreign countries adhere to their trade agreement obligations benefiting the United States and to obtain the elimination of other unjustifiable, unreasonable, or discriminatory foreign practices."[10] Amendments have expanded Section 301's coverage and clarified aspects of Section 301 procedure, with an overall goal of further strengthening USTR's hand in negotiations, but with no mention of massive authority to completely revamp the U.S. tariff schedule.

---

[8] Senate Finance Committee Report, Trade Reform Act of 1974, Report No. 93-1298, 93rd Congress, 2nd Session (Nov. 1974) at 13.

[9] Report of the House Ways and Means Committee on Trade Reform Act of 1974, House Report No. 93-571, 93d Cong., 1st Sess., p. 66 (Oct. 10, 1973) at 13.

[10] Senate Finance Committee Report, Omnibus Trade Act of 1987, 100th Cong., 1st Sess., Report No. 100-71, p. 73 (June 12, 1987).

Importantly, Congress has rejected efforts to recast U.S. trade law to authorize across-the-board tariffs or import restrictions. During the debates over 1988 Act, the so-called Gephardt Amendment sought to impose sweeping economic sanctions, presumably in the form of across-the-board tariffs or quotas, against countries with excessive, unfair trade surpluses,[11] much as the Trump Administration has sought to do under IEEPA, Section 122, and Section 301. Congress and the Administration discarded the Gephardt Amendment and substituted a "Super 301" procedure focusing on specific unfair trade practices.

In short, for over a half-century, past Administrations and Congresses have adhered to the broad parameters set out in the 1974 Act – deploying Section 301 for targeted actions against individual countries to generate leverage to negotiate the elimination of barriers to U.S. goods, services, investment, and intellectual property, and if necessary, the imposition of individual sanctions to pressure that country to address its unfair barriers. Broader U.S. tariff levels have remained the prerogative of Congress and set through delegations of specific negotiating authority for GATT or WTO agreements, free trade agreements (FTAs), or legislation approving such agreements.

The appropriate course of action for the President, if he wanted the United States to impose a blanket tariff, was to ask Congress for authority to do so.

---

[11] H.Amdt.56 to H.R.3, 100th Congress (1987-88).

## E. USTR'S INVESTIGATORY PROCESS AND THE REMEDIES PROVIDED WERE ARBITRARY AND CAPRICIOUS AND WENT BEYOND ITS STATUTORY AUTHORITY UNDER SECTION 301 AND THE APA

Unlike IEEPA and Section 122, which are Presidential authorities,[12] USTR's actions under Section 301 are subject to the Administrative Procedures Act (APA), including judicial review of whether an action is arbitrary and capricious, an abuse of discretion, or a violation of the law.

### 1. The Text of Section 301 Makes Clear USTR's Tariffs Are a Misuse of its Statutory Authority

As the Supreme Court stated in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the courts, not administrative agencies, are the ultimate arbiters of statutory meaning. The APA requires courts to exercise their "independent judgment" in deciding whether an agency has acted within its statutory authority. As the Court of Appeals for the Federal Circuit explained in *Gilda Industries, Inc. v. United States*, 622 F. 3d 1358, 1363 (Fed. Cir. 2010), "the court must 'decide all relevant questions of law, interpret constitutional and statutory provisions,' and 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'"

While the Trump Section 301 tariffs ostensibly deal with forced labor violations, they bear a remarkable resemblance to the President's 10 percent reciprocal tariffs under IEEPA, which were struck down by the Supreme Court in *Learning Resources,* and his Section 122 tariffs which were struck down by this court in *Burlap & Barrel, Inc. v. United States*, Ct. No. 26-1606, Slip Op. 26-47 (Ct. Int'l Trade May 7, 2026). They cover U.S. trade in the same comprehensive manner with virtually an identical set of exclusions designed to accommodate key U.S. stakeholders or fend off

[12] As this court held in *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1323-26 (Ct. Int'l Trade 2022), USTR is an "agency" and language to the effect that its determinations are "subject to the direction of the President" does not transform its Section 301 determinations into Presidential actions.

a political backlash.[13] In short, the Section 301 tariffs appear to be a thinly disguised pretext for reimposing the President's IEEPA tariffs under the guise of dealing with forced labor, after all too often sham "investigations." While the President's conviction that the United States would benefit from higher tariffs is longstanding, the appropriate solution was to seek legislation to increase tariffs from Congress, as President McKinley did, as the tariff power resides in that body under the Constitution.

Under Section 301(b), for issues not covered by trade agreements, like forced labor, USTR can investigate an "act, policy, or practice of a foreign country" by pursuing government-to-government negotiations aimed at the "elimination of that act, policy, or practice."[14] To this end, the statute spells out a specific process to be followed, including initial consultations with the foreign country,[15] the negotiation of "binding agreements with such foreign country that commit such foreign country to … eliminate, or phase out, the act policy or practice that is the subject of the action …,"[16] and monitoring of "the implementation of each measure undertaken, or agreement that is entered into by a foreign country."[17]

If a negotiated agreement is not forthcoming or breaks down, and the USTR determines that the foreign act, policy or practice is "unreasonable or discriminatory and burdens or restricts United States commerce" under Section 301(b), USTR can take "appropriate and feasible" action by suspending trade agreement concessions or "imposing duties or other import restrictions on the goods of … <u>such foreign country</u>." As the statutory text makes clear, the goal of "appropriate and

---

[13] USTR Section 301 Press Release, *Fact Sheet: USTR Section 301 Action in Response to the Failure of 60 Economies to Ban Imports Produced with Forced Labor*, at https://ustr.gov/about/policy-offices/press-office/fact-sheets/2026/july/fact-sheet-ustr-section-301-action-response-failure-60-economies-ban-imports-produced-forced-labor.

[14] 19 U.S.C. § 2411(b).

[15] *See* 19 U.S.C. § 2413.

[16] 19 U.S.C. § 2411(c)(1)(D).

[17] 19 U.S.C. § 2416(a).

feasible action" is to "obtain the elimination of that act, policy or practice"[18] by the foreign country involved, while minimizing the costs for U.S. stakeholders.

In short, Congress created Section 301 for use in negotiations with a foreign country over specific, identified unfair trade practices. It specifies a process to be followed before authorizing retaliatory duties to bring a recalcitrant trading partner to the negotiating table. It does not confer broader authority for the Executive Branch to reset U.S. general tariff rates, or to supplant post-war tariff reductions enacted on a bipartisan basis by successive Administrations and Congresses.

By its terms, Section 301 requires USTR to find a "burden on U.S. commerce." The Administration made no effort to identify how each individual country's practices affected U.S. commerce and instead resorted to generalized observations that forced labor practices can disadvantage U.S. competitors by providing an unfair cost advantage. It made no attempt to link the specific practices of individual countries to such harms and thus failed to meet the "burden or restriction" requirement of the law. In fact, the tariffs appear wildly out of proportion to the impacts of forced labor practices, which are extremely rare in the advanced industrialized economies that account for the bulk of U.S. trade, like the EU, Canada, Japan, etc., and can be readily addressed by banning such imports under Section 307 of the Tariff Act of 1930, 19 U.S.C. § 1307.

### 2. USTR's Justifications for Imposing Tariffs Are Contradictory and Incoherent, Fail to Meet the APA's Arbitrary and Capricious Standard, and Represent an Abuse of Discretion

The Administrative Procedure Act (APA) authorizes judicial review of USTR's factual justifications and determinations under Section 301 in order to ascertain whether USTR's actions

[18] 19 U.S.C. § 2411(b)(2).

are "arbitrary and capricious or an abuse of discretion." In *In re Section 301 Cases*, this Court stated*:* "An agency's explanation of the basis and purpose of its action must demonstrate a 'consideration of relevant factors' … and 'must offer a rational connection between the facts found and the choice made.'"[19]

While the arbitrary and capricious standard provides a level of deference to USTR and other administrative agencies on factual findings, the courts can dig more deeply into an agency's purported justification if it appears arbitrary, incoherent, or at odds with its stated purposes, or fails to engage with stakeholder comments or clearly explain the justification for higher tariffs.

Section 304(c) explicitly requires USTR to publish in the Federal Register any determination that the specific requirements of Section 301(b) have been met "together with a description of the facts on which such description is based." 19 U.S.C. § 1413(c) Accordingly, USTR's imposition of retaliatory duties has typically been accompanied by a detailed explanation of the unfair practices and the amount of trade damage, or by a WTO report detailing why a foreign WTO Member's practices violate the WTO Agreements.[20] A good example is USTR's determination in the first Trump Administration's 181-page "Report on China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation" (Mar. 22, 2018), which was ultimately upheld by this Court in *In re Section 301 Cases*, 628 F. Supp. 3d 1235 (Ct. Int'l Trade 2023) and by the Federal Circuit in *HTMX Industries LLC v. United States*, 156 F. 4th 1236 (Fed. Cir 2025).

Here, USTR's determinations consist of rote, conclusory recitations that the 60 countries either have "failed to effectively enforce a prohibition on the importation of goods produced with

[19] 570 F. Supp. 3d at 1338.

[20] *See*, *e.g.*, Appellate Body, EC Measures Concerning Meat and Meat Products (Hormones), AB-1997-4, WT/DS26/AB/R, WT/DS48/AB/R (Jan. 16, 1998) at https://www.wto.org/english/tratop_e/dispu_e/hormab.pdf.

forced or compulsory labor" or have "failed to impose and effectively enforce" a forced labor import prohibition.[21]

While the tariffs are ostensibly based on failures by the 60 countries to prohibit forced labor, the Administration's claims of leadership in "tackling modern-day slavery at its source" are contradicted by its decision in March 2025 to allow "DOGE" to cancel or decimate 69 Department of Labor programs addressing forced and child labor[22] and to eliminate $500 million in Department's International Labor Affairs Bureau (ILAB) funding for such programs.

The Administration appears to have made only a cursory effort, if any, at negotiations or detailed factual inquiries into the specific labor practices of individual countries, and instead conducted an abbreviated investigation, even though the statute permits up to 12 months for negotiations and 18 months in "more complicated" investigations. In its haste, the Administration apparently did not even consult with 14 of the targeted foreign countries, despite a clear statutory requirement to engage in consultations.

The Administration also omitted any provisions for the removal of Section 301 tariffs as an incentive for the negotiated elimination of objectionable forced labor practices. In short, the goal throughout was to reimpose higher U.S. tariffs by Presidential fiat, not to eliminate forced labor, and the Section 301 investigations were a thinly veiled pretext for reimplementing the President's 10 percent IEEPA and Section 122 tariffs.

USTR found that all 60 of the countries failed to prohibit the importation of forced labor goods. For countries with statutory prohibitions (Canada, Ecuador, EU, Indonesia, Mexico, and

---

[21] USTR's Report on Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (June 2, 2026) ("Section 301 Forced Labor Report") and subsequent USTR's Notice of Actions, 91 Fed. Reg. 47,318 (USTR July 28, 2026).

[22] Press Release, Alliance to End Slavery & Trafficking (Apr. 23, 2025) at https://endslaveryandtrafficking.org/atest-joins-100-organizations-to-urge-restoration-of-ilabs-grant-program-to-combat-forced-and-child-labor/.

Pakistan), USTR cited a lack of adequate documentation or official data regarding "investigations, seizures, or other lack of information." USTR then grouped the countries into two categories: those with import prohibitions which were subject to a 10 percent tariff and those which lacked a statutory import prohibition, which were subject to a 12.5 percent tariff. However, it also cited a variety of justifications for lowering its tariffs from 12.5 percent to 10 percent for certain countries and for exempting certain products entirely, which do not have anything to do with acting against forced labor imports.

In making its determinations, USTR found that forced labor imposes a "burden or restriction" on U.S. commerce under Section 301 through unfair competition in the markets of investigated economies, competition with U.S. goods in global markets, or unfair competition in the U.S. market from imported forced labor goods, citing findings by International Labor Organization ("ILO") on forced labor in global markets and a report by the Department of Labor's International Labor Affairs Bureau ("ILAB").[23]

While USTR relied heavily on ILAB's reports, its findings are at odds with many of ILAB's findings. For example, in a 2024 Annual Report,[24] ILAB cited 9 countries as achieving its "highest level of Significant Advancement." ILAB findings are wildly at odds with those of USTR, which excused some and gave increased tariffs to others that ILAB cited for their exemplary records on forced labor (*e.g.*, Argentina, Chile, Colombia, Ecuador, and Thailand). ILAB cited eight countries for their "complicity in the worse forms of child labor." Six of them were exempted from tariffs – Afghanistan, Burma, Chad, Eritrea, Rwanda, and South Sudan. While ILAB identified forced labor practices in Indonesia, Pakistan, Bangladesh, El Salvador, Ecuador, and India, all benefited

---

[23] Section 301 Forced Labor Report at 16.

[24] ILAB, "2024 Annual Report on Findings on the Worst Forms of Child Labor" (Sep. 2025).

from the lower 10% tariffs. Put plainly, the selection of countries targeted for tariffs and the groupings of countries for 10 percent and 12.5 percent tariffs appear arbitrary and wholly unrelated to the stated objectives of USTR's forced labor tariff. While USTR cited Brazilian beef as an example of forced labor products, it was exempted from the new tariff.

In addition, USTR failed to explain, as required by the statute, how each country's individual regime leads to the export of forced labor goods to the U.S. or impedes export sales of U.S. goods so as to result in a burden or restriction on U.S. commerce. While forced labor is deeply repugnant and violates accepted international norms, it is also extremely rare. The tariffs are wildly disproportionate to the wholly speculative harms suffered.

The failure to provide a reasoned, record-based explanation for imposing near-uniform tariffs across 60 economies and interpreting Section 301 is the exercise of a sweeping global taxing power Congress did not grant, render the USTR tariff arbitrary, capricious and unsupported by law.

## CONCLUSION

For the foregoing reasons, we respectfully urge the Court to determine that the Section 301 "Forced Labor" tariffs, go beyond its statutory authority under Section 301, are arbitrary and capricious, and are therefore invalid. Importers are therefore entitled to a refund of any duties collected with applicable interest.

Respectfully submitted,

/s/ Alan Wm. Wolff

Alan Wm. Wolff
20 Bridle Court
P.O. Box 59110
Potomac, MD 20854
(202) 577-6107
alan.wolff@alanwmwolff.com

/s/ Warren H. Maruyama

Warren H. Maruyama
4131 Harrison Street NW
Washington, DC 20015
(202) 253-3844
WHMaruyama@gmail.com

/s/ Carla A. Hills

Carla A. Hills
5610 Wisconsin Avenue
Unit 20C
Chevy Chase, MD 20815
(202) 441-1875
Cahills@hillsandco.com

Date: September 10, 2026

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing AMICI CURIAE BRIEF OF FORMER U.S. TRADE OFFICIALS IN SUPPORT OF PLAINTIFF contains **4,935 words**, excluding those portions that do not count toward the word limitation and thus complies with the Court's Procedural Order for Section 301 Forced Labor Cases (Aug. 13, 2026) in this case and Standard Chambers Procedures.

/s/ Alan Wm. Wolff