| | |
|---|---|
| **IN RE SECTION 301 FORCED LABOR CASES**<br><br>*This Document Relates To: ALL CASES* | **Court No. 26-cv-03555-3JP**<br><br>Before: Choe-Groves, Reif,<br>and Wang, Judges<br><br>*Sample Case:*<br>Learning Resources, Inc. v.<br>United States, No. 1:26-cv-03347-3JP |

## MOTION FOR LEAVE TO FILE BRIEF OF AMICUS CURIAE

Pursuant to USCIT Rules 7(b) and 76, Barry Appleton respectfully moves for leave to file the proposed brief accompanying this motion as amicus curiae in the master case, in support of Plaintiffs' pending Motion for Judgment on the Agency Record, conditionally filed herewith.[1]

Amicus is a member of the Bar of this Court.[2] He is Co-Director and Distinguished Senior Fellow, Center for International Law, New York Law School; Managing Partner, Appleton & Associates International Lawyers LP; Interim Director, Balsillie Legal Advisory Centre, Balsillie School of International Affairs; and, as of August 1, 2026, Adjunct Professor at Wilfrid Laurier University, Waterloo, Ontario. He filed three written submissions and gave sworn oral testimony in the underlying agency proceeding, Docket USTR-2026-0265, portions of which this brief

[1]USCIT R. 76 (addressing the timing and filing of an amicus brief and requiring the motion for leave to state the amicus's interest and why the brief is desirable and relevant). See also Standard Procedural Order No. 26-03, In re Section 301 Forced Labor Cases, Court No. 26-cv-03555-3JP (Ct. Int'l Trade Sept. 2, 2026), ECF No. 19 (confirming that a motion for leave to file an amicus brief must comply with USCIT Rules 7 and 76 and the Standard Procedural Orders entered in this action, and that the proposed brief may be conditionally filed with the motion).

[2]USCIT R. 75(b)(1) (each amicus curiae must appear through an attorney authorized to practice before the court). Amicus is a member of the Bar of this Court.

discusses.[3] Those submissions are part of the administrative record, and neither they nor the additional primary-source research discussed below is cited in Plaintiffs' motion.[4]

The Court applies five factors on a motion for leave.[5] Amicus is not a party to any coordinated action and has no financial interest in the outcome. Amicus is aware of no opposition to this motion. The proposed brief does not repeat Plaintiffs' statutory-authority, arbitrary-and-capricious, or pretext arguments; it adds Canada-specific record and procedural points that Plaintiffs' motion does not develop.[6] Those points are relevant to the Canada determination and useful because the principal filings do not develop them.

This filing is made in the master case established by Standard Procedural and Scheduling Order No. 26-01,7where Learning Resources, Inc. v. United States is the designated sample case

[3]Barry Appleton, A Standard Never Stated: Canada, the Enforcement Record, and the Section 301 Forced Labor Determination, Post-Hearing Rebuttal Comments, Docket No. USTR-2026-0265-00133410 (July 16, 2026) [hereinafter Rebuttal Comments]. His principal comment, Ratification Buys Nothing, Docket No. USTR-2026-0265-00131068 (July 2, 2026), and supplemental comment, No Duty Should Do the Same Work Twice, Docket No. USTR-2026-0265 (July 5, 2026), are also part of the record.

[4]Plaintiffs' Motion for Judgment on the Agency Record, In re Section 301 Forced Labor Cases, Court No. 26-cv-03555-3JP (Ct. Int'l Trade Aug. 24, 2026), ECF No. 16. It does not cite amicus's agency submissions or the additional research discussed in Parts III, IV, and V below.

[5]Irving Paper Ltd. v. United States, 296 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2018) (five factors: disinterestedness; whether there is opposition; whether counsel can present the argument unassisted; the strength of the information and argument offered; and its usefulness to the Court).

[6]Pls.' Mot., supra note 4, at 19–51. The proposed brief addresses different Canada-specific record and procedural issues.

[7]Standard Procedural and Scheduling Order No. 26-01, In re Section 301 Forced Labor Cases, Court No. 26-cv-03555-3JP (Ct. Int'l Trade Aug. 13, 2026), ECF No. 1 (directing use of the master case and requiring the caption to indicate whether a filing relates to all cases or specified cases).

and the other coordinated actions are stayed.[8] The proposed brief addresses the Report and Final Notice common to all coordinated cases and bears the notation required by that order.

The combined motion and proposed brief comply with the Court's stated 5,000-word limit, as reflected in the certificate below. For the foregoing reasons, amicus respectfully requests that the Court grant leave to file the proposed brief.

Respectfully submitted,

/s/ Barry Appleton

**Barry Appleton**
Member of the Bar of this Court
*Amicus Curiae, pro se*
185 West Broadway
New York, NY 10013
(416) 966-8800
bappleton@appletonlaw.com

Dated: September 10, 2026

[8] Standard Procedural Order No. 26-02, In re Section 301 Forced Labor Cases, Court No. 26-cv-03555-3JP (Ct. Int'l Trade Aug. 19, 2026) (designating Learning Resources as the sample case and staying the other coordinated cases, including Burlap and Barrel).

**Certificate of Service**

I, Barry Appleton, hereby certify that on September 10, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record and other CM/ECF participants.

Dated: September 10, 2026

/s/ Barry Appleton

**Barry Appleton**

**Certificate of Compliance**

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1) and Standard Procedural and Scheduling Order No. 26-01, I certify that the motion and proposed brief in this single filing, including headings, footnotes, and quotations but excluding the captions, signature blocks, the certificate of service, this certificate, and the proposed order, contain 3,957 words according to the word-processing system used to prepare the filing and comply with the Court's 5,000-word combined limit.

**Proposed Order**

Upon consideration of the Motion for Leave to File Brief of Amicus Curiae Barry Appleton and the proposed brief submitted with that motion, it is hereby ORDERED that the motion is GRANTED.

It is further ORDERED that the proposed brief is accepted for filing as the brief of amicus curiae Barry Appleton in the master case and relates to all coordinated cases identified in Standard Procedural and Scheduling Order No. 26-01.

**IN RE SECTION 301 FORCED LABOR CASES**

*This Document Relates To: ALL CASES*

**Court No. 26-cv-03555-3JP**

Before: Choe-Groves, Reif,
and Wang, Judges

*Sample Case:*
Learning Resources, Inc. v.
United States, No. 1:26-cv-03347-3JP

# PROPOSED BRIEF OF AMICUS CURIAE BARRY APPLETON IN SUPPORT OF PLAINTIFFS

## Statement of Interest

Amicus filed three written submissions and gave sworn oral testimony at the July 2026 hearing concerning the agency's investigation, and the proposed brief draws on that record.[9] He is a professor of law who has taught and practiced on both sides of the Canada-United States border for more than thirty years, with extensive professional experience in Canadian trade and regulatory practice. He currently serves as Co-Director and Distinguished Senior Fellow at the Center for International Law, New York Law School, and, as of August 1, 2026, as Adjunct Professor at Wilfrid Laurier University in Waterloo, Ontario. He has no financial interest in the outcome. The proposed brief does not ask the Court to hold that Section 301 is unavailable to address forced labor and does not repeat Plaintiffs' statutory-authority, arbitrary-and-capricious, or pretext arguments.[10] It offers five Canada-specific, record-based points that are not developed in Plaintiffs' motion.

[9]See supra note 3.

[10]Pls.' Mot., supra note 4, at 19–51.

## Summary of Argument

Five Canada-specific issues warrant the Court's attention. First, the Report and Final Notice use inconsistent formulations about whether Canada has an import prohibition, without explaining the difference. Second, USTR does not identify how Canada's conduct burdened United States commerce. Third, the record does not show that USTR completed the consultation sequence Section 303 prescribes for a trade-agreement investigation. Fourth, the Report's analytical and quantitative predicates require reconciliation with the sources it cites. Fifth, CBSA's own parliamentary testimony reports figures that do not reconcile with one another or with the count USTR used, and the Report does not address the discrepancy.

## I. The Report and Final Notice Use Inconsistent Formulations About Canada's Import Prohibition

The Report and Final Notice describe Canada's import-prohibition status inconsistently, and neither document explains the discrepancy.

The Trade Representative's June 2, 2026 Report states, in examining whether Canada imposes a prohibition, "Accordingly, USTR does not find that Canada has failed to impose a forced labor import prohibition."[11] In the section addressing the unreasonableness finding, however, the

[11]Office of the U.S. Trade Representative, Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (June 2, 2026) [hereinafter Report], at 21 ("Accordingly, USTR does not find that Canada has failed to impose a forced labor import prohibition."). The Report makes the same finding for Ecuador, the European Union, Indonesia, Mexico, and Pakistan.

Report concludes that it is unreasonable for Canada and five other economies "to fail to effectively enforce" a prohibition each maintains[12]. That reasoning assumes that the prohibition exists.

The Final Notice, published July 28, 2026 and effective July 24, repeats the inconsistency. It says that "All of the investigated economies have failed to impose a forced labor import prohibition and to effectively enforce such a prohibition[13]," yet two paragraphs earlier identifies Canada among six economies that "have failed to effectively enforce a prohibition[14]."

The Canada-specific operative paragraph states that Canada "has failed to effectively enforce its forced labor import prohibition" and imposes a 10 percent tariff.[15] That paragraph is coherent, but it does not reconcile the contrary global recitation.

Even if the Government later characterizes the inconsistency as inadvertent, *State Farm* requires the Court to evaluate the rationale the agency actually gave. The Canada-specific paragraph may provide the operative rationale, but the Notice itself also presents the conflicting sentence as part of the final determination and does not explain which formulation controls.[16] Under State Farm and Chenery, a reviewing court evaluates the reasons the agency gave, not a

[12]Report, supra note 11, at 34 (Section IV.E) (concluding that it is unreasonable for Canada, Ecuador, the European Union, Indonesia, Mexico, and Pakistan "to fail to effectively enforce" a prohibition each maintains).

[13]Notice of Actions in Section 301 Investigations, 91 Fed. Reg. 47,318, 47,318 (July 28, 2026) [hereinafter Final Notice] (reciting that "All of the investigated economies have failed to impose a forced labor import prohibition and to effectively enforce such a prohibition"). The Notice states that additional duties apply to goods entered for consumption on or after July 24, 2026.

[14]Final Notice, supra note 13, 91 Fed. Reg. at 47,318 (listing Canada among six economies found to have failed to effectively enforce a forced-labor import prohibition).

[15]Final Notice, supra note 13, 91 Fed. Reg. at 47,322 (§ II.A.10) (stating that Canada failed to effectively enforce "its forced labor import prohibition" and imposing 10 percent tariffs).

[16]Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); SEC v. Chenery Corp., 318 U.S. 80, 87 (1943); accord Kingtom Aluminio S.R.L. v. United States, 805 F. Supp. 3d 1317, 1328 (Ct. Int'l Trade 2025) (setting aside a forced-labor determination for a barebones recitation lacking a rational connection between facts found and action taken).

rationale supplied after the fact.[17] The issue is therefore not whether the Court can imagine a coherent Canada rationale; it is whether the agency gave one and whether the inconsistency was harmless.

The sentence appears in the June Report and was repeated in the July Final Notice, after the agency had received additional comments and held hearings. At minimum, the agency should clarify the finding and its effect on Canada's rate; if the agency cannot show that the error had no bearing on the decision, the Court should consider the appropriate remedy under the APA.[18]

## II. USTR Did Not Explain How Canada's Conduct Burdened United States Commerce

Section 301(b) requires a finding that the practice "burdens or restricts United States commerce." The question for Canada is not whether USTR could ever rely on an economy-wide theory; it is whether the Report identified facts connecting Canada's alleged enforcement failure to a burden on United States commerce.[19]

Plaintiffs' motion challenges USTR's generalized burden theories and develops Japan as its principal country-specific example.[20] It does not develop the Canada-specific application.[21]

Amicus's post-hearing submission put the problem this way: "Canada is the largest export market for United States goods in the world. The proposition must therefore be that a shipment the Canada Border Services Agency failed to detain displaced an American export to Canada. The

[17] Plaintiffs' Mot., supra note 4, at 10–16 (describing the investigation, comment periods, and hearings).

[18] 5 U.S.C. § 706(2)(A) (a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, or otherwise not in accordance with law).

[19] 19 U.S.C. § 2411(b)(1).

[20] Report, supra note 11, at 27 (discussing Canada's enforcement record without identifying a burden on United States commerce specific to Canada).

[21] Report, supra note 11, at 50, 54–55; Pls.' Mot., supra note 4, at 37–39 & n.23.

Report does not identify that export. It does not identify the shipment. It does not identify the product. It does not quantify the injury."[22] The Report offers no Canada-specific causal connection between the alleged enforcement failure and any identified burden on United States commerce, and the statute requires one. An economy-wide finding may be permissible if the agency explains the causal link, but the Report does not make that explanation for Canada.

## III. The Record Does Not Show Compliance with Section 303's Trade-Agreement Procedure

Section 303 sets out a separate procedural sequence when an investigation involves a trade agreement. The record does not show that USTR completed that sequence before acting against Canada.

If consultations do not produce a mutually acceptable resolution before the earlier of the agreement's consultation period or the 150th day after consultations commenced, 19 U.S.C. § 2413(a)(2) states that the Trade Representative "shall promptly request proceedings . . . under such agreement's" formal dispute-settlement procedures.[23] The practice at issue is tied to USMCA article 23.6, which requires each Party to prohibit the importation of goods produced in whole or in part by forced or compulsory labor.[24] Canada has stated in parliamentary testimony that it considers itself to have met that obligation.[25]

---

[22] Rebuttal Comments, supra note 3, Part III.C ("The defect is at its most acute as applied to Canada"), confirmed against the filed submission.

[23] 19 U.S.C. § 2413(a)(2).

[24] USMCA art. 23.6 (obliging each Party to prohibit the importation of goods produced in whole or in part by forced or compulsory labor).

[25] House of Commons of Canada, Standing Committee on International Trade, Evidence, Meeting 44, 45th Parl., 1st Sess. (June 18, 2026) (testimony of Lynn McDonald, Director General, North America Trade Policy Bureau, stating that article 23.6 is an existing obligation and that Canada considers its CUSMA obligations met).

The June 5 Notice confirms that USTR requested consultations with Canada on March 12, 2026, the date the investigations were initiated.[26] If that request was the USMCA Article 31.4 request, the 75-day consultation period for a non-perishable-goods matter ended May 26, 2026. USTR issued the Report and its initial determinations on June 2, seven days later, and the materials before the Court identify no request for Chapter 31 proceedings. If the March 12 request was not an Article 31.4 request, the 150-day statutory backstop would have expired on or about August 9, making the June 2 action premature only under that reading of Section 2413(a)(2).[27] The record therefore presents a material characterization question that USTR did not resolve: what consultation it requested, which period governed, and whether it complied with the next statutory step.[28]

Section 2413(a)(2) is not permissive. It provides that once the consultation period closes without resolution, the Trade Representative "shall promptly request proceedings . . . under such agreement's" formal dispute-settlement procedures. The record does not show that this plainly obligatory step was taken.

Authorities concerning USMCA article 10.12, the binational-panel mechanism for reviewing antidumping and countervailing-duty determinations, do not resolve this question. Article 10.12 addresses a different forum and category of proceeding[29]; § 2413(a)(2) invokes

---

[26]Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations, 91 Fed. Reg. 34,272, 34,273 (June 5, 2026) (confirming that consultations were requested with Canada on March 12, 2026).

[27]USMCA art. 31.6.1 (75-day consultation period for a non-perishable-goods matter); 19 U.S.C. § 2413(a)(2).

[28]See Defendant's Master Answer, ECF No. 17, at 8 (asserting compliance with statutory requirements).

[29]USMCA art. 10.12; compare id. ch. 31 (general state-to-state dispute settlement).

Chapter 31's general state-to-state dispute-settlement procedures. That distinction does not establish that any omission was harmless; it simply limits what those authorities can show here.

If USTR did not complete the Section 303 sequence, the action against Canada may lack the procedural predicate the statute requires — an independent basis for the Court to set aside the determination under the APA.

## IV. Section 301's Continuation Mechanism Makes the Appropriate-Action Explanation Especially Important

Section 301's continuation mechanism makes the durability of the selected action relevant to the appropriate-action explanation.

Plaintiffs argue that USTR never showed, at the time of its determination, that the tariffs could "end or reverse" any particular economy's practices.[30] That is a challenge to the agency's explanation when the action was selected. A related question is how the selected action is expected to operate over time. Section 301 actions terminate after four years unless a representative of the benefiting domestic industry timely requests continuation; if continuation is requested, USTR conducts a review of effectiveness and economic effects.[31] Independent research reports that the technology-transfer tariffs imposed against China in 2018 remained in force in 2026 after successive reviews, while Section 301 investigations generally concluded well within their statutory ceilings.[32]

---

[30] HMTX Indus. LLC v. United States, 156 F.4th 1236, 1252 (Fed. Cir. 2025) ("an appropriate discretionary action is one that can end or reverse the investigated conduct"); accord Pls.' Mot., supra note 4, at 42–44.

[31] 19 U.S.C. § 2417(c)(1), (c)(3) (an action terminates at the end of a four-year period absent a timely continuation request; if a request is made, USTR conducts a review of the action's effectiveness and effects on the United States economy).

[32] Barry Appleton, How Long Does a Section 301 Action Last? A Duration Chart of Section 301 Investigations (Aug. 11, 2026), https://ssrn.com/abstract=7268098 (reporting that the 2018 China technology-transfer tariffs remained in force in 2026 after successive reviews and that

The point is not that Congress's four-year mechanism is unlawful or that USTR must guarantee termination. The mechanism is a feature of the statute, and future continuation decisions may be contingent. But durability bears on whether the agency explained how the selected remedy could induce compliance. USTR need not forecast every later review; it should identify the mechanism by which the action is expected to end or reverse Canada's identified practice. Neither the Report nor the Notice does so.

The timeline of this investigation bears on that question. Independent research into the primary Federal Register record shows that the eight Section 301 investigations preceding this one, initiated between 2017 and 2025, ran from initiation to determination in periods ranging from approximately 112 days to 364 days, with most falling between six and ten months.[33] This investigation, covering sixty economies, more than any prior Section 301 action, moved from initiation on March 12, 2026 to determination on June 2, 2026, a span of approximately eighty-two days, shorter than every comparator in that record. Amicus does not ask the Court to draw a conclusion from timing alone. He offers it because a compressed timeline is part of the same record that already shows an internally contradicted finding, an unaddressed burden theory, and unreconciled enforcement figures, and the Court may find it relevant to whether the agency's process allowed for the individualized consideration the statute requires.

investigations generally concluded within their statutory ceilings). This research is cited as background on durability, not as part of the administrative record.

[33] Id.

## V. The Report's Remaining Factual Predicates Require Reconciliation with Their Sources

The Report's remaining factual predicates require reconciliation with the sources it cites, particularly as to the enforcement framework, the RAND estimate, and Canada's enforcement data.

The enforcement standard applied across the sixty economies comes from a single 2026 policy paper. USTR did not identify the paper as a statute or regulation,[34] and the Report does not explain why the paper's eight elements establish unreasonableness or ineffective enforcement for Canada specifically.

The Report also invokes a RAND study for a 2.5 percent tariff-equivalent figure. RAND defines that figure as the tariff rate that would produce the same decline in United States import volume already associated with enforcement of the Uyghur Forced Labor Prevention Act. It is not an estimate of the cost to a foreign government of complying with an import prohibition.[35] The figure may illustrate an effect of United States enforcement. It does not by itself quantify the burden caused by Canada's alleged non-enforcement or justify Canada's tariff.

---

[34]Report, supra note 11, at 26 & n.102 (citing Laura Murphy, An International Blueprint for Forced Labor Import Bans, Carr-Ryan Center for Human Rights, Harvard Kennedy School, Issue 2026-08 (2026)). The Report does not explain why the paper's eight elements supply a binding benchmark for Canada.

[35]Report, supra note 11, at 13–14 & n.50 (citing Victoria A. Greenfield et al., Forced Labor in Global Supply Chains: Trade Enforcement Impacts and Opportunities, RAND Corp. RR-A2534-1 (2025)). The study defines the 2.5 percent figure as a tariff-equivalent rate for the decline in United States imports associated with UFLPA enforcement, not a foreign government's compliance cost. The Report's other citations to the study concern its risk classification and regression table, not this estimate. Rebuttal Comments, supra note 3, Part III.A & n.38.

Finally, the Final Notice repeatedly states that the Trade Representative could not accommodate comments inconsistent with the President's specific direction.[36] That explanation does not show how Canada-specific evidence was weighed.

As to Canada, the Report's enforcement finding rests on figures that the enforcing agency itself reported differently to Parliament. At Meeting 16, the Executive Director of the Canada Border Services Agency's Commercial Programs Directorate testified that there had been 48 detentions, two forced-labor determinations, and that one was later overturned on appeal. The components he supplied—37 released, two prohibited, seven re-exported, and one abandoned—total 47.[37] In an earlier parliamentary appearance, the same agency confirmed that the earlier determination was released after recourse proceedings found that the goods had not, on the balance of probabilities, been produced with forced labor.[38] These accounts may reflect different definitions, time periods, or reporting errors; the record does not say. The Report does not identify which count it used or reconcile the difference.

These discrepancies do not, standing alone, establish that Canada's enforcement was adequate or inadequate. They present an unreconciled evidentiary problem: the record contains

[36]Final Notice, supra note 13, 91 Fed. Reg. at 47,329–30, 47,330–31, 47,334–35 (§§ B.1–B.3, F) (repeating that comments inconsistent with the President's specific direction could not be accommodated).

[37]House of Commons of Canada, Standing Committee on International Trade, Evidence, Meeting 16, 45th Parl., 1st Sess. (Nov. 27, 2025) (testimony of Alexander Lawton, Executive Director, Commercial Programs Directorate, Canada Border Services Agency) (reporting 48 detentions, two forced-labor determinations, one later overturned, and component figures totaling 47). Other Canadian government materials cited in Rebuttal Comments, supra note 3, Part VI.C.3, report different totals; the Report does not reconcile them.

[38]House of Commons of Canada, Standing Committee on International Trade, Evidence, Meeting 92, 44th Parl., 1st Sess. (testimony of Doug Band, Director General, Trade and Anti-dumping Programs Directorate, Canada Border Services Agency) (confirming release after recourse proceedings found that the goods had not, on the balance of probabilities, been made with forced labor).

different counts and a determination later reversed, while the agency's Canada analysis does not identify the operative count, explain the scope of the figures, or address the reversal. A reviewing court need not accept a stated reason that cannot reasonably be credited against the available record,[39] but the Court should not substitute its own count for USTR's. The proper point is narrower: before relying on quantitative enforcement data to classify Canada, USTR had to confront the discrepancies or explain why they did not affect its conclusion.

The problem bears on Canada's rate. The Final Notice places Canada in the 10 percent tier for economies that impose, or have committed to impose, a full or partial forced-labor import prohibition, consistent with its operative recognition that Canada has a prohibition.[40] But the Notice does not explain which CBSA enforcement figures supported Canada's placement in that tier or how the agency treated the later reversal. The rate therefore rests on a factual predicate the agency did not reconcile, even if a properly reconciled record could ultimately support the same conclusion.

## Conclusion

Amicus respectfully asks the Court to consider these Canada-specific points alongside the parties' arguments: the inconsistent prohibition findings, the unexplained Canada burden theory, the unresolved Section 303 sequence, the need for a more disciplined appropriate-action explanation, and the unreconciled factual predicates. These points identify gaps in the agency's

[39] Dep't of Commerce v. New York, 588 U.S. 752, 785 (2019); accord Pls.' Mot., supra note 4, at 48–51 (citing the same case for the related pretext argument).

[40] Final Notice, supra note 13, 91 Fed. Reg. at 47,318, 47,322 (§ II.A.10); Defendant's Master Answer, ECF No. 17, at 4–5 (describing the lower rate for economies with a forced-labor import prohibition).

explanation and record that bear on whether the Canada determination was made in accordance with law and supported by substantial evidence.

If the Court finds the Canada determination unlawful, vacatur is appropriate. The deficiencies identified above — an internally contradicted finding, an unaddressed burden showing, and enforcement figures the agency's own record does not reconcile — are not omissions in reasoning that further explanation could fill; they are inconsistencies in what USTR already said. HMTX's observation that "vacatur is not always required" addressed a Section 307 modification where the underlying Section 301 finding was not challenged41; it does not govern the remedy here.

If the Court instead remands, it should require USTR to address the identified inconsistencies, the Section 303 procedure, the Canada-specific burden, and the evidentiary discrepancies before leaving the tariff in effect.

Respectfully submitted,

/s/ Barry Appleton

**Barry Appleton**
Member of the Bar of this Court
*Amicus Curiae, pro se*
185 West Broadway
New York, NY 10013
(416) 966-8800
bappleton@appletonlaw.com

Dated: September 10, 2026

[41] HMTX Indus. LLC v. United States, 156 F.4th 1236, 1258 (Fed. Cir. 2025) (noting in a Section 307 modification case that "vacatur is not always required" for inadequate reasoning).