**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONRABLE LISA W. WANG, JUDGE

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-CV-03555-3JP |

**BRIEF AMICUS CURIAE OF GOLDWATER INSTITUTE IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITES ................................................................................................ ii

IDENTITY AND INTEREST OF AMICUS…………………………………............................ 1

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I. Statutory limits on the tariff power cannot yield to deference. …………………………..... 3

A. Congress imposed procedural restrictions, including individualized determinations and responses, on the President's authority. ……………………..... 3

B. Agency findings must actually connect cause and effect with meaningful specificity. ………………………….............................................................. 6

II. These tariffs are the result of a "prejudged political conclusion," not a faithful application of the statutorily required evaluation…………………………………...…..…………………… 9

CONCLUSION …………………...……………………………...………………..……... 13

CERTIFICATE OF COMPLIANCE …...………………………..……………….……..…... 14

## TABLE OF AUTHORITIES

### Cases

*Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir. 1993) ............................................ 8

*Bam, Inc. v. Bd. of Police Comm'rs*, 9 Cal. Rptr.2d 738 (App. 1992) .......................................... 6

*Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860 (11th Cir. 2018)................................................ 6

*Campbell v. U.S. Dep't of Just.*, 164 F.3d 20 (D.C. Cir. 1998) .................................................... 2

*Cedar-Riverside Environmental Defense Fund v. Hills*, 422 F. Supp. 294 (D. Minn. 1976), *vacated as moot on appeal*, 560 F.2d 377 (8th Cir. 1977) ....................................................... 2

*Florida E. Coast Ry. LLC v. Fed. R.R. Admin.*, No. 24-11076, 2026 WL 2321640 (11th Cir. Aug. 11, 2026) ........................................................................................................................ 12

*Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015)................................................................. 1

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692 (10th Cir. 2010) ................. 6, 7, 12

*HMTX Indus. LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025), *cert. denied*, 2026 WL 1718004 (U.S. June 15, 2026) ............................................................................................... 5

*Ho Ah Kow v. Nunan*, 12 F. Cas. 252 (C.C.D. Cal. 1879)........................................................... 1

*International Snowmobile Manufacturers Ass'n v. Norton*, 340 F. Supp.2d 1249 (D. Wyo. 2004) ........................................................................................................................................ 2, 7

*Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025)........................................................... 1

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) .................................................. passim

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .................................................... 12

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)......................................................................... 7

*Mills v. Arizona Bd. of Tech. Registration*, 514 P.3d 915 (Ariz. 2022)........................................ 1

*Nat'l TPS All. v. Noem*, 166 F.4th 739 (9th Cir. 2026)................................................................. 7

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008)........................................................... 12

*Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d 573 (5th Cir. 1978) ................................................................................................................................. 2, 7

*United States v. S. Poverty L. Ctr., Inc.*, No. 2:26-CR-139-ECM, 2026 WL 2280675 (M.D. Ala. Aug. 7, 2026) .......... 12

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) .......... 1

*Zheng v. Rokosky*, 826 F. Supp.3d 545 (D.N.J. 2026) .......... 1

**Constitutional Provisions**

U.S. Const. art. II § 3 .......... 3

**Statutes**

19 U.S.C. § 2411(b)(2) .......... 5, 12

19 U.S.C. § 2411(c)(1)(A) .......... 5

19 U.S.C. § 2411(c)(1)(B) .......... 5

19 U.S.C. § 2411(c)(1)(d) .......... 5

19 U.S.C. § 2411(d)(3)(B)(iii) .......... 4

**Other Authorities**

Bello & Holmer, *The Heart of the 1988 Trade Act: A Legislative History of the Amendments to Section 301, in Aggressive Unilateralism: America's 301 Trade Policy and the World Trading System* (Bhagwati & Patrick, eds., 1990) .......... 4, 5

Bennett & Schmitz, *Why the Supreme Court Ruled Against Trump's Tariffs*, PBS News (Feb. 20, 2026) .......... 9

*Forced Labour in the UK's Supply Chains*, U.K. Parliament (July 24, 2025) .......... 11

Frankl, *Switzerland Rejects Forced Labor Accusations After U.S. Imposes New Tariffs*, Wall St. J., July 24, 2026 .......... 11

Holmer & Bello, *The 1988 Trade Bill: Is It Protectionist?,* 5 Int'l Trade Rep. (BNA) 1347 (Oct. 5, 1988) .......... 5

Holmer & Bello, *U.S. Trade Law and Policy Series No. 14 the 1988 Trade Bill: Savior or Scourge of the International Trading System?,* 23 Int'l Law. 523 (1989) .......... 5

Lambert, *White House Ready to Take on Tariffs Another Way, Navarro Says*, BBC News (May 29, 2025) .......... 10

Lincicome, *Here Comes Another Round of Sham Tariffs*, The Dispatch (July 23, 2026) .......... 10, 12

Lyons & Evershed, *“Nowhere on Earth is Safe”: Trump Imposes Tariffs on Uninhabited Islands Near Antarctica*, The Guardian (Apr. 2, 2025)................................................................ 10, 11

Manny, *The Section 301 Provisions of the Omnibus Trade Act*, 23 Bus. L. Rev. 133 (1990) ... 3, 4

Murphy, *Just How Reciprocal Are These Tariffs, Anyway?*, U.S. Chamber of Com. (Apr. 3, 2025) ........................................................................................................................ 11

*New U.S. Trade Law is Protectionist, European Community Tells GATT Council,* 5 Int’l Trade Rep. (BNA) 1302 (Sept. 28, 1988) ............................................................................... 4

*Paul Gigot in Conversation with U.S. Treasury Secretary Scott Bessent*, Wall St. J. (Apr. 15, 2026) ...................................................................................................................... 9, 10

Romm, et al., *How Are Trump’s Tariff Rates Calculated?*, N.Y. Times (Apr. 2, 2025)............. 11

Secretary Statements and Remarks, U.S. Dep’t of Treasury (Feb. 20, 2026) ............................... 9

Silverman, *Multilateral Resolution over Unilateral Retaliation: Adjudicating the Use of Section 301 Before the WTO*, 17 U. Pa. J. Int’l Econ. L. 233 (1996) ................................................ 4, 5

*Trump Announces 10% Global Tariff After Supreme Court Strikes Down His Sweeping Policy*, PBS News (Feb. 20, 2026)....................................................................................................... 9

**IDENTITY AND INTEREST OF AMICUS**

Goldwater Institute (GI) was established in 1988 as a nonpartisan public policy and research foundation devoted to advancing the principles of limited government, individual freedom, and constitutional protections. Through its Scharf-Norton Center for Constitutional Litigation, GI litigates cases and files amicus briefs when its or its clients' objectives are directly implicated. Among GI's priorities is the enforcement of constitutional checks and balances that protect individual rights against arbitrary and unauthorized executive branch agencies, and it has appeared in numerous courts to vindicate that principle, both representing parties and as an amicus. *See, e.g., Kennedy v. Braidwood Mgmt., Inc*., 606 U.S. 748 (2025); *Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015); *Mills v. Arizona Bd. of Tech. Registration*, 514 P.3d 915 (Ariz. 2022). GI also participated as amicus before the Federal Circuit in *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1322-23 (Fed. Cir. 2025), and the U.S. Supreme Court in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

**INTRODUCTION**

"[J]udges need not 'shut [their] eyes to matters of public notoriety and general cognizance. When [they] take [their] seats on the bench [they] are not struck with blindness, and forbidden to know as judges what [they] see' as ordinary members of society." *Zheng v. Rokosky*, 826 F. Supp.3d 545, 559 (D.N.J. 2026) (quoting *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879)).

It's a matter of common knowledge that the Defendants do *not*, in fact, think the tariffs *sub judice* are warranted by any concern for forced labor. Instead, it is using allegations of forced labor as a pretext for implementing the same tariffs declared unlawful in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026), through a performative gesture at the statutory requirements to serve a predetermined decision.

This brief discusses how courts have addressed such situations—that is, where executive agencies have sought to manipulate an administrative review process (thus to exercise power not actually contemplated by the statute) by gaming that process to result in a prejudged outcome.

Whatever deference may be appropriate in the ordinary case, bad-faith manipulation of the law exceeds it. *Cf. Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998) ("[D]eference is not equivalent to acquiescence" and cannot apply when there is "lack of detail and specificity, bad faith, and failure to account for contrary record evidence."). Cases from a wide variety of contexts have held that where, as here, an agency leader indicates that he or she has reached "a prejudged political conclusion," *International Snowmobile Manufacturers Ass'n v. Norton*, 340 F. Supp.2d 1249, 1261 (D. Wyo. 2004), or the agency "fails to consider relevant and important pieces of information," *Cedar-Riverside Environmental Defense Fund v. Hills*, 422 F. Supp. 294, 320 (D. Minn. 1976), *vacated as moot on appeal*, 560 F.2d 377 (8th Cir. 1977), or acts contrary to "good faith objectivity," *Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d 573, 575 (5th Cir. 1978), the agency's formalistic pretense at following the procedural requirements of the statute can be disregarded. That is what the Court should do here.

The *Learning Resources* Court reminded us that "emergencies can 'afford a ready pretext for usurpation' of congressional power," 607 U.S. at 247 (citation omitted)—or, more accurately, that the concoction of nonexistent emergencies is an effective tool for twisting out of recognition the language of statutes that were written to address genuine emergencies. The situation here is even more extreme: rather than faithfully apply the law, the government is engaging in a *pro forma* exercise to reach a predetermined conclusion in order to take advantage of a statute that was actually designed to *prevent* that. This Court should not condone such tactics.

## ARGUMENT

### I. Statutory limits on the tariff power cannot yield to deference.

#### A. Congress imposed procedural restrictions, including individualized determinations and responses, on the President's authority.

Whatever deference the Executive Branch is owed, *Learning Resources* made plain that it cannot exceed statutory limits. Congress is in charge of the taxing power, and while it can authorize executive action, that authorization must exist within both statutory and constitutional boundaries. Specifically, when it delegates to the Executive Branch power over a major question, such as international tariffs, it says so explicitly. Yet here, not only does Section 301 *not* explicitly authorize across-the-board worldwide tariffs—untailored to any particular country or industry—but Congress, in adopting Section 301, actually made plain that it was seeking to constrict, not expand, presidential discretion.

That provision was fashioned to empower the President to respond in a case-by-case fashion to particular concerns about other countries' actions, with those responses tailored to the specific circumstances. That has not occurred here. Instead, the Administration has issued a *pro forma* report with the intent of manipulating the statute to empower it to pursue the same tariffs invalidated in *Learning Resources*. That is intransigence, not "tak[ing] care that the laws be faithfully executed." U.S. Const. art. II § 3.

The best reading of Section 301 is that it empowers the Executive Branch to engage in (good-faith) analysis where a foreign economy is engaging in forced labor; to investigate the circumstances, and to impose restrictions tailored to resolve specific case-by-case concerns. In fact, today's Section 301 was designed to *reduce* Presidential authority. It had previously given the President "direct final authority to retaliate against foreign trade practices"—but Congress amended it to transfer that power to the U.S. Trade Representative, albeit subject to Presidential oversight, in order to attain a degree of objectivity in the administration of tariffs. Manny, *The*

*Section 301 Provisions of the Omnibus Trade Act*, 23 Bus. L. Rev. 133, 134 (1990). And it imposed limitations on the procedure and substance of any resulting tariffs.

Thus, when the United States' Ambassador to the General Agreement on Tariffs and Trade was asked whether Section 301 would give the White House power to impose tariffs at will to pursue a protectionist trade strategy, he called that idea "balderdash." *New U.S. Trade Law is Protectionist, European Community Tells GATT Council,* 5 Int'l Trade Rep. (BNA) 1302 (Sept. 28, 1988). In fact, they pointed out that the Senate, in adopting Section 301, *rejected* a proposal which "would have required retaliation against trading partners that have a trade surplus with the United States." *Id.* Other executive officials said that the amendments "renew[] rather than renege[] on the U.S. commitment to a multilateral trading system," and that it "does not legislate barriers at our borders to close the U.S. market and create a Fortress America." Holmer & Bello, *The 1988 Trade Bill: Is It Protectionist?,* 5 Int'l Trade Rep. (BNA) 1347, 1347 (Oct. 5, 1988).

Among other things, the 1988 amendments defined for the first time words like "unjustifiable" and "unreasonable," and required the Trade Representative to make detailed findings to demonstrate that, e.g., a foreign nation is engaging in a "persistent pattern of conduct … that denies workers the rights of association" or "fails to provide a minimum age for the employment of children" before tariffs could be imposed. 19 U.S.C. § 2411(d)(3)(B)(iii).

These and other alterations "significantly altered section 301," making the imposition of tariffs "a more elaborate process with substantially restricted governmental discretion." Silverman, *Multilateral Resolution over Unilateral Retaliation: Adjudicating the Use of Section 301 Before the WTO*, 17 U. Pa. J. Int'l Econ. L. 233, 244-46 (1996). In the words of one Senator, these amendments were "an effort aimed not at closing markets, but at opening markets." Quoted in Bello & Holmer, *The Heart of the 1988 Trade Act: A Legislative History of the*

*Amendments to Section 301, in Aggressive Unilateralism: America's 301 Trade Policy and the World Trading System* 81 (Bhagwati & Patrick, eds., 1990).

In other words, Congress amended the statute so that "the Executive Branch no longer has complete discretion to determine either the severity of an unfair trade practice or the appropriate retaliatory response, but rather is 'handcuffed' by tighter procedures and deadlines." Silverman, *supra* at 247-48. By restricting, rather than expanding, the Executive Branch's discretionary power, Congress expected Section 301 "not only to maintain freer trade to the extent it now exists, but also to extend freer trade, to open more markets, and to increase the predictability of international rules for businessmen." Holmer & Bello, *U.S. Trade Law and Policy Series No. 14 the 1988 Trade Bill: Savior or Scourge of the International Trading System?,* 23 Int'l Law. 523, 527 (1989). *See also* Silverman, *supra* at 248 (under Section 301 "the Executive Branch no longer has complete discretion.").

The amendments were also designed to ensure that tariffs, where authorized, are *targeted*. Section 301(c) authorizes the Executive Branch to take action with respect to "*the* foreign country referred to," 19 U.S.C. § 2411(c)(1)(A) (emphasis added), to impose restrictions on "*such* foreign country," *id.* (c)(1)(B) (emphasis added), and to enter into agreements "with *such* foreign country." *Id.* (c)(1)(d) (emphasis added). And even in the provision of Section 301 that contemplates the widest grant of authority—that is, its authorization of the President to "other appropriate and feasible action"—that authority is limited to actions that are "appropriate … to obtain the elimination of that [unreasonable] act, policy, or practice." *Id.* (b)(2). "Appropriate" means that the action "can end or reverse the investigated conduct." *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1252 (Fed. Cir. 2025), *cert. denied*, 2026 WL 1718004 (U.S. June 15, 2026).

In other words, nothing in the structure of Section 301 or the legislative history suggests that the statute was designed to empower the President to restrict trade at will, with a broad swathe of countries, without regard to *individual tailoring* toward particular offenses by specific nations, and without designing the action to achieve the "end[ing] or revers[ing] the investigated conduct." *Id*. Yet instead, in this case, the tariffs are not targeted to particular countries, particular practices, or to particular responses aimed at eliminating actually existing offenses. Instead, the government is seeking to manipulate the individualized processes of Section 301 to eliminate its individualized nature and accomplish across-the-board trade restrictions under a bare pretense.

**B. Agency findings must actually connect cause and effect with meaningful specificity.**

Many statutes require agencies to evaluate considerations or weigh various factors before acting. The purpose of such requirements is to ensure that executive officials actually engage in a process of rational evaluation that connects the facts, through the purposes of action, to an ultimate conclusion. As the Tenth Circuit phrased it in an environmental case, the administrative review process "is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).

A better description was offered by one California court, which said that administrative agency findings

> are not supposed to be a post hoc rationalization for a decision already made. To the contrary, they are supposed to "conduce the administrative body to draw legally relevant sub-conclusions supportive of [the] ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions."

*Bam, Inc. v. Bd. of Police Comm'rs*, 9 Cal. Rptr.2d 738, 740 (App. 1992) (citation omitted). *See also Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 874 (11th Cir. 2018) (findings are supposed

to be "'sufficient to enable a reviewing court to perceive that [the agency] has heard and thought and not merely reacted.'" (citation omitted)).

Consequently, "when an agency irreversibly and irretrievably commits itself to a plan of action … before the agency has completed [the statutorily required] analysis," it has engaged in prejudgment in violation of administrative law. *Forest Guardians*, 611 F.3d at 714 (emphasis removed).

If, for example, the agency makes a contract that assumes the answer to a question it is supposed to determine only after a fair weighing of alternatives, that fact can be "strong evidence" that the agency was already "slanted in favor" of a particular conclusion before beginning the process of fairly considering the question. *Metcalf v. Daley*, 214 F.3d 1135, 1144 (9th Cir. 2000).

So, too, if the agency's leader indicates that he or she has reached "a prejudged political conclusion," *Norton*, 340 F. Supp. 2d at 1261, or if the agency "fails to consider relevant and important pieces of information," *Hills*, 422 F. Supp. at 320, or acts contrary to "good faith objectivity," *Save Our Sycamore*, 576 F.2d at 575, these facts can indicate that the agency's subsequent conclusions are really *post hoc* rationalizations for a predetermined outcome instead of the reasoned decision-making the law requires. Statutes that say administrators must make certain findings and engage in reasoned decision making do so for a reason; agency consideration should not be "preordained and pretextual." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 772 (9th Cir. 2026) (Mendoza, J., concurring).

*Norton, supra*, is a good example. That case involved a regulation restricting the use of snowmobiles in Yellowstone and Grand Teton National Parks, and allowing only snowcoaches, instead. Whether to exclude snowmobiles was supposed to be determined through an administrative process governed by statute, and the Park Service engaged in that process. Yet in

reaching the findings supporting its snowmobile ban, the Service actually aimed at a predetermined conclusion. First, it reviewed literature concerning sound levels and vehicle emissions from snowmobiles, but ignored the analogous downsides to snowcoaches. *See* 340 F. Supp.2d at 1259. Second, while it was supposedly weighing alternatives, the Assistant Secretary for Fish and Wildlife and Parks sent a memo to the Service's Director directing him to ban snowmobiles in the parks, and held a press conference saying that there was "no future" for snowmobiles in the parks. *Id.* at 1260. These and other factors persuaded the court the Service "could [not] have issued any other rule than the one [banning snowmobiles]," which showed that the Service "reached a prejudged political conclusion," and that its purported consideration of the propriety of the rule was "nothing more than *pro forma* compliance with the requirements of [the statute.]" *Id*. at 1261.

Another good example is *Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir. 1993), which concerned a federal requirement that states develop their own Medicaid plans, and incorporate certain findings into those plans. The question before the Fifth Circuit was whether the state had "engaged in a findings process to substantiate its compliance" with federal law. *Id.* at 804. This requirement, the court said, "is not a mere formality that can be satisfied simply by having a state officer think a bit about hospital costs and then copy out the statutory language on a piece of paper, put the heading 'assurances' on that piece of paper, and send it to [Washington, D.C.]." *Id*. at 805. Instead, a state must "conduct[] an objective analysis." *Id.* But that had not happened, because the state official "conducted no studies and made no efforts to determine which state hospitals are efficiently and economically run," "gathered no information and conducted no empirical analysis," and "didn't do an actual analysis but based the 'process' on what she thought was right based on her experience." *Id*. at 806-07. In short, "[f]indings were not made, instead assumptions were made." *Id*. at 808.

The same is true here. First, there can be no rational doubt that the Trade Representative's analysis was prejudged, and that Proclamation 11012 resulted from a predetermination—i.e., that compliance with the statute was merely *pro forma*, as opposed to an orderly analysis supportive of the ultimate decision.

## II. These tariffs are the result of a "prejudged political conclusion," not a faithful application of the statutorily required evaluation.

In response to *Learning Resources* in February, the President issued a statement declaring that "numerous other federal statutes, which is so true, authorize[] the president to impose tariffs and might justify most, if not all, of the tariffs issued in this case. [E]ven more tariffs…. All of these things I know so well." Bennett & Schmitz, *Why the Supreme Court Ruled Against Trump's Tariffs*, PBS News (Feb. 20, 2026).[1] After denouncing the Justices as "unpatriotic" "fools" who are "disloyal to the Constitution," the President immediately declared a 10 percent tariff worldwide, on the grounds that "we have very powerful alternatives [to IEEPA]." *Trump Announces 10% Global Tariff After Supreme Court Strikes Down His Sweeping Policy*, PBS News (Feb. 20, 2026).[2]

Treasury Secretary Bessent also said, on the day the *Learning Resources* decision was announced, that "[t]his Administration will invoke alternative legal authorities to replace the IEEPA tariffs. We will be leveraging Section 232 and Section 301 tariff authorities." Secretary Statements and Remarks, U.S. Dep't of Treasury (Feb. 20, 2026).[3] He added that the Administration "will be implementing or conducting Section 301 studies so that the tariffs could be back in place at the previous level by beginning of July." *Paul Gigot in Conversation with*

---

[1] https://www.pbs.org/newshour/show/why-the-supreme-court-ruled-against-trumps-tariffs.
[2] https://www.pbs.org/newshour/politics/watch-live-trump-holds-news-conference-after-supreme-court-strikes-down-his-global-tariffs.
[3] https://home.treasury.gov/news/press-releases/sb0403.

*U.S. Treasury Secretary Scott Bessent*, Wall St. J. (Apr. 15, 2026).[4] White House Trade Advisor Peter Navarro, in fact, had already informed the public, *before* the Court ruled, that "even if we lose, we will do it another way…. The Trump tariff agenda … will be implemented." Lambert, *White House Ready to Take on Tariffs Another Way, Navarro Says*, BBC News (May 29, 2025).[5]

Statements like these indicate a predetermination to implement tariffs by whatever means were available—as opposed to the carefully wrought process Section 301 contemplates, which requires the Executive Branch to make particularized and objective findings with respect to specific countries, and to tailor responses accordingly.

Consider also the flimsiness of the Trade Representative's report. It devotes about a half a page to each country targeted, with much of the text copied-and-pasted unchanged. It simply notes the lack of an express ban on forced-labor goods, which is not proof that a country's economy relies on forced labor, and makes no effort to evaluate the amount of forced labor a country employs, or to calculate the degree of burden on American commerce imposed thereby. As international trade expert Scott Lincicome observes, "The findings were clearly predetermined. The methodology is thin to the point of embarrassment. The remedy is both ridiculously blunt and wildly out of proportion to any measurable economic distortion." Lincicome, *Here Comes Another Round of Sham Tariffs*, The Dispatch (July 23, 2026).[6]

Equally indicative is the arbitrary manner in which the tariff regime has been implemented from the beginning. The tariffs that *Learning Resources* declared invalid were set irrationally, with an arbitrarily chosen 10 percent baseline on all countries in the world; they even applied to two uninhabited islands. *See* Lyons & Evershed, *"Nowhere on Earth is Safe": Trump*

---

[4] https://www.wsj.com/podcasts/opinion-potomac-watch/paul-gigot-in-conversation-with-us-treasury-secretary-scott-bessent/ce6e45f7-9a20-4ba9-b0be-98a33021623f.
[5] https://www.bbc.com/news/live/c2dekzjg6gzt.
[6] https://thedispatch.com/newsletter/dispatch-markets/trump-tariffs-section-301-forced-labor-pretext.

*Imposes Tariffs on Uninhabited Islands Near Antarctica*, The Guardian (Apr. 2, 2025).[7] Other tariff amounts were apparently calculated "based on the U.S. trade deficit with a foreign country, divided by the country's exports," Romm, et al., *How Are Trump's Tariff Rates Calculated?*, N.Y. Times (Apr. 2, 2025),[8] a formula that makes no economic sense. But even countries such as Singapore and Brazil, with whom the United States has a trade *surplus*, were subjected to a 10 percent tariff. Murphy, *Just How Reciprocal Are These Tariffs, Anyway?*, U.S. Chamber of Com. (Apr. 3, 2025).[9]

The new Section 301 tariffs challenged here simply replicate these original impositions, retaining the arbitrary 10 percent baseline, and adding more impositions on top of that. Even the *Federal Register* announcement makes clear that the tariffs are not actually connected to forced labor, because it imposes 10 and 12.5 percent tariffs on countries such as Switzerland (which does not engage in forced labor, *see* Frankl, *Switzerland Rejects Forced Labor Accusations After U.S. Imposes New Tariffs*, Wall St. J., July 24, 2026[10]), and the United Kingdom (where a recent study found that the only "forced labor" involved in the country's economy concerns the purchase of raw materials from elsewhere. *Forced Labour in the UK's Supply Chains*, U.K. Parliament (July 24, 2025).[11])

What's more, the tariffs imposed here are not targeted at any particular industry or sector of the economy, nor is any reason given why the amounts of 10 and 12.5 percent are likely to exclude the products of forced labor, to penalize anyone involved in forced labor, or to remediate any impact on the American economy. On the contrary, they are dramatically out of proportion

---

[7] https://www.theguardian.com/us-news/2025/apr/03/donald-trump-tariffs-antarctica-uninhabited-heard-mcdonald-islands.
[8] https://www.nytimes.com/2025/04/02/business/economy/trump-tariff-rates-calculation.html.
[9] https://www.uschamber.com/international/reciprocal-tariffs.
[10] https://www.wsj.com/economy/trade/switzerland-rejects-forced-labor-accusations-after-u-s-imposes-new-tariffs-66d82043.
[11] https://publications.parliament.uk/pa/jt5901/jtselect/jtrights/633/report.html#heading-0.

to the real "burdens" that forced labor could conceivably impose on the American economy. Forced labor may perhaps account for a little over 4 percent of the economies of the targeted countries. *See* Lincicome, *supra*. Yet the tariffs are set at 10 and 12.5 percent, generating some $97 billion in revenue for the federal government—compared to the $15 billion or so that could possibly be connected to forced labor. *See id*. This demonstrates that the 10 and 12.5 percent figures are arbitrary and capricious, as opposed to being "appropriate … to obtain the elimination of such [unreasonable] act, policy, or practice." 19 U.S.C. § 2411(b)(2).

Taken as a whole, these factors indicate that the Trade Representative's decision was a foregone political conclusion, not an "objective, good faith inquiry." *Forest Guardians*, 611 F.3d at 714.[12] As in *Ramsey,* the agency "reduced its findings process to a simple exercise of compilation and assumption, completely ignoring the Congressional mandate that [the Trade Representative] consider relevant factors." 3 F.3d at 808. The Administration's "inability to articulate an orderly process of evaluation," combined with the expressly articulated predeterminations of agency leaders and the arbitrary nature of the tariffs "renders meritless its argument that it engaged in a *bona fide* findings process." *Id*. at 810.

"[D]eference has limits." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008). As the Supreme Court has made clear in cases such as *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), *West Virginia v. EPA*, 597 U.S. 697, 727 (2022), and, of course, *Learning Resources,* the Executive Branch's job is to execute the laws Congress makes. Agency authority is not supposed to operate as a "work around" to evade Congress's responsibility to choose when

[12] It cannot have escaped this Court's notice that the Administration has put the presumption of regularity under "stress" in a wide variety of contexts. *Florida E. Coast Ry. LLC v. Fed. R.R. Admin.*, No. 24-11076, 2026 WL 2321640, at *19 (11th Cir. Aug. 11, 2026). *See also United States v. S. Poverty L. Ctr., Inc.*, No. 2:26-CR-139-ECM, 2026 WL 2280675, at *15 (M.D. Ala. Aug. 7, 2026) ("Although the Government is entitled to the presumption of regularity, courts are not forced to turn a blind eye to constitutionally suspect conduct.").

to adopt taxes. Manipulating the Section 301 process to reach a predetermined conclusion through a *pro forma* gesture toward the statute is an abuse of discretion and should not be blessed by this Court.

**CONCLUSION**

The Plaintiffs' motion should be *granted*.

RESPECTFULLY SUBMITTED this 9th day of September, 2026.

GOLDWATER INSTITUTE

/s/ *Timothy Sandefur*
Timothy Sandefur (033670)
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, Arizona 85004

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation set forth in the Cour's Court of International Trade Standard Chambers Procedures § 2(B)(1), as modified by the Court's Standard Procedural and Scheduling Order in this case dated August 13, 2026 (ECF No. 1) and contains 3,820 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

*/s/ Timothy Sandefur*