UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Honorable Jennifer Choe-Groves

Honorable Timothy R. Reif

Honorable Lisa W. Wang, Judge

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES; | Court No. 26-cv-3555-3JP |

**AMICUS CURIAE BRIEF OF ED GRESSER AND PROGRESSIVE POLICY INSTITUTE IN SUPPORT OF PLAINTIFFS**

Nithya Nagarajan
Husch Blackwell LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
(202) 378-2409
Nithya.Nagarajan@huschblackwell.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS


Table of Authorities ........ ii

INTEREST OF THE *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

I. Forced Labor Background: Available Data and U.S. Experience ........ 4

II. USTR's Report does not Establish a Burden on U.S. Commerce ........ 10

A. Failure to Demonstrate Actual Imports of Forced-Labor Goods ........ 12

B. Failure to Demonstrate Forced Labor Imports Would Affect U.S. Commerce ........ 14

CONCLUSION ........ 19

Certificate of Compliance ........ 21

# TABLE OF AUTHORITIES

## Other Authorities

"Asia: White Rice Export Prices Rise on Firming Demand, Tighter Supply," Rice News Today, December 2025 .................... 17

"CBP Modifies Withhold Release Order on certain tobacco imports from Premium Tobacco Malawi Limited," Customs and Border Protection, May 2021 .................... 18

"Department of Labor Finds Children Employed Illegally in Dangerous Jobs, Obtains $4.8 Million in Wages, Damages for Poultry Industry Workers in California," U.S. Department of Labor, May 2024 .................... 8

"Forced Labor in the United States," Department of Homeland Security .................... 7

"Forced Labor" Enforcement Actions," Customs and Border Protection, accessed June 2026 .................... 7

"Human Smuggling, Forced Labor Among Allegations in South Georgia Indictment", U.S. Department of Justice, November 2021 .................... 15

"Human Trafficking Data Collection Activities, 2025", Department of Justice, July 2026 .................... 7

"ICE Atlanta unveils results of labor trafficking investigation," Immigration and Customs Enforcement .................... 8

"Investigation: Technology Transfer, Intellectual Property, and Innovation," Office of the U.S. Trade Representative, March 2018 .................... 10

"Three Defendants Associated with Human Trafficking Operation Sentenced to Federal Prison," U.S. District Attorney's Office, Southern District of Georgia, June 12, 2026 .................... 8

"Uyghur Forced Labor Prevention Act Statistics", U.S. Customs and Border Protection .................... 7

"Withhold Release Order and Finding Modification Guide," Office of Trade, Customs and Border Protection .................... 6

"World Trade Statistics", World Trade Organization .................... 5

International Labour Organization, "Global Estimates of Modern Slavery: Forced Labour and Forced Marriage," September 2022 .................... 5

International Labour Organization, Global Estimates of Modern Slavery: Forced Labour and Forced Marriage," September 2022 ........ 6

International Labour Organization, Profits and Poverty: The Economics of Forced Labour," March 2024 ........ 5

U.S. Department of Agriculture Global Agricultural Trade Statistics ........ 9

U.S. Department of Labor, "2024 List of Goods Produced by Child Labor or Forced Labor", September 2024 ........ 13

U.S. Department of Labor, 2024 List of Goods Produced by Child Labor or Forced Labor", U.S. Department of Labor, September 2024 ........ 17

U.S. Department of the Treasury, "Secretary of the Treasury Scott Bessent's Remarks Before the Economic Club of Dallas – Economic Security First," February 20, 2026 ........ 3

U.S. International Trade Commission Dataweb ........ 9

U.S. Trade Representative Office, "Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor," June 2026 ........ passim

USDA Global Agricultural Trade System database ........ 18

## INTEREST OF THE *AMICI CURIAE*

*Amici* Ed Gresser is Vice President and Director for Trade and Global Markets at the Progressive Policy Institute (PPI), a 501(c)(3) non-profit think-tank, established in 1989 and active on a broad range of public policy issues.[1] PPI institutionally, and Gresser personally, have an interest in this case given their long-time advocacy for trade policy grounded in sound economic analysis and careful assessment of facts and trade statistics, and their assessment that forced labor is an egregious violation of human rights. *Amici* submit this brief to assist the court on a discrete question of statutory authority: whether Section 301 permits USTR to impose tariffs on 60 economies accounting for nearly all U.S. imports, based on general assertions that trade anywhere in the world in goods of an indeterminate amount that have potentially been made with forced labor sufficiently demonstrates a burden on U.S. commerce.

## INTRODUCTION

USTR's June 2nd, 2026, Report entitled "*Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor"* (hereafter "the Report"), covers 60 economies. Together they provided about 99% of America's imported goods in 2025. The Report

---

[1] No counsel for a party authored this brief in whole or in part. No person other than Amici Curiae and their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

provides the justification for USTR's "Final Determination"[2] imposing tariffs of 12.5% above MFN rates on goods from 41 of these economies, 10% above MFN rates on goods from 17, and 10% on two, as a "remedy" for their lack of a law similar to America's ban on imports of goods made wholly or partially with the use of forced labor, or for supposed failure to sufficiently enforce such a law. Extrapolating from ten months' experience with the 10% worldwide tariff temporarily imposed by Executive Order 14257, this will likely cost American goods-buyers – families, manufacturers, construction firms, restaurants, clinics, retail shops, and so on – about $100 billion annually. This is roughly double the money raised by the lawful and Congressionally authorized Harmonized Tariff Schedule, and nearly 100 times the combined $1.3 billion average annual value of goods shipments Customs and Border Protection has blocked or seized over the last five years on "reasonable suspicion", or actual demonstration, of forced labor content.

We at PPI share the view expressed in the Report that forced labor is an egregious violation of human rights. We likewise agree that U.S. policy has an important role in eliminating it worldwide as well as at home. We are not, however, persuaded by the Report's premise that the self-evident effectiveness and superiority of U.S. policy justify imposing tariff penalties on virtually all U.S. imports from every other major economy. And as a matter of law and policy, we are

[2] *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026).

not persuaded that the Report's recommendations are genuinely intended to address forced labor, given the lack of any discussion of using the tariffs as leverage to eliminate the offending practices or adopt stronger enforcement mechanisms.

Whatever the administration's intent, the Report does not satisfy the basic requirement Section 301 imposes for imposition of tariffs – that is, it does not demonstrate that each foreign government's "unreasonable or discriminatory" "acts, policies or practices" have created a "burden" on American commerce. The Report does not show that any of the 60 listed economies actually import goods made with the use of forced labor. Neither does it show that such imports, if they actually occur, have any necessary effect on U.S. exports or American import-competing businesses and workers. The Report does not establish any burden on U.S. commerce. Therefore the tariff action taken pursuant to it is illegal.

## I. USTR's Report Does not Establish a Burden on U.S. Commerce

If an administration wishes to use "Section 301" to impose tariffs, it must identify an "unreasonable or discriminatory" "act, policy, or practice" by a foreign government, and demonstrate that this act, policy, or practice "burdens or restricts" U.S. commerce. Section 301 requires a specific connection between the unreasonable practice of an individual foreign government and the demonstrated burden on U.S. commerce. USTR has failed to make such a showing for any of the 60 economies in the Report; it cannot rely on mere conjecture.

This lack of specificity stands in stark contrast to recent Section 301 investigations. For example, USTR's March, 2018, report on Chinese forced technology transfer and industrial espionage, entitled "*Investigation: Technology*

*Transfer, Intellectual Property, and Innovation*"[3], cited and quoted specific government policy directives such as the China Foreign Investment Catalogue[4], State Council decisions on electric vehicles[5] [30], and civil aviation policy guidance[6]; identified a Chinese People's Liberation Army Department assigned to carry out electronic intrusions meant to extract confidential business information from U.S. businesses [154-155], and cited harm to specific U.S. businesses such as SolarWorld, Westinghouse, and ATI.[7] It then, using experts at the U.S. Trade Representative Office's Office of Economics and the Council of Economic Advisers, conducted a professional modeling of economic impact estimating about $50 billion worth of damage to U.S. enterprises through unauthorized capture of intellectual property, lost exports, artificial creation of new competitors, and import competition.

One can debate whether the ensuing tariffs on a set of Chinese goods were successful. But the 2018 Report made a serious effort to identify unreasonable "acts, policies, or practices," explain their implementation in practice, and demonstrate through real-world examples and economic analysis that they imposed a $50 billion "burden on U.S. commerce".

In this instance, the Report fails to meet the requirement to demonstrate a burden on U.S. commerce in two distinct ways:

---

[3] "Investigation: Technology Transfer, Intellectual Property, and Innovation," Office of the U.S. Trade Representative, March 2018, access August 2026, at https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF.
[4] Ibid, pg. 25
[5] Ibid., pg. 30
[6] Ibid., pg. 33
[7] Ibid, pp. 154-155.

(i) It does not provide evidence showing that the listed economies are importing goods made with the use of forced labor.

(ii) It does not demonstrate that, if any country on the list actually is importing goods made with the use of forced labor, this would necessarily "burden or restrict" U.S. commerce.

**A. Failure to Demonstrate Actual Imports of Forced-Labor Goods**

First, to demonstrate that a foreign country's imports of goods made with forced labor impose a "burden" on the United States, the Report must obviously show that the country regularly imports goods made with forced labor. It fails to do so. The Report, in fact, appears to contain neither an estimate of the scale of importation of forced labor goods for any of the 60 listed economies, nor any example of a single shipment of goods verifiably made with the use of forced labor passing through a listed economy's Customs service and into its consumer markets or production chains. Pages 59-79 summarize its "findings" for each of the 60 listed economies, and none contains any overall guess at a scale of imported goods known to be produced by forced labor, nor even any anecdotal example of such imports. Rather, the Report simply uses its negative assessments of their trade laws to presume that they must be importing at least some forced-labor goods.

Lacking these actual data, the Report instead attempts an approximation by noting that the listed economies are known to import some goods on the Labor Department's "TVPRA" ("Trafficking Victims Protection Reauthorization Act") list, and may use them as inputs in production:

> "USTR was able to identify major downstream industries by extrapolating from several sources, including: the TVPRA List and DOL's ImportWatch tool; industry descriptions of production process inputs and outputs; and trade data. Each of the following is a top exporter of at least one good for which forced labor has been found as an input: Australia, Austria, Argentina, [et cetera]."[8]

This misuses the TVPRA list and in no way demonstrates imports of goods made with the use of forced labor. First, the fact that a country is an exporter of a good for which forced labor has been found in production of an input says nothing about whether the exporting country imports the input material at all, much less imports it from a country found at risk of forced labor in the input good involved, and even less that the imports came from a facility where forced labor was suspected.

Second, the TVPRA report does not claim that all its listed goods are invariably made with forced labor, but in fact explicitly cautions readers to avoid such an assumption: "a listing of any particular good and country cannot be generalized to all production of that good in the country".[9] And USTR's use of the TVPRA list appears to go far beyond a mistaken claim that the citation of (say) Burmese rice production as possibly involving forced labor means that *all* Burmese rice involves forced labor. It does not limit its condemnation to countries importing Burmese rise.

---

[8] U.S. Trade Representative Office, "Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor," (hereafter "The Report"), June 2026, pg. 37, https://ustr.gov/sites/default/files/files/Press/Releases/2026/USTR%20Report%20Sec%20301%20FL%20301%206-2-26%20FINAL%20for%20upload.pdf

[9] U.S. Department of Labor, "2024 List of Goods Produced by Child Labor or Forced Labor", September 2024, Pg. 71, accessed August 2026, at https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/2024-tvpra-list-of-goods.pdf

Its implication instead is that any importation of rice — wherever grown — is enough to show purchases of goods made with forced labor.

The Report uses two statistical Appendixes, B and C, to this effect. Appendix B lists six categories of goods — aluminum, cotton, electronics, lithium-ion batteries, rice, and tobacco — and says they represent "forced labor inputs" competing with similar American goods, without explanation even of the countries the relevant goods came from, let alone whether they came from enterprises reasonably suspected of using forced labor. A country is implied to be guilty if it imports aluminum, cotton, electronics, lithium-ion batteries, rice, or tobacco from anywhere in the world, and also imported the same product from the United States. Appendix C is broader, with eleven categories of goods (aluminum, cotton, cocoa, fish, coffee, nickel, palm oil, peanut, polysilicon, rice, and tobacco) cited as "forced labor inputs" for downstream goods exported to the United States. That is to say, the Report appears to assert that any import of aluminum, coffee, rice, and so forth, everywhere except the United States, is enough to demonstrate a "forced labor input".

A brief survey of U.S. trade data shows that the TVPRA list could be (mis)used equally well to target the United States. American manufacturers, food producers, and other businesses regularly import, for example, cacao beans from Cote d'Ivoire, coffee from Costa Rica, cobalt from the Democratic Republic of Congo, and numerous other goods on the TVPRA list. But this by no means shows that any specific American firm buys forced-labor goods, and indeed, CBP has not issued a

"Withold Release Order (WRO)" indicating reasonable suspicion of forced labor use against these imports. American trade policymakers would rightly object if any foreign government were to assert that all American goods should be presumed to contain forced labor content because one company imported coffee from Costa Rica or cacao beans from Cote d'Ivoire, without proof that even these specific imports involved forced labor.

In sum, the Report does not demonstrate that any listed economy imports goods made with the use of forced labor.

### B. Failure to Demonstrate Forced Labor Imports Would Affect U.S. Commerce

Second, the Report fails to show that, if any of the investigated countries do in fact buy goods made with forced labor, this would necessarily "burden or restrict" U.S. commerce. Instead, it asserts an unproven hypothesis about the nature of forced-labor enterprises as unquestioned fact, and presents several unsatisfactory "case studies" to illustrate this assertion.

The Report's claim about the impact of forced labor on U.S. goods-producers runs as follows:

> "Unfair competition from forced labor goods adversely affects U.S. exports in the markets in which they compete. In general, these goods are able to be sold in markets, including those of the investigated economies, at a lower price and in greater volumes than they would but for the use of forced labor. When U.S. exports are forced to compete with lower-priced forced labor goods, they do so at a disadvantage. This, in turn, may affect U.S. exports of competitive goods through lost sales, revenues, and exports. This may ultimately decrease the profitability of U.S. producers."[10]

[10] U.S. Trade Representative Office, "The Report," pg. 37.

The argument that forced labor goods come to market at unreasonably low prices is not implausible. Some forced-labor enterprises may well operate that way, hoping to capture market share by selling at unreasonably low prices. But that is simply a guess. Forced-labor enterprises might equally hope to capture maximum profit for themselves by selling at market prices.

Indeed, an instructive real-world example comes from the Justice Department's investigation of a forced-labor enterprise in Georgia onion and blueberry harvesting, entitled "Blooming Onions", which closed on June 12, 2026, with the last of 24 sentencings for offenses including international forced labor trafficking, various forms of fraud, and money laundering.[11] The case documents provide a detailed look at the inner workings of a large forced-labor enterprise involved in goods production. Its core was a labor-contracting business called Rojas Avila Harvesting ("Rojas"), which provided seasonal harvesting workers from Central America for onion and blueberry farmers in six South Georgia counties. The farmers — almost all apparently unaware of the company's abuses — contracted with Rojas management, paying the company to recruit these workers and take responsibility for visa fees and paperwork, transport costs, housing, and wages. On the workers' arrival — very much as the ILO's 2022 report noted below describes — Rojas officers would confiscate their passports, take part of their wages, impose debt on

[11] "Three Defendants Associated with Human Trafficking Operation Sentenced to Federal Prison," U.S. District Attorney's Office, Southern District of Georgia, June 12, 2026, https://www.justice.gov/usao-sdga/pr/three-defendants-associated-human-trafficking-operation-sentenced-federal-prison.

them for transport costs, and threaten them with violence should they leave or seek help. Over the six years of the scheme, the Justice Department's indictment reports that the Rojas operators extracted about $200 million in profits.[12]

The case documents do not tell us whether any of the onions and berries were exported abroad or sold solely to U.S. domestic groceries and food producers. U.S. trade data for the period during which this scheme operated, though, report exports of blueberries to 59 countries and onions to 80 countries.[13] Either way, the products tainted by association with Rojas appear to have sold at normal market prices, as the Rojas operators' goal was not to "undersell" other businesses but to earn maximum profits for themselves.[14]

Or, given the ILO's view that forced-labor enterprises selling on world markets are most often small suppliers of low-level raw materials, many might simply accept whatever price buyers offer. In the latter cases, neither import-competing American businesses nor U.S. exporters on world markets would suffer a burden. The only way to determine which approach is being taken, or whether one approach is prevalent in some countries and other approaches elsewhere, or whether (as the

[12] See Justice Department indictment document filed at the U.S. District Court, Southern District of Georgia, October 5, 2021, at https://www.justice.gov/usao-sdga/press-release/file/1450546/dl?inline.
[13] U.S. International Trade Commission Dataweb, at dataweb.usitc.gov; also see U.S. Department of Agriculture Global Agricultural Trade Statistics, at https://apps.fas.usda.gov/gats/default.aspx
[14] "Human Smuggling, Forced Labor Among Allegations in South Georgia Indictment", U.S. Department of Justice, November 2021, https://www.justice.gov/usao-sdga/pr/human-smuggling-forced-labor-among-allegations-south-georgia-federal-indictment.

Report claims) any "in general" rule exists at all, is through empirical data and analysis.

The Report makes no attempt to provide this data and analysis — either by demonstrating that forced-labor goods-producing enterprises "in general" sell their goods at prices below market rates, nor even by offering anecdotal real-world descriptions of forced-labor enterprises that did in fact sell products at unreasonably low prices. Instead, it offers several "case studies" meant to suggest a general pattern. These do not succeed. To the contrary, the more one accepts the Report's (unproven) premise that these cases actually did involve imports of forced-labor goods, the more they suggest that forced-labor enterprises probably more often "maximize profits" by selling at market prices than "capture market-share" through low-priced sales.

For example, on pages 30–44, the Report argues that supposedly inadequate European Union laws have enabled EU members Spain and Poland to damage American exporters of rice, tobacco, malt liquor, and cigarettes, by buying Burmese rice and Malawian tobacco. This justifies a 10% tariff on European goods generally — not simply Spanish malt liquor and Polish cigarettes, but Danish toys and hearing aids, German auto parts, Italian wine, Portuguese cork, Irish butter, French artworks and fashion, etc. — with attendant costs for American families buying food, hospitals buying medical supplies, and manufacturers buying inputs and capital goods. But the case studies do not in any way support the specific claims

about forced-labor content in Spanish malt liquor and Polish cigarettes, much less the recommendation for a tariff on all European goods.

The passage relating to Spain reads thus:

> "The TVPRA list has flagged rice from Burma as being at risk of forced labor since 2009. . . . While not all of Spain's imports of rice from Burma were necessarily produced using forced labor, the prevalence of forced labor in rice production in Burma strongly suggests that at least some of Spain's imports of rice were produced wholly or in part with forced labor. The European Union's failure to impose and effectively enforce a forced labor import prohibition afforded a cost advantage to Burmese rice and distorted competition. With a forced labor import prohibition, the United States would likely have experienced greater sales, revenues, and exports of rice to Spain, all else equal. Faced with higher input costs, Spain would have exported a lower volume of downstream malt beer products to the investigated economies . . . [while] the United States would likely have experienced greater sales, revenues, and exports of malt beer, all else equal."[15]

Each sentence here fails in its own way. First, the Report's core source, the TVPRA list, is badly dated with no citation since 2017, so it is not clear that rice from Burma continues to be at risk of being made with forced labor.[16] The second sentence's wording — "strongly suggests that at least some of Spain's imports of rice were produced wholly or in part with forced labor" –demonstrates that USTR does not know whether any Spanish rice imports were produced with forced labor, and simply thinks it might be likely. The third sentence's supposed "cost advantage to Burmese rice" is an error: Burmese rice sells at prices cheaper than U.S., Japanese, or Korean rice, but similar to those of Indian, Cambodian, and other South and

---

[15] U.S. Trade Representative Office, "The Report," at 44.
[16] U.S. Department of Labor, 2024 List of Goods Produced by Child Labor or Forced Labor", U.S. Department of Labor, September 2024, pg. 173, at https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/2024-tvpra-list-of-goods.pdf

Southeast Asian rice.[17] The Report makes the assumption that whatever the amount of Burmese rice produced with forced labor imported by Spain (if any), it was large enough to substantially distort prices, without examination of the substantial volumes of domestically produced rice or the level of imports from other countries.

More generally, rice as a raw material, produced by whatever means, is a tiny factor in malt liquor production costs and unlikely to affect its wholesale price. Capping all this, Americans too can legally buy Burmese rice at any time – and have done so in five of the last six years[18] – since CBP has not imposed a Withhold Release Order indicating reasonable suspicion of forced labor, let alone a "Finding" banning Burmese rice imports as clearly involving forced labor.

The similar passage on Poland asserts that Polish cigarette firms' purchases of tobacco from three Malawian companies placed under a CBP "Withhold Release Order" from November 2019 to May 2021[19] likely damaged U.S. tobacco farmers and cigarette manufacturers:

> "While we acknowledge that not all of Poland's imports of tobacco from Malawi were necessarily produced using forced labor, the prevalence of forced labor in tobacco production across Malawi prior to CBP's modification of its region-wide WRO strongly suggests that a significant proportion, if not most,

---

[17] "Asia: White Rice Export Prices Rise on Firming Demand, Tighter Supply," Rice News Today, December 2025, https://ricenewstoday.com/asia-white-rice-export-prices-rise-on-firming-demand-tighter-supply/

[18] USDA Global Agricultural Trade System database, accessed August 2026, at https://apps.fas.usda.gov/gats/default.aspx

[19] "CBP Modifies Withhold Release Order on certain tobacco imports from Premium Tobacco Malawi Limited," Customs and Border Protection, May 2021, www.cbp.gov/newsroom/national-media-release/cbp-modifies-withhold-release-order-certain-tobacco-imports-premium.

> of Poland's imports prior to 2020 were produced wholly or in part with forced labor."[20]

Again, the phrases "not all . . . necessarily produced using forced labor" and "strongly suggests" imply that the Report's authors think Poland may have bought tobacco produced with the use of forced labor, but don't actually know. The short duration of CBP's WRO likewise indicates that since 2021, CBP has been satisfied that Malawian tobacco production complies with U.S. law, and recent U.S. trade shows regular purchases of Malawian tobacco. And while it is true that Malawian tobacco, mostly "burley" grade, sold for less than higher-quality American flue-leaf tobacco before CBP imposed its WRO, it appears to have brought about the same price as comparable "burley" tobacco from Malawi's immediate neighbor, Mozambique, again suggesting the absence of any pricing advantage.

### C. Available Data Suggest Trade in Forced Labor Goods Is Not of a Sufficient Magnitude to Distort Competition in All Markets in the World for All Products

Since forced labor enterprises are criminal businesses, we lack official statistics describing either their productive scale or the degree to which they sell their products on world as opposed to purely domestic markets. However, the Report's claim that "[d]ata regarding forced labor goods is difficult to acquire, in part, because of the illicit nature of forced labor" and that therefore USTR is "ha[s] no obligation to conduct studies before taking action" is mistaken. The "acts, policies, and practices" described in the 2018 Report on Chinese intellectual property and technology policy were often illicit and/or clandestine, but USTR nonetheless was

[20] U.S. Trade Representative Office, "The Report," pp. 39-40.

able to describe them in detail. In the case of forced labor, research by International Labour Organization (ILO), data published by U.S. Customs and Border Protection (CBP), and real-world cases such as that of Rojas, do help assess the Report's arguments by providing a sense of the scale and nature of forced-labor trade.

*ILO Research – Human Scale and Financial Scale:* The ILO has published two systematic reports on contemporary worldwide forced labor. These are widely respected, and USTR's investigation uses them as points of reference.

The first, published in 2022, estimates the number of people engaged in forced labor worldwide, surveys the 'sectors' in which it appears, and describes the forms it can take. It estimates that 27.6 million people were in forced labor conditions worldwide in 2021. This would be about 0.7% of the 3.4 billion-strong global labor force, including about 8.4 million in production of tradeable goods — 6.3 million in "industry" (which in ILO usage combines manufacturing, utilities, construction), and 2.1 million in "agriculture." It further finds that the most common form of forced labor, representing about 9.9 million of the 27.6 million workers, involves trapping workers in jobs by withholding pay. Other forms of forced labor range from confiscation of migrant workers' passports, to debt bondage, threats of violence by criminal gangs, and in perhaps 1% of cases actual chattel slavery.[21]

---

[21] International Labour Organization, "Global Estimates of Modern Slavery: Forced Labour and Forced Marriage," September 2022, https://www.ilo.org/publications/major-publications/global-estimates-modern-slavery-forced-labour-and-forced-marriage.

The second, published in 2024, examines the financial scale of forced labor. Its authors estimate a global total of $236 billion in profits from the practice, about three-quarters of this which came from human trafficking for sexual purposes. "Industry" profits totaled $35.4 billion and "agriculture" profits $5.0 billion.[22] The report does not estimate the actual value of goods and services these enterprises produce, but the combined $40.4 billion in "industry" and "agriculture" profits would be roughly 0.1% of the World Bank's estimates of $30 trillion in value-added industry and agricultural output as of 2021[23], and likewise about 0.1% of the $25 trillion[24] worth of annual worldwide goods exports.[25]

With respect to trade, neither international research nor U.S. reporting estimates how large the specifically international flow of forced-labor goods might be, either in absolute terms or relative to purely domestic forced-labor goods flows. The ILO's 2022 report does, however, argue that forced labor rates appear "highest in severity and scale" in "informal micro- and small enterprises operating at the lower links of supply chains in high-risk sectors and locations". It also notes that

---

[22] International Labour Organization, Profits and Poverty: The Economics of Forced Labour," March 2024, https://www.ilo.org/publications/major-publications/profits-and-poverty-economics-forced-labour.

[23] See World Bank databases for "Industry (including construction) Value Added (Current U.S. Dollars)," accessed June 2026, https://data.worldbank.org/indicator/NV.IND.TOTL.CD, and "Agriculture, Forestry, and Fishing, Value Added (Current U.S. Dollars)," accessed June 2026, https://data.worldbank.org/indicator/NV.AGR.TOTL.CD.

[24] World Trade Organization, Merchandise Trade Statistics Dashboard, accessed June 2026, https://stats.wto.org/dashboard/merchandise_en.html

[25] "World Trade Statistics", World Trade Organization, accessed August 2026, at https://www.wto.org/english/res_e/statis_e/world_trade_statistics_e.htm

with respect to goods destined for wealthier countries, forced labor is likely most common in "raw materials production in the lower links of supply chains of consumer goods."[26] This suggests, though does not conclusively prove, that the amount of forced labor products that enter international trade flows is modest.

Turning to U.S. data, CBP's statistics on blockages and seizures of goods suspected of forced labor content suggest a similar conclusion about the scale of forced-labor trade.

In the last three years, CBP has imposed 16 "Withhold Release Orders" (indicating "reasonable suspicion" of forced labor, but not certainty[27],) and two "Findings" (indicating proof) under Section 307 of the Tariff Act of 1930 (19 U.S.C. § 1307). Together these blocked $1.75 billion worth of imports in Fiscal Year 2024, $0.16 billion in FY2025, and $0.22 billion through July of FY 2026[28]. Import blocks under the Uyghur Forced Labor Prevention Act, which likewise does not require proof of forced-labor content, totaled $1.77 billion in FY2024, $0.19 billion in FY2025, and $0.26 billion in FY 2026[29]. Though these totals obviously vary widely

---

[26] International Labour Organization, Global Estimates of Modern Slavery: Forced Labour and Forced Marriage," September 2022, pg. 28, https://www.ilo.org/publications/major-publications/global-estimates-modern-slavery-forced-labour-and-forced-marriage.

[27] "Withhold Release Order and Finding Modification Guide," Office of Trade, Customs and Border Protection, accessed June 2026, https://www.cbp.gov/sites/default/files/2025-05/FLD_Withhold_Release_Order_and_Finding_Modifications_Guide.pdf.

[28] "Forced Labor" Enforcement Actions," Customs and Border Protection, accessed June 2026, www.cbp.gov/trade/forced-labor/enforcement.

[29] "Uyghur Forced Labor Prevention Act Statistics", U.S. Customs and Border Protection, accessed August 2026, at

from one year to the next, the combined average of around $1.45 billion a year would be roughly 0.04% of the U.S.'s $3.3 trillion annual imports of goods. Given CBP's reliance of "reasonable suspicion" of forced labor content rather than absolute proof, while some forced-labor goods imports likely escape notice, CBP's blockages may include some shipments wrongly suspected of having forced-labor content.

However, the overall modest scale of trade in goods made with forced labor undermines USTR's assertion of a burden on U.S. commerce. USTR starts with the contention that forced labor goods distort market competition both in the market in which they are produced and in third-country markets.[30] Even if true, nothing in the Report indicates why production of some rice in Burma with forced labor distorts the market, in Burma or elsewhere, for aluminum, or cotton, or cocoa, or nickel, or polysilicon or any of the other products outlined in USTR's Appendix C purporting to show distortions in all 60 countries for all listed products. Nor, as noted above, does anything in the report specifically tie trade in a forced-labor product as an input to measurable distortions in all export markets for all products.

## CONCLUSION

USTR's Report does not produce evidence that the specific listed economies are buying forced-labor goods. Nor does it demonstrate that, if some are, this would necessarily impose any burden at all on U.S. commerce. The two gaps mean that the Report overall fails to meet Section 301's statutory requirements and cannot justify

https://www.cbp.gov/newsroom/stats/trade/uyghur-forced-labor-prevention-act-enforcement-statistics

[30] The Report, at 18.

any imposition of a tariff — let alone one on a scale like that the agency announced on June 23rd, with its $100 billion annual tariff burden on American goods-buyers.

Amici share the view that forced labor is an egregious human rights violation and an appropriate target for policy. Our hope would be that, once this case is closed, we could see the U.S. government return to vigorous support for forced-labor remediation and eradication abroad and at home, cooperation with governments seeking to improve their laws and implementation, and coordination with U.S. friends, neighbors, and allies on an important issue of common concern. We do not, however, believe the administration has demonstrated any "burden" or "restriction" on U.S. commerce, and therefore conclude that it has not satisfied the basic requirement of Section 301. Therefore, this Court should strike down all the tariffs set forth in USTR's Final Determination.

Dated: September 11, 2026

Respectfully submitted,

/s/ Nithya Nagarajan
Nithya Nagarajan
Husch Blackwell LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
(202) 378-2409
Nithya.Nagarajan@huschblackwell.com
*Counsel for Amici Curiae*

/s/ Ed Gresser
*Amici Curiae on Behalf of Progressive Policy Institute*

**Certificate of Compliance**

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel, certifies this brief complies with the Court's type-volume limitation rules. This brief contains 4,874 words, excluding the cover page, table of contents, table of authorities, and signature block. This brief also complies with all typeface and margin requirements.

/s/ Nithya Nagarajan
Nithya Nagarajan