**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | | |
|---|---|---|
| **IN RE SECTION 301 FORCED LABOR CASES** | : | **Case No. 26-cv-3555-3JP** |

**<u>BRIEF OF TIMOTHY MEYER AND GREGORY SHAFFER AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS</u>**

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

John M. Peterson
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
jpeterson@npwny.com

*Counsel for Proposed Amici Curiae, Professors Timothy Meyer and Gregory Shaffer*

Dated: September 11, 2026

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS .... ii

TABLE OF AUTHORITIES .... iii

INTRODUCTION AND SUMMARY OF ARGUMENT .... 2

I. The History of Section 301 and Its Amendments. .... 3

II. Section 301's Labor-Related Categories Address Only a Foreign Country's Treatment of Its Own Workers and Its Non-Enforcement of Reciprocal Commitments. .... 5

A. The 1988 Worker-Rights Definition of "Unreasonable" Addresses Only a Country's Treatment of Its Own Domestic Workforce. .... 5

B. The Drafting History Confirms the Provision's Deliberately Limited Scope. .... 6

C. The Only "Failure to Enforce" Category Congress Has Added Is Confined to Reciprocal Agreement Commitments and Does Not Reach the Conduct at Issue. .... 7

D. USTR Cannot Salvage Its Action Under the Residual "Unreasonable" Standard. .... 9

III. Section 301's Consistent Historical Practice Confirms That It Reaches the Unreasonable Practice of a Particular Country—Not a Global Tariff Applied Across Economies. .... 11

A. Every Prior Section 301 Determination Targeted a Single Country or Economy. .... 11

B. USTR's Own Prior Forced-Labor Actions—Against Nicaragua and China—Show How Section 301 Applies to Forced Labor, and Confirm What Is Missing Here. .... 12

IV. Because USTR's Reading Would Transfer Congress's Taxing Power to the Executive, the Major Questions and Nondelegation Doctrines Require That Section 301 Be Construed Not to Authorize It. .... 14

CONCLUSION .... 16

CERTIFICATE OF COMPLIANCE .... 18

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Biden v. Nebraska*, 600 U.S. 477 (2023) .......... 15
*Duncan v. Walker*, 533 U.S. 167 (2001) .......... 10
*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824) .......... 15
*Industrial Union Dep't v. American Petroleum Inst.*, 448 U.S. 607 (1980) .......... 16
*Learning Resources, Inc. v. Trump,* 607 U.S. 229 (2026) .......... 1, 2, 15
*National Federation of Independent. Businesses v. OSHA*, 595 U.S. 109 (2022) .......... 15
*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) .......... 10
*Russello v. United States*, 464 U.S. 16 (1983) .......... 9
*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) .......... 15
*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 15

## STATUTES, RULES AND REGULATIONS

U.S. Const. art. I, § 8, cl. 1 .......... 15
19 U.S.C. § 2112 .......... 3, 4
19 U.S.C. § 2411 .......... passim
Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107 .......... 4
Trade Act of 1974, Pub. L. No. 93-618, tit. III, 88 Stat. 1978 .......... 3
Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 .......... 4
Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 304, 98 Stat. 2948 .......... 4
Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122, 189 (2016) .......... 8
Uruguay Round Agreements Act, Pub. L. No. 103-465, § 314, 108 Stat. 4809 (1994) .......... 4

## OTHER AUTHORITIES

85 Fed. Reg. 34,709 (June 5, 2020) .......... 11
86 Fed. Reg. 16,828 (Mar. 31, 2021) .......... 12
86 Fed. Reg. 30,356 (June 7, 2021) .......... 12
86 Fed. Reg. 30,361 (June 7, 2021) .......... 12
Agreement Between the United States of America, the United Mexican States, and Canada art. 23.6, Nov. 30, 2018 .......... 8
Cong. Rsch. Serv., IF11400, *Presidential Authority to Address Tariff Barriers in Trade Agreements under Trade Promotion Authority* (2025) .......... 3
Cong. Rsch. Serv., R46604, *Section 301 of the Trade Act of 1974: Origin, Evolution, and Use* 4 (2020) .......... 4
Desiree LeClercq, *The Section 301 Forced Labor Import Ban Report*, Int'l Econ. L. & Pol'y Blog (June 4, 2026) .......... 16
H.R. Rep. No. 100-576 (1988) (Conf. Rep.) .......... 7
H.R. Rep. No. 114-376 (2015) (Conf. Rep.) .......... 9
John H. Jackson, *The World Trading System: Law and Policy of International Economic Relations* (2d ed. 1997) .......... 3

PAGE(S)

Off. of the U.S. Trade Representative, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (June 2, 2026).. 3, 8, 14, 16

Off. of the U.S. Trade Representative, *Report on China's Acts, Policies, and Practices Targeting the Maritime, Logistics, and Shipbuilding Sectors for Dominance* (2025) .................. 12, 13, 14

Off. of the U.S. Trade Representative, *Section 301 Investigation Report on Nicaragua's Acts, Policies, and Practices Relating to Labor Rights, Human Rights and Fundamental Freedoms, and the Rule of Law* (Oct. 2025) ........................................................................... 12, 13

S. Rep. No. 100-71 (1987) ........................................................................................ 7

S. Rep. No. 93-1298 (1974) ........................................................................................ 3, 4

## INTEREST OF AMICI CURIAE

Amici Curiae Timothy Meyer and Gregory Shaffer are respectively professors of law at Duke University School of Law and Georgetown University Law Center and experts in U.S. and international trade law. They have a substantial interest in the sound interpretation of Section 301 of the Trade Act of 1974 and in preserving the constitutional allocation of the tariff power between Congress and the Executive. Amici submit this brief not to address the wisdom of combating forced labor—an objective amici share—but to assist the Court on a discrete question of statutory authority: whether Section 301 permits the United States Trade Representative to impose tariffs on economies accounting for nearly all United States imports based on their asserted failure to enact and enforce forced-labor import prohibitions of their own. The reading the government advances would transform a targeted, country-specific enforcement tool into a standing grant of global tariff authority, unsettling both the text Congress wrote and the constitutional boundaries the Supreme Court enforced in *Learning Resources, Inc. v. Trump,* 607 U.S. 229 (2026). Amici offer the historical, textual, and practical context below to aid the Court's resolution of that question.

This brief is submitted with amici curiae's Motion for Leave to File under USCIT Rules 7 and 76. That motion identifies amici's interest and also states the reasons why the participation of amici curiae is desirable in this matter.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Section 301 authorizes a bounded, practice-specific inquiry. It permits the United States Trade Representative to find that a particular act, policy, or practice of a particular foreign country that is unreasonable or discriminatory; to determine that the identified practice burdens or restricts United States commerce; and to select action calibrated to eliminate that specific practice. The challenged action does none of these things. It instead wields Section 301 as a standing source of de facto global tariff authority for the Executive—the very species of "unlimited" tariff power, untethered from any specific statutory predicate, that this Court rejected in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

This resort to Section 301 is clearly pretextual. As the record shows, USTR reached for Section 301 only after the global tariffs it sought to preserve were first imposed under the International Emergency Economic Powers Act and struck down in *Learning Resources*, then reimposed under Section 122 of the Trade Act of 1974—a provision that caps such tariffs at 15 percent and 150 days. Section 301 is the third statute pressed into service to sustain these across-the-board tariffs. To let it succeed where the others failed would drain Section 301 of the limits Congress wrote into it and circumvent Congress's constitutional role, under Article I, Section 8, in setting the Nation's tariff rates.

This brief addresses the text, purpose, history, and settled practice of Section 301, and explains why the challenged tariffs cannot be reconciled with any of them. In 2026, USTR imposed tariffs on sixty economies (the "Targeted Economies"), accounting for 99.4 percent of goods

imported into the United States, for their asserted failure to prohibit the importation of goods produced with forced labor.[1]

That action departs from Section 301's text, from the purpose Congress expressed in enacting and amending it, and from the practice of every administration that has invoked it. The challenged tariffs exceed the authority Congress conferred and should be set aside.

## I. The History of Section 301 and Its Amendments.

Section 301 was enacted as Title III of the Trade Act of 1974 (§§ 301–310, codified at 19 U.S.C. §§ 2411–2420) against the backdrop of a changed trading environment.[2] By the early 1970s, successive rounds of multilateral negotiation had substantially reduced tariffs, and foreign nontariff barriers had emerged as the principal obstacles to United States commerce and exports.[3] Congress responded with legislation whose overarching object was to open foreign markets and induce other nations to reduce their barriers on a reciprocal basis.[4] In furtherance of that object, the Act "urged" the President to "harmonize, reduce, or eliminate" barriers to and distortions of international trade and authorized him to negotiate agreements to that end—the negotiating

---

[1] Off. of the U.S. Trade Representative, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* 1 (June 2, 2026), https://ustr.gov/sites/default/files/files/Press/Releases/2026/USTR%20Report%20Sec%20301%20FL%20301%206-2-26%20FINAL%20for%20upload.pdf [hereinafter Forced Labor Report].

[2] Trade Act of 1974, Pub. L. No. 93-618, tit. III, 88 Stat. 1978, 2041–56 (codified as amended at sections of 19 U.S.C., such as §§ 2411–2420).

[3] *See* Christopher A. Casey, Cong. Rsch. Serv., IF11400, *Presidential Authority to Address Tariff Barriers in Trade Agreements under Trade Promotion Authority (TPA)* 1 (2025) (noting that by the late 1960s nontariff barriers had become the focus of multilateral trade negotiations); John H. Jackson, *The World Trading System: Law and Policy of International Economic Relations* 73-78 (2d ed. 1997); *see also* S. Rep. No. 93-1298, at 12–14 (1974).

[4] 19 U.S.C. § 2112(a) (congressional finding that barriers to and other distortions of international trade "are reducing the growth of foreign markets for the products of United States . . . commerce, . . . adversely affecting the United States economy, . . . and preventing the development of open and nondiscriminatory trade among nations").

mandate for the Tokyo Round (1973–1979), whose tariff reductions and nontariff-barrier "codes" were implemented through the Trade Agreements Act of 1979.[5] As the legislative history reflects, Congress conceived Section 301's retaliatory authority principally as "negotiating leverage" to eliminate foreign trade barriers and expand United States export opportunities—not as a tool to set general tariff rates or inflict economic harm untethered to the removal of burdens on United States commerce.[6]

Congress has amended Section 301 several times since 1974.[7] Most significantly, in 1988 Congress restructured it into two branches—mandatory and discretionary action.[8] It is the discretionary branch, § 301(b), that USTR invokes here. Through each revision, Section 301's authority to respond to unreasonable or discriminatory practices has remained trained on a specific practice of a particular foreign country, with the object of inducing that country to eliminate the practice and thereby expand trade. That orientation is embodied in the operative text: § 301(b)

---

[5] 19 U.S.C. § 2112(a) (source of quoted phrase); Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (implementing the Tokyo Round results).

[6] S. Rep. No. 93-1298, at 163 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7301; *see* Andres B. Schwarzenberg, Cong. Rsch. Serv., R46604, *Section 301 of the Trade Act of 1974: Origin, Evolution, and Use* 4 (2020) [hereinafter 2020 CRS Report] (concluding that the motivation behind the retaliatory mechanism was "primarily to expand U.S. export opportunities and to induce other nations to reduce trade barriers—not to punish or inflict economic harm on trading partners").

[7] Section 301 has been amended repeatedly, including by the Trade Agreements Act of 1979, Pub. L. No. 96-39, § 901, 93 Stat. 144, 295; the Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 304, 98 Stat. 2948, 3002; the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107, 1164; and the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 314, 108 Stat. 4809 (1994). *See generally* 2020 CRS Report, *supra* note 6.

[8] Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107, 1164 (dividing Section 301 into mandatory action, 19 U.S.C. § 2411(a), and discretionary action, *id.* § 2411(b)).

authorizes action where "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce."[9]

## II. Section 301's Labor-Related Categories Address Only a Foreign Country's Treatment of Its Own Workers and Its Non-Enforcement of Reciprocal Commitments.

USTR made no finding that any Targeted Economy's practices were "discriminatory." Its reliance on Section 301(b) thus depends on identifying an act, policy, or practice that is "unreasonable." But in 1988 and 2016, Congress specified the reach of that authority by enumerating specific categories of "unreasonable" acts, policies, and practices and hedging them with express conditions. As to forced labor, it supplied only two paths—a foreign country's toleration of forced labor in its own economy, and its failure to enforce a reciprocal agreement commitment—in addition to a residual "unfair and inequitable" standard. Because USTR's findings fault the Targeted Economies for how they respond to the practices of third countries, its action fits neither enumerated path; and because Congress specifically legislated which forced-labor policies are "unreasonable," the residual standard cannot be stretched to reach what those provisions clearly leave out. USTR's own contemporaneous forced-labor actions, discussed in Part IV, confirm this reading.

### A. The 1988 Worker-Rights Definition of "Unreasonable" Addresses Only a Country's Treatment of Its Own Domestic Workforce.

Among the acts Congress defined as "unreasonable" in 1988 was a discrete cluster of core labor rights: an act, policy, or practice is "unreasonable" if it "constitutes a persistent pattern of conduct that" "denies workers the right of association," "denies workers the right to organize and bargain collectively," "permits any form of forced or compulsory labor," "fails to provide a

[9] 19 U.S.C. § 2411(b)(1).

minimum age for the employment of children," or "fails to provide standards for minimum wages, hours of work, and occupational safety and health of workers."[10]

Congress hedged this ground with express limitations that constrain USTR from misuse. First, USTR must find "a persistent pattern of conduct"; isolated incidents do not suffice. Second, conduct "shall not be treated as being unreasonable" where the foreign country "has taken, or is taking, actions that demonstrate a significant and tangible overall advancement in providing . . . the rights and other standards" described in the labor-rights subclauses. And third, it likewise is not unreasonable where "such acts, policies, and practices are not inconsistent with the level of economic development of the foreign country."[11]

Each condition focuses the inquiry on the labor conditions and progress within the country whose conduct is said to burden United States commerce. When Congress addressed forced labor in Section 301, it reached a foreign country's toleration of forced labor in its own economy—conduct that confers an unfair competitive advantage and thereby burdens United States commerce—not whether that country has failed to bar forced-labor goods produced elsewhere from entering its market. Both the operative definition and its provisos evaluate the domestic labor conditions and progress of a country whose own practices burden United States commerce; neither asks whether a country has enacted or enforced a prohibition on importing goods produced with forced labor abroad. Yet it is this latter omission on which the challenged tariffs rest.

### B. The Drafting History Confirms the Provision's Deliberately Limited Scope.

The drafting history confirms this limited scope. The Senate Finance Committee explained that the 1988 amendment was intended to "include in the definition of 'unreasonable' a persistent

---

[10] 19 U.S.C. § 2411(d)(3)(B)(iii).

[11] *Id.* § 2411(d)(3)(B)(iii) (persistent-pattern requirement); *id.* § 2411(d)(3)(C)(i)(I)–(II) (conditions).

pattern of acts, policies, or practices that deny certain internationally recognized worker rights and burden or restrict U.S. commerce."[12] It identified the precise harm at which the provision aimed: "the competitive advantage in international trade that some countries derive from the systematic denial to their workers of basic internationally recognized worker rights."[13] Of particular significance here, it cautioned that the provision was not to "be used for the purpose of closing the U.S. market," for addressing isolated incidents, or as a general instrument of foreign policy.[14] And it made the limits explicit: "it is not the intent of this provision to apply U.S. labor laws or to impose U.S. labor standards on other countries, or to define as unfair foreign laws or standards that differ from those in the United States."[15] Congress adopted this formulation; the Conference Report provided that "the House recede[d]."[16]

### C. The Only "Failure to Enforce" Category Congress Has Added Is Confined to Reciprocal Agreement Commitments and Does Not Reach the Conduct at Issue.

That leaves one other enumerated category that could bear on forced labor: the enforcement provision Congress added in 2016. It does not reach the conduct at issue either—both by its terms and because USTR did not invoke it. The amendment reaches a "persistent pattern of conduct by the government of a foreign country under which that government fails to effectively enforce commitments under agreements to which the foreign country and the United States are parties,

---

[12] S. Rep. No. 100-71, at 87 (1987), https://www.finance.senate.gov/imo/media/doc/srpt100-71.pdf.

[13] *Id.* at 88.

[14] *Id.*

[15] *Id.*

[16] H.R. Rep. No. 100-576, at 568–69 (1988) (Conf. Rep.), https://www.finance.senate.gov/imo/media/doc/crpt100-576.pdf.

including with respect to . . . labor."[17] By its terms it is confined to non-enforcement of obligations the foreign country has undertaken to the United States in a shared agreement, and it requires that the failure form a persistent pattern of conduct that burdens or restricts U.S. commerce.

Here, however, the agency faulted the sixty economies not for failing to enforce any commitment owed to the United States under a shared agreement, but for failing, unilaterally, to enact and enforce their own prohibition on the importation of goods produced with forced labor. And for most of the Targeted Economies, the United States has no agreement containing any such commitment.[18] Even as to the few that do—for example, the United States-Mexico-Canada Agreement (USMCA) Agreement obligates Canada and Mexico to prohibit forced-labor imports—USTR did not proceed on a failure-to-enforce theory, but on the same generalized unreasonableness rationale it applied to economies with no such agreement.[19] The provision it would have needed, it did not use.

When Congress reached a government's failure "to effectively enforce," it did so only as to shared-agreement commitments, and only where the failure forms a persistent pattern; it expressly rejected a broader failure to enforce category untethered to any U.S. agreement.[20] Having

[17] 19 U.S.C. § 2411(d)(3)(B)(iv), added by Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, § 607, 130 Stat. 122, 189 (2016).

[18] USTR's own report treats the great majority of the sixty economies as having no forced-labor import-prohibition commitment to the United States; only a handful have undertaken any such commitment. *See* Forced Labor Report, *supra* note 1, at 10.

[19] *See* Agreement Between the United States of America, the United Mexican States, and Canada art. 23.6, Nov. 30, 2018 ("[E]ach Party shall prohibit the importation of goods into its territory . . . produced in whole or in part by forced or compulsory labor . . . ."); Forced Labor Report, *supra* note 1, at 21, 27, 29-30, 70 (applying the general "unreasonable" standard to Canada and Mexico rather than proceeding under 19 U.S.C. § 2411(d)(3)(B)(iv)).

[20] During conference, House and Senate conferees narrowed the Senate's broader "fails to effectively enforce" provision (which addressed environmental law enforcement), retaining only the clause reaching a government's failure to enforce "commitments under agreements to which

specified the form of enforcement failure that qualifies as "unreasonable," Congress is presumed to have omitted others intentionally.[21] The enumerated categories are illustrative, not exhaustive—but a residual standard does not authorize a category Congress considered and bounded.

### D. USTR Cannot Salvage Its Action Under the Residual "Unreasonable" Standard.

Unable to fit its action within any enumerated category, USTR falls back on the residual definition of "unreasonable" to claim broad Presidential authority: that the sixty economies' failure to prohibit forced-labor imports, although "not necessarily in violation of, or inconsistent with, the international legal rights of the United States, is otherwise unfair and inequitable."[22] That fallback fails for three reasons.

First, the residual standard cannot be used to reach on unbounded terms the very conduct Congress addressed specifically and confined. Congress legislated as to forced labor twice—reaching a country's own toleration of forced labor (§ 2411(d)(3)(B)(iii)(III)) and a government's failure to enforce reciprocal commitments (§ 2411(d)(3)(B)(iv))—and hedged each with express conditions. Having done so, it did not also authorize USTR to reach a third, unenacted theory—a country's failure to bar forced-labor imports—through the residual clause, free of those conditions. Reading the catch-all otherwise would render the specific provisions surplusage: the "persistent pattern" requirement, the economic-development and "significant and tangible advancement" provisos, and the reciprocal-agreement limitation of (B)(iv) would all become optional, evaded

---

the foreign country and the United States are parties." *See* H.R. Rep. No. 114-376, at 201 (2015) (Conf. Rep.) (Joint Explanatory Statement); *compare* 19 U.S.C. § 2411(d)(3)(B)(iv).

[21] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

[22] 19 U.S.C. § 2411(d)(3)(A); *see id.* § 2411(b)(1).

whenever USTR relabeled the same subject "unfair and inequitable." The specific governs the general, and a residual clause does not license an agency to reach what the specific provisions deliberately leave out.[23]

Second, even on its own terms the residual standard reaches only "an act, policy, or practice of a foreign country"—a specific measure attributable to a particular country.[24] USTR identified none. It faulted sixty economies en masse for an omission—the absence of a forced-labor import prohibition—pitched so generally that it applies identically to nations sharing nothing else in common. A generalized failure to adopt the legislation USTR prefers is not a specific "act, policy, or practice" of any country.

Third, the residual standard—like every path to discretionary action—applies only where the practice "burdens or restricts United States commerce."[25] USTR did not show that any identified practice does so. It offered instead a chain of hypothetical effects: that the absence of foreign import bans may permit forced-labor goods to circulate in global supply chains, may lower production costs abroad, and may thereby disadvantage some United States producer at some remove. But Congress required a burden traceable to the foreign practice at issue—not a speculative prediction that a regulatory gap somewhere in the world might, through global markets, eventually disadvantage an unspecified United States industry. The "burdens or restricts United States commerce" requirement would mean nothing if satisfied on so attenuated a theory.

---

[23] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (statutes should be construed so that "no clause, sentence, or word shall be superfluous, void, or insignificant" (citation omitted)); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

[24] 19 U.S.C. § 2411(b)(1); *id.* § 2411(d)(3)(A).

[25] 19 U.S.C. § 2411(b)(1).

Read as USTR urges, the residual standard would authorize tariffs on nearly any country for nearly any domestic policy the agency deems "unfair," so long as some indirect effect on United States commerce can be imagined. That is precisely the boundless authority Congress withheld when it defined "unreasonable" by reference to specific, commerce-burdening foreign practices and hedged even its forced-labor category with conditions.

## III. Section 301's Consistent Historical Practice Confirms That It Reaches the Unreasonable Practice of a Particular Country—Not a Global Tariff Applied Across Economies.

### A. Every Prior Section 301 Determination Targeted a Single Country or Economy.

The Congressional Research Service catalogued 130 Section 301 cases from 1974 through 2020, organized by economy, practice, product, and disposition.[26] USTR has invoked the statute since then in a similar manner until this case. Across five decades the mode of use has been constant: Section 301 responds to a specific, identified practice of a particular economy—licensing, subsidies, procurement, intellectual property, taxation, market access, or the like—attributable to that economy and remediable as to it. In each matter, the investigation and any action ran against a single economy or customs union; a customs union such as the European Union was treated as one economy alongside its member States, as here.[27] Not once in five decades did USTR sweep a common finding across a group of unrelated economies, let alone economies accounting for nearly all United States imports. The closest prior approximation confirms the rule. Although the 2020 Digital Services Tax (DST) investigations were announced in a single notice covering ten jurisdictions (*see* 85 Fed. Reg. 34,709 (June 5, 2020)), USTR split the investigations

[26] 2020 CRS Report, *supra* note 6, at Appendix A, Tables A-1 and A-2.

[27] *Id.*; *see* Forced Labor Report, *supra* note 1, at 22, 23, 28, 66 (treating the European Union as a single economy).

and reports, making separate findings and proposed action for each jurisdiction and calculating coverage country by country.[28] This new case stands alone: USTR made materially identical findings against economies accounting for 99.4 percent of United States goods imports, converting a country-specific enforcement tool into a standing grant of global tariff authority to the Executive.

### B. USTR's Own Prior Forced-Labor Actions—Against Nicaragua and China—Show How Section 301 Applies to Forced Labor, and Confirm What Is Missing Here.

Before this case, USTR made forced labor a basis of a Section 301 determination only twice: once at the core of its 2024–2025 Nicaragua investigation, and once as one component of its investigation of China's dominance in maritime, logistics, and shipbuilding. Each proceeded against a single country on a detailed, country-specific record.[29] The contrast with this case is dispositive.

In December 2024, USTR initiated a Section 301 investigation into Nicaragua's practices relating to labor rights, human rights, and the rule of law.[30] In its October 2025 report, USTR found that those practices "burden or restrict U.S. commerce" by "suppress[ing] Nicaraguan workers'

---

[28] *E.g.*, Austria's list carried "an estimated trade value for calendar year 2019 of approximately $65 million," 86 Fed. Reg. 30,361, 30,362 (June 7, 2021); India's "approximately $119 million." 86 Fed. Reg. 30,356, 30,357 (June 7, 2021). USTR also terminated investigations on jurisdiction-specific grounds because those jurisdictions "either have not adopted or not implemented a DST during the period of investigation." 86 Fed. Reg. 16,828 (Mar. 31, 2021).

[29] *See* Off. of the U.S. Trade Representative, *Section 301 Investigation Report on Nicaragua's Acts, Policies, and Practices Relating to Labor Rights, Human Rights and Fundamental Freedoms, and the Rule of Law* (Oct. 2025), https://ustr.gov/sites/default/files/files/Press/Releases/2025/Nicaragua%20Section%20301%20Report_0.pdf [hereinafter Nicaragua Report]; Off. of the U.S. Trade Representative, *Report on China's Acts, Policies, and Practices Targeting the Maritime, Logistics, and Shipbuilding Sectors for Dominance* (2025), https://ustr.gov/sites/default/files/enforcement/301Investigations/USTRReportChinaTargetingMaritime.pdf [hereinafter China Maritime Report].

[30] Nicaragua Report, *supra* note 29, at 1.

wages and result[ing] in artificially low-cost Nicaraguan products."[31] It did not rest on the residual standard: it rather found that Nicaragua engaged in the enumerated "persistent pattern[s] of conduct"—denying associational and bargaining rights, permitting forced labor, failing to bar child labor, and failing to protect workplace standards—citing Section 2411(d)(3)(B)(iii) directly.[32]

That determination rested on a country-specific record. USTR cited evidence of labor trafficking across industries; State Department findings on the government's failure to respond to trafficking; research estimating modern-slavery prevalence at 7.3 per thousand; and research estimating that 47.7 percent of children aged 10 to 14 engaged in child labor, including forced labor.[33] It then tied those documented abuses to a measured effect on U.S.-Nicaragua commerce, finding that worker exploitation suppressed Nicaraguan wages and yielded artificially low-cost products—supported by comparative data, including Nicaragua's bottom-of-region GDP and an average hourly wage less than one-sixteenth of that in the United States.[34]

USTR's China investigation confirms the same method. There too USTR proceeded under Section 301(b) against a single economy, grounding its determination in concrete, country-specific market-share and commerce data.[35] Tellingly, even where forced labor entered the analysis, USTR treated it as one input to China's artificial cost advantages within a country-specific finding—not as a freestanding theory that a government's failure to bar forced-labor imports is itself

---

[31] *Id.* at 29.

[32] *Id.* at 21 & nn. 66–67 (citing 19 U.S.C. § 2411(d)(3)(B)(iii)).

[33] *Id.* at 9–11.

[34] *Id.* at 29–33.

[35] China Maritime Report, *supra* note 29, at 116–40.

actionable.[36] In both of these prior actions, USTR identified a specific practice of a specific country and traced it to a specific burden on United States commerce.

This case inverts that method at every step. The 2026 report acknowledges the persistent-pattern provision but—unlike the Nicaragua report months earlier—makes no finding that any Targeted Economy's government engaged in a persistent pattern of permitting forced labor. In place of the country-specific practice and record Section 301 requires, the agency adopted the design of the United States' own forced-labor import regime as the benchmark of "fairness" (despite acknowledging that regime's limitations),[37] then found substantially identical burdens across all sixty economies. That uniform finding cannot be squared with the differentiated picture USTR's own materials present, which recognize that the incidence and gravity of forced labor differ markedly among the sixty.[38] The same agency that, only months earlier, built a country-specific record to condemn Nicaragua declined to build one for any of the sixty—yet reached a result of vastly greater sweep. Having shown what a lawful forced-labor determination requires, USTR cannot substitute a one-size-fits-all condemnation of sixty disparate economies.

## IV. Because USTR's Reading Would Transfer Congress's Taxing Power to the Executive, the Major Questions and Nondelegation Doctrines Require That Section 301 Be Construed Not to Authorize It.

The reading of Section 301 that USTR advances would let the President, through USTR, raise tariffs on any or every trading partner, without limit as to amount, duration, or scope, on a finding that some foreign regulatory choice is "unfair." That claim raises grave constitutional and statutory problems, and the Court should not lightly attribute it to Congress.

---

[36] *Id.* at 89–98 (treating China's labor practices as one source of non-market cost advantages within a country-specific unreasonableness finding).

[37] *See infra* note 44.

[38] Forced Labor Report, *supra* note 1, at 4–5, 31–34, 58–79.

As in *Learning Resources*, the case implicates the major questions doctrine, which requires clear congressional authorization before the Executive may decide questions of "vast economic and political significance."[39] Courts should be especially skeptical where the government "has never previously claimed powers of this magnitude" and past uses "have been extremely modest and narrow in scope."[40] A power to impose tariffs of unbounded scope across economies accounting for nearly all United States imports is a paradigm major question, and—as Part IV shows—no prior administration has read Section 301 to authorize global, across-the-board tariffs. The Court said as much of the parallel authority at issue in *Learning Resources*: it found it "telling" that in a "half century of existence," no President had invoked IEEPA "to impose any tariffs—let alone tariffs of this magnitude and scope," and it characterized the claimed power as extraordinary and unheralded.[41] Section 301's five-decade history is no different. Such a power may not be inferred from ambiguous text but must be delegated in unmistakable terms. Section 301 contains no such delegation. Congress designed it to open individual foreign markets by remedying specific unfair practices in particular countries—not as a standing global tariff-setting or revenue-raising mechanism at the President's disposal.

USTR's proposed reading would also press Section 301 to the edge of the nondelegation doctrine. *Learning Resources* held that the power to impose tariffs is "'very clear[ly] . . . a branch of the taxing power,'" committed by Article I, Section 8 to Congress.[42] Read as USTR would have

---

[39] *See West Virginia v. EPA*, 597 U.S. 697, 716, (2022) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)); *see also Learning Resources, Inc. v. Trump*, 607 U.S. 229, 231-33 (2026).

[40] *Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

[41] *Learning Resources*, at 245 (Roberts, C.J.) (quoting *National Federation of Independent. Businesses v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam)); 261 (Gorsuch concurrence).

[42] *Id.* at 252 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)); *see* U.S. Const. art. I, § 8, cl. 1.

it, the statute would supply no intelligible principle cabining the Executive's tariff power: any policy—or as in this case, any omission—by any number of countries that the agency deemed "unfair," plus a conjectural effect on United States commerce, would suffice to tax any import at any rate. That alone is reason to reject USTR's reading, for where one construction raises a serious constitutional question and another avoids it, the Court adopts the latter.[43] A narrower construction—compelled by Section 301's text, history, and USTR's own practice—is available here.

The agency's theory cannot be taken at face value. The government demands of sixty economies a universal standard against forced-labor imports that the United States does not itself meet,[44] and deploys that rationale to tariff nearly all imports at the President's direction. The pretextual use of Section 301 reveals what is at issue: not the targeted, practice-specific enforcement Congress authorized, but a general tariff authority in search of a predicate.

**CONCLUSION**

The Court should hold that USTR exceeded its statutory authority. That holding should rest on the statute, so the constitutional questions need not be reached. A holding limited to arbitrary-and-capricious review would not suffice. It would fault only USTR's explanation, inviting the agency to assemble more elaborate reports and postpone the question the courts ultimately cannot avoid—whether Section 301 authorizes global duties. Because Section 301 makes plain that it does not, that delay would serve only to let USTR continue collecting unlawful

---

[43] *See Industrial Union Dep't v. American Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality opinion) (construing a delegation narrowly to avoid the nondelegation question).

[44] *Compare* Forced Labor Report, *supra* note 1, at 20-31 (premising the commerce-burden finding on effective U.S. enforcement), *with id*. at 33, 47-55 (acknowledging that forced-labor inputs continue to enter the U.S. supply chain despite existing prohibitions); *see* Desiree LeClercq, *The Section 301 Forced Labor Import Ban Report*, Int'l Econ. L. & Pol'y Blog (June 4, 2026), https://ielp.worldtradelaw.net/2026/06/the-section-301-forced-labor-import-ban-report/.

tariffs while it accomplishes the administration's hardly veiled purpose: the President's assumption, through USTR, of a taxing power the Constitution vests in Congress. These global tariffs should be set aside as beyond the authority Section 301 confers.

Respectfully submitted,

/s/ Richard F. O'Neill
Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
jpeterson@npwny.com

*Counsel for Proposed Amici Curiae, Professors Timothy Meyer and Gregory Shaffer*

Dated: September 11, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

**-------------------------------------------------------------------X**

**IN RE SECTION 301 FORCED LABOR CASES : Case No. 26-cv-3555-3JP**

**-------------------------------------------------------------------X**

**CERTIFICATE OF COMPLIANCE**

I, Richard F. O'Neill, of Neville Peterson LLP, counsel responsible for the foregoing Brief, certify that the Brief complies with the word limitation set forth in Standard Procedural and Scheduling Order No. 26-01 (ECF No. 1) and contains 4,984 words, excluding the parts of the Brief exempted by the Court's Standard Chambers Procedures, as measured by the word-count function of the word processing program used to prepare it.

/s/ Richard F. O’Neill
Richard F. O’Neill
Neville Peterson LLP

*Counsel for Proposed Amici Curiae, Professors Timothy Meyer and Gregory Shaffer*