**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-03555-3JP |

**BRIEF AMICUS CURIAE OF CONSUMER WATCHDOG IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**


Alan B. Morrison

**GEORGE WASHINGTON UNIVERSITY LAW SCHOOL**
2000 H Street NW
Washington D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

R. Will Planert
Donald B. Cameron, Jr.
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Edward J. Thomas III
Xi (Jack) Yang

**TAFT STETTINIUS & HOLLISTER, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4819

*Counsel to Amicus Curiae Consumer Watchdog*


September 11, 2026

**TABLE OF CONTENTS**


**I. INTEREST OF THE AMICUS CURIAE ........................................................................ 1**

**II. ARGUMENT........................................................................................................................ 2**

**A. THE CHALLENGED TARIFFS ARE UNLAWFUL. ................................................ 2**

**B. THE COURT SHOULD DIRECT THAT THE TARIFFS ORDER BE VACATED TO AVOID IRREPARABLE HARM TO CONSUMERS WHO WILL BEAR THE ULTIMATE COST OF THESE TARIFFS. ................................................................ 6**

**III. CONCLUSION ................................................................................................................ 12**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................6, 7

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)....................4

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)....................2, 4, 8, 10

*Oregon v. United States*, Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669,
(Ct. Int'l Trade May 7, 2026)....................8, 9

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................7, 8

**Statutes**

5 U.S.C. § 706(2)....................6, 7

19 U.S.C. § 1307....................3

19 U.S.C. § 2411(b)....................2, 3, 4

28 U.S.C. § 1581(i)....................8

28 U.S.C. § 2640(e)....................7

50 U.S.C. § 1702....................4, 8, 9, 10

**Other Authorities**

*Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318, 47,320 (July 28, 2026)....................5, 7

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-03555-3JP |

**BRIEF AMICUS CURIAE OF CONSUMER WATCHDOG IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I. INTEREST OF THE AMICUS CURIAE

The amicus curiae Consumer Watchdog is a non-profit, non-partisan public interest organization dedicated to protecting consumers from economic harm caused by unfair market practices, corporate abuses, and improper governmental actions. Consumer Watchdog has previously filed amicus briefs in support of two separate challenges to tariffs imposed by the Executive Branch because tariffs function as a regressive tax that disproportionately burdens working families and economically vulnerable consumers. Tariffs of the magnitude at issue here inevitably raise consumer prices and threaten the economic security of working families and small businesses.[1]

In addition to supporting Plaintiffs on the merits of their claims, this brief will emphasize the importance to consumers of immediate vacatur relief if the Court agrees with Plaintiffs that

[1] *See* Addendum, Part I (materials showing the extent to which the 2025 tariffs were passed on to purchasers).

these tariffs are unlawful. While the refund remedy may suffice for many importers, it does not help the millions of consumers to whom the tariffs are passed on by those who pay the tariffs when they are imposed. The victory by the challengers to the more than $160 billion in tariffs at issue in *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026), resulted in refunds to those who paid the tariffs, but not a dollar went to consumers on whom the cost of the tariffs eventually fell.

## II. ARGUMENT

### A. THE CHALLENGED TARIFFS ARE UNLAWFUL.

The issue in this case is the legality of the imposition by the Office of the United States Trade Representative ("USTR") of 10% or 12.5% tariffs on 99% of the products imported from 60 economies, comprised of 86 countries, under section 301(b) of the Trade Act of 1974, 19 U.S.C. § 2411(b). USTR claims that the failure to enact and enforce bans on imports from countries with forced labor in all 86 countries is the basis for these tariffs. *See* Def.'s Resp. in Opp'n to Rule 56.1 Mot. for J. on Agency R. ("Def.'s Br.") at 21, ECF No. 22. As the briefs of the Plaintiffs explain in full, section 301(b) has several central requirements, none of which are met by these tariffs. These features are clear from the text of section 301(b) on which USTR relies.

First, section 301(b) is directed at specific "unreasonable or discriminatory" trade practices from specific countries – "an act, policy, or practice of a foreign country." 19 U.S.C. § 2411(b). The notion that 86 countries have all harmed United States exporters by the same means defies logic and common sense.

Second, section 301(b) is directed at "an act, policy, or practice of **a** foreign country," which reaches only affirmative conduct by a country. *Id.* (emphasis added). But these tariffs are not directed at what other countries have done themselves–producing goods using forced labor–but at what they failed to do–enact or enforce an explicit ban on the imports of goods made by

forced labor. Def.'s Br. at 12–13. Section 301(d)(3)(B)(iii) specifically addresses when forced labor is "unreasonable"–only if it "constitutes a persistent pattern of conduct" that "permits any form of forced or compulsory labor." 19 U.S.C. § 2411(d)(3)(B)(iii). Treating passive conduct as unreasonable is inconsistent with this express provision on this very topic. Allowing tariffs for such secondary conduct would massively expand section 301 far beyond what Congress has provided. Moreover, it would render 19 U.S.C. § 1307, which already bans the importation into the United States of products made with forced labor, largely unnecessary.

Third, section 301(b) is designed to protect U.S. exporters from an unfair act that "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). To come within section 301(b), the unreasonable or discriminatory conduct would have to harm U.S. exporters who make goods that compete with goods that have been made under the prohibited conditions that are covered by section 301. *See id.* In this case, U.S. goods would have to compete with goods produced using forced labor, such as clothing or shoes. But USTR has not even attempted to show that U.S. manufacturers generally are adversely affected by the conduct that it relies on, let alone that U.S. manufacturers have been harmed by the conduct relied on by USTR in each of the 86 countries whose imports will be subject to these tariffs.

Fourth, section 301 operates to bring into balance situations in which another country has imposed unreasonable trade practices. *See* 19 U.S.C. § 2411(b)(2). Its effects are remedial, not punitive, and may be used only "to obtain the elimination of that act, policy, or practice." *Id.* However, USTR has failed to show that 10% or 12.5% tariffs perform that remedial function for each of the 86 countries that are subject to these tariffs. This notion of proportionality is supported by a limitation in the mandatory action requirements of § 2411(a)(3) under which any tariffs must be "in an amount that is equivalent in value to the burden or restriction being

imposed by that country on United States commerce." USTR argues that the mandatory tariffs under section 301(a) are different from the discretionary tariffs that it imposed under section 301(b), but it never explains why Congress would insist on proportionality for mandatory tariffs but relax that requirement for those that are discretionary. *See* Def.'s Br. at 28, 47.

Defendants do not dispute that section 301 imposes limits on what USTR, or the President, can do beyond merely that their actions are "appropriate." 19 U.S.C. § 2411(c)(1)(B). Without such limits, section 301 would become the kind of wholly open-ended law that the Supreme Court found in *Learning Resources*, 607 U.S. at 230, and could not be used to impose the tariffs challenged there under the International Emergency Economic Powers Act, 50 U.S.C. § 1702 ("IEEPA"). The *Learning Resources* Court did not reach the claim that, if IEEPA authorized the President to issue those tariffs, it would violate the prohibition against excessive delegation of legislative authority, as most recently enunciated in *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672–73 (2025). But if Defendants were to contend that section 301 is without boundaries, this Court would have to decide the delegation question.

Instead of arguing directly that section 301(b) has no requirements, USTR reinterprets section 301(b) from a statute targeting specific trade practices that harm U.S. companies into a provision that is as easily satisfied as Defendants unsuccessfully claimed IEEPA was in *Learning Resources*, 607 U.S. 229. But that is not what section 301(b) mandates. It requires an unreasonable trade practice by each country that burdens United States sellers of competing products, and for which the tariff imposed is needed to remedy that harm. 19 U.S.C. § 2411(b)(1). Instead, USTR has transformed section 301(b) into a provision in which it is enough if USTR can identify one unreasonable trade practice that is allegedly found in every covered country for which USTR can find any product that the trade practice is injuring a U.S. company.

*See* Def.'s Br. at 40–41.

The following example illustrates the parties' differing views on how section 301(b) operates. USTR has identified Poland as a country that purportedly does not adequately prevent products made with forced labor from being imported there. *See* PR-6 at 38–41. Poland imports tobacco from Malawi, and USTR found that some of that tobacco is produced with forced labor. According to USTR, U.S. manufacturers export tobacco to Poland, and they are injured because they have to compete in Poland with tobacco produced with forced labor in Malawi. *See id.* Therefore, a tariff of 10% on goods from Poland is appropriate to remedy that harm. *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318, 47,320 (July 28, 2026) ("Tariffs Order"). Assuming all those facts to be established, under a proper reading of section 301(b), those findings would only validate a 10% tariff on a sufficient number of products from Poland to eliminate Poland's targeted import practice.

But USTR reads section 301(b) to extend its authority to impose tariffs, based on the Poland situation and one or two other examples, to impose the 10% or 12.5% tariff on every country that USTR believes does not adequately police imports of forced labor. According to Defendants, it may impose these tariffs regardless of whether each of the 80 countries subject to these tariffs actually imports products made with forced labor, *and* most significantly, without having to show that those imports unfairly compete with the same U.S. products. *See* Def.'s Br. at 40–41. Although section 301(b) operates on a country-by-country, product-by-product basis, USTR incorrectly claims that, once it has identified an unreasonable trade practice, it can use section 301(b) to impose a 10% or 12.5% tariff on *every* product coming from any country that

has that practice, as long as it can show that the unreasonable trade practice in at least one country may competitively harm one U.S. company there. *See id* at 9, 40–41. In short, USTR misreads section 301(b) to enable it to do on an international wholesale basis what the statute requires to be done on a country-by-country and product-by-product retail basis. That fundamentally flawed reading of section 301(b) should be rejected by this Court.

**B. THE COURT SHOULD DIRECT THAT THE TARIFFS ORDER BE VACATED TO AVOID IRREPARABLE HARM TO CONSUMERS WHO WILL BEAR THE ULTIMATE COST OF THESE TARIFFS.**

Plaintiffs have requested that this Court vacate the order authorizing the imposition of these tariffs under section 301(b). As explained above and in the briefs of the Plaintiffs, USTR has not come close to justifying worldwide tariffs of 10% or 12.5% under section 301(b) on the grounds that it has asserted. Because its order is applicable to all imports from the covered countries, the proper remedy is to vacate the order as provided by 5 U.S.C. § 706(2), directing courts to "set aside agency action" found to be unlawful.

Although the Government cites no precedent for its novel assertion that a plaintiff with an Administrative Procedure Act ("APA") cause of action must satisfy the permanent injunction factors before a court can vacate the unlawful agency action (as the statute commands and courts regularly do in APA cases), *see* Def.'s Br. at 60–61, those factors are nonetheless satisfied here. In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the Supreme Court made clear the standard for granting a permanent injunction, at least in cases involving private parties:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391. If this were simply a case in which importers claimed that the Government had unlawfully imposed tariffs on them, there would be no basis to vacate the Tariffs Order while the case proceeded on appeal. A full refund, plus statutory interest, would surely be considered adequate, and the importer would not have suffered an irreparable injury.

But those cases are very different, and the circumstances here clearly favor immediate relief. These tariffs have been imposed on almost all of the products from 86 countries, in an effort to replicate the tariff revenue from the unlawful IEPPA tariffs that produced approximately $165 billion in revenue in less than eleven months. As explained below, the harms that have been, and will continue to be, inflicted on importers, intermediaries, and consumers are of a different nature from the typical tariff case before this Court, and they surely differ significantly from the private party patent litigation in *eBay*, 547 U.S. 388. The real question on the vacatur issue is whether this Court may protect parties who are directly injured by these tariffs but are unable to sue because only those who actually pay the tariffs can bring a claim in this or any other Court.

Contrary to the Government's contention, this case is distinguishable from *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), in ways that compel a different result. The main dispute in *CASA* was under what circumstances a federal court may properly issue an injunction that benefits not just the named Plaintiffs but also non-parties, extending potentially to everyone subject to the action being challenged. 606 U.S. at 837–38. Three major aspects of *CASA* that led to the narrow ruling that precluded broad relief there do not apply here: (1) that action was brought against the President, who is not an agency, so that relief under the APA, 5 U.S.C. § 706(2), was not available. Here, Plaintiffs have sued an agency, USTR, and they have invoked the APA and 28 U.S.C. § 2640(e) which authorize courts to "set aside" or vacate

unlawful agency actions, including these tariffs; (2) the claims at issue in *CASA* had been properly brought in many jurisdictions, and so there was a distinct possibility that the Defendants might prevail in some districts, creating a conflict not possible in this case where exclusive jurisdiction lies in this Court; and (3) there were no barriers that prevented anyone who alleged that they were harmed by the Executive Order in *CASA* from suing and obtaining full relief for themselves, whereas here, only the importer who pays the tariff can sue, and others who pay more for their goods due to the tariffs are not eligible to sue for a "refund" in this or any other Court. Thus, the scope of the permissible vacatur relief is not controlled by *CASA*, and the question is whether Defendants should be allowed to continue to collect tariffs found to be unlawful while the case continues on appeal.

The great remedial lesson learned from the Supreme Court's decision striking down the IEEPA tariffs in *Learning Resources*, 607 U.S. at 255, is that the only parties who will benefit from the refund of tariffs resulting from that decision are U.S. importers of record who paid the tariffs. Many importers passed on all or part of the cost of the unlawful tariffs to their customers, who in turn did the same to their customers, until the product on which the tariff was paid was sold to the ultimate consumer, who had no choice but to absorb the unlawful tariffs included in the purchase price. The result, which is such common knowledge that it could be subject to judicial notice, is that although the Supreme Court's decision may result in refunds of more than $160 billion to importers, those refunds will not benefit consumers because under the applicable statute, 28 U.S.C. § 1581(i), the persons who paid the tariffs are the only parties authorized to sue for refunds.[2] *Oregon v. United States,* Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL

---

[2] *See* Addendum, Part II (materials on the operation of the refund process and the absence of any avenue by which a downstream purchaser may recover).

1257669, at *10–11 (Ct. Int'l Trade May 7, 2026). Although there have been news reports that some large importers indicated that they might lower their prices or find some other way to pass on some of the refunds to their customers, there is no evidence that many companies are actually doing this, let alone that consumers who absorbed most of these costs will obtain any benefits from the IEEPA refunds that will be paid.[3]

The inevitable result, as applied to this case, is that no matter how quickly and decisively this Court acts, it cannot issue an injunction that will prevent irreparable harm to consumers from these illegal tariffs. Plaintiffs, wisely, did not seek a preliminary injunction, presumably in light of the APA's default vacatur remedy. As evidenced by the speed with which this Court was able to issue its decision in *Oregon v. United States,* striking down the section 122 tariffs, the period for which there will inevitably be harm to consumers can be kept to a minimum. *Id.* at *10–11. In addition, there is often a period after a tariff is imposed, especially controversial ones like these, in which, for a variety of reasons, importers do not immediately raise their prices to offset the effect of the tariff, thereby reducing the harm to intermediaries and consumers.[4]

The critical time for protecting consumers is when the Defendants seek a stay of the vacatur order pending appeal. In the ordinary tariff case, with only the interest of the party who actually paid the tariff, there might not be sufficient reason to order an immediate end to the collection of the unlawful tariffs. That is how the Government treated the injunctive orders in

[3] The Addendum to this brief contains some of the many media reports showing that consumers are not benefitting directly from the IEEPA refunds. *See* Addendum, Part IV. It also cites to the reports that some consumers have filed class actions against major companies that obtained tariff refunds but did not share the refunds with their customers. *See* Addendum, Part V. By contrast, Federal Express, United Parcel Service, and DHL, which directly added any tariff imposed on the customer's bill, are reportedly rebating the refunds to their customers. *See* Addendum, Part VI.

[4] *See* Addendum, Part VII (describing the choice between raising prices and absorbing the cost of the tariff).

the IEEPA and section 122 cases, where it claimed that the promise to pay refunds, plus interest, justified the stay of the orders enjoining the collection of those tariffs. *See e.g.* Emergency Mot. for Stay Pending Appeal & Immediate Admin. Stay 25, *V.O.S. Selections, Inc. v. Trump*, Nos. 2025-1812, -1813 (Fed. Cir. May 29, 2025), 25, ECF No. 6. But that was before the post-Supreme Court lesson in *Learning Resources*, 607 U.S. 229, became apparent: that the consumer who is the ultimate payor of most, if not all, of the tariffs will not receive any of those refunds.

There is one other factor that should be considered in weighing the Government's inevitable request for a stay. As the judges of this Court are well aware, the process of providing for the hundreds of thousands of IEEPA refunds imposed massive burdens of time and money on this Court, the Executive Branch, and the claiming parties.[5] This is all the more certain given the Government's position in the ongoing IEEPA cases, that the Court can only order full refunds to parties in the litigation and cannot direct CBP to refund duties to non-parties.[6] Most of those costs – which cannot be "refunded" – can be avoided if the Court finds these tariffs to be unlawful and vacates them.

If the Court vacates this Tariff Order and Defendants ultimately prevail on appeal, the original order would be reinstated, and the Government may be entitled to seek to collect whatever is owed under the then-reinstated tariffs. Amicus does not understand the Government to take the contrary position. Moreover, all of the paperwork needed to assess the tariffs owed will have been completed when the goods arrive in this country, and the full force of the Federal

---

[5] *See* Addendum, Parts VII, VIII (collecting accounts of importers and small businesses navigating the refund process, including partial and delayed disbursement and the cost of pursuing a claim).

[6] The Government has appealed this Court's orders directing U.S. Customs and Border Protection to refund IEEPA duties to all importers of record, contending that relief may run only to importers that filed suit. *See Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 616128, at *1–2 (Ct. Int'l Trade Mar. 4, 2026); *V.O.S. Selections, Inc. et al. v. Donald J. Trump et al.*, Ct. No. 25-00066, Defendants' Notice of Appeal, ECF No. 91 (June 2, 2026).

Government can be used to collect the money owed, with interest.

Amicus recognizes that the Defendants will almost certainly appeal and seek a stay of any adverse ruling, but it urges this Court to reject the near-automatic full stays that it and the Federal Circuit have previously granted. Rather, this Court should grant a stay of no more than fourteen days and make it clear that this limited stay is being granted solely to enable the Defendants to attempt to persuade the Federal Circuit that they are correct on the merits. Because the equities so strongly favor the Plaintiffs, there should be no further stay of the vacatur order.

## III. CONCLUSION

For the foregoing reasons and those set forth in the briefs of the Plaintiffs, the Court should rule that the challenged tariffs are not authorized by section 301 and should enter an order vacating the section 301 tariff determinations.

Respectfully submitted,

/s/ Alan B. Morrison
Alan B. Morrison
**GEORGE WASHINGTON UNIVERSITY LAW SCHOOL**
2000 H Street NW
Washington D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

/s/ R. Will Planert
R. Will Planert
Donald B. Cameron, Jr.
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Edward J. Thomas III
Xi (Jack) Yang

**TAFT STETTINIUS & HOLLISTER, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4819

*Counsel to Amicus Curiae Consumer Watchdog*

Dated: September 11, 2026

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

## INTRODUCTORY NOTE

This Addendum collects publicly available materials bearing on two factual matters described in the brief amicus curiae of Consumer Watchdog: the incidence of the 2025 tariffs and the operation of the refund process. It is submitted so that those sources are before the Court in an accessible form. It advances no argument beyond the brief, and nothing in it is offered as part of the administrative record.

Each entry states the date of the source, its identity, the full internet address at which it may be found, and the operative language for which it is cited, quoted in relevant part. Internet-based materials were last visited on September 10, 2026. Court filings are included for the fact and content of the positions taken in them, not for the truth of those positions, and news reports are included to show that the matters described were publicly reported and that the statements quoted were made, not for the truth of any characterization by a reporter.

### I. Effects of Tariffs on Prices and Costs

| Date | Citation | Material Cited |
|---|---|---|
| June 1, 2025 | Business Insider, *Walmart workers are sharing photos of price hikes of 38% or more — and some prices are up at Target too* (June 1, 2025), https://www.businessinsider.com/walmart-price-increases-items-tariffs-target-reddit-2025-5 (last visited Sept. 10, 2026) | The report documents individual shelf-price increases of as much as forty-five percent over a period of weeks, against the retailer's statement that "We'll keep prices as low as we can for as long as we can given the reality of small retail margins." The article cautions that the listings do not establish how much, if any, of each increase was attributable to tariffs. |
| Oct. 16, 2025 | The Wall Street Journal, *IKEA's Yearslong Price-Cutting Bonanza Is Coming to an End* (Oct. 16, 2025), https://www.wsj.com/business/retail/ikeas-low-price-mantra-is-tested-by-trumps-tariffs-4455986a (last visited Sept. 10, 2026) | A retail executive at the company operating most IKEA stores explains that although "Our ambition is to continue lowering prices," the tariffs make that "very difficult or even impossible at some point," so that the company must "adapt and pass on parts of the cost increase to the customers." The report adds that "Goldman Sachs estimates U.S. consumers will ultimately pay 55% of tariff costs." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Nov. 25, 2025 | Business Insider, *Abercrombie & Fitch, Walmart, Nike, and other major brands that say Trump's tariffs are pushing them to raise prices* (Nov. 25, 2025), https://www.businessinsider.com/companies-raising-prices-increases-trump-tariffs-2025 (last visited Sept. 10, 2026) | Asked on an earnings call about the prospect of further tariffs, AutoZone's chief executive stated that "we will pass those tariff costs back to the consumer," adding that the company "generally raise[s] prices ahead of that."<br>Nike's chief financial officer described the tariffs as "a new and meaningful cost headwind" warranting a "surgical price increase" in the United States, and Leica USA attributed its own increase not to any "Leica-initiated price increase, but [to] a result of the newly enacted tariffs." |
| Jan. 2026 | Julian Hinz, Aaron Lohmann, Hendrik Mahlkow & Anna Vorwig, *America's Own Goal: Who Pays the Tariffs?*, Kiel Policy Brief No. 201, Kiel Institute for the World Economy (Jan. 2026), https://www.kielinstitut.de/publications/americas-own-goal-who-pays-the-tariffs-19398/ (last visited Sept. 10, 2026) | Drawing on shipment-level data covering more than 25 million transactions valued at nearly $4 trillion, the authors find near-complete pass-through of the tariffs to United States import prices: "American importers and consumers bear nearly the entire cost," while foreign exporters absorb "only about 4% of the tariff burden—the remaining 96% is passed through to US buyers."<br>The authors accordingly describe the resulting surge in "US customs revenue […] by approximately $200 billion in 2025" as "a tax paid almost entirely by Americans." Event studies of the tariffs imposed on Brazil and India confirmed that foreign "export prices did not decline," and that "[t]rade volumes collapsed instead." |
| Aug. 6, 2026 | Letters of Sen. Elizabeth Warren to Apple, Amazon, Energizer, Motorola, Nike, Target & Walmart (Aug. 6, 2026), https://www.warren.senate.gov/wp-content/uploads/2026/08/Tariff-Refund-Letters.pdf (last visited Sept. 10, 2026) | Writing to seven major importers, Senator Warren states that "Importers pushed the costs of tariffs onto American consumers and small businesses," citing Congressional Budget Office data "showing that American families will have ended up paying 95% of the tariffs."<br>She adds that, unlike the importers receiving refunds, "American families have no recourse for the increased prices they paid." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Aug. 7, 2026 | *Warren presses U.S. companies to share billions in tariff refunds with customers*, CBS News (Aug. 7, 2026), https://www.cbsnews.com/news/elizabeth-warren-tariff-refunds-ieepa/ (last visited Sept. 10, 2026) | Reporting on those letters, CBS News repeats the estimate that "American families will have ended up paying 95% of the tariffs," and observes that the resulting disparity is "leading to a wave of class-action lawsuits from consumers suing corporations for refunds of the tariff surcharges." |
| Aug. 7, 2026 | Yahoo Finance, *'Your refund: $0': Companies claim billions in tariff refunds, months after Trump floated $2,000 checks* (Aug. 7, 2026), https://finance.yahoo.com/economy/policy/articles/refund-0-companies-claim-billions-185000374.html (last visited Sept. 10, 2026) | Collecting the congressional and Federal Reserve estimates, the report states that "Democrats on the Joint Economic Committee tallied the expense at $1,744.75 per household over the tariffs' first year, from $231.35 billion in consumer costs," and that "Nonpartisan New York Fed economists confirmed that nearly 90% of the burden landed on U.S. firms and consumers rather than foreign exporters." |
| Aug. 24, 2026 | Yale Budget Lab, *The State of U.S. Tariffs* (updated Aug. 24, 2026), https://budgetlab.yale.edu/research/state-us-tariffs (last visited Sept. 10, 2026). | The average statutory tariff rate now stands at 11.0%, "roughly where it settled after Section 122 tariffs expired on July 24th and were replaced with new tariffs under Section 301," and is set to reach 11.8% by year end. The Budget Lab estimates "the ultimate consumer price impact of current-law tariff policy to be about 0.7%," with "household costs due to tariffs total about $1,100 annually under current law," and roughly $1.9 trillion raised over ten years. |
| Sept. 2, 2026 | Tax Foundation, *Tracking the Impact of the Trump Tariffs & Trade War* (last updated Sept. 2, 2026), https://taxfoundation.org/research/federal-tax/trump-tariffs-trade-war/ (last visited Sept. 10, 2026) | The Foundation estimates that in 2025 "the newly imposed tariffs amounted to an average tax increase of $1,000 per US household," and that for 2026 "the tariffs will amount to an average tax increase of $840 per US household, as the tariffs struck down by the Supreme Court have not been fully replaced." (US Taxpayer & Household Burdens tab) |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

**II. Tariff Refund Eligibility and Downstream Purchasers and Consumers**

| Date | Citation | Material Cited |
|---|---|---|
| Mar. 25, 2026 | Greg Wells & Joyce Adetutu, *Downstream Tariff Refund Suits Face Hurdles From Antitrust Law*, Bloomberg Law (Mar. 25, 2026), https://news.bloomberglaw.com/legal-exchange-insights-and-commentary/downstream-tariff-refund-suits-face-hurdles-from-antitrust-law (last visited Sept. 10, 2026) | Trade practitioners explain that the Supreme Court's ruling "created a potential opportunity for importers of record to recover unlawfully imposed tariffs, but it didn't create a right of recovery for downstream purchasers." |
| Aug. 7, 2026 | Yahoo Finance, *'Your refund: $0': Companies claim billions in tariff refunds, months after Trump floated $2,000 checks* (Aug. 7, 2026), https://finance.yahoo.com/economy/policy/articles/refund-0-companies-claim-billions-185000374.html (last visited Sept. 10, 2026) | Describing the mechanics of the refund, the report explains that because "customs rules recognize only the company that paid it there," the result is that "You paid Walmart, Walmart paid customs, customs is now paying Walmart back and there's no federal system for reaching the person at the end of that chain."<br><br>The refund therefore "returns an unlawful tax to the businesses that legally paid it," while "The people who ultimately covered those duties have no equivalent paperwork to file." |
| Aug. 14, 2026 | *How consumers can get a refund for Trump tariffs struck down by Supreme Court*, CBS News (Aug. 14, 2026), https://www.cbsnews.com/news/how-to-get-a-tariff-refund-ieepa/ (last visited Sept. 10, 2026) | The chief executive of the customs logistics firm FlavorCloud states that "There's no way for consumers to get money from customs," and that if consumers recover at all, "it's directly from carriers who decide to send them refunds."<br><br>Trade counsel at Foley & Lardner adds that retail purchasers who accepted a stated price "don't have a claim," because "they were told at the time, 'This is how much the good costs, do you want it or not?'" |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Aug. 24, 2026 | Stephan Bisaha, *U.S. businesses are getting tariff refunds. Will customers get any money back?*, NPR (Aug. 24, 2026), https://www.npr.org/2026/08/24/nx-s1-5939518/u-s-businesses-are-getting-tariff-refunds-will-customers-get-any-money-back (last visited Sept. 10, 2026) | Reporting the account of a Tampa consumer who paid roughly $3,500 in additional cost for an imported wheelchair, NPR explains that because she "paid a business" rather than the government, "the federal government can't give her that money back."<br><br>Terence Lau, Dean of Syracuse University College of Law, explains why retail pass-through cannot be traced or reversed: "It's like the retailer stirred the tax into the batter. So once it's cooked into the cake, you can't just back it out ingredient by ingredient anymore because it's not separated." |
| Aug. 27, 2026 | Marketplace, *Here's what companies like Walmart and Amazon say they're doing with their tariff refunds* (Aug. 27, 2026), https://www.marketplace.org/story/2026/08/27/heres-what-companies-like-walmart-and-amazon-say-theyre-doing-with-their-tariff-refunds (last visited Sept. 10, 2026) | The report states that "These refunds are only supposed to go to the people or businesses who directly imported a product," and that although "Some consumers have filed class-action lawsuits," attorneys regard those suits as "unlikely to succeed because you'd have to prove that a company raised prices due to tariffs." |

**III. Tariff Refunds to Importers of Record**

| Date | Citation | Material Cited |
|---|---|---|
| Aug. 5, 2026 | CNN Business, *Corporate America got billions of dollars in tariff refunds. Where's your cut?* (Aug. 5, 2026), https://www.cnn.com/2026/08/05/economy/companies-got-tariff-refunds-wheres-your-cut (last visited Sept. 10, 2026) | Contrasting the corporate recoveries with consumer outcomes, the report states that "Apple got an estimated $2.2 billion tariff refund last quarter. Amazon got $600 million. Nike got $300 million. But American consumers who paid higher prices […] are getting almost nothing back."<br><br>In total, the report explains, the government "is on the hook to refund hundreds of thousands of importers a total of around $166 billion." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Aug. 6, 2026 | The Wall Street Journal, *Warby Parker Swings to Profit on Tariff Refund* (Aug. 6, 2026), https://www.wsj.com/business/earnings/warby-parker-swings-to-profit-on-tariff-refund-1fff716a (last visited Sept. 10, 2026) | The eyewear retailer "posted a quarterly profit of $4.64 million, or 4 cents a share, compared with a loss of $1.75 million" in the prior year, a reversal it attributed to a quarter that "includes a tariff-refund benefit of $11.8 million." |
| Aug. 10, 2026 | South China Morning Post, *Wave of US tariff refunds flows back to Chinese firms, buoying profits by millions* (Aug. 10, 2026), https://www.scmp.com/economy/global-economy/article/3363528/wave-us-tariff-refunds-flows-back-chinese-firms-buoying-profits-millions (last visited Sept. 10, 2026) | Illustrating that the refund follows the importer of record, including foreign exporters, the report states that "More than US$38 million in tariff rebates, plus accrued interest […] has landed in the bank accounts of five listed Chinese firms," each securing "an average tariff refund of US$7.64 million, representing between 13.12 per cent and 53.58 per cent of their 2025 net profit." |
| Aug. 19, 2026 | Fortune, *Fortune 500 companies got billions in tariff refunds. Here's who's giving customers a cut—and who isn't* (Aug. 19, 2026), https://fortune.com/article/fortune-500-companies-billions-tariff-refunds-customers-08-19-2026/ (last visited Sept. 10, 2026) | As of July 31, 2026, the administration "certified $100 billion in tariff refunds, including interest, out of the $166 billion it collected."<br><br>Amazon reported in its filings that "we received approximately $640 million of tariff refunds under the International Emergency Economic Powers Act"; Target received $994 million, Ford recorded a $1.3 billion benefit, and General Motors $500 million.<br>Nike "had received $302 million as of May 31, and recorded another $684 million as 'outstanding IEEPA tariff receivable,'" and "has remained quiet on whether consumers will see any refunds, even as consumers sue the company for not refunding tariff-related costs." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

**IV. Treatment of Tariff Refunds by Importers and Sellers**

| Date | Citation | Material Cited |
|---|---|---|
| Apr. 22, 2026 | U.S. News & World Report, *Tariff Refunds Are Coming. Just (Probably) Not for You.* (Apr. 22, 2026), https://www.usnews.com/news/u-s-news-decision-points/articles/2026-04-22/tariff-refunds-are-coming-just-probably-not-for-you (last visited Sept. 10, 2026) | Costco stated that "our commitment will be to find the best way to return this value through lower prices," which, the report observes, means "implicitly […] consumers won't see a direct cash payout."<br><br>A senior economist at the Tax Foundation told The New York Times that he "did not expect businesses to exhibit an 'immediate urge to pass all that back to consumers.'" |
| Aug. 7, 2026 | The Washington Post, *The Trump administration has refunded $100 billion in tariffs. Will you get any of the money?* (Aug. 7, 2026), https://www.washingtonpost.com/business/2026/08/07/how-get-your-tariff-refund/ (last visited Sept. 10, 2026) | Although "The Trump administration has refunded about $100 billion in tariffs to major corporations, like Apple and Ford," and "some companies have said they will use the refunds to reduce their prices," the report concludes that "experts say not to expect many price cuts." |
| Aug. 22, 2026 | CNN, *Tariffs raised prices you paid. But most businesses won't be passing tariffs refunds back to you* (Aug. 22, 2026), https://www.cnn.com/2026/08/22/business/tariffs-refunds-companies-consumers (last visited Sept. 10, 2026) | A senior United States economist at Deutsche Bank explains that because "Walmart sales are massive compared to the $3 billion in tariff refunds," and because sellers "know the customer has no clue if they're actually passing on the cost or not," it "becomes very murky what they're actually doing with the tariff refund." |
| Aug. 24, 2026 | Stephan Bisaha, *U.S. businesses are getting tariff refunds. Will customers get any money back?*, NPR (Aug. 24, 2026), https://www.npr.org/2026/08/24/nx-s1-5939518/u-s-businesses-are-getting-tariff-refunds-will-customers-get-any-money-back (last visited Sept. 10, 2026) | A senior fellow at the Institute on Taxation and Economic Policy describes the net effect of paying the refund to sellers rather than to those who bore the cost: "It's all just a giant transfer from consumers to corporations, which – you can't really design a worse tax than that." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Aug. 6, 2026 | Letters of Sen. Elizabeth Warren to Apple, Amazon, Energizer, Motorola, Nike, Target & Walmart (Aug. 6, 2026), https://www.warren.senate.gov/wp-content/uploads/2026/08/Tariff-Refund-Letters.pdf (last visited Sept. 10, 2026) | Addressing the tariffs now before the Court, Senator Warren writes that whether the invalidated tariffs are returned to customers matters especially because the President imposed broad new tariffs under Section 301 of the Trade Act on July 24, 2026, which have already drawn legal challenges. She warns that if those new tariffs are struck down, consumers could again be left with nothing while large corporations collect the refunds. |

**V. Litigation Concerning Tariff Refunds**

| Date | Citation | Material Cited |
|---|---|---|
| Feb. 20, 2026 | Complaint ¶¶ 42, 57, *Anastopoulo v. United Parcel Serv., Inc.*, No. 1:26-cv-01005-VMC (N.D. Ga. filed Feb. 20, 2026), ClassAction.org, https://www.classaction.org/media/ups-complaint.pdf (last visited Sept. 10, 2026) | An individual UPS customer alleges that UPS breached its shipping contracts by charging and collecting unlawful tariff-related fees and was unjustly enriched by retaining those amounts. The complaint does not identify the goods shipped or state whether the transaction was personal or commercial. Compl. ¶¶ 1, 4, 42, 57. |
| Feb. 27, 2026 | Complaints, *Reiser v. Federal Express Corp.*, No. 1:26-cv-21328-JB (S.D. Fla. filed Feb. 27, 2026), and *Ward v. EssilorLuxottica S.A.*, No. 1:26-cv-01133 (E.D.N.Y. filed Feb. 2026), reported in Assoc. Press, *Retail customers file lawsuits over tariffs against FedEx and Ray-Bans maker* (Feb. 27, 2026), https://apnews.com/article/tariffs-refunds-customers-lawsuits-c2286c22cf0bdafc67dc39b6a2a7af27 (last visited Sept. 10, 2026) | Although FedEx stated "that it would return any tariff refund it might get to shippers and customers who had paid them," the Reiser complaint alleges that the pledge "creates no legally enforceable obligation and is expressly contingent on future government and court guidance that may never materialize." Compl. ¶ 42.<br><br>The companion action alleges that "despite seeking an order entitling it to a refund of the duties collected as a result of the subject tariffs, EssilorLuxottica continues to collect and has not refunded the tariff surcharges it collected from consumers." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Mar. 6, 2026 | Complaint ¶¶ 6, 17, *Flaherty v. Fabletics, LLC*, No. 2026CH02139 (Ill. Cir. Ct. Cook Cnty. Ch. Div. filed Mar. 6, 2026), https://www.dandodiary.com/wp-content/uploads/sites/893/2026/04/2450000-2450401-fabletics-tariff.pdf (last visited Sept. 10, 2026) | Plaintiff alleges that the seller "paid IEEPA tariffs when it imported the products Plaintiff and similarly situated consumers purchased," and then "passed the tax burden onto Plaintiff and similarly situated consumers by directly or indirectly charging them the cost of the unlawful IEEPA tariffs." Compl. ¶ 6. She alleges that she "purchased clothing products from Defendant's website" on multiple occasions after the tariffs were imposed, and that the seller "charged Plaintiff $14.58 in unlawful IEEPA Tariffs across three transactions." Compl. ¶ 17. |
| Mar. 11, 2026 | Complaint ¶¶ 5, 37, *Stockov v. Costco Wholesale Corp.*, No. 1:26-cv-02734 (N.D. Ill. filed Mar. 11, 2026), https://storage.courtlistener.com/recap/gov.uscourts.ilnd.496864/gov.uscourts.ilnd.496864.1.0_1.pdf (last visited Sept. 10, 2026) | The complaint states that the action "seeks to prevent Costco, the third-largest retailer in the world, from double recovery," because "Costco has made no commitment to return any portion of anticipated tariff refunds to the consumers who bore those costs." Compl. ¶ 5. Plaintiff alleges that Costco "is poised to be paid twice for the same unlawful tariff burden: once by its customers (through elevated prices) and once by the U.S. government (through tariff refunds)." Compl. ¶ 37. |
| Apr. 21, 2026 | Complaint ¶ 8, *Hoffert v. Nintendo of Am. Inc.*, No. 2:26-cv-01360-RAJ (W.D. Wash. filed Apr. 21, 2026), ECF No. 1; see also Ars Technica, *Lawsuit: Nintendo is getting tariff refunds—its customers should get them instead* (Apr. 22, 2026), https://arstechnica.com/tech-policy/2026/04/lawsuit-nintendo-is-getting-tariff-refunds-its-customers-should-get-them-instead/<br>Complaint: https://storage.courtlistener.com/recap/gov.uscourts.wawd.361585/ | Suing on behalf of United States residents who purchased the defendant's products between February 2025 and February 2026, plaintiffs allege that "Unless restrained by [the court], Nintendo stands to recover the same tariff payments twice —once from consumers through higher prices and again from the federal government through tariff refunds, including interest paid by the government on those funds." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| | gov.uscourts.wawd.361585.1.0.pdf (last visited Sept. 10, 2026) | |
| May 2026 | Complaint, *Markland v. Amazon.com, Inc.*, No. 2:26-cv-01670 (W.D. Wash. filed May 15, 2026), consolidated sub nom. In re Amazon Tariff Litigation, No. 2:26-cv-01670-TL (W.D. Wash. June 29, 2026); case materials collected at Hagens Berman Sobol Shapiro LLP, *Amazon Import Tariff Consumer Class Action*, https://www.hbsslaw.com/cases/amazon-import-tariff-consumer-class-action (last visited Sept. 10, 2026) | Plaintiffs allege that Amazon raised prices on imported goods while the tariffs were in effect and passed those costs to consumers. The complaint further alleges that only the importer of record may seek a refund, and that consumers who bore the economic burden "have no direct avenue for redress," lacking both a cause of action in the Court of International Trade and standing to seek a refund. Compl. at 1. Amazon's subsequent announcement of a limited customer-refund program is collected in Part VI. |
| June 1, 2026 | Complaint, *Matthews v. IKEA N. Am. Servs., LLC*, No. 2:26-cv-03712 (E.D. Pa. filed May 29, 2026), reported in Reuters, *IKEA customers sue for share of Trump tariff refunds* (June 1, 2026) https://www.reuters.com/legal/government/ikea-customers-sue-share-trump-tariff-refunds-2026- | Seeking to represent "potentially hundreds of thousands of customers who allegedly paid higher prices under the tariffs," plaintiffs allege that "It would be unjust for defendants to retain the overcharges paid by plaintiff and class members because these overcharges comprise tariff expenses that defendants passed along to their customers, and these tariffs were illegal." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| | 06-01/ (last visited Sept. 10, 2026) | |
| June 30, 2026 | Complaint, *Alsaady v. Lululemon USA, Inc.*, No. 3:26-cv-05708 (W.D. Wash. filed June 30, 2026), reported in Top Class Actions, *Class action claims Lululemon kept tariff windfall instead of refunding customers* (July 29, 2026) https://topclassactions.com/lawsuit-settlements/lawsuit-news/class-action-claims-lululemon-kept-tariff-windfall-instead-of-refunding-customers/ (last visited Sept. 10, 2026) | Alleging that approximately forty percent of the seller's products are manufactured in Vietnam, plaintiffs contend that “After the Supreme Court invalidated the tariffs, Lululemon allegedly sought government refunds, while consumers, on the other hand, do not have the option of recovering overcharges directly.” |
| July 9, 2026 | Erik K. Swanholt & Kelsey C. Boehm, *After Learning Resources: Defending Against the Wave of Consumer Class Actions Seeking Tariff Refunds*, Foley & Lardner LLP (July 9, 2026), https://www.foley.com/insights/publications/2026/07/after-learning-resources-defending-against-the-wave-of-consumer-class-actions-seeking-tariff-refunds/ (last visited Sept. 10, 2026) | Counsel who defend these actions report that since the Supreme Court’s decision plaintiffs’ firms have filed more than one hundred putative consumer class actions against businesses nationwide, across a range of industries, alleging that the defendants passed tariff costs on to consumers and now stand to collect an improper double recovery through government refunds.<br>The article states that “No court has yet ruled on the merits of these claims,” and that defendants have raised a number of significant threshold, procedural, and substantive defenses, which the authors summarize from matters they are handling for clients. |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| July 16, 2026 | Complaint, *Johns v. Five Below, Inc.*, No. 2:26-cv-04954 (E.D. Pa. filed July 16, 2026); reported in Top Class Actions, *Five Below class action claims retailer kept tariff refunds owed to customers* (Aug. 4, 2026) https://topclassactions.com/lawsuit-settlements/lawsuit-news/five-below-class-action-claims-retailer-kept-tariff-refunds-owed-to-customers/ (last visited Sept. 10, 2026) | The complaint alleges that "Companies, even those which passed the entirety of their tariff burdens onto their customers, nonetheless remain fully empowered to recover a complete refund for any unlawful tariffs paid," and that "[a]s a direct result of [Five Below's] pass-through pricing, [the] plaintiff and class members paid more for tariffed goods than they would have absent the unlawful IEEPA tariff." |
| July 20, 2026 | Motion to Dismiss, *Hoffert v. Nintendo of Am. Inc.*, No. 2:26-cv-01360-RAJ (W.D. Wash. July 20, 2026), reported in Game Developer, *Nintendo says consumers are not legally entitled to tariff refunds* (July 21, 2026), https://www.gamedeveloper.com/business/nintendo-says-consumers-are-not-legally-entitled-to-tariff-rebate (last visited Sept. 10, 2026) | The seller's answer to the double-recovery theory. Nintendo contends that purchasers "received exactly what they bargained and paid for," and that they are not entitled to a rebate on account of intervening legal developments concerning the tariffs. Offered for the position taken, not for its correctness. |
| Aug. 18, 2026 | Ashley Akers & Austin Rainwater, *IEEPA Tariff Consumer Class Actions: Litigation Update*, Holland & Knight (Aug. 18, 2026), https://www.hklaw.com/en/insights/publications/2026/08/ieepa-tariff-consumer-class-actions-litigation-update (last visited Sept. 10, 2026) | As of the date of the report, nearly one hundred putative consumer class actions arising from the IEEPA tariffs were pending in nearly thirty federal districts, with new complaints filed weekly and the pace of filing not meaningfully slowed. Several cases were fully briefed, and the first decisions addressing the core legal theories were expected in the near term.<br>Defendants are relying heavily on standing, ripeness, the voluntary payment doctrine, contractual defenses, and arbitration. The alert advises companies to coordinate any customer accommodation program with their litigation strategy so as not to strengthen plaintiffs' claims, and reports that plaintiffs are pointing to competitors' consumer refund programs as evidence that such refunds are feasible. |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

**VI. Refund Practices for Separately Itemized Tariff Charges**

| Date | Citation | Material Cited |
|---|---|---|
| Apr. 22, 2026 | U.S. News & World Report, *Tariff Refunds Are Coming. Just (Probably) Not for You.* (Apr. 22, 2026), https://www.usnews.com/news/u-s-news-decision-points/articles/2026-04-22/tariff-refunds-are-coming-just-probably-not-for-you (last visited Sept. 10, 2026) | FedEx, which billed the duty as a separate line item, stated that "if refunds are issued to FedEx, we will issue refunds for IEEPA tariffs paid to the shippers and consumers who originally bore those charges." |
| July 30, 2026 | Amazon.com, Inc., Q2 2026 Earnings Call (July 30, 2026) (remarks of Brian Olsavsky, Sr. Vice President & Chief Financial Officer), reported in Supply Chain Dive, *Amazon to Issue Tariff Refunds in 'Limited Set of Circumstances'* (Aug. 3, 2026), https://www.supplychaindive.com/news/amazon-to-issue-tariff-refunds-in-limited-set-of-circumstances/826815/ (last visited Sept. 10, 2026) | Amazon reported receiving approximately $600 million in refunds, which it described as the significant majority of what it expects to recover. It stated that it had identified "a limited set of circumstances" in which it can trace a specific import charge passed on to a customer, and that in those cases it will contact the customer and issue a refund automatically.<br>The report describes Amazon as committing to direct customer refunds in the limited circumstances where it can trace a specific import charge, while applying the remaining refund proceeds to lower prices. |
| Aug. 14, 2026 | *How consumers can get a refund for Trump tariffs struck down by Supreme Court*, CBS News (Aug. 14, 2026), https://www.cbsnews.com/news/how-to-get-a-tariff-refund-ieepa/ (last visited Sept. 10, 2026) | The report describes refund information pages maintained by UPS and FedEx. FedEx's portal allows a customer to enter shipment information and, where Customs has paid a refund, to view the amount, including interest. UPS states that customer refunds will be processed after it receives payment from the government. No comparable mechanism exists for purchasers from retailers that folded the tariff into the shelf price. |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| Aug. 24, 2026 | Stephan Bisaha, *U.S. businesses are getting tariff refunds. Will customers get any money back?*, NPR (Aug. 24, 2026), https://www.npr.org/2026/08/24/nx-s1-5939518/u-s-businesses-are-getting-tariff-refunds-will-customers-get-any-money-back (last visited Sept. 10, 2026) | Dean Lau explains that carriers that itemized the charge stand differently from retailers: "now that FedEx and UPS have received a refund of that $100 from the federal government, they are absolutely obligated to return it to the person they collected it from. Otherwise, it would be a pretty open-and-shut lawsuit against them for unjust enrichment." The report confirms that "UPS, DHL and FedEx all say they are returning tariff dollars to customers," but cautions that consumers should "not expect the same from retailers." UPS advises that remittance takes up to three months. |

**VII. Small Businesses and Intermediaries**

| Date | Citation | Material Cited |
|---|---|---|
| May 12, 2026 | Yahoo Finance, *US tariff refunds start rolling out as Oshkosh, Basic Fun report receiving payments* (May 12, 2026), https://ca.finance.yahoo.com/news/us-tariff-refunds-start-rolling-163537971.html (last visited Sept. 10, 2026) | Having received $400,000 against $7.4 million in claims, the chief executive of the toy manufacturer Basic Fun framed the question as whether "the funds [will] flow like a river or fire hose or like a stream or garden hose," and reported that "So far, the funds are trickling out." |
| May 30, 2026 | U.S. News & World Report, *Trump Plans to Appeal Order Allowing All Importers That Paid Struck-Down Tariffs to Seek Refunds* (May 30, 2026), https://www.usnews.com/news/business/articles/2026-05-30/trump-plans-to-appeal-order-allowing-all-importers-that-paid-struck-down-tariffs-to-seek-refunds (last visited Sept. 10, 2026) | Illustrating the pace of recovery for smaller importers, the report states that Manscaped "has received about 30% of the $12 million in refunds it applied for," and that Greenbar Distillery had received $18,000 against an application of roughly $90,000. Its owner described the tariffs as "painful," explaining that "Our choices were bad and worse: raise prices and lose customers, or keep prices the same and not make any money." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| June 29, 2026 | *Small Businesses Shun Push to File Suits to Get Tariff Refunds*, Bloomberg Law (June 29, 2026), https://news.bloomberglaw.com/in-house-counsel/small-businesses-shun-push-to-file-suits-to-get-tariff-refunds (last visited Sept. 10, 2026) | Where recovery of a refund requires suit, the report explains, "legal costs are a bigger burden" for smaller importers "than for large companies," and some "are even weighing the cost of filing suit and finding it wouldn't pay to seek refunds."<br><br>The chief executive of Princess Awesome stated that "We're certainly not going to pay for outside counsel, because we don't have enough money to do that," and the executive director of We Pay the Tariffs, representing approximately 1,200 small businesses, expects members to "look at this and say, 'This isn't worth it,' and just give up that money that they would be legally entitled to otherwise." |
| July 27, 2026 | Axios, *Small businesses launch new Trump tariff challenge* (July 27, 2026), https://www.axios.com/2026/07/27/trump-tariff-court-small-business (last visited Sept. 10, 2026) | The co-founder of a watch retailer whose refunds from the invalidated tariffs remain outstanding states that "Section 301 tariffs are most definitely going to hamstring my business in the exact same way that the previous two phases of tariffs have." |

**VIII. Accounts of Consumers, Importers, and Downstream Purchasers**

| Date | Citation | Material Cited |
|---|---|---|
| Apr. 26, 2026 | Alina Selyukh, *Diary of a business owner trying to get a tariff refund from the U.S. government*, NPR (Apr. 26, 2026), https://www.npr.org/2026/04/26/nx-s1-5753970/diary-of-a-business-owner-trying-to-get-a-tariff-refund-from-the-u-s-government (last visited Sept. 10, 2026) | Richard Brown runs Proof Culture, a two-person business selling sneaker accessories. The government owes it up to $25,000, roughly ten percent of prior-year revenue. Because freight forwarders and suppliers handled his customs filings, Brown spent weeks assembling shipping invoices and reaching overseas carriers while running the business, recording that he felt "pretty overwhelmed." On the asymmetry between paying and reclaiming: "And now you're telling me if I want my money back, figure it out." |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| | | NPR frames the burden as one of proof rather than entitlement: "The government has the numbers, but Brown has to do the math and show the proof" and reports that more than two-thirds of importers were not ready when the portal opened, with small importers describing technical errors and unanswered calls to Customs. Larger importers filed within minutes on April 20. |
| May 20, 2026 | Kristin Schwab, *Tariff refunds are rolling out*, Marketplace (May 20, 2026), https://www.marketplace.org/story/2026/05/20/tariff-refunds-for-businesses-are-rolling-out (last visited Sept. 10, 2026) | As of roughly May 13, CBP had approved more than $35 billion of the $166 billion owed. Sarah Wells, whose company makes products for new mothers, received $10,000 (about half her claim) and earmarked it to pay other tariffs still in force.<br><br>Zhang Liuhe of Glory International Trade, which imports small appliances from China and Vietnam, received $20,000 and was still awaiting $40,000, saying he was "a little bit skeptical about the remaining amount" because he was not sure there would be any money left over. He described cutting his own household spending: "Less family vacations or trips if any at all, less going out to eat" and reasoned that his customers were likely doing the same. |
| Aug. 24, 2026 | Stephan Bisaha, *U.S. businesses are getting tariff refunds. Will customers get any money back?*, NPR (Aug. 24, 2026), https://www.npr.org/2026/08/24/nx-s1-5939518/u-s-businesses-are-getting-tariff-refunds-will-customers-get-any-money-back (last visited Sept. 10, 2026) | Sandra Alonso of Tampa, Florida replaced her wheelchair after her old one fell apart, choosing a powered, lightweight model that folds and fits in a vehicle: "just the perfect chair for me." It was made in China, and when she bought it tariffs on Chinese goods stood at 145 percent. She paid an extra $3,500: "There was no reason that I had to pay, you know, double for this chair. None. And, you know, the federal government should give me my money back."<br><br>She cannot recover it from the government, because she did not pay the duty directly. UPS imported the chair, UPS is being refunded, |

**Addendum to the Amicus Curiae Brief of Consumer Watchdog:**

**Publicly Available Materials Concerning the 2025 Tariffs and the Operation of the Refund Process**

| | | |
|---|---|---|
| | | and UPS told her by email that her refund was in process. A month later she had received nothing: "It'd be nice to update me 'cause I sure would like that money. It would be very useful right now, considering how expensive everything is now, a year later." |
| Sept. 1, 2026 | Khyati Patel, *Importers navigate tariff refund process after court ruling*, Spectrum News 1 (Ky.) (Sept. 1, 2026), https://spectrumnews1.com/ky/louisville/news/2026/08/27/kentucky-customs-broker-tariff-refunds (last visited Sept. 10, 2026). | Brandon Hauck, who imports rare rocks, minerals, and collectibles for Derby City Mineral Gallery in Louisville, describes charges he cannot identify or explain: "I don't know what all the fees are for [...] Ultimately, at the end of the day, I just am seeing increased costs. I guess customs clearance with no real answers. When I call FedEx or DHL, they just say, 'Well, this is the fees we charge now.'" |

**Certificate Of Compliance**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 3,489 words, including text, footnotes, and headings, and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

/s/ R. Will Planert
R. Will Planert

Dated: September 11, 2026