IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Jennifer Choe-Groves, Timothy M. Reif, and Lisa W. Wang, Judges

| | |
|---|---|
| *In re Section 301 Forced Labor Cases* | Case No. 26-3555 |

JOINT BRIEF OF *AMICI CURIAE* CATO INSTITUTE, MICHAEL W. MCCONNELL, AND ILYA SOMIN

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

Michael W. McConnell
559 Nathan Abbot Way
Stanford, CA 94305
Phone : (650) 736-1326
mcconnell@law.stanford.edu

Joshua A. Claybourn, Esq.
SHILOH COUNSEL LLC
P.O. Box 5093
Evansville, IN 47716
Phone: (812) 480-6224
jclaybourn@jacksonkelly.com

*Of Counsel*

Alexander H. Schaefer
CROWELL & MORING LLP
600 Fifth St., NW
Washington, DC 20001
Phone: (202) 624-2773
aschaefer@crowell.com

Weronika Bukowski
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave
New York, NY 10001
Phone: (212) 530-1930
wbukowski@crowell.com

*Attorneys to Amici Curiae*

# TABLE OF CONTENTS


INTEREST OF AMICI CURIAE .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 4

I. Section 301 Does Not Authorize Sweeping Worldwide Tariffs of the Sort Imposed Here. .......... 4

II. The Major Questions Doctrine Requires Invalidation of These Section 301 Tariffs. .......... 7

A. The Section 301 tariffs raise a major question. .......... 8

B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues. .......... 12

III. If Section 301 Grants Defendants the Power Claimed here, it Would be an Unconstitutional Delegation of Legislative Power to the Executive. .......... 15

A. The Section 301 tariffs violate the nondelegation doctrine. .......... 16

B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues. .......... 19

C. The constitutional avoidance canon requires interpreting Section 301 to avoid a sweeping delegation of tariff authority that raises constitutional problems. .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) (per curiam) .......... 7, 9, 14

*Am. Inst. for Int'l Steel, Inc. v. United States*,
376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante) .......... 15

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) .......... 16

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 9, 13

*FCC v. Consumers' Research*,
606 U.S. 656 (2025) .......... *passim*

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 7

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) .......... 16

*Gundy v. United States*,
588 U.S. 128 (2019) (Gorsuch, J., dissenting) .......... 18

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025), *cert. denied*, 2026 WL 1718004 (U.S. June 15, 2026) .......... 5, 12, 18

*J.W. Hampton, Jr. & Co. v. United States*,
276 U.S. 394 (1928) .......... 16, 20

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 4, 21

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) .......... *passim*

*Merritt v. Welsh*,
104 U.S. 694 (1882) .......... 13

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
595 U.S. 109 (2022) (per curiam) .......... 9, 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 20, 21

*Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Labor*,
312 U.S. 126 (1941) .......... 16

*Oregon v. United States*,
2026 WL 1257669 (Ct. Int'l Trade May 7, 2026), *appeal docketed*,
No. 26-1804 (Fed. Cir. May 8, 2026) .......... 5

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 3, 7

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) .......... *passim*

*V.O.S. Selections v. Trump*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) .......... 11, 15

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .......... 18

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 10, 14

**Statutes**

19 U.S.C. § 2411(b) .......... 2, 4, 6

19 U.S.C. § 2412 .......... 4

20 U.S.C. § 1098bb(a)(1) .......... 13

42 U.S.C. § 264(a) .......... 14

**Other Authorities**

*CDC Eviction Moratorium*, Reason (Aug. 3, 2021),
https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium/ .......... 9

Curtis A. Bradley & Jack L. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, (2024) .......... 20

Executive Order 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*. 90 Fed. Reg. 15,041 (April 7, 2025) .......... 5

Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, Tax Found. (July 27, 2026), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/ .......... 8

*The Federalist* No. 33 .......... 16

Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority,* Cato Sup. Ct. Rev. 69 (2022) .......... 9, 11

Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, Reason (Aug. 3, 2021) .......... 9

Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022) .......... 14

Scott Lincicome, *Here Comes Another Round of Sham Tariffs*, Dispatch (July 23, 2026), https://thedispatch.com/newsletter/dispatch-markets/trump-tariffs-section-301-forced-labor-pretext/ .......... 6

Ilya Somin, *How the Supreme Court Spared America*, Atlantic (Feb. 21, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ .......... 14

*Trump Tariffs & Trade War*, Tax Found. (July 27, 2026), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/ .......... 8

Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, Cato Inst. (Feb. 19, 2026), https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs .......... 14

Yale Budget Lab, *State of U.S. Tariffs* (Aug. 11, 2026),
https://budgetlab.yale.edu/research/state-us-tariffs ............................................. 8

## INTEREST OF AMICI CURIAE

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies, established in 1989, promotes the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs in state and federal courts. This case concerns Cato because of its significance to the constitutional separation of powers and its potential effect on free trade and the U.S. economy.

Michael W. McConnell is the Richard and Frances Mallery Professor of Law and Director of the Constitutional Law Center at Stanford Law School, and a Senior Fellow at the Hoover Institution. From 2002 to 2009 he served as a judge on the United States Court of Appeals for the Tenth Circuit. He has argued numerous cases before the Supreme Court and has written widely on constitutional structure, the separation of powers, and the original understanding of the Constitution, including *The President Who Would Not Be King: Executive Power Under the Constitution* (Princeton Univ. Press 2020). He was Counsel of Record for the small business plaintiffs in *V.O.S. Selections, Inc. v. Trump*, decided under the caption *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

Ilya Somin is Visiting Professor of Law at the University of Virginia School of Law, Professor of Law at the Antonin Scalia Law School at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute,

and the author of numerous works on constitutional law and related issues, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government Is Smarter* (2d ed. 2016), and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* (rev. ed. 2016). His briefs and writings have been cited in decisions by the United States Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. His writings helped inspire *V.O.S. Selections, Inc. v. Trump*, the case that led to the invalidation of the IEEPA tariffs, and he served as co-counsel for the plaintiffs throughout that litigation in the Court of International Trade, the Federal Circuit, and the Supreme Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since the Supreme Court invalidated the International Emergency Economic Powers Act (IEEPA) tariffs in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026), the President has imposed other worldwide tariffs without congressional approval, under the purported authority of Section 301 of the Trade Act of 1974. These tariffs range from 10 to 12.5 percent *ad valorem* on imports from sixty trading partners. This sweeping imposition is just as unlawful as the IEEPA tariffs were, and for many of the same reasons.

Part I explains that Section 301 grants limited authority to impose tariffs in response to specific "unreasonable or discriminatory" government policies by "a foreign country" that "burden[] or restrict[] United States commerce"; it is not a blank check for whatever tariffs the executive branch may want to impose against dozens of countries around the world. 19 U.S.C. § 2411(b)(1). Part II explains why, if

there is any ambiguity about whether Section 301 authorizes these massive tariffs, the major questions doctrine requires that the issue be resolved against Defendants. That doctrine obliges Congress to "speak clearly" when it assigns to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The impact of these massive Section 301 tariffs is as large or larger than most policies previously invalidated by the Supreme Court on major questions grounds. And the tariff power is not exempt from major questions scrutiny on the supposed ground that it is a "foreign affairs" power. The doctrine also counts against giving the administration a blank check to decide whether the requisite conditions for invoking Section 301 exist.

Part III shows that if Section 301 did grant the President the power he claims, it would violate the nondelegation doctrine, which constrains transfer of legislative power to the executive. "[T]he core Congressional power to impose taxes such as tariffs is vested exclusively in the legislative branch by the Constitution." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1332 (Fed. Cir. 2025), *aff'd sub nom. Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). If Defendants' interpretation of Section 301 is correct, the Office of the United States Trade Representative (USTR) can impose unlimited tariffs on virtually any imports from any country at any time. Such a sweeping delegation of a core congressional power would violate the requirements that (1) Congress not make "boundless" delegations of the power to tax, and (2) that "[t]he 'guidance' needed is greater when an agency action will 'affect the entire national economy' than when it addresses a narrow,

technical issue." *FCC v. Consumers' Research*, 606 U.S. 656, 673, 680 (2025) (internal quotations omitted). At the very least, the constitutional issues this claimed delegation raises are enough to trigger the constitutional avoidance canon, under which courts should "shun an interpretation that raises serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

## ARGUMENT

### I. Section 301 Does Not Authorize Sweeping Worldwide Tariffs of the Sort Imposed Here.

The Supreme Court has described Section 301 as one of the "clear and limited delegations" of tariff power Congress has given the executive branch. *Learning Res.*, 607 U.S. at 244. The tariffs at issue here exceed any plausible bounds of those limitations and amount to a power to "impose tariffs on imports from any country, of any product, at any rate, for any amount of time"—the very power the Court held the executive branch may not claim. *Id.* at 240.

Section 301 may be invoked only if USTR conducts an investigation and determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce." 19 U.S.C. §§ 2411(b), 2412. Any resulting tariffs must be "appropriate and feasible action authorized under [Section 301(c)] . . . to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). They must therefore be tied to conditions that would end the "unreasonable or discriminatory" practices that justified their imposition. "[A]ppropriate" actions under Section 301 must be "one[s] that can end

or reverse the investigated conduct." *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1252–53 (Fed. Cir. 2025), *cert. denied*, 2026 WL 1718004 (U.S. June 15, 2026).

The day after the Supreme Court invalidated the IEEPA tariffs in *Learning Resources*, the administration moved to replace them with similarly sweeping tariffs under Section 122 of the Trade Act of 1974. This Court invalidated the Section 122 tariffs as well. *See Oregon v. United States*, 2026 WL 1257669 (Ct. Int'l Trade, May 7, 2026), *appeal docketed*, No. 26-1804 (Fed. Cir. May 8, 2026). That same day, administration officials—including United States Trade Representative Jamieson Greer—announced that they planned to splice in Section 301 tariffs to replace those struck down by the Court. *See* Complaint at 8, *Burlap and Barrel, Inc. et al v. United States of America et al*, No. 26-03345 (Ct. Int'l Trade July 24, 2026) ECF No. 2 ("Burlap & Barrel Compl"). This obviously occurred before any investigation, negotiation, or determination of "unreasonable or discriminatory practices" under Section 301 could have been undertaken.

In spite of the fact that the IEEPA tariffs were designed to deal with "large and persistent" trade deficits[1] (a worldwide problem), whereas Section 301 is designed to deal with country-specific unfair trade practices, administration officials stated that the new Section 301 tariffs would essentially replicate the old. Treasury Secretary Scott Bessent publicly indicated that the Section 301 tariffs would yield "virtually unchanged tariff revenue" relative to the IEEPA tariffs the Supreme

[1] See Executive Order 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*. 90 Fed. Reg. 15,041 (April 7, 2025).

Court had invalidated, and USTR fixed the rates it wanted before investigating the "forced labor" practices that supposedly justified them. Burlap & Barrel Compl. at 14; *see also* Complaint at 16–17, *Oregon et al v. Donald J. Trump et al*, No. 26-03347 (Ct. Int'l Trade Aug. 3, 2026) ECF No. 2 ("Oregon v. Trump Compl.") (quoting similar later statements by Greer and Bessent). The resulting tariffs reach some 99.4 percent of U.S. imports from sixty trading partners. The quantum of the tariffs bears no relation to either the extent to which any country allows imports or exports of goods produced by forced labor or the extent to which those goods burden U.S. exports. Oregon v. Trump Compl. at 16–17.

Nor has USTR set any conditions whose satisfaction would end the Section 301 tariffs upon proof the supposed forced labor practices have stopped. The record contains extensive evidence that the USTR "forced labor" investigation was a sham designed to reach a predetermined conclusion, namely, to justify the same types of worldwide tariffs the Supreme Court struck down in *Learning Resources*. *See* Scott Lincicome, *Here Comes Another Round of Sham Tariffs*, Dispatch (July 23, 2026), https://thedispatch.com/newsletter/dispatch-markets/trump-tariffs-section-301-forced-labor-pretext/ (surveying the evidence in detail).

All of this contravenes Section 301's requirements that tariffs respond to specific "unreasonable or discriminatory" policies that "burden[] or restrict[] United States commerce" and must be aimed at "obtain[ing] the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(1)–(2).

Plaintiffs' complaints lay out more fully how far Defendants' policies depart from Section 301's requirements. *See* Compl. at 2–3, 11–18; Burlap & Barrel Compl. at 8–17; Oregon v. Trump Compl. at 17–31. Amici will not restate those arguments in detail, but instead will emphasize the larger structural issues raised by this case: the major questions doctrine, the nondelegation doctrine, and constitutional avoidance.

## II. The Major Questions Doctrine Requires Invalidation of These Section 301 Tariffs.

The major questions doctrine requires Congress to "speak clearly" when it delegates to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (the Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (holding that Congress cannot be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" because "Congress could not have intended to delegate a decision of such economic and political significance" without explicitly saying so).

As the Federal Circuit held in *V.O.S. Selections*, the major questions doctrine applies to delegations of tariff authority, and "when Congress delegates this power in the first instance, it does so clearly and unambiguously." *V.O.S. Selections*, 149 F.4th at 1332. The court accordingly ruled that "[t]he Government's interpretation

of IEEPA as providing the President power to impose unlimited tariffs . . . runs afoul of the major questions doctrine." *Id.* at 1334. That conclusion was reinforced by the fact that "tariffs are a core Congressional power." *Id.* at 1335. The Federal Circuit's holding, of course, binds this Court.

**A. The Section 301 tariffs raise a major question.**

For reasons already given, Congress, at the very least, did not clearly indicate that Section 301 can be used to impose sweeping tariffs on nearly all our trading partners. Given the magnitude of the authority Defendants claim, the major questions doctrine necessarily applies.

The Section 301 tariffs are at least comparable in magnitude to actions ruled to be major questions in past Supreme Court decisions. The nonpartisan Tax Foundation estimates they will impose some $629 billion in new taxes on Americans over the next decade. Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, Tax Found. (July 27, 2026), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

That estimate does not include the costs borne by consumers, investors, and others. All told, apart from the IEEPA tariffs recently invalidated by the Supreme Court, this amounts to produce the highest average U.S. tariff schedule since 1936, when the notorious Smoot-Hawley tariffs that deepened the Great Depression were in effect. *See* Yale Budget Lab, *State of U.S. Tariffs* (Aug. 11, 2026), https://budgetlab.yale.edu/research/state-us-tariffs.

This impact exceeds that of several policies the Supreme Court has declared to be major questions. For instance, the amount here is even larger than the $430

billion at stake in President Biden's student loan forgiveness program, which the Court declared to be a major question in *Biden v. Nebraska*, 600 U.S. 477 (2023). *See id.* at 483 (noting that the plan "canceled roughly $430 billion of federal student loan balances").

The Court also held that a temporary nationwide eviction moratorium imposed to curb the spread of COVID-19 qualified as a major question. *Ala. Ass'n of Realtors*, 594 U.S. at 764. The National Apartment Association estimated that the moratorium cost property owners some $26 billion. *See CDC Eviction Moratorium*, Reason (Aug. 3, 2021), https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium/. That is far less than the impact of the Section 301 tariffs at issue here.

The Court likewise found a major question in a nationwide COVID-19 vaccination mandate for employees of firms with 100 or more workers, even though the cost of getting vaccinated by then was low. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022) (per curiam) [hereinafter *NFIB v. OSHA*]; *cf.* Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021–2022 Cato Sup. Ct. Rev. 69, 75–76 (2022) (explaining that vaccination was free and readily available to workers by the time the mandate was imposed). Like the OSHA mandate, which affected some 84 million workers (*NFIB v. OSHA*, 595 U.S. at 118–19), the Section 301 tariffs would impose costs on tens of millions of Americans. And these costs are far greater than those associated with getting vaccinated.

Moreover, the authority claimed here reaches further than the tariffs imposed by this particular action. In *West Virginia v. EPA*, 597 U.S. 697 (2022), the Supreme Court held that EPA's claim of authority to regulate greenhouse gas emissions raised a major question even though the agency did not at that point have a specific regulatory plan it sought to implement. What matters, is the magnitude of the authority claimed, not just the specific details of how that authority is deployed in a particular case. The question is whether the executive has laid claim to a "highly consequential power," even if how much of that power it intends to use remains unclear. *Id.* at 723–24. Defendants' position in the present case would give the executive the power to use Section 301 to impose massive tariffs whenever USTR conducts a sham investigation with a predetermined result.

The Federal Circuit held that the IEEPA tariffs ran afoul of the major questions doctrine in part because they were "both 'unheralded' and 'transformative.'" *V.O.S. Selections*, 149 F.4th at 1334 (quoting *West Virginia*, 597 U.S. at 722, 724). Those factors led three Supreme Court Justices to reach the same conclusion. *Learning Res.*, 607 U.S. at 231 (opinion of Roberts, C.J.) (emphasizing the "transformative" impact of the authority the executive claimed).

The Section 301 tariffs imposed by the President are similarly unheralded and transformative. Section 301, unlike IEEPA, does authorize tariffs in some circumstances. But it has never been used to impose them on this scale, indiscriminately targeting dozens of trading partners simultaneously. The scope of the power Defendants claim is undoubtedly large enough to be "transformative,"

since it would enable them to impose tariffs on any imports from any nation virtually anytime the executive wishes.

The fact that Section 301, unlike IEEPA, does permit imposition of tariffs in some situations does not vitiate the application of major questions doctrine. The key issue is not only whether some tariff authority has been granted, but the scope of that authority. It matters greatly whether Section 301 only authorizes the imposition of tariffs in strictly limited circumstances, or whether it can be used anytime USTR wants, so long as it first conducts a pretextual investigation with predetermined results.

In *V.O.S. Selections*, both this Court and the Federal Circuit ruled that the major questions doctrine required invalidation of the IEEPA tariffs because of the enormous magnitude of the authority claimed, even though both declined to resolve the issue of whether IEEPA might authorize tariffs in some narrower set of circumstances. *V.O.S. Selections,* 149 F.4th at 1332-34; *V.O.S. Selections v. Trump*, 772 F. Supp. 3d 1350, 1372 (Ct. Int'l Trade 2025).

Similarly, in *NFIB v. Department of Labor*, the Supreme Court ruled that OSHA's imposition of a massive vaccination mandate affecting 84 million workers ran afoul of the major questions doctrine, even though the statute in question might well permit more narrowly tailored vaccination mandates. As the Court noted, "[w]here the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible." *NFIB*, 595 U.S. at 119; cf. Somin, *A Major Question of Power,* supra, at 82-83 (discussing

this aspect of the Court's ruling). But the major questions doctrine still barred "OSHA's indiscriminate approach." *Id*.

The Federal Circuit's recent decision upholding expansions of earlier Section 301 tariffs against a challenge based in part on the major questions doctrine further reinforces the points made here. *HMTX Indus. v. United States*, 156 F.4th 1236 (Fed. Cir. 2025). In that case, the Federal Circuit ruled that an expansion of Section 301 tariffs imposed on certain Chinese imports did not run afoul of the major questions doctrine because these modifications "do not involve a transformation of USTR's regulatory authority. USTR has modified its own unchallenged and statutorily permissible original action in this case." *Id.* at 1255. By contrast, the imposition of massive tariffs on dozens of U.S. trading partners is undeniably transformative.

The Federal Circuit distinguished the *HMTX* case from *V.O.S. Selections*, where the major questions doctrine was implicated because "the government had never previously claimed powers of th[at] magnitude under the relevant statute." *Id.* (quoting *V.O.S. Selections*, 149 F. 4th at 1336). The tariffs in the present case are indeed of a magnitude never previously claimed under Section 301.

### B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues.

Defendants cannot evade application of the major questions doctrine by claiming that tariffs are matters of foreign affairs. There is no general foreign affairs exception to the major questions doctrine. Even if there were, tariffs are not

purely a foreign affairs issue, because first and foremost they are taxes imposed on Americans.

As noted, the Federal Circuit has held that the major questions doctrine applies to tariffs, and that holding binds this Court. *V.O.S. Selections*, 149 F.4th at 1332–34. In *Learning Resources*, three Justices in the majority likewise held that the doctrine applies to tariffs and that no "foreign affairs" exception applies to the tariff power. *Learning Res.*, 607 U.S. at 247. Chief Justice Roberts emphasized that "the President and Congress do not 'enjoy concurrent constitutional authority' to impose tariffs during peacetime" and that "[t]he Framers gave that power to 'Congress alone'—notwithstanding the obvious foreign affairs implications of tariffs." *Id.* (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1882)).

The Supreme Court has repeatedly applied the major questions doctrine to policies with significant foreign affairs implications. In *Biden v. Nebraska*, the Court rejected a claim of authority to forgive student loans based on a national emergency declaration, even though the asserted authority in question was based on the 2003 HEROES Act, legislation aimed largely at war and foreign policy emergencies. 600 U.S. at 494 (noting that "[t]he HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency'" (quoting 20 U.S.C. § 1098bb(a)(1))).

In *Alabama Association of Realtors*, the Court applied the doctrine to invalidate a nationwide eviction moratorium meant to curb the spread of COVID-19, even though the statute authorized measures against the "spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 594 U.S. at 761 (quoting 42 U.S.C. § 264(a)). The possibility that the eviction moratorium could inhibit the spread of COVID-19 "from foreign countries" did not prevent application of the major questions doctrine. Moreover, the widespread death and economic disruption inflicted by the COVID-19 emergency quite obviously impacted U.S. foreign policy and national security. *See* Off. of the Dir. of Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022), https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf (outlining the foreign policy implications in detail). That did not prevent the Supreme Court from applying the major questions doctrine to policies intended to mitigate the pandemic. Similarly, in *West Virginia v. EPA*, the Court ruled that an assertion of power to impose environmental regulations intended to combat climate change qualify as a major question, even though climate change is a major international problem, with obvious foreign affairs implications. 597 U.S. at 723–32.

In addition, tariffs are obviously not purely or even primarily matters of foreign affairs. They are, in fact, taxes imposed on Americans. Studies consistently find that 90% or more of the cost imposed by the IEEPA tariffs mandated by the President was paid by American businesses and consumers. *See* Ilya Somin, *How the Supreme Court Spared America*, Atlantic (Feb. 21, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ (citing multiple studies on this point); Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, Cato Inst. (Feb. 19, 2026), https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs (same). There is no reason to expect the Section 301 tariffs to be any different.

## III. If Section 301 Grants Defendants the Power Claimed here, it Would be an Unconstitutional Delegation of Legislative Power to the Executive.

If this Court concludes that Section 301 grants the executive the power to impose the tariffs at issue, it must invalidate the statute under the nondelegation doctrine. "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante). In *V.O.S. Selections*, this Court rightly applied the nondelegation doctrine to tariffs, emphasizing that "[t]he separation of powers is always relevant to delegations of power between the branches." *V.O.S. Selections*, 772 F. Supp. 3d at 1371–72. That principle applies here as well.

### A. The Section 301 tariffs violate the nondelegation doctrine.

The Supreme Court has long held that the nondelegation doctrine requires Congress to supply an "intelligible principle" to constrain executive discretion. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Research*, 606 U.S. at 673 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Congress must also "provide[] sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* (quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)).

It is especially important to constrain delegations of tariff authority. "The power to impose tariffs is 'very clear[ly] . . . a branch of the taxing power,'" and the Framers "[r]ecogniz[ed] the taxing power's unique importance, having just fought a revolution motivated in large part by 'taxation without representation.'" *Learning Res.*, 607 U.S. at 241 (opinion of Roberts, C.J.) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)). As the Supreme Court has emphasized, Alexander Hamilton wrote in the Federalist Papers that the power to tax was "the most important of the authorities proposed to be conferred upon the Union." *Learning Res.*, 607 U.S. at 240 (quoting *The Federalist* No. 33 (Alexander Hamilton)).

Last year, in *FCC v. Consumers' Research*, the Supreme Court held that a delegation of authority to impose taxes or fees must have a "floor" and a "ceiling," and that the "guidance" Congress must give is greater "when an agency action will

'affect the entire national economy' than when it addresses a narrow, technical issue." *Consumers' Research*, 606 U.S. at 673, 681 (internal quotation marks omitted). The power to impose virtually unlimited tariffs on imports from all our trading partners unquestionably affects the entire national economy.

Defendants' interpretation of Section 301 violates these requirements. It supplies no ceiling and enables the imposition of tariffs without meaningful qualitative or quantitative limit, so long as USTR concludes that the rate is desirable after an "investigation" designed to yield a predetermined outcome.

Even a fixed numerical ceiling is not constraining enough if it leaves the executive with what amounts to "boundless power." *Id.* at 680. As the Court explained, a hard $5 trillion limit on the "contributions" the FCC could levy would not suffice, because "[t]he purpose of the nondelegation doctrine is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the law,'" and "[t]he anywhere-up-to-$5-trillion tax statute would not do that." *Consumers' Research*, 606 U.S. at 680 (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). Such a permissive approach violates nondelegation constraints because it "effectively leaves [the] agency with boundless power." *Id.* Here, if the executive can use Section 301 to impose unlimited tariffs whenever USTR conducts an investigation, it wields almost boundless tariff authority—enough to impose trillions of dollars in taxes on Americans—and no effective limit constrains its "degree of policy judgment." *Id.*

The power Defendants claim violates virtually any plausible theory of the nondelegation doctrine. In a well-known 1825 decision, Chief Justice Marshall wrote that Congress cannot delegate power over "important subjects." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). Although "the line has not been exactly drawn which separates those important subjects which must be entirely regulated by the legislature itself from those of less interest," it is undeniably true that the power to impose sweeping, unlimited tariffs on products from every nation in the world qualifies as important. *Wayman*, 23 U.S. (10 Wheat.) at 43. Modern precedent requires an "intelligible principle," but also insists that delegations of the taxing power carry clear, stringent limits, especially in cases where the policy in question will affect the "entire national economy." *Consumers' Research*, 606 U.S. at 673. Delegations of the taxing power must also have both a floor and a ceiling. *Id.* at 681. Defendants' interpretation of Section 301 meets none of these requirements.

Justice Gorsuch has argued that nondelegation requires Congress to "make . . . the policy decisions when regulating private conduct," leaving the executive to "fill up the details" and engage in appropriate fact-finding. *Gundy v. United States*, 588 U.S. 128, 157–59 (2019) (Gorsuch, J., dissenting). Sweeping authority to impose unlimited tariffs on imports from any nation at almost any time is clearly a delegation of power over private conduct.

The Federal Circuit's recent ruling upholding modifications of Section 301 tariffs on Chinese imports against a nondelegation challenge is consistent with amici's position. *See HMTX*, 156 F.4th at 1254. The court held those modifications

were permissible because "Section 307(a)(1)(C) authorizes only those actions that would have been permissible in the first instance under Section 301(b)—specifically, those appropriate to obtain the elimination of the foreign practices found to be unfair after a full investigation." *Id.* (internal quotation marks omitted). But if Section 301(b) is itself interpreted in the way the government advocates in this case, there would be no meaningful limits to what qualifies as a "full investigation" or what actions can be considered "appropriate" to securing the "elimination" of "unfair" foreign practices.

### B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues.

Just as claimed delegations of tariff authority are not exempt from the major questions doctrine on the grounds that they are "foreign affairs" issues, so they are not exempt from normal constitutional constraints on delegation on that basis. Many of the reasons why tariffs are not exempt from the major questions doctrine also apply to nondelegation. *See supra* Part II.B. Most notably, tariffs are not pure exercises of powers related to foreign affairs; they are taxes imposed on Americans. While they also have an impact on foreign nations, the same thing is true of policies enacted under many other congressional powers. As Justice Gorsuch noted in his concurring opinion in *Learning Resources*, such powers "include not only the power to impose tariffs . . . but also the power to establish uniform rules of naturalization, . . . appropriate money for armies, . . . and define and punish offenses against the law of nations." *Learning Res.*, 607 U.S. at 286 (Gorsuch, J., concurring). If powers touching foreign affairs were largely exempt from nondelegation constraints, "all

these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow." *Id.*

Tariffs are also part of the "core congressional power of the purse," over which the President holds no inherent authority of his own. *Learning Res.*, 607 U.S. at 243 (opinion of Roberts, C.J.). That distinguishes tariff delegations from delegations of authority in areas where the President does hold inherent power. *See Learning Res.*, 607 U.S. at 286 (Gorsuch, J., concurring) (emphasizing this distinction); *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (distinguishing tariffs from the "traditionally executive embargo authority" on this basis); *cf.* Curtis A. Bradley & Jack L. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international commerce" and that "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to foreign trade issues).). Moreover, "the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with [the Supreme Court's ruling in] *J.W. Hampton*, which addressed a tariff statute while creating the intelligible principle standard." *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (citing *J.W. Hampton*, 276 U.S. at 409).

### C. The constitutional avoidance canon requires interpreting Section 301 to avoid a sweeping delegation of tariff authority that raises constitutional problems.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). "The question is not whether" an interpretation that avoids constitutional problems "is the most natural statutory interpretation"—"only whether it is a 'fairly possible'" one. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) (citation omitted). The severe nondelegation concerns raised by the government's sweeping interpretation of Section 301 are more than sufficient to trigger the constitutional avoidance canon.

The Court can avoid constitutional problems by limiting Section 301 to the circumstances the statutory text describes: tariffs that precisely target specific policies imposed by foreign governments and are geared to eliminating them. *See supra* Part II. That reading of Section 301 is undeniably at least "fairly possible." *NFIB*, 567 U.S. at 563. That is all that is needed to trigger application of the avoidance canon.

## CONCLUSION

For the foregoing reasons, this Court should rule for Plaintiffs.

Respectfully submitted,

*/s/ Alex H. Schaefer*
Alex H. Schaefer
CROWELL & MORING LLP
600 Fifth St., NW
Washington, DC 20001
Phone: (202) 624-2773
aschaefer@crowell.com

Weronika Bukowski
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave
New York, NY 10001
Phone: (212) 530-1930
wbukowski@crowell.com

*Attorneys to Amici Curiae*

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

Michael W. McConnell
559 Nathan Abbot Way
Stanford, CA 94305
Phone : (650) 736-1326
mcconnell@law.stanford.edu

Joshua A. Claybourn, Esq.
SHILOH COUNSEL LLC
P.O. Box 5093
Evansville, IN 47716
Phone: (812) 480-6224
jclaybourn@jacksonkelly.com

*Of Counsel*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Jennifer Choe-Groves, Timothy M. Reif, and Lisa W. Wang, Judges

| | |
|---|---|
| *In re Section 301 Forced Labor Cases* | Case No. 26-3555 |

## **Certificate of Compliance**

Pursuant to the U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel certifies that this brief complies with the Court's type-volume limitation. The brief contains no more than 5,000 words excluding tables, signature blocks, and the statement of interest, and complies with all typeface and margin requirements.

Respectfully submitted,

*Alex H. Schaefer*