IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Honorable Jennifer Choe-Groves, Judge
Honorable Timothy R. Reif, Judge
Honorable Lisa W. Wang, Judge

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-03555-3JP |

**Amici Curiae Brief of Burlap and Barrel, Inc. and Collective Horology, LLC**

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Amici Curiae*

# Table of Contents

Table of Authorities ........ ii

Statement of Interest of the Amici Curiae ........ 1

Introduction ........ 4

Argument ........ 6

I. USTR's investigation did not examine whether any economy's specific practices burdened U.S. commerce. ........ 6

A. The Section 301 Action relies on a generic causal theory rather than economy-specific evidence that the practices of each targeted economy burden U.S. commerce. ........ 6

B. USTR's investigation was not designed to determine whether any economy's practices burden U.S. commerce as Section 2411(b)(1) requires. ........ 8

II. The Section 301 tariffs were not designed to obtain the elimination of the identified practices. ........ 10

A. The Section 301 Action provides no standard for determining whether an objectionable practice of a foreign economy has been eliminated. ........ 11

B. The Section 301 Action was designed to replicate the prior tariff regime, not to eliminate any identified foreign practice. ........ 14

Conclusion ........ 17

Certificate of Compliance ........ 19

# Table of Authorities

## Cases

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9, 10, 16

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 16

## Statutes

19 U.S.C. § 2411 .......... passim

19 U.S.C. § 2414 .......... 5

19 U.S.C. § 2417 .......... 12

5 U.S.C. § 706 .......... 9

## Regulations

91 Fed. Reg. 9,339 (Feb. 25, 2026) .......... 15

91 Fed. Reg. 34,272 (June 5, 2026) .......... 15

91 Fed. Reg. 47,318 (July 28, 2026) .......... 1

## Statement of Interest of the Amici Curiae

Amici Curiae Burlap and Barrel, Inc. ("Burlap & Barrel") and Collective Horology, LLC ("Collective") are two small American businesses that import goods they cannot source domestically and are harmed by *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026), PR-768 (the "Section 301 Action").

Amici are plaintiffs in *Burlap and Barrel Inc., et al. v. Greer, et al.*, Court No. 26-cv-03345, the first case filed before this Court challenging the Section 301 Action. Their individual case was stayed when this Court consolidated related cases under the master case, *In Re Section 301 Forced Labor Cases*, Court No. 26-cv-03555-3JP, and designated *Learning Resources, Inc. et al. v. United States of America et al.*, Court No. 26-cv-03347, as the sample case. Amici had prepared a motion for judgment on the agency record at the time the stay was entered.

Burlap & Barrel is a New York-based, mission-driven food company that sources single-origin spices from smallholder farmers in 22 countries across four continents. Burlap & Barrel's mission is not solely to increase profits, but also to end inequality and exploitation in food systems by connecting spice farmers to U.S. consumers, helping smallholder farmers generate a larger share of the product's value, and establishing long-term, mutually beneficial partnerships with suppliers. By sourcing directly and eliminating commodity intermediaries, it pays farmers two to

ten times the prevailing market price for their products. Burlap & Barrel is deeply and affirmatively opposed to forced labor; it sources exclusively from suppliers who adhere to key labor standards, and its entire commercial model is structured around the supply-chain transparency that is the antithesis of forced-labor risk.

Most of the spices Burlap & Barrel carries are imported from other countries and grown under specific conditions using agricultural practices rooted in longstanding cultural norms, including cultivating rare heirloom varieties and intercropping with other local crops. Many spice plants can only be found or cultivated in specific climates or regions around the world. They are not otherwise available in the United States, and many are not grown here at all due to climate and geography. Burlap & Barrel, therefore, cannot avoid the Section 301 tariffs through domestic substitution.

The Section 301 Action has harmed Burlap & Barrel's business through lost profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain uncertainty, and lost customers, partners, and contracts due to inventory shortages. Burlap & Barrel has paid tariffs imposed under the Section 301 Action of at least $10,000 and expects to continue to pay such tariffs at a comparable rate for as long as they remain in effect.

Collective is a Ventura, California-based small business retailer focused on enthusiast-oriented independent and high-end mechanical watches. Since its founding in 2018, Collective has represented approximately 20 independent watchmakers—individual artisans and small workshops in Switzerland, the United

Kingdom, France, Austria, Denmark, and the Netherlands—and introduces their work to American collectors. Collective is deeply committed to the values of independent craftsmanship and ethical commerce and deeply opposed to the use of forced labor. Collective works directly with founders, designers, and craftspeople—not conventional wholesale intermediaries—and selects the brands it represents based on the quality and distinctiveness of their work, not their commercial popularity.

The watches it sells cannot be sourced domestically: they reflect craft traditions, technical expertise, and maker-specific design languages that are inseparable from the places where they are produced. A duty of 10 or 12.5 percent, payable at the port before a sale is made, falls with immediate and disproportionate force on a small retailer without the capital reserves of a multinational importer, requiring it to choose between absorbing the cost and raising prices on goods that American collectors cannot obtain elsewhere. Since the Section 301 Action was imposed, Collective has paid approximately $10,000 in tariffs and expects to pay approximately $60,000 in tariffs over the coming months. For as long as the Section 301 tariffs remain in effect, Collective estimates that it will continue to pay tariffs at a comparable rate.

Amici bring to this Court a perspective shaped both by direct economic injury and by the irony of their position: two businesses that are deeply and affirmatively committed to eliminating forced labor from global supply chains are being taxed by the Section 301 Action, adopted under the pretext of combatting forced labor, but

which does not meaningfully serve that purpose and was designed to preserve substantially the same broad tariff regime that this Court and the Supreme Court have held Congress did not authorize under IEEPA and Section 122.

That irony is not merely rhetorical. It reflects the concrete consequence of an investigation that asked only whether each economy had enacted the desired legal framework rather than whether its specific practices actually burdened U.S. commerce, and of a tariff regime calibrated to replicate a prior tariff structure rather than to obtain the elimination of any identified foreign practice. Amici file this brief to supplement the arguments presented by Learning Resources, developing in greater depth two of the structural defects in the Section 301 Action that their own experience illustrates most directly.

## Introduction

This Court has twice held that the broad tariff regime the Executive Branch has sought to maintain through successive statutory vehicles—first, under IEEPA, and then under Section 122—was not authorized by Congress. The Section 301 Action now before the Court is the third iteration of that regime.

Section 301(b) conditions tariff authority on the satisfaction of two statutory predicates. First, USTR must determine that an act, policy, or practice of a particular foreign economy "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). Second, USTR must take action "appropriate and feasible to obtain the elimination of" that identified conduct. 19 U.S.C. § 2411(b)(2). The Section 301 Action fails both.

I. Section 301 requires USTR to determine, for a particular foreign country, that a specific act, policy, or practice "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). USTR must provide "a description of the facts on which such determination is based," 19 U.S.C. § 2414(c), not a generic causal theory that would justify action against any country in the world regardless of whether that country's specific conduct produces any ascertainable effect on U.S. commerce. USTR's investigation did not make that determination. Its three-part theory—that each economy's failure to prohibit forced-labor imports creates unfair competition, permits commingling, and displaces fairly produced goods in the U.S. market—is a generic causal chain untethered to any economy-specific evidence.

II. Section 301 also requires that any action USTR takes be "appropriate and feasible to obtain the elimination of" the identified practice. 19 U.S.C. § 2411(b)(2). "Elimination" means cessation of the identified conduct—the end of the act, policy, or practice that USTR has found unreasonable or discriminatory. It does not mean the adoption of a specific legislative and enforcement architecture by the targeted economy. The Section 301 Action does not satisfy this requirement.

USTR has provided no off-ramp—no explanation of what conduct by a targeted economy would terminate, reduce, or even pause the tariffs. The eight-element framework USTR uses as the benchmark for compliance is not a standard for determining when the identified harmful conduct has ceased; it is a blueprint for a specific legislative and enforcement architecture that USTR wants foreign governments to establish. The timing, rates, product coverage, exclusions, and the

Administration's own public statements further confirm that the Section 301 Action was designed to replicate a prior tariff regime—not to induce a change in foreign conduct. Defendants' determinations do not satisfy the statutory requirements of Section 301 or the applicable APA standards.

Each defect is independently sufficient to require vacatur.

## Argument

### I. USTR's investigation did not examine whether any economy's specific practices burdened U.S. commerce.

Section 2411(b)(1) requires a determination that a specific act, policy, or practice of each targeted economy "burdens or restricts United States commerce." That determination must be grounded in evidence of actual trade effects attributable to each economy's conduct—not a generic causal theory of equal applicability to every country in the world, and not an assessment of each economy's legal and enforcement framework untethered to what is actually crossing the U.S. border.

#### A. The Section 301 Action relies on a generic causal theory rather than economy-specific evidence that the practices of each targeted economy burden U.S. commerce.

The statute requires more than a generalized theory that forced labor distorts global trade. It requires a determination that the specific act, policy, or practice identified for each economy—as distinct from the global existence of forced labor, international trade in forced-labor goods, or foreign trade generally—burdens or restricts United States commerce. 19 U.S.C. § 2411(b)(1). USTR's three-part theory—that a given economy's failure to prohibit the importation of goods produced with forced labor (1) incentivizes unfair competition in that economy's own market,

(2) allows commingling of forced-labor goods in the U.S. market, and (3) displaces fairly produced goods to the U.S. market—is not tethered to any economy-specific evidence. USTR Investigation Report, PR-6, at 34. It is a generic causal chain that would apply equally to any country in the world, regardless of the actual volume of forced-labor goods entering U.S. commerce from that country, the nature of that country's existing enforcement regime, or the extent to which that country's particular practices—as opposed to global supply-chain dynamics—cause any identifiable burden on U.S. commerce.

The Section 301 Action's treatment of economies that reformed their practices after USTR's initial determinations confirms that USTR's theory was never actually tethered to any economy's specific conduct. Following USTR's June 2, 2026 determinations, at least six economies—Cambodia, Guatemala, Honduras, India, Sri Lanka, and Trinidad and Tobago—enacted forced-labor import prohibitions of the kind USTR identified as the relevant benchmark. Final Decision Memorandum, PR-763, at 3. Notwithstanding those reforms, USTR subjected all six to 10 percent tariffs in the final Section 301 Action, attributing its decision to inadequate enforcement. PR-768; Final Decision Memorandum, PR-763, at 12, 14–15, 21–22. But USTR made no individualized assessment of whether any particular economy's enforcement posture had actually altered the burden on U.S. commerce. Each of the six received the same outcome regardless of the specific steps each had taken and the particular characteristics of its supply chains and export sectors. That uniform result, applied without economy-specific assessment of actual trade effects, confirms

that USTR's commerce-burden theory is a generic predicate—not a particularized determination of how any given economy's specific conduct burdens U.S. commerce.

If USTR's generic theory were sufficient to satisfy the commerce-burden requirement, Section 301(b) would authorize tariffs on any country in the world based on any global trade concern—a reading that would render the statutory predicate meaningless. USTR was required to identify, for each economy, how that economy's specific act, policy, or practice, not the global phenomenon of forced labor, burdens or restricts U.S. commerce. It did not do so.

**B. USTR's investigation was not designed to determine whether any economy's practices burden U.S. commerce as Section 2411(b)(1) requires.**

USTR's investigation focused on whether each economy had enacted and enforced a formal import prohibition on goods produced with forced labor. USTR Investigation Report, PR-6, at 25–31. USTR's written consultation instrument—the questions it actually posed to the 60 economies—asked whether each economy had legal authority to prohibit forced-labor imports, whether it exercised that authority, and whether it was considering adopting such a prohibition; it did not ask about the volume or prevalence of forced-labor goods entering U.S. commerce from that economy. *See USTR's Consultations Questions for Confidential Consultations with Investigated Economies without Forced Labor Import Prohibitions*, PR-71 (Apr. 13, 2026). It did not investigate the actual prevalence of forced-labor goods within each economy's supply chains or domestic production systems, the volume of such goods entering U.S. commerce from each economy, or the relationship between each economy's enforcement architecture and the actual incidence of forced-labor goods

in trade. This is a significant gap in the administrative record, because the statutory question is not whether a foreign government has adopted a particular legal form, but whether its act, policy, or practice is unreasonable or discriminatory and burdens or restricts U.S. commerce. 19 U.S.C. § 2411(b)(1).

An investigation that examines only the formal features of a foreign regulatory regime, without examining whether that regime's actual performance produces the asserted burden on U.S. commerce, does not provide the factual foundation required for a reasoned determination. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). USTR cannot determine that a foreign economy's enforcement is inadequate, and that the inadequacy burdens U.S. commerce, without examining what forced-labor goods are actually entering U.S. commerce from that economy and how the economy's enforcement practices relate to that flow. The failure to conduct that inquiry means that USTR's determinations rest on comparative assessments of each economy's legal and enforcement framework rather than on evidence of actual trade burdens, and that the Section 301 Action is therefore unsupported by substantial evidence in the administrative record. 5 U.S.C. § 706(2)(E).

The methodological gap identified above reflects a structural mismatch between the investigation USTR conducted and the statutory question USTR was required to answer. Even if USTR had conducted its formal-compliance inquiry flawlessly—even if every response to PR-71 were accurate and complete—the investigation would remain incapable of establishing what § 2411(b)(1) requires: whether a

specific act, policy, or practice of a particular foreign economy burdens or restricts U.S. commerce. USTR's investigation asked only whether each economy had enacted a specific legal framework. These are different questions, and evidence sufficient to answer one does not establish an answer to the other. This is not the kind of evidentiary deficiency that can be corrected by supplemental record evidence. An agency "must examine the relevant aspects of the problem" before acting. *State Farm*, 463 U.S. at 43. USTR did not examine the relevant aspects of the problem—it examined a different problem entirely.

## II. The Section 301 tariffs were not designed to obtain the elimination of the identified practices.

Even if USTR had established a burden on U.S. commerce as required by § 2411(b)(1), the Section 301 Action would separately fail because the tariffs are not designed to obtain the elimination of any identified practice, as § 2411(b)(2) independently requires. The tariffs are structurally incapable of satisfying that requirement—no off-ramp identifies what conduct would end them, USTR's compliance benchmark demands adoption of a specific legislative and enforcement architecture rather than the cessation of identified conduct, and the six-country evidence confirms that even the prescribed legislative step does not terminate the tariffs. And the timing, rates, exclusions, and the Administration's own public statements show that the tariffs were designed for a purpose other than obtaining the elimination of identified foreign practices.

### A. The Section 301 Action provides no standard for determining whether an objectionable practice of a foreign economy has been eliminated.

Section 301 requires USTR to select action that is "appropriate and feasible" to obtain the elimination of the objectionable act, policy, or practice. 19 U.S.C. § 2411(b)(2). Section 301 does not authorize duties for revenue generation, general economic policy, retaliation unrelated to the investigated conduct, or indefinite preservation of a preexisting tariff architecture. Yet USTR points to no connection between the tariff and the elimination of forced-labor-import practices. Nor is there any explanation of why the 10 and 12.5 percent rates are appropriate to obtain the elimination of the practices. And the covered economies are in a bind—while USTR identified circumstances associated with a lower 10-percent rate and certain product-level relief, it provided no explained standard for when an economy's reforms would terminate the tariffs, produce further rate reductions, or establish that enforcement is sufficiently effective. Final Decision Memorandum, PR-763, at 2–3, 5–8; *see also Actions by the United States in the Investigations under Section 301 of the Trade Act of 1974 of the Acts, Policies, and Practices of 60 Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (July 23, 2026), PR-766 ("Presidential Memorandum"), § 1(a)–(b). Indeed, all indications are that these tariffs are designed to last indefinitely, not to encourage economies to remedy the identified conduct. The absence of any off-ramp is itself evidence that the tariffs are not designed to obtain the elimination of any practice because a remedy genuinely aimed at changing foreign conduct would, at minimum, identify

what changed conduct looks like and what happens when it occurs. That the rates were not modified following the public comment period is further evidence that the rates reflect a predetermined tariff structure rather than a calibrated remedy designed to obtain the elimination of identified foreign conduct.

Section 301 authorizes action "to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). "Elimination" means cessation of the identified conduct—the end of the act, policy, or practice that USTR has found unreasonable or discriminatory. It does not mean the adoption of a new affirmative regulatory regime. If it did, the authorization provided by Section 2411(b) would be greatly expanded—while there is a finite number of acts, policies, or practices of a foreign country that can be eliminated, there is a near-infinite number of regulations that could be adopted. The textual case for this reading is grounded in the statute's ordinary meaning and its internal structure. "Elimination" in its ordinary sense denotes the removal or cessation of something that exists—not the creation of something new. When § 2411(b)(2) authorizes action "to obtain the elimination of that act, policy, or practice," that phrase refers to the specific identified conduct. To obtain its elimination is to obtain its cessation—the targeted economy stops engaging in the identified practice. Section 2417 confirms this reading. That provision authorizes USTR to modify or terminate retaliatory action when the "act, policy, or practice that is the subject of such action . . . has been eliminated." 19 U.S.C. § 2417(a)(1)(A). For § 2417 to operate as Congress intended—as a mechanism for restoring normal trade relations once a foreign government changes

its conduct—elimination must refer to an ascertainable change in conduct, not the adoption of a particular legislation and enforcement architecture. The modification-and-termination provision makes functional sense only if "elimination" is tied to whether the identified practice has actually ceased, not to whether the foreign government has adopted any particular statutory form.

But USTR's theory does not seek the elimination of any identified practice. USTR's eight-element framework—requiring a forced-labor definition, a designated enforcement authority, a public entity list, a rebuttable presumption, evidentiary standards, remediation requirements, a reporting mechanism, and transparency measures—is not a standard for determining when a harmful practice has ceased. It is a blueprint for a particular regulatory architecture that USTR wants foreign governments to establish. Section 301 does not authorize the United States to use tariffs to compel foreign countries to adopt specific domestic legislation. That is not the elimination of an act, policy, or practice; it is the imposition of one.

Even if a country adopted every element of USTR's eight-element framework, it would not have "eliminated" any identified act, policy, or practice—it would have enacted new law. The six-country record confirms this conclusion most forcefully. Six economies—Cambodia, Guatemala, Honduras, India, Sri Lanka, and Trinidad and Tobago—enacted forced-labor import prohibitions after USTR's initial June 2 determinations. USTR subjected all six to tariffs anyway, attributing its decision to inadequate enforcement. But USTR never defined what adequate enforcement would look like, identified no metric or benchmark that enforcement would need to

satisfy, and provided no process by which any of those economies could demonstrate that its enforcement posture warranted relief. Those six economies had taken the specific legislative step USTR's framework identified as the relevant remedial measure—and still received no defined path to ending the tariffs. If enacting the prescribed prohibition does not end or reduce the tariffs, and if USTR has defined no enforcement standard that would, then there is no off-ramp—not for the six economies that enacted prohibitions, and not for any of the remaining 54. The only coherent explanation is that the tariffs serve a different purpose entirely—one that Section 301 does not authorize. The Section 301 Action is therefore not calibrated to obtain the elimination of the challenged practices; it is calibrated to maintain a tariff regime regardless of what foreign governments do.

### B. The Section 301 Action was designed to replicate the prior tariff regime, not to eliminate any identified foreign practice.

The record demonstrates that the Section 301 tariffs were not designed to obtain the elimination of identified foreign practices, but rather to replicate and preserve the broad tariff regime invalidated under IEEPA and expiring under Section 122. A remedy designed to replicate a prior tariff regime rather than to obtain the elimination of identified conduct is not "appropriate and feasible to obtain the elimination of" the identified practices within the meaning of § 2411(b)(2), regardless of how USTR characterizes it.

The sequence, timing, scope, rates, exclusions, and public statements support the inference that the Section 301 Action was designed to preserve the broad tariff regime invalidated under IEEPA and expiring under Section 122. The Section 122

tariffs were announced, on the day the Supreme Court struck down the IEEPA tariffs, as an explicit replacement (itself held unlawful by this Court), and the Section 301 investigations followed soon after. The Section 301 investigations were truncated to only 82 days and timed precisely to go into effect the day the Section 122 tariffs expired. And the Section 301 investigations, according to the Administration itself, were carried out at the direction of the President, not initiated internally within USTR. Final Decision Memorandum, PR-763, at 1–2, 4–7; Presidential Memorandum, PR-766, at 1–4. Each of these features is inconsistent with a genuine forced-labor investigation and consistent with a predetermined effort to maintain a tariff regime by whatever statutory vehicle remained available. The Administration does not distinguish between these initiatives; rather, it is using inconsistent trade authorities for the same purpose of perpetuating a broad, worldwide trade war—and bragging that they are successfully replacing the IEEPA tariff revenue, as if that were a legitimate use of these authorities. The Administration is entitled to have that policy preference, but it is not entitled to use authorities whose statutory predicates it has not satisfied to achieve that objective.

The product exclusions further confirm the pretextual nature of the Section 301 Action. The exclusions in the Section 301 Action mirror the annex to Proclamation No. 11012—the Section 122 tariff—rather than reflecting any forced-labor-specific analysis of which products are or are not implicated in forced-labor supply chains. *Compare* 91 Fed. Reg. 34,272, 34,274, 34,277–344 (June 5, 2026), *with* Proclamation No. 11012, 91 Fed. Reg. 9,339, 9,343–45 (Feb. 25, 2026). If

the exclusions were genuinely calibrated to the forced-labor rationale, they would reflect an analysis of which product categories are most or least associated with forced-labor supply chains. Instead, they replicate a prior tariff annex wholesale—strong evidence that the Section 301 Action is a continuation of the same tariff regime under a new statutory label.

The legal significance of this evidence is not merely that the Administration preferred a particular tariff policy. An agency action taken for a purpose other than the one the authorizing statute prescribes is ultra vires, regardless of whether the agency could have taken the same action for a lawful purpose. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"). The record here runs counter to USTR's forced-labor rationale at every turn: the timing, the rates, the exclusions, the truncated investigation, and the Administration's own public statements all point to a different purpose. *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious when the agency has "offered an explanation for its decision that runs counter to the evidence before the agency"). USTR cannot sustain the Section 301 Action by pointing to a forced-labor rationale if the record demonstrates that it was designed to replicate a broad tariff regime for revenue and trade policy purposes. The statute authorizes action to obtain the elimination of identified foreign practices. It does not authorize action to maintain tariff revenue, replace an invalidated tariff regime, or pursue a general trade policy. If the actual purpose of

the Section 301 Action was the latter, then it exceeds the authority Congress granted.

## Conclusion

Section 301(b) authorizes discretionary action only when USTR determines that an "act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce," and that action is appropriate. 19 U.S.C. § 2411(b)(1), (2). Even when those predicates are satisfied, action is only authorized "to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). Section 301 is therefore a targeted trade-remedy statute—a mechanism for addressing identified conduct by a particular trading partner. And it does not authorize tariffs simply because USTR believes a global problem is morally serious, economically distortive, or related in some attenuated way to trade. The Section 301 Action exceeded these statutory limits.

Amici respectfully request that this Court grant Plaintiffs' motion for judgment on the agency record. Plaintiffs are entitled to vacatur of the Final Determination and an order directing Defendants to refund, with interest, any duties paid pursuant to the Section 301 Action.

Dated: September 11, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Amici Curiae*

## Certificate of Compliance

I hereby certify that this brief complies with the 5,000-word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) and this Court's August 13, 2026 Standard Procedural and Scheduling Order (see Dkt. 1), because this brief contains 4,305 words, excluding the parts of the brief exempted from the word limitation. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Dated: September 11, 2026

Respectfully submitted

/s/ Jeffrey M. Schwab