**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**
**THE HONORABLE TIMOTHY R. REIF, JUDGE**
**THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| **IN RE SECTION 301 FORCED LABOR CASES** | **Court No. 26-03555-3JP** |

**PROPOSED BRIEF OF PLAINTIFF STATES AS AMICI CURIAE**
**IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**
**FILED BY PLAINTIFFS LEARNING RESOURCES ET AL.**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. INTEREST OF AMICI CURIAE ..... 1

III. ARGUMENT ..... 2

A. USTR's Action on Forced-Labor Imports Was a Pretextual "Alternative Tool" to Continue the Administration's Global Tariff Policy. ..... 3

1. Pretextual Action Is Independently a Violation of the APA ..... 3

2. The Administration's Actions and Public Statements Reveal Stark Evidence of Pretext. ..... 5

3. The Scope and Speed of USTR's Section 301 Investigation Further Demonstrate that the Investigation Was Pretextual. ..... 8

4. The Outcome and Timing of the Section 301 Proceeding Underscore that Concern About Forced-Labor Imports Was a Pretext. ..... 10

B. The Court Should Consider The Administration's Public Statements and Actions. ..... 12

C. The Pretextual Use of Section 301 Underscores Why the Tariff Action Is Arbitrary, Capricious, and Contrary to Law. ..... 14

IV. CONCLUSION ..... 17

CERTIFICATE OF COMPLIANCE ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

### STATUTES


5 U.S.C. § 706 .......... 13

19 U.S.C.
§ 2132 .......... 6
§ 2411 .......... 14, 15
§ 2413 .......... 16
§ 2414 .......... 15, 16

50 U.S.C. § 1701 .......... 5


### REGULATIONS


Exec. Order No. 14,257 (Apr. 2, 2025), 90 Fed. Reg. 15,041 (Apr. 7, 2025) .......... 5

Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9,339 (Feb. 25, 2026) .......... 6

*Initiation of Section 301 Investigations: Acts, Policies, and Practices of Various Economies Relating to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 12,884 (Mar. 17, 2026) .......... 7

*Initiation of Section 301 Investigations: Acts, Policies, and Practices of Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors*, 91 Fed. Reg. 12,886 (Mar. 17, 2026) .......... 10

*Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 34,272 (June 5, 2026) .......... 8, 9, 10, 16

*Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) .......... *passim*


### CASES


*Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372 (Fed. Cir. 2009) .......... 17

*Amfac Resorts, LLC v. Dep't of the Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001) .......... 13

*Axiom Res. Mgmt. v. United States*,
564 F.3d 1374 (Fed. Cir. 2009)....12

*CAADES v. United States*,
32 F.4th 1130 (Fed. Cir. 2022) ....4, 5

*Chae v. Yellen*,
579 F. Supp. 3d 1343 (Ct. Int'l Trade 2022), *aff'd,* No. 2022-2017, 2023 WL 3072385 (Fed. Cir. Apr. 25, 2023) ....12

*Citizens to Pres. Overton Park v. Volpe*,
401 U.S. 402 (1971)....13

*Dep't of Com. v. New York*,
588 U.S. 752 (2019).... *passim*

*Doe v. Noem*,
832 F. Supp. 3d 353 (S.D.N.Y. 2026)....16

*FCC v. Prometheus Radio Proj.*,
592 U.S. 414 (2021)....3

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025) ....15

*Lands Council v. Powell*,
395 F.2d 1019 (9th Cir. 2005) ....13

*Learning Res. v. Trump*,
607 U.S. 229 (2025)....1, 14

*Maritel, Inc. v. Collins*,
422 F. Supp. 2d 188 (D.D.C. 2006) ....13

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)....14, 15

*Oregon v. Trump*,
Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026), *stay granted*, Nos. 2026-1804, 2026-1805, 2026 WL 1702442 (Fed. Cir. June 11, 2026)....1

*Orion Int'l Techs. v. United States*,
60 Fed. Cl. 338 (2004) ....13

*Retractable Techs., Inc. v. United States*,
739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ....16

*R.I. State Council of Churches v. Rollins*,
808 F. Supp. 3d 370 (D.R.I. 2025)....................12

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977)....................4

*V.O.S. Selections, Inc. v. United States*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), *aff'd in relevant part*, 149 F.4th 1312 (Fed. Cir. 2025)....................1

**OTHER AUTHORITIES**

Bureau of Int'l Lab. Aff., Dep't of Lab., *2024 List of Goods Produced by Child Labor or Forced Labor* (2024), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/2024-tvpra-list-of-goods.pdf....................11

CNBC, *CNBC Transcript: U.S. Treasury Secretary Scott Bessent Speaks with CNBC's Joe Kernen on "Squawk Box" Today* (June 24, 2026), https://www.cnbc.com/2026/06/24/cnbc-transcript-us-treasury-secretary-scott-bessent-speaks-with-cnbcs-joe-kernen-on-squawk-box-today.html [https://perma.cc/45GG-C8SM]....................7, 8

CNBC TELEVISION, *President Trump Holds a Bilateral Meeting with German Chancellor Friedrich Merz – 3/3/2026* (YouTube, streamed Mar. 3, 2026), https://www.youtube.com/watch?v=n6skNyV5yxo....................7

Danielle M. Trachtenburg, Cong. Rsch. Serv., IF11346, Section 301 of the Trade Act of 1974 (2026), https://www.congress.gov/crs-product/IF11346....................9

Declaration of Professor James R. Hines, Jr., *Oregon v. Trump*, No. 26-01472-3JP (Ct. Int'l Trade Mar. 13, 2026), ECF No. 27-5....................2

PR-6, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (2026), https://ustr.gov/sites/default/files/files/Press/Releases/2026/USTR%20Report%20Sec%20301%20FL%20301%206-2-26%20FINAL%20for%20upload.pdf.................... *passim*

PR-132, Press Release, USTR, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision....................6

ROLL CALL FACTBASE VIDEOS, *Donald Trump Holds Political Rally in Asheville, North Carolina* (YouTube, Aug. 14, 2024), https://www.youtube.com/watch?v=orrZ9b3-9kM....................5

Scott Bessent, Sec'y, U.S. Dep't of Treasury, Remarks Before the Economic Club of Dallas: Economic Security First (Feb. 20, 2026), https://home.treasury.gov/news/press-releases/sb0403 [https://perma.cc/9NKD-22YR] ............................................7

*The President's 2026 Trade Agenda: Hearing Before the S. Comm. on Fin.*, 199th Cong. (2026) (Statement of Jamieson Greer, U.S. Trade Representative), https://www.finance.senate.gov/imo/media/doc/07222026_greer_opening_statement.pdf ..............................................................................................................8

USTR, *Finding of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (2018), https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF ...........................................................................................9

USTR, *Section 301 Investigation: Report on Turkey's Digital Services Tax* (2021), https://ustr.gov/sites/default/files/enforcement/301Investigations/Report%20on%20Turkey%E2%80%99s%20Digital%20Services%20Tax.pdf ..................................9

## I. INTRODUCTION

The Learning Resources Plaintiffs established that the Section 301 tariffs (Tariff Action) are unlawful because they exceed USTR's statutory authority, are arbitrary and capricious, and are pretextual. Pls. Mot. for J. on Agency R. (MJAR), ECF No. 16. Amici curiae, the 25 Plaintiff States in Court No. 26-cv-03467-3JP, endorse all three arguments; this brief underscores the third. Below, amici provide a more complete account exposing the Administration's stated rationale for the tariffs—countries' forced-labor import practices—as a pretext, contrived to circumvent this Court's decisions invalidating the Administration's prior attempts to unlawfully impose worldwide tariffs. Such pretext is sufficient to invalidate the Tariff Action. Moreover, USTR's contrived reasons for action demonstrate that the agency's decision is arbitrary, capricious, and contrary to law.

## II. INTEREST OF AMICI CURIAE

Amici have consistently challenged the President's unilateral efforts to tax the states and American consumers through illegal tariffs. In April 2025, the States filed suit challenging Trump's tariffs under the International Emergency Economic Powers Act (IEEPA), obtaining a judgment from this Court, which the Federal Circuit and Supreme Court affirmed. *See Oregon v. Trump*, Court No. 25-00077-3JP (Apr. 23, 2025) (*Oregon I*); *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), *aff'd in relevant part*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom.*, *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). Similarly, the States challenged the President's illegal invocation of Section 122 to again impose tariffs, which this Court also struck down. *See Oregon v. Trump*, Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026), *stay granted*, Nos. 2026-1804, 2026-1805, 2026 WL 1702442 (Fed. Cir. June 11, 2026) (*Oregon II*). Now, the States again oppose the executive branch's attempt to arrogate Congress's legislative power to itself.

The Section 301 tariffs have already harmed Plaintiff States and will continue to do so if they remain in place. Amici spend billions of dollars annually purchasing imports necessary to provide public services and thus stand to pay hundreds of millions of dollars annually in Section 301 tariffs. *See Oregon II*, No. 26-01472-3JP, ECF No. 27-5, ¶ 19 (estimating 10% tariffs cost Plaintiff States $748 million annually).

## III. ARGUMENT

The stated rationale for the Tariff Action is pretextual. A robust catalog of public statements by Administration officials—from before the President took office through the tariffs' announcement—demonstrates that the Tariff Action, 91 Fed. Reg. 47,318 (July 28, 2026), has nothing to do with forced labor and everything to do with reimposing the invalidated global tariffs. USTR's findings under Section 301—which neither specify how any country's forced-labor import practices burden U.S. commerce, nor explain how global tariffs of 10% and 12.5% will eliminate those practices—only bolster the conclusion that the Administration's newfound concern with forced labor is a pretext.

Because USTR's stated reasons are "contrived," not "genuine," the Tariff Action is unlawful under the APA, irrespective of whether the Action violates other APA requirements. *Dep't of Com. v. New York*, 588 U.S. 752, 782-85 (2019). Yet that pretext also forcefully demonstrates that the Tariff Action is arbitrary, capricious, and in excess of USTR's statutory authority. Because the outcome of its investigation was preordained, USTR neither made the findings Section 301 requires nor engaged in the reasoned decision-making the APA demands.

### A. USTR's Action on Forced-Labor Imports Was a Pretextual "Alternative Tool" to Continue the Administration's Global Tariff Policy.

USTR proffers only one reason for the Tariff Action: the investigated economies' purported failures to effectively ban forced-labor imports.[1] But extensive evidence shows this reason is pretextual. First, the Administration's actions show its determination to institute global tariffs, its effort to find any rationale to impose such tariffs, and its reliance on Section 301 only after other avenues failed. Second, USTR fast-tracked the simultaneous investigation into 60 economies, spanning 86 countries, without regard to their record on forced labor. Third, the tariff rates and exemptions track the previous, unlawful tariff regimes and were timed to take effect the moment the prior tariffs expired. Because USTR's Section 301 investigation and findings are pretextual, the Tariff Action violates the APA.

#### 1. Pretextual Action Is Independently a Violation of the APA.

The APA requires agency actions to be "reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). An agency violates the APA when it provides a pretextual basis for its actions. *Dep't of Com.*, 588 U.S. at 785. A finding of pretext is independent from a finding that agency action is arbitrary and capricious. *See id.* at 773-76, 783-85 (finding action pretextual but not arbitrary and capricious).

Agency action is pretextual when the stated explanation "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. at 785. For example, when an agency offers a "contrived" reason that "played an insignificant role in the decisionmaking process[,]" it violates the APA. *Id.* at 782, 784. "The reasoned explanation

---

[1] "Each tariff action on an economy taken by the Trade Representative … is only for the purpose of obtaining the elimination of the applicable economy's acts … found actionable under Section 301 in that investigation." 91 Fed. Reg. at 47,335.

requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785. In reviewing whether an agency action is pretextual, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

The Supreme Court articulated this standard in *Department of Commerce*, in which it held that the Secretary of Commerce's stated reason to add a citizenship question to the 2020 Census was pretextual and thus violated the APA. *Id.* at 776, 785. The Secretary claimed that the citizenship question was added at the request of the Department of Justice, which allegedly sought certain data for purposes of enforcing the Voting Rights Act (VRA). *Id.* at 752. But the Court found "a significant mismatch between the decision the Secretary made and the rationale he provided" and concluded that the "sole stated reason [] seems to have been contrived." *Id.* at 783-84. The evidence demonstrated that the Secretary was intent on adding the citizenship question from the time he took office and took steps to do so before considering the VRA rationale, sought the best rationale to include the question, and pursued the VRA rationale only after other attempts failed. *Id.* at 784-85. This evidence of pretext sufficed for the Court to conclude that the agency's action violated the APA. *Id.* at 785.

A parallel pattern unfolded here, as detailed in Sections III.A.2-4, *infra*. Defendants misapply *CAADES v. United States*, 32 F.4th 1130 (Fed. Cir. 2022), in asserting that consideration of pretext is foreclosed here. Opp'n 52, ECF No. 22. In *CAADES*, the Federal Circuit rejected a claim that a trade decision was based on "improper political influence," finding "no impropriety" in either a trade group or a Senator urging an agency to take action. *CAADES*, 32 F.4th at 1141. The Federal Circuit relied on *Department of Commerce* for the proposition that

a court "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* at 1142 (quoting *Dep't of Com.*, 588 U.S. at 781). But this is not an improper-influence case. The Tariff Action violates the APA not because the Administration was influenced by outside interests or held policy preferences, but because the Administration's own "enforcement rationale"—forced-labor imports—"seems to have been contrived." *Dep't of Com.*, 588 U.S. at 784. That disconnect is apparent from information properly in the record, *see infra* Section III.B, and it violates the APA.

### 2. The Administration's Actions and Public Statements Reveal Stark Evidence of Pretext.

The Administration entered office in 2025 determined to impose tariffs on most imports worldwide. During his 2024 campaign, President Trump proposed "10 to 20% tariffs on foreign countries that have been ripping us off for years."[2] *Cf. Dep't of Com.*, 588 U.S. at 782-83 ("Th[e] evidence showed that the Secretary was determined to reinstate a citizenship question from the time he entered office.").

The Administration based its first attempt to levy worldwide tariffs on the President's Executive Order No. 14,257, asserting "a national emergency arising from conditions reflected in large and persistent annual U.S. goods trade deficits," which "have contributed to the atrophy of domestic production capacity" and "compromised military readiness." 90 Fed. Reg. 15,041, 15,044-45 (Apr. 7, 2025). The President invoked IEEPA to impose 10% worldwide tariffs, purportedly to address an "unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). That action gave no hint that

---

[2] ROLL CALL FACTBASE VIDEOS, *Donald Trump Holds Political Rally in Asheville, North Carolina*, at 1:08:03 (Aug. 14, 2024), https://www.youtube.com/watch?v=orrZ9b3-9kM.

forced-labor imports were a motivation for the tariffs. *Cf. Dep't of Com.*, 588 U.S. at 783 ("The record shows that the Secretary began taking steps to reinstate a citizenship question about a week into his tenure, but it contains no hint that he was considering VRA enforcement in connection with that project.").

After the IEEPA attempt failed, Trade Representative Jamieson Greer pledged that "alternative tools would be implemented to address many of the issues at the heart of the President's reciprocal tariff program." PR-132. *Cf. Dep't of Com.*, 588 U.S. at 783-84 ("The Director initially attempted to elicit requests for citizenship data from [other agencies]. … After those attempts failed, he asked Commerce staff to look into [another way] the Secretary could reinstate the question[.]"). Ambassador Greer declared that "[t]he Trump Administration will take … actions in short order to ensure continuity," including by "**[i]mmediately impos[ing] a temporary 10 percent surcharge on articles imported into the United States, pursuant to Section 122 of the Trade Act of 1974**." PR-132. Because Section 122 tariffs are limited by statute to 150 days, 19 U.S.C. § 2132(a), he also promised to **"[i]nitiate several investigations under Section 301**" and "conduct these investigations on an accelerated timeframe," following which "tariffs are one tool that may be imposed." *Id.*

To justify imposing the same worldwide tariff policy under Section 122, the President misconstrued the prerequisites for such tariffs,[3] proclaiming that "fundamental international payments problems within the meaning of section 122 exist." Proclamation No. 11012, 91 Fed. Reg. 9,339, 9,341 (Feb. 20, 2026). President Trump also vowed that during the five-month

[3] *See* 19 U.S.C. § 2132(a).

period the Section 122 tariffs were in effect, the Administration would "do[] the various studies and things and we'll be coming out with tariffs[.]"[4]

Other Administration officials confirmed this plan. The day the Supreme Court invalidated the IEEPA tariffs, Treasury Secretary Scott Bessent declared that "[t]his Administration will invoke alternative legal authorities to replace the IEEPA tariffs," including Section 301, "result[ing] in virtually unchanged tariff revenue in 2026."[5] Ambassador Greer affirmed: "By the time the five-month period has elapsed, we'll have completed investigations under Section 301 that Secretary Bessent talked about."[6]

With little time before the Section 122 tariffs expired, Ambassador Greer searched for a new rationale. *See Dep't of Com.*, 588 U.S. at 783 ("The Secretary's Director of Policy ... saw it as his task to 'find the best rationale.'"). Soon after the President announced the Administration would "do the various studies" supporting permanent tariffs, USTR initiated its Section 301 investigations into 60 economies over forced-labor imports. 91 Fed. Reg. 12,884 (Mar. 17, 2026).

After USTR issued its Section 301 investigation report, Secretary Bessent again confirmed that the purpose of Section 301 tariffs was to replace the unlawful IEEPA tariffs and expiring Section 122 tariffs:

> The president used IEEPA, which was a very efficient way to put on tariffs. We have rebooted the tariff program. Right now, we have something called section 122 tariffs, which is a 10 percent global tariff. Currently, USTR, Ambassador Jamieson Greer, is doing

[4] CNBC TELEVISION, *President Trump Holds a Bilateral Meeting with German Chancellor Friedrich Merz*, at 20:57 (Mar. 3, 2026), https://www.youtube.com/watch?v=n6skNyV5yxo.

[5] Sec'y Scott Bessent, Remarks Before the Economic Club of Dallas: Economic Security First (Feb. 20, 2026), https://home.treasury.gov/news/press-releases/sb0403 [https://perma.cc/9NKD-22YR].

[6] CNBC TELEVISION, *supra* note 4, at 21:56.

> studies for section 301. And if those studies are successful and I have no reason to believe they won't be, but we don't know until they are, *then the tariff rates are going to go back to exactly where they were.*[7]

Two days before the Section 122 tariffs expired, Ambassador Greer again confirmed, in Senate testimony, that the Administration was using a new legal authority to pursue the same policy:

> [T]he President's trade policy in 2025 was defined by a national emergency: a $1.2 trillion trade deficit …. That national emergency still exists, and so our policy remains the same. The specific authorities this administration is using have changed, but the trade strategy has not. Specifically, we are continuing to impose tariffs ….

*The President's 2026 Trade Agenda: Hearing Before the S. Comm. on Fin.*, 199th Cong. (July 22, 2026) (Ambassador Greer).

### 3. The Scope and Speed of USTR's Section 301 Investigation Further Demonstrate that the Investigation Was Pretextual.

The way the Section 301 investigation unfolded confirms that forced-labor practices were but a convenient means to achieve the Administration's desired ends. The breadth and pace of USTR's investigation, which aberrated from usual practice, are inconsistent with a genuine inquiry into the burden each economy's practices impose on U.S. commerce and whether tariffs would eliminate those practices.

USTR announced its investigation of the forced-labor practices of 60 economies less than three weeks after the Supreme Court invalidated the IEEPA tariffs. The agency then prepared, in just 82 days, a 92-page report (including appendices) covering 59 countries and the European Union, PR-6 (Report), and published its proposal the same day, 91 Fed. Reg. 34,272 (June 5,

---

[7] *CNBC Transcript: U.S. Treasury Secretary Scott Bessent Speaks with CNBC's Joe Kernen on "Squawk Box" Today* (June 24, 2026), https://www.cnbc.com/2026/06/24/cnbc-transcript-us-treasury-secretary-scott-bessent-speaks-with-cnbcs-joe-kernen-on-squawk-box-today.html [https://perma.cc/45GG-C8SM] (emphasis added).

2026) (Proposal). Seven days after the comment period on the Proposal closed, USTR published its notice of final determination. 91 Fed. Reg. 47,318. The Tariff Action took effect seven hours later.

That process starkly departs from prior Section 301 investigations. Typically, a Section 301 investigation examines one economy, takes much longer, and results in a more detailed report. For example, USTR's investigation of China's technology transfer and intellectual property policies took eight months and culminated in a 215-page report. USTR, *Finding of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (2018).

Even in the rare instances USTR has investigated multiple economies at once, it has produced substantial country-specific reports. *See, e.g.*, MJAR 46-47 (discussing USTR investigation of 10 countries and the European Union regarding digital services taxes). For example, in the digital services tax investigation—the only multiple-economy Section 301 investigation completed by USTR since 1977[8]—the report on Turkey alone was 71 pages and took approximately six months to complete. USTR, *Section 301 Investigation: Report on Turkey's Digital Services Tax* (2021). By contrast, the report here delivers country-by-country "findings" on 60 economies in a scant 32 pages—about a half-page each. Report 21-31, 58-79. And most of that text is the same rote verbiage declaring that "acts, policies and practices" of each country "related to the failure to impose and effectively enforce a forced labor important prohibition" are "unreasonable and burden or restrict U.S. commerce." *E.g.*, *id.* at 59 (covering

[8] Danielle M. Trachtenburg, Cong. Rsch. Serv., IF11346, Section 301 of the Trade Act of 1974 (2026). Defendants argue that USTR previously conducted investigations of the European Union and its predecessor. Opp'n 4, 25. But those entities were a single, common market. USTR's investigation of 60 *different* economies at once is unprecedented.

Algeria, Angola, and Argentina). Consistent with the imperative to impose global tariffs, the Report is devoid of *any* individualized analysis of most investigated countries.

**4. The Outcome and Timing of the Section 301 Proceeding Underscore that Concern About Forced-Labor Imports Was a Pretext.**

Viewing the Tariff Action as a reasoned decision to address forced-labor imports requires ignoring the obvious: The Administration implemented a global tariff regime substantially similar to those attempted previously, on the very day it needed those tariffs to "ensure continuity," without attempting to explain how those tariffs were calibrated to eliminate forced-labor imports in any investigated economy.

The Section 301 tariffs of 10% and 12.5% largely track the former IEEPA and Section 122 tariffs, which both imposed a baseline 10% tariff on most goods.[9] But USTR makes no effort to link those tariff rates to the burden each country purportedly imposes on U.S. commerce, or justify why the rates are "appropriate" "to obtain the elimination of" forced-labor imports in each country, as Section 301 requires. *See* MJAR 29-31. This results in *non sequiturs* USTR does not attempt to justify. For example, USTR imposed tariffs on countries that already have reciprocal agreements with the U.S. regarding forced-labor import prohibitions. 91 Fed. Reg.at 34,274-75. USTR discounts these agreements as only commitments for future action but does not explain why a tariff is appropriate where the U.S. itself negotiated each commitment and its operative date. *Id.* at 34,275.

[9] The IEEPA tariffs also imposed country-specific higher rates, which the Administration may be attempting to recreate. On March 11, 2026, USTR initiated another Section 301 investigation contemplating tariffs related to "structural excess capacity and production in certain manufacturing sectors" into 16 economies, most of which were subject to high IEEPA rates. *Initiation of Section 301 Investigations: Acts, Policies, and Practices of Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors*, 91 Fed. Reg. 12,886, 12,887 (Mar. 17, 2026). USTR has not yet issued findings from that investigation.

USTR also does not tie the tariffs to success in preventing forced-labor imports. USTR identifies no process to release an economy from the tariffs, nor benchmarks to measure the effectiveness of new restrictions or improved enforcement. There is no adjustment process and no plan to revisit these tariffs—all indicia that there is no mechanism for a country to satisfy the Administration's demands.

The convenient similarity of the Section 301 tariffs to the invalidated tariffs, and their lack of connection to forced-labor imports, is also visible in the goods that are exempted: Annexes I and II of the Tariff Action exempt the same goods as the Section 122 tariffs. The Department of Labor identified numerous goods produced with forced labor, among them coffee and various mined elements. Bureau of Int'l Lab. Aff., Dep't of Lab., *2024 List of Goods Produced by Child Labor or Forced Labor* 15 (2024). But those are inexplicably exempted from the Section 301 tariffs. *Compare with* Annexes I, II. Further, the Report's only case study from a tariffed country focuses on frozen beef from Brazil, Report 45-47, but Annex I exempts frozen beef from Brazil. 91 Fed. Reg. at 47,396-98. Yet again, only one explanation makes sense: the forced-labor rationale is a pretext to reinstitute the Administration's failed global tariff regime.

Finally, the timing of the tariffs offers unmistakable evidence of pretext. There is no rationale grounded in concern about forced-labor imports to explain why or how USTR investigated 60 economies in precisely the timeframe necessary to impose Section 301 tariffs, at identical or slightly higher rates, the moment the Section 122 tariffs expired. The Court is "not required to exhibit a naiveté from which ordinary citizens are free," and it should not do so here. *See Dep't of Com.*, 588 U.S. at 785.

*****

The Administration's actions and public comments, together with the scope, speed, outcome, and timing of the Section 301 investigation, "tell[] a story that does not match the [agency's] explanation for [its] decision." *See id.* at 784. From the start, the Administration sought to impose worldwide tariffs of at least 10%. The Administration took steps to do so via IEEPA and Section 122, pivoting to Section 301 only when those efforts failed. It then advanced a superficial investigation at breakneck speed and, in the end, imposed tariffs closely tracking the prior regimes at the exact moment the Section 122 tariffs expired. "If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* at 785. The Court should find that the agency's action is pretextual and therefore violates the APA.

**B. The Court Should Consider The Administration's Public Statements and Actions.**

The Administration's statements and actions, *see supra* Section III.A.2, are properly before the Court. Defendants suggest that the Court must blind itself to publicly known facts that preceded USTR's decision because it omitted them from its Administrative Record Index. Opp'n 51-52. Not so.

First, the Court may take judicial notice of these public statements, as their accuracy is not subject to reasonable dispute. This applies in APA cases just as in other litigation. *See, e.g.*, *Chae v. Yellen*, 579 F.Supp.3d 1343, 1357 (Ct. Int'l Trade 2022)*, aff'd,* No. 2022-2017, 2023 WL 3072385 (Fed. Cir. Apr. 25, 2023); *R.I. State Council of Churches v. Rollins*, 808 F.Supp.3d 370, 385 (D.R.I. 2025) (considering President Trump's social media posts in reviewing whether agency action was pretextual). Consideration of the statements is justified, because "the omission of extra-record evidence precludes effective judicial review." *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1380-81 (Fed. Cir. 2009); *see also Dep't of Com*, 588 U.S. at 782 (reviewing "the

District Court's ruling on pretext in light of all the evidence in the record before the court, including the extra-record discovery.").

Second, the Court has authority to complete the administrative record, if necessary. The APA requires "plenary review" of an agency's decision "based on the full administrative record that was before the [decisionmaker] at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706 (in evaluating agency action, "the court shall review the whole record"); *Amfac Resorts, LLC v. Dep't of the Interior*, 143 F.Supp.2d 7, 12 (D.D.C. 2001) ("a complete administrative record should include all materials that might have influenced the agency's decision" (internal quotation marks omitted)). The public statements cited above meet this standard. Ambassador Greer was the decisionmaker on the Tariff Action. 91 Fed. Reg. at 47,319-28. His statements are relevant to the ultimate decision and were certainly before him at the time he made the decision. He and USTR were aware of the President's statements (some made while the President stood beside him), as USTR's reliance on "the specific direction of the President" shows. Ambassador Greer's statements also demonstrate awareness of Secretary Bessent's remarks. Further, whether USTR *relied* on the public statements is immaterial; the "record must include all documents and materials that the agency directly or indirectly considered." *Maritel, Inc. v. Collins*, 422 F.Supp.2d 188, 196 (D.D.C. 2006) (internal quotation marks omitted). If the Court wishes to formally supplement the administrative record beyond the Administrative Record Index, these statements readily meet the governing standards. *See Lands Council v. Powell*, 395 F.2d 1019, 1030 (9th Cir. 2005) (setting out standard to allow extra-record evidence); *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) ("the record may be supplemented with … relevant information that by its very nature would not be found in an agency record-such as evidence of bad faith").

Third, finding pretext is also supported by the Administration's actions themselves. The President signed two prior proclamations implementing effectively the same worldwide tariffs policy, citing wholly different rationales than those asserted here. Courts "cannot ignore [a] disconnect between the decision made and the explanation given." *Dep't of Com.*, 588 U.S. at 785.

**C. The Pretextual Use of Section 301 Underscores Why the Tariff Action Is Arbitrary, Capricious, and Contrary to Law.**

While pretext is an independent basis to invalidate the Tariff Action, the Administration's contrived justification also illustrates that USTR did not otherwise comply with the APA. Because USTR's paramount objective was to quickly reimplement the President's preferred tariffs, the agency took shortcuts that do not satisfy Section 301's "demanding procedural prerequisites." *Learning Res.*, 607 U.S. at 244. And because that objective overrode crafting effective solutions to the Administration's new concern with forced-labor imports, the Tariff Action lacks a "rational connection to the facts found." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Accordingly, the Court should take pretext into account in determining that the Tariff Action is arbitrary and capricious and exceeds USTR's authority.

Pretext pervades USTR's Section 301 findings; we note only some examples here. First, USTR shoehorned generalized findings to justify tariffs against 60 economies—accounting for virtually all U.S. imports—into a single, 92-page Report. PR-6. USTR paid lip service to Section 301's requirement that the agency make country-specific findings. 19 U.S.C. § 2411(b)(1) (referring to determinations regarding "an act, policy, or practice of *a* foreign country") (emphasis added); *see also* MJAR 20-32. Although the Report and Tariff Action include rote findings for each economy, *see supra* Section III.A.3, individualized assessments—of the unreasonableness of each economy's practices, how those practices burden U.S. commerce, what

action is appropriate to eliminate those practices—are absent. These omissions are even more untenable given Section 301's mandate that USTR publish its determinations *and* "a description of the facts on which such determination[s] [are] based." 19 U.S.C. § 2414(c). The absence of country-specific findings renders the Tariff Action arbitrary and capricious, since USTR could not draw a "rational connection" between the tariffs and the burden presented by each economy's forced-labor import practices. *Motor Vehicles Mfrs.*, 463 U.S. at 43.

Second, USTR repeatedly deferred to "the President's judgment" and "specific direction" in deciding to adopt tariffs of 10% and 12.5%. 91 Fed. Reg. at 47,320, 47,335. The agency also dismissed comments proposing changes to the tariff rates and exemptions—or alternatives to the tariffs altogether—as "inconsistent with the specific direction of the President." *Id.* at 47,329-30, 47,334-35. Given Administration statements about the purpose of the Section 301 investigation, USTR's acceptance of the President's "direction" is simply a shorthand acknowledgment that the forced-labor investigation was pretext to reimplement the global tariff regime. Section 301 assigns to USTR, not the President, determination of what actions are "appropriate" and "feasible" to eliminate the targeted practices. 19 U.S.C. § 2411(b)(2). Although USTR's determination is "subject to" the President's direction, *HMTX Industries, LLC v. United States*, 156 F.4th 1236, 1252 (Fed. Cir. 2025), Congress mandated a substantive role for the agency. Here, that role required USTR to determine that the 10% and 12.5% tariffs are calibrated to eliminate deficiencies in legal safeguards against forced-labor imports in each country, which USTR did not do. *See id.* ("An appropriate discretionary action is one that can end or reverse the investigated conduct."). USTR's abdication of its role in favor of the President's wishes is both contrary to Section 301 and arbitrary and capricious.

Third, USTR treated Section 301's requirement to engage in "consultations" with each "foreign country concerned," 19 U.S.C. §§ 2413(a)(1), 2414(a)(1), merely as a box-checking exercise to support the predetermined outcome. "Consultation is … not satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Doe v. Noem*, 832 F. Supp. 3d 353, 373-76 & n.13 (S.D.N.Y. 2026) (collecting cases). "The question of whether there was a proper consultation … is a serious and substantial one, as it implicates both the President's and USTR's authority under … the Trade Act." *Retractable Techs., Inc. v. United States*, 739 F.Supp.3d 1330, 1339 (Ct. Int'l Trade 2024) (discussing analogous requirement to consult domestic producers under Section 307(a)(2)).

The Proposal described USTR's consultations, initiated the same day it opened the investigation, as "confidential." 91 Fed. Reg. at 34,273. Whatever the consultations' contents, they could hardly have been a substantive effort to consider targeted economies' views—following as they did on repeated Administration statements that it would use Section 301 to reimpose substantially the same, twice-thwarted tariffs. And USTR did not consult at all with 14 of the 60 economies, which either "did not accept" a "request" for consultations or "were otherwise unable to participate." *Id*. USTR failed to explain what efforts it made, if any, to consult with those 14 countries beyond the initial, undescribed outreach. What is clear is that USTR cut short, after less than three months, all attempts to consult with targeted economies—even though Congress contemplated up to a full year for Section 301 determinations. 19 U.S.C. § 2414(a)(2)(B).

That approach to consultation is consistent with the Administration's goal of ensuring continuity of global tariffs, but not with an effort to genuinely evaluate whether each country's practices are unreasonable, how those practices burden U.S. commerce, and what action is

appropriate to eliminate those practices. For example, USTR narrowly focused on each economy's use and enforcement of a single mechanism—an "express prohibition on the importation of goods produced with forced labor." Report 25. Even though "[o]ther economies represented that certain of their laws, when taken together, amount to a forced labor import prohibition," *id.*, USTR does not appear to have consulted with those economies to determine whether their legal frameworks were sufficient or they had developed other ways to curtail forced-labor imports. USTR's implementation of the tariffs without meaningful consultation exceeded its authority under Section 301, and its failure to consider "important part[s] of the problem" was arbitrary and capricious. *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

Because concern with forced labor was but a convenient means to an end, USTR conducted a materially defective Section 301 investigation. The Court should find that the Tariff Action is arbitrary and capricious and exceeds USTR's statutory authority.

## IV. CONCLUSION

The Plaintiffs' motion for judgment on the agency record should be granted, and the Tariff Action should be vacated and set aside.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

BENJAMIN GUTMAN
Deputy Attorney General
DUSTIN BUEHLER
Special Counsel

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Leanne Hartmann
Samuel Kubernick*
Brian Collins*
Brian Bowcut*
*Senior Assistant Attorneys General*
YoungWoo Joh
*Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov
Brian.Collins@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Brian.Bowcut@doj.oregon.gov

*Counsel for the State of Oregon*
**ROB BONTA**
Attorney General
State of California

By: */s/ Shiwon Choe*
Lara Haddad*
*Supervising Deputy Attorney General*
Shiwon Choe
Zelda Vassar
Carolyn Downs*
Samuel Sokolsky*
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Tel: (415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley*
Jaylia Yan *
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, Arizona 85004
Tel: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway #10
Denver, CO 80203
Tel: (720) 508-6000
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
Tel: (860) 808-5020
Michael.Skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
IAN R. LISTON*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Tel: (302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
Tel: (808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General State of Illinois

By: *<u>/s/ Gretchen Helfrich</u>*
Cara Hendrickson
*Executive Deputy Attorney General*
Gretchen Helfrich
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel: (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In his official capacity as Governor of the Commonwealth of Kentucky

By: *<u>/s/ S. Travis Mayo</u>*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street Frankfort, KY 40601
Tel: (502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for Governor Andy Beshear*

**AARON M. FREY**
Maine Attorney General

By: *<u>/s/ Katherine W. Thompson</u>*
Katherine W. Thompson
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: (207) 626-8455
Fax: (207) 287-3145
Kate.thompson@maine.gov

*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: *<u>/s/ James C. Luh</u>*
James C. Luh
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel: (410) 576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks*
*Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
Tel: (617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
Tel: (517) 241-1050
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (0393071)
*Deputy Solicitor General*
LINDSEY E. MIDDLECAMP (0392589)
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ David N. Birch*
David N. Birch*
*Deputy Attorney General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
Tel: (609) 696-5363
david.birch@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Allison Johnson*
ALLISON JOHNSON
*Assistant Attorney General*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Tel: (505) 490-4060
ajohnson@nmdoj.gov

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
Tel: (212) 416-8883
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
Tel: (919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**JOSH SHAPIRO**,
in his official capacity as Governor of the Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
*Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street, Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale
*Special Assistant Attorney General*
Office of the Attorney General - State of Rhode Island
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: <u>*/s/ S. Todd Sipe*</u>
TODD SIPE, WSBA 23203
*Assistant Attorney General*
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel: (206) 464-7744
todd.sipe@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin

By: <u>*/s/ Brian Keenan*</u>
Brian Keenan*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
Tel: (608) 266-0020
brian.keenan@wisdoj.gov

*Counsel for the State of Wisconsin*

* *Admission application pending or forthcoming*

Dated: September 11, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Procedural and Scheduling Order No. 26-01, I certify that this Proposed Brief of Plaintiff States as Amici Curiae in Support of Motion for Judgment on the Agency Record Filed by Plaintiffs Learning Resources et al., including headings, footnotes, and quotations (but excluding the table of contents, table of authorities, counsel's signature blocks, and this certificate) complies with the word limitation requirement. The word count for this submission, as computed by the word processing system used to prepare the brief, is 4,995 words.

Respectfully submitted,

*/s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
Senior Assistant Attorney General

*Counsel for the State of Oregon*