**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES<br><br>Before: Jennifer Choe-Groves, Judge<br>Timothy M. Reif, Judge<br>Lisa W. Wang, Judge | Case No. 26-cv-03555-3JP |

**BRIEF OF ECONOMISTS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**

/s/ *Adam G. Unikowsky*
Adam G. Unikowsky
Aaron R. Cooper (*Admission pending*)
Jenner & Block LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: +1 202 639 6000
Facsimile: +1 202 639 6066
AUnikowsky@jenner.com

*Counsel for Amici Curiae*

Dated: September 11, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTERESTS OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 1

I. The Tariffs Are Disproportionate ........ 2

A. The Impact of Forced Labor on Trade Flows Is Small ........ 3

B. Proportional Tariffs Would Be Much Lower Than Those Imposed ........ 7

II. The Tariffs Are of Vast Economic Significance ........ 8

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758 (2021) ..................... 2, 8

**Statutes**

19 U.S.C. § 2411(a)(3)............................................................................................... 2

**Other Authorities**

Aaron Flaaen & Justin R. Pierce, *Disentangling the Effects of the 2018–2019 Tariffs on a Globally Connected U.S. Manufacturing Sector*, REV. ECON. & STAT. 1–15 (2026)........................................................................................................ 9

Andrei Markevich & Ekaterina Zhuravskaya, *The Economic Effects of the Abolition of Serfdom: Evidence from the Russian Empire*, 108 AM. ECON. REV. 1074 (2018) ..................... 6

Caroline Freund et al., *Is US Trade Policy Reshaping Global Supply Chains?*, 152 J. INT'L ECON 104011 (2024) ........................................................................................ 6

Daron Acemoglu & Alexander Wolitzky, *The Economics of Labor Coercion*, 79 ECONOMETRICA 555 (2011) ....................................................................................... 6

Emily J. Blanchard et al., *Global Value Chains and Trade Policy*, 93 REV. ECON. STUD. 181 (2026) ............................................................................................... 9

International Labour Organization, *Global Estimates of Modern Slavery: Forced Labour and Forced Marriage* (2022), https://www.ilo.org/sites/default/files/2025-09/ILO_GEMS-2022_Report_EN_Web.pdf ................................................................... 4

Kimberly Clausing & Maurice Obstfeld, *Who Pays for Tariffs? Insights From Recent Research*, Peterson Institute for International Economics (Aug. 3, 2026), https://www.piie.com/blogs/realtime-economics/2026/who-pays-tariffs-insights-recent-research ............................................................................................ 8, 9

Kyle Handley et al., *Rising Import Tariffs, Falling Exports: When Modern Supply Chains Meet Old-Style Protectionism*, 17 AM. ECON. J. APPLIED ECON. 208 (2025)................. 9

Notice, 85 Fed. Reg. 34,709 (June 5, 2020) ........................................................................ 3

Notice, 85 Fed. Reg. 43,292 (July 16, 2020)........................................................................ 2

Notice, 86 Fed. Reg. 30,350 (June 7, 2021) ........................................................................ 2

Notice, 86 Fed. Reg. 30,353 (June 7, 2021) ........................................................................ 3

Notice, 86 Fed. Reg. 30,356 (June 7, 2021) ........................................................................ 2

Notice, 86 Fed. Reg. 30,358 (June 7, 2021) .......... 2

Notice, 86 Fed. Reg. 30,361 (June 7, 2021) .......... 2

Notice, 86 Fed. Reg. 30,364 (June 7, 2021) .......... 3

Notice, 91 Fed. Reg. 12,884 (Mar. 17, 2026) .......... 1, 4

Notice, 91 Fed. Reg. 34,272 (June 5, 2026) .......... 1

Notice, 91 Fed. Reg. 47,318 (July 28, 2026) .......... 1

Office of the U.S. Trade Representative, Report in Section 301 Investigations: Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (2026) .......... 4

Pablo D. Fajgelbaum & Amit K. Khandelwal, *Measuring the Unequal Gains from Trade*, 131 Q. J. ECON. 1113 (2016) .......... 9

Pablo D. Fajgelbaum et. al, *The Return to Protectionism*, 135 Q. J. ECON. 1 (2020) .......... 8

Suresh Naidu & Noam Yuchtman, *Coercive Contract Enforcement: Law and the Labor Market in Nineteenth Century Industrial Britain*, 103 AM. ECON. REV. 107 (2013) .......... 6

Tax Foundation, *Tracking the Impact of the Trump Tariffs & Trade War*, https://taxfoundation.org/research/federal-tax/trump-tariffs-trade-war/ (last visited Sept. 10, 2026) .......... 8

United Nations, UN Comtrade Database, https://comtradeplus.un.org/ (last visited Sept. 10, 2026) .......... 5, 6, 7

Walk Free, *The Global Slavery Index 2023* (2023) https://cdn.walkfree.org/content/uploads/2023/05/17114737/Global-Slavery-Index-2023.pdf .......... 4

William R. Cline, *The New Section 301 Tariffs for Forced Labor are Vastly Excessive*, Economics International Inc. (2026), https://econintl.com/wp-content/uploads/2026/09/EIIRN26-1rv9.pdf .......... 3, 4

Yale University, The Budget Lab, *The State of U.S. Tariffs*, https://budgetlab.yale.edu/research/state-us-tariffs (last updated Aug. 24, 2026) .......... 8

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are professional economists at leading universities and public policy research organizations who have dedicated their professional lives to understanding international economics and tax policy.[2] Many have put their expertise to use in public service for the federal government. *Amici* have an interest in ensuring that the fundamentals of international economics are correctly represented in this litigation.

All parties consent to the filing of this brief.

## SUMMARY OF ARGUMENT

On March 12, 2026, the United States Trade Representative ("USTR") initiated investigations under Section 301 of the Trade Act of 1974 into the acts, policies, and practices of 60 economies relating to their failure to impose, or to enforce effectively, a prohibition on the importation of goods produced with forced labor. Notice, 91 Fed. Reg. 12,884 (Mar. 17, 2026). USTR determined those practices to be actionable and proposed tariffs in June. Notice, 91 Fed. Reg. 34,272 (June 5, 2026). On July 23, 2026, the President directed the tariffs to be imposed, and USTR imposed additional ad valorem duties on all goods of each covered economy. The rate is 12.5 percent for most covered economies and 10 percent for seventeen that have adopted a forced-labor import prohibition, committed to adopting one, or put a partial regime in place. The European Union and Taiwan are capped at 10 percent inclusive of most-favored-nation duties, and Japan, Korea, and Switzerland at 12.5 percent. The duties apply to goods entered for consumption on or after 12:01 a.m. eastern time on July 24, 2026, subject to product exclusions and to tariff-rate quotas for certain textile and apparel imports. Notice, 91 Fed. Reg. 47,318 (July 28, 2026).

---

[1] *Amici curiae* state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amici* and their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] A complete list of *amici* is included in Appendix A, attached hereto.

*Amici* do not directly address the parties' legal arguments in this brief. Instead, they submit this brief to assist the Court in understanding the economic context in which those arguments arise. Specifically, this brief addresses two issues. First, *amici* explain how, applying standard economic analysis, the tariffs are disproportionate as a mathematical matter: the economic impact of forced labor on the pattern of U.S. employment, production, and trade is small under any reasonable evaluation, but the tariffs are not.[3] Second, *amici* explain that the tariffs themselves are large enough to raise a major question under the Supreme Court's decision in *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021), because of the revenue these taxes raise, their effects on consumers, and their impact on firms and U.S. competitiveness. In sum, forced labor's effect on U.S. commerce is small; the tariffs meant to address it are not.

## I. The Tariffs Are Disproportionate

*Amici* have applied standard economic analysis to understand the relative size of the effect of forced labor on U.S. commerce compared to the effect of the tariffs. Based on that analysis, *amici* have found that the effect of forced labor on U.S. commerce is small at every step: forced labor is concentrated outside tradable sectors (*i.e.*, sectors for which trade flows would be impacted by tariffs), is a small share of tradable employment even in the developing world, and its removal would barely move trade flows or require U.S. production to replace much of it. Proportional tariffs would therefore be far smaller than those imposed.[4]

---

[3] *Amici*'s analysis solely concerns the economic burden that forced labor places on U.S. commerce, not its immorality or the harm inflicted on the individuals who are subject to forced labor.

[4] *Amici* note that proportionality is a relevant consideration for mandatory actions under Section 301, which "shall be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." 19 U.S.C. § 2411(a)(3). Proportionality has historically been USTR's approach to discretionary actions as well, under 19 U.S.C. § 2411(b), including when it pursued multi-country actions, such as against eleven jurisdictions across two investigations in response to their (proposed) digital services taxes in 2019-2020. *See, e.g.*, Notice, 85 Fed. Reg. 43,292, 43,293 (July 16, 2020) (imposing tariffs on $1.3 billion of French imports after calculating the magnitude of France's actions and determining that the proposed tariffs would "result in the collection of tariffs on goods of France at comparable, though somewhat lower amounts"); Notice,

### A. The Impact of Forced Labor on Trade Flows Is Small

First, *amici* have assessed the impact of forced labor on trade flows in order to estimate the maximum impact on U.S. commerce. To do so, *amici* followed an approach demonstrated by Dr. William R. Cline. *See* William R. Cline, *The New Section 301 Tariffs for Forced Labor are Vastly Excessive*, Economics International Inc. (2026), https://econintl.com/wp-content/uploads/2026/09/EIIRN26-1rv9.pdf. Specifically, *amici* estimate this impact by assessing what would happen if forced labor were suddenly eliminated from foreign countries where it exists. If that were to occur, some of the goods made abroad with forced labor would no longer be made. As a result, economic principles dictate that the countries in which those goods are produced would export less, both to the U.S. and to U.S. trading partners. Conversely, both the U.S. and U.S. trading partners would import less from those countries, and American producers would replace some of those lost imports. That resulting increase in domestic U.S. production is how economists measure the burden of forced labor on U.S. commerce today: the difference between U.S. production with and without that forced labor.

In practice, these calculations proceed as follows. First, *amici* estimate the tradable-sector employment attributable to forced labor; second, *amici* assume that the same share of output and exports would disappear if forced labor were eliminated; and third, *amici* calculate the resulting change in trade flows.

With respect to the tradable-sector employment attributable to forced labor, the International Labour Organization, Walk Free, and the International Organization for Migration

86 Fed. Reg. 30,361, 30,362 (June 7, 2021) ($65 million in Austrian goods); Notice, 86 Fed. Reg. 30,356, 30,357 (June 7, 2021) ($119 million in Indian goods); Notice, 86 Fed. Reg. 30,350, 30,350 (June 7, 2021) ($386 million in Italian goods); Notice, 86 Fed. Reg. 30,358, 30,359 (June 7, 2021) ($155 million in Spanish goods); Notice, 86 Fed. Reg. 30,353, 30,354 (June 7, 2021) ($310 million in Turkish goods); Notice, 86 Fed. Reg. 30,364, 30,365 (June 7, 2021) ($887 million in goods from the United Kingdom); *see also* Notice, 85 Fed. Reg. 34,709 (June 5, 2020).

estimate that of the 27.6 million people in forced labor in 2021, up to 9.4 million worked in tradable sectors such as agriculture and manufacturing or in state-imposed forced labor (International Labour Organization, *Global Estimates of Modern Slavery: Forced Labour and Forced Marriage* (2022), https://www.ilo.org/sites/default/files/2025-09/ILO_GEMS-2022_Report_EN_Web.pdf ("ILO/Walk Free/IOM Study")).[5] Tradable sectors are sectors of the economy that produce goods that can be shipped and sold across borders, as opposed to activity such as construction, utilities, haircuts, and other services that are consumed where they are produced. According to these data, the rest of the forced labor population worked in sectors outside tradable production.

*Amici* note that those 9.4 million workers in forced labor in tradable sectors constitute a small share of total tradable employment (including unforced labor) worldwide. To make this assessment, *amici* focus on the amount of forced labor in tradable sectors in countries outside the Organization for Economic Co-operation and Development (OECD), an international group of 38 high-income countries. *Amici* take this approach because because, according to Walk Free, forced labor is concentrated in non-OECD countries[6] and it is particularly uncommon in OECD countries other than Mexico, Turkey, and the United States. Based on ILOSTAT[7] data from 2021, there are 1.27 billion workers employed in tradeable sectors in non-OECD countries.[8] The 9.4 million

[5] These are the standard estimates that are also relied upon by the government. USTR's report cites the same ILO/Walk Free/IOM Study for the 27.6 million figure, for the division between state-imposed forced labor and forced labor in the private economy, and for the sectors in which forced labor occurs. *See* Office of the U.S. Trade Representative, Report in Section 301 Investigations: Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor 11 & nn.40–42, 16 & n.61 (2026). The notice initiating the investigations also relies on these same estimates. *See* Notice, 91 Fed. Reg. at 12,885.

[6] Walk Free is one of the three organizations that jointly publish the forced-labor numbers *amici* and the government rely on. Walk Free, *The Global Slavery Index 2023* (2023) https://cdn.walkfree.org/content/uploads/2023/05/17114737/Global-Slavery-Index-2023.pdf (providing country-specific detail).

[7] ILOSTAT is the statistical database of the International Labour Organization, one of the three organizations that jointly publish the forced-labor numbers *amici* and the government rely on.

[8] *Amici* calculate this figure by adding ILOSTAT 2021 data for sections A (agriculture, forestry, fishing), B (mining), and C (manufacturing). This is a more conservative approach than Dr. Cline's analysis, which

workers in forced labor in tradable sectors constitute 0.74 percent of those 1.27 billion total workers.

To understand the maximum potential impact of forced labor on trade flows, *amici* then make three hypothetical assumptions involving the total elimination of forced labor: (1) that these 9.4 million workers in forced labor stop working entirely (e.g., because of a ban); (2) that the associated plants and equipment, which economists refer to as capital stock, are destroyed; and (3) that the tradable output and exports from these non-OECD countries fall proportionally to the reduction in tradable-sector employment. If each of these events were to occur, then *amici* find that OECD country imports (other than the United States) from non-OECD countries would fall by about $28 billion, and the United States' own imports from non-OECD countries would fall by a smaller $9.4 billion.[9] Based on standard economic theory and historical experience, not all of the $28 billion shortfall in imports by other OECD countries will be replaced entirely with goods produced in the U.S. It is more realistic that all countries would contribute to replacing the overall

relies on a figure of 1.54 billion workers in overall employment for non-OECD countries. Cline, *supra* p. 3, at 3. The difference from *amici*'s calculation here is that Dr. Cline also includes the non-tradable construction and utilities sectors in his overall number. *Amici* take a more conservative approach by removing construction and utilities from that total, which modestly *increases* the estimated burden of forced labor on U.S. commerce relative to Dr. Cline's calculations. *Amici* also include all state-imposed forced labor in the numerator even though much of it lies outside tradable production, which is conservative in the same sense. The 9.4 million figure is worldwide, so measuring it against non-OECD tradable employment alone overstates the share attributable to forced labor in those countries, another conservative assumption.

[9] In 2024, total goods imports by OECD members other than the United States amounted to $11.0 trillion. *See* United Nations, UN Comtrade Database, https://comtradeplus.un.org/ (last visited Sept. 10, 2026) (Trade aggregates from UN Commodity Trade Statistics Database (Comtrade)). Of this total, $1.32 trillion (12 percent) was imported from the United States and $3.82 trillion from non-OECD countries, with the remainder trade among those OECD countries themselves. *Id.* The $28 billion figure is 0.74 percent of that $3.82 trillion. The United States itself imported $2.08 trillion from other OECD countries in 2024 and $1.28 trillion from non-OECD countries. *Id.* The $9.4 billion figure is 0.74 percent of the latter.

shortfall in proportion to their existing trade.[10] In that more realistic scenario, the effect on the United States would be smaller still, as exports would increase by only $3.4 billion.[11]

*Amici* note that these estimates rely on an extreme set of assumptions. Based on established economic theory and the historical record[12], even if non-OECD countries were to eradicate all forced labor, *amici* would expect at least some of the workers involved to shift to work in regular, non-forced labor; that the capital stock would adjust more slowly and be used for non-forced labor purposes; that some production formerly reliant on forced labor would continue; and that imports from other non-OECD sources would increase. As such, the outer bound described above does not represent a reasonable expected measurement of forced labor's impact on trade flows, which should be less than such estimates. *Amici* use it only to show that even under extreme assumptions, the burden of forced labor on U.S. commerce is small.

---

[10] Recent experience under Section 301 supports this assumption. Caroline Freund et al., *Is US Trade Policy Reshaping Global Supply Chains?*, 152 J. INT'L ECON 104011 (2024), find that when China's share of U.S. imports fell from 22 percent to 16 percent as a result of the Section 301 tariffs, the displaced trade was taken up by other foreign country suppliers. These foreign country suppliers were, like China, overwhelmingly large developing economies that are comparatively low-cost producers of the affected products. Displaced imports were thus replaced abroad rather than by domestic production. Because that reallocation was weighted toward suppliers with revealed comparative advantage in the affected goods, a description that does not fit the United States for the labor-intensive products in which forced labor is concentrated, the proportional-share calculation, if anything, still overstates the increase in U.S. exports.

[11] The United States supplied 12.0 percent of other OECD members' goods imports in 2024 ($1.32 trillion of $11.00 trillion). *See* United Nations, UN Comtrade Database, https://comtradeplus.un.org/ (last visited Sept. 10, 2026). Applying that share to the $28.3 billion shortfall in those countries' imports from non-OECD sources yields an increase in U.S. exports of $3.4 billion.

[12] In economics, coercion is understood principally as a means of extracting rents from workers rather than as a technology for producing output: employers use it to hold the wage below what workers would otherwise accept, so its removal shifts the division of the surplus rather than eliminating the underlying productive activity. *See* Daron Acemoglu & Alexander Wolitzky, *The Economics of Labor Coercion*, 79 ECONOMETRICA 555 (2011). The historical record is consistent. When Britain abolished criminal sanctions for breach of labor contract in 1875, wages rose differentially in the counties that had relied most heavily on such enforcement, while the affected industries continued to operate. *See* Suresh Naidu & Noam Yuchtman, *Coercive Contract Enforcement: Law and the Labor Market in Nineteenth Century Industrial Britain*, 103 AM. ECON. REV. 107 (2013). Following the abolition of serfdom in the Russian Empire, agricultural productivity and industrial output rose. *See* Andrei Markevich & Ekaterina Zhuravskaya, *The Economic Effects of the Abolition of Serfdom: Evidence from the Russian Empire*, 108 AM. ECON. REV. 1074 (2018).

### B. Proportional Tariffs Would Be Much Lower Than Those Imposed

The second question is to determine the level of proportional tariffs – that is, the level of tariffs on those countries that rely on forced labor to produce goods, and those that import such goods, that would reduce U.S. imports in an amount equivalent to the burden on U.S. commerce from forced labor. *Amici* have calculated these tariffs as follows.

An increase in U.S. exports of $3.4 billion to OECD countries would amount to 0.16 percent of U.S. imports from those countries.[13] *Amici* calculated what would constitute an equivalent action against U.S. trade with those same economies. (Imports from non-OECD countries are addressed separately below.) To do this, *amici* have assumed a relatively low import demand sensitivity: that imports fall by only one percent for each one percentage point increase in the average tariff rate. On that assumption, the tariff required to reduce U.S. imports from OECD countries by $3.4 billion is simply equal to the percentage reduction sought, or 0.16 percent. However, the Section 301 tariffs imposed on OECD countries in this case are between 61 and 77 times higher, depending on the country.

The non-OECD countries require a slightly different calculation, because they rely on forced labor directly in domestic production, not indirectly through their imports, as is generally the case for the OECD countries. For that reason, the burden they impose on U.S. commerce comes from direct exports to the United States. Under similarly extreme assumptions to those used above for exports to other OECD countries, *amici* calculate that U.S. imports from non-OECD countries would fall by 0.74 percent. Assuming that all of these imports would be replaced by U.S. domestic production—another extreme assumption—an equivalent action is a tariff of 0.74 percent on that

---

[13] According to 2024 UN Comtrade data, the $3.4 billion figure equals 0.16 percent of the $2.08 trillion in goods the United States imported from other OECD countries. United Nations, UN Comtrade Database, https://comtradeplus.un.org/ (last visited Sept. 10, 2026).

trade. However, the imposed tariffs on such non-OECD countries are between 13 and 17 times higher, depending on the country, illustrating a similar lack of proportionality.

In each of these calculations *amici* have assumed a relatively low sensitivity of imports to tariffs; a greater sensitivity, as the empirical literature suggests, would imply a still smaller proportional tariff in every case. *See, e.g.*, Pablo D. Fajgelbaum et. al, *The Return to Protectionism*, 135 Q. J. ECON. 1 (2020).

## II. The Tariffs Are of Vast Economic Significance

According to recent estimates, these Section 301 forced-labor tariffs are expected to raise between $580 and 640 billion from 2026 to 2035, net of offsets.[14] The Supreme Court has deemed a policy with an economic impact of about $50 billion to be of "vast economic and political significance." *Ala. Ass'n of Realtors*, 594 U.S. at 764 (citation and quotation marks omitted). The revenue impact of the tariffs alone is more than ten times greater, and the tariffs' economic consequences extend far beyond that impact, with distinct effects on households and on firms.

Recent studies indicate that the 2025 tariffs have substantially raised prices for U.S. consumers and businesses. *See* Kimberly Clausing & Maurice Obstfeld, *Who Pays for Tariffs? Insights From Recent Research*, Peterson Institute for International Economics (Aug. 3, 2026), https://www.piie.com/blogs/realtime-economics/2026/who-pays-tariffs-insights-recent-research. For households, tariffs raise prices, exacerbating an already-strained affordability outlook and

[14] Tariffs shrink profits and wages, so the Treasury collects less in income and payroll taxes. These figures already subtract those revenue losses, which are typically referred to as "offsets". The Tax Foundation estimates $611 billion in conventional revenue (net of offsets) from 2026–2035, with $797 billion in direct tariff revenue before offsets. Tax Foundation, *Tracking the Impact of the Trump Tariffs & Trade War*, https://taxfoundation.org/research/federal-tax/trump-tariffs-trade-war/ (last visited Sept. 10, 2026). Yale Budget Lab estimates $638 billion on a conventional basis and $581 billion on a dynamic basis over the same period. Yale University, The Budget Lab, *The State of U.S. Tariffs*, https://budgetlab.yale.edu/research/state-us-tariffs (last updated Aug. 24, 2026). To display the specific estimates relevant here, click the "Previous Vintages" tab; select "July 24th, 2026" in the "Vintage" drop-down on the left panel; and select the "Alternative Scenarios" drop-down. A comparison of the "Current law" and "Ex forced labor 301" scenarios shows the incremental effects of the forced labor 301 actions.

pushing some households incrementally toward longer-term (and hard to reverse) consequences such as lower credit scores, evictions, defaults, and bankruptcy. These effects fall disproportionately on households that own or work for import-reliant businesses and on lower-income households. Lower-income households consume a higher share of their income, and some studies also find that lower-income consumers have a higher share of consumption that is imported. Pablo D. Fajgelbaum & Amit K. Khandelwal, *Measuring the Unequal Gains from Trade*, 131 Q. J. ECON. 1113 (2016).

For firms, tariffs raise the cost of imported inputs. And because global value chains link firms' input costs to their own competitiveness abroad, a tariff aimed at protecting a domestic industry can raise the cost of that industry's exports, making tariffs especially costly in the era of global value chains. Emily J. Blanchard et al., *Global Value Chains and Trade Policy*, 93 REV. ECON. STUD. 181 (2026). Studying the U.S. tariff increases of 2018–2019, Kyle Handley et al., *Rising Import Tariffs, Falling Exports: When Modern Supply Chains Meet Old-Style Protectionism*, 17 AM. ECON. J. APPLIED ECON. 208 (2025), found that U.S. exporters most exposed to the resulting import tariffs on their own inputs saw export growth decline by an amount equivalent to a 2 to 4 percent ad valorem tariff on their exports. In complementary work, Aaron Flaaen & Justin R. Pierce, *Disentangling the Effects of the 2018–2019 Tariffs on a Globally Connected U.S. Manufacturing Sector*, REV. ECON. & STAT. 1–15 (2026) found that even the manufacturing industries directly protected by those same tariffs saw employment fall on net: the benefit of import protection was outweighed by the combined cost of pricier inputs and foreign retaliation. Similar patterns appear to hold for the 2025 tariffs, and both manufacturing and blue-collar job growth have experienced declines in 2025 and 2026. Clausing & Obstfeld, *supra* p. 8. Tariffs also strain firms' financial liquidity: because firms must pay for imported inputs before they can sell the output made from them, even a firm that will fully pass tariff costs on to customers

must first absorb additional expenses. The associated financial burden is even greater in today's high interest rate environment.

## CONCLUSION

In sum, the tariffs are disproportionate to the economic impact of forced labor on the U.S. economy, and they have a major economic importance, for the fiscal position of the United States, for American households, and for the competitiveness of American workers and firms.

Dated: September 11, 2026

Respectfully submitted,

/s/ *Adam G. Unikowsky* ________________

Adam G. Unikowsky
Aaron R. Cooper
Jenner & Block LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: +1 202 639 6000
Facsimile: +1 202 639 6066
AUnikowsky@jenner.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Counsel hereby certifies that the foregoing brief contains 3,617 words, in compliance with this Court's word limitations.

Dated: September 11, 2026

Respectfully submitted,

/s/ *Adam G. Unikowsky*

Adam G. Unikowsky
Aaron R. Cooper
Jenner & Block LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: +1 202 639 6000
Facsimile: +1 202 639 6066
AUnikowsky@jenner.com

*Counsel for Amici Curiae*

## APPENDIX A: SIGNATORIES

Stan Veuger is Senior Fellow at the American Enterprise Institute.

Emily Blanchard is Associate Professor at the Tuck School of Business at Dartmouth College. She served as Chief Economist at the Department of State from 2022 to 2023.

Daniel Bunn is President and CEO of the Tax Foundation. He worked as Senior Policy Advisor to the Senate's Joint Economic Committee and on the policy staff for Senators Mike Lee and Tim Scott from 2013 to 2018.

Kimberly Clausing holds the Eric M. Zolt Chair in Tax Law and Policy at the UCLA School of Law and is nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Deputy Assistant Secretary of the Treasury for Tax Analysis from 2021 to 2022.

Kyle Handley is Professor of Economics, Rafael and Marina Pastor Chancellor's Endowed GPS Faculty Fellow, and Director of the Center for Commerce and Diplomacy at the University of California, San Diego's School of Global Policy and Strategy, and Adjunct Scholar at the Cato Institute.

Simon Johnson is Ronald A. Kurtz (1954) Professor of Entrepreneurship at the MIT Sloan School of Management. He served as Chief Economist of the International Monetary Fund from 2007 to 2008. He received the Nobel Prize in Economics in 2024.

Steven B. Kamin is Senior Fellow at the American Enterprise Institute. He was Director of the Division of International Finance at the Board of Governors of the Federal Reserve System from 2011 to 2020.

Kyle Pomerleau is Senior Fellow at the American Enterprise Institute.

Mark Sobel is U.S. Chairman at the Official Monetary and Financial Institutions Forum. He served as United States Representative at the International Monetary Fund from 2015 to 2018 and as Deputy Assistant Secretary of the Treasury for International Monetary and Financial Policy from 2000 to 2015.

Alan D. Viard is Senior Fellow Emeritus at the American Enterprise Institute. He served as Visiting Scholar at the U.S. Department of the Treasury's Office of Tax Analysis in 2005, and as Senior Economist at the White House's Council of Economic Advisers from 2003 to 2004.

Erica York is Vice President of Federal Tax Policy at the Tax Foundation.