**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-3555-3JP |

**PLAINTIFFS' REPLY**
**IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS HAVE STANDING ........ 2

II. THE GLOBAL SECTION 301 TARIFFS EXCEED STATUTORY AUTHORITY ........ 3

A. Section 301 Requires Fact-Based Country-By-Country Findings ........ 3

B. USTR Failed To Make Section 301's Required Country-By-Country Findings ........ 5

*1. Burden on U.S. Commerce* ........ 5

*2. Unreasonable Practice* ........ 6

*3. Appropriate Action* ........ 7

III. THE GLOBAL SECTION 301 TARIFFS VIOLATE OTHER APA REQUIREMENTS ........ 8

A. The Global Section 301 Tariffs Are Arbitrary And Capricious ........ 8

*1. Burden on U.S. Commerce* ........ 9

*2. Unreasonable Practice* ........ 13

*3. Appropriate Action* ........ 14

B. The Government's Pretextual Inquiry Underscores USTR's Violations ........ 16

IV. VACATUR IS THE ONLY PROPER REMEDY HERE ........ 18

## TABLE OF AUTHORITIES

**<u>CASES</u>:**

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ....................18

*American Sec. Ass'n v. SEC*,
147 F.4th 1264 (11th Cir. 2025) ....................19, 20

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017)....................16

*Arizona Pub. Serv. Co. v. United States*,
742 F.2d 644 (D.C. Cir. 1984) ....................9, 10, 19

*CAADES v. United States*,
32 F.4th 1130 (Fed. Cir. 2022) ....................18

*Checkosky v. SEC*,
23 F.3d 452 (D.C. Cir. 1994) ....................19

*Chrysler Corp. v. DOT*,
472 F.2d 659 (6th Cir. 1972) ....................9

*Connecticut Light & Power Co. v. FERC*,
627 F.2d 467 (D.C. Cir. 1980) ....................3

*Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................20

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) ....................20

*Department of Com. v. New York*,
588 U.S. 752 (2019)....................16, 17, 18, 19

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................19

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018)....................2

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ....................20

*Heitmeyer v. F.C.C.*,
95 F.2d 91 (D.C. Cir. 1937) ....................3

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025) ....................4, 5, 15, 19

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)....................9

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*,
145 F.4th 1308 (Fed. Cir. 2025) ....................11

*Learning Resources, Inc. v. Trump*,
784 F. Supp. 3d 209 (D.D.C. 2025) ....................2
607 U.S. 229 (2026)....................4, 5

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................21

*N.A.A.C.P., Jefferson Cnty. Branch v. U.S. Sugar Corp.*,
84 F.3d 1432 (D.C. Cir. 1996) ....................22

*National Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ....................20

*National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001)....................19

*National TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ....................21

*Natural Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) ....................12

*Nippon Steel Corp. v. United States*,
182 F. Supp. 2d 1330 (CIT 2001) ....................12

*NLRB v. Yeshiva Univ.*,
444 U.S. 672 (1980)....................14

*Nucor Corp. v. United States*,
675 F. Supp. 2d 1340 (CIT 2010) ....................12

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004)....................21, 22

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................7

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)....................14

*Sierra Club v. United States EPA*,
60 F.4th 1008 (6th Cir. 2023) ....................20

*Sierra Club v. United States EPA*,
972 F.3d 290 (3d Cir. 2020)....................20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................20

*Trump v. Orr*,
146 S. Ct. 44 (2025)....................15

*United States v. Lopez*,
514 U.S. 549 (1995)....................13

*University of Colo. Health at Mem'l Hosp. v. Burwell*,
151 F. Supp. 3d 1 (D.D.C. 2015)....................16

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
435 U.S. 519 (1978)....................18

**STATUTES:**

5 U.S.C.
§ 706(2)(A) ....................9, 18, 21
§ 706(2)(E)....................9

19 U.S.C.
§ 2411(b)....................3
§ 2411(b)(1) ....................6
§ 2411(b)(2) ....................7, 15
§ 2411(d)(3)(B)....................6, 12
§ 2411(d)(3)(B)(iii)(III) ....................6, 7
§ 2411(d)(3)(B)(iv) ....................7
§ 2411(d)(3)(C)....................6, 12
§ 2414(a)(1)(B) ....................7
§ 2414(b)(1)(A)....................9
§ 2414(c) ....................7, 20

22 U.S.C.
§ 211a....................15

28 U.S.C.
§ 1491(b)(4) ....................21

**OTHER AUTHORITIES:**

FED. R. EVID. 201(b) ....................16

H. Rep. No. 100-576 (1988) ....................................................................................................15

HICKMAN, KRISTIN E & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 20.3 (7th ed. 2025) ....................................................................................................19

Hillman, Jennifer et al., *International Forced Labor Import Bans: A Case for WTO Compatibility*, 55 GEO. J. INT'L L. 619 (2024) ....................................................................7

*Initiation of Section 301 Investigations: Acts, Policies, and Practices of Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors*, 91 Fed. Reg. 12,886 (Mar. 17, 2026) ....................................................17

Liu, Lucille & Jenny Leonard, *US Eyes China Overcapacity Tariffs of 7.5% Before Xi Visits*, BLOOMBERG LAW (Aug. 24, 2026), ....................................................17

PR-6, OFFICE OF THE UNITED STATES TRADE REPRESNTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (June 2, 2026) .............................. *passim*

PR-132, Press Release, Office of the USTR, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026) ....................................................16

PR-768, *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) ........................3, 8, 15, 18

## INTRODUCTION

Defendants' response confirms the central defect in USTR's Global Section 301 Tariff action: USTR imposed sweeping tariffs on 60 distinct economies without making the country-specific, fact-based determinations required by Section 301 and the Administrative Procedure Act ("APA"). Rather than confront that fundamental flaw, Defendants devote pages to attacking strawmen. But Plaintiffs' objection was never to the length or organization of USTR's Report and Final Determination. Whatever form USTR's analysis took, USTR was required to determine—based on record evidence rather than speculation—that *each* investigated economy engaged in an unreasonable practice that burdens U.S. commerce and is appropriately addressed with a particular tariff measure. USTR fell grossly short.

Defendants' response boils down to a plea for deference. They concede that USTR's conclusions rest on generic economic principles, incomplete illustrations, speculative likelihoods, and loose correlations, all applied indiscriminately across 60 disparate economies comprising 86 different countries. But Section 301 requires more: a determination that each economy's "unreasonable" practice actually (*i.e.*, presently and non-trivially) "burdens" U.S. commerce on a country-by-country basis, not merely an assumption that the statutory condition is "likely" satisfied across the board from Algeria to Vietnam. Nor does the APA permit abstract economic guesswork to substitute for record evidence regarding each economy at issue. Asking that basic statutory requirements be followed is neither "nitpick[ing]" nor "[s]plitting hairs." Resp. 41, 43.

The inadequacy of USTR's analysis is utterly unsurprising given the preordained objective of its investigation: to ensure continuity with the invalidated Global IEEPA Tariffs. That objective, even if dictated by the President, cannot excuse USTR's failure to satisfy Section 301

and the APA. And those failures require vacatur, not a do-over that allows USTR to return to the drawing board while continuing to collect billions of dollars in unlawful taxes from Americans.

**ARGUMENT**

**I. PLAINTIFFS HAVE STANDING**

The government half-heartedly contests Plaintiffs' standing, but there is no doubt that Plaintiffs satisfy Article III's requirements. Defendants know this: They have access to Customs and Border Protection data showing Plaintiffs regularly import goods subject to the Global Section 301 Tariffs from a range of covered economies. As importers of goods directly subject to the challenged tariffs, Plaintiffs suffer a concrete economic injury that is plainly traceable to Defendants' actions and readily redressable through vacatur. That is presumably why Defendants did not even raise standing as an "Anticipated Defense[]" in their Answer. ECF No. 17.

Indeed, these same Plaintiffs successfully challenged prior tariffs imposed by the current Administration on the same categories of products now subject to the new tariffs, without any challenge to their standing. *See Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). Plaintiffs bring this action for the same reason they brought the prior case: because the challenged tariffs require them to pay millions of dollars in additional duties while suffering significant business uncertainty and pricing disruptions. To dispel any conceivable doubt, Plaintiffs attach declarations confirming these indisputable facts. *See* Attach. A at ¶¶ 5-24; Attach. B at ¶¶ 7-16; *see, e.g., E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1004 (Fed. Cir. 2018) (finding Article III standing based on "declarations in support of standing" submitted "[a]fter [defendant] challenged [plaintiff's] standing in its responsive brief").[1]

[1] To the extent Defendants contend that Plaintiffs may challenge the tariff determinations only as to the economies from which they import, that argument is irreconcilable with Defendants'

## II. THE GLOBAL SECTION 301 TARIFFS EXCEED STATUTORY AUTHORITY

### A. Section 301 Requires Fact-Based Country-By-Country Findings

Defendants do not contest that Section 301 requires USTR to make economy-specific determinations regarding burden, unreasonable practice, and appropriate remedy for "*each* of the 60 economies investigated." Resp. 23. Defendants nonetheless contend that USTR satisfied its statutory obligations by parroting, 60 times over, the conclusion that each economy's practices "related to the failure to impose and effectively enforce a forced labor import prohibition are unreasonable and burden or restrict U.S. commerce," PR-6 at 59-79, and that the imposition of one of just two tariff rates was therefore "appropriate," PR-768, Final Determination, 91 Fed. Reg. 47,318, 47,321-47,328 (July 28, 2026); *see* 19 U.S.C. § 2411(b). Defending USTR's check-the-box approach, it is Defendants, not Plaintiffs, that elevate form over substance. *See* Resp. 21-27 (spending pages establishing USTR's *pro forma* compliance with unchallenged procedural requirements).

But it has long been the rule that "[g]eneral statements of this kind, following the language of the statute, are not sufficient to constitute findings of fact such as are contemplated by the statute." *Heitmeyer v. F.C.C.*, 95 F.2d 91, 97 (D.C. Cir. 1937); *see Connecticut Light & Power Co. v. FERC*, 627 F.2d 467, 473 (D.C. Cir. 1980) ("nonexplanatory boiler plate" cannot substitute for statutorily required reasoning). Nor can Defendants salvage USTR's rote findings with generic theories about forced-labor import prohibitions and their "likely" effects on U.S. commerce that

---

acknowledgement that USTR relied on "the same reasons supporting each determination 60 times over." Resp. 17. Defendants nowhere suggest that the agency's action could be lawful as to some countries but not others (and make no effort to differentiate the "lawful" countries anyway). Regardless, in designating Plaintiffs' case as the "sample case," the Court did not intend to restrict litigation of claims common to all three plaintiff groups, which collectively import goods from dozens of covered economies. *See* Attach. A at ¶ 5; Attach. B at ¶ 7; Compl. ¶¶ 12-13, *Burlap & Barrel, Inc. v. Greer*, Case No. 26-cv-03345 (July 24, 2026), ECF No. 2; Compl. ¶ 132, *Oregon v. Trump*, No. 26-cv-03467 (Aug. 3, 2026), ECF No. 2.

are untethered to any country-specific characteristics whatsoever. *See* Resp. 26-27, 43. If that were enough, virtually any generalized economic proposition could satisfy Section 301's country-specific requirement. USTR could, for example, impose a global tariff regime based solely on the theory that most countries subsidize domestic industries in some manner, distorting either their own or international markets and thereby burdening U.S. commerce.

USTR's past Section 301 investigations do not countenance such an approach. *Contra* Resp. 25-26. "Not once in five decades did USTR sweep a common finding across a group of unrelated economies, let alone economies accounting for nearly all United States imports." Meyer & Shaffer Br. 11. Defendants point to investigations involving the European Community and European Union, but no one disputes that those unions can be treated as a single economy. And as Plaintiffs have explained (MJAR 46-47), USTR's investigation into multiple digital-services-tax regimes—which resulted in seven different country-specific reports and seven tailored country-specific actions (ranging from tariffs on $65 million to $1.3 billion in goods)—is an example of exactly what USTR failed to do here.

Defendants' view also runs afoul of the major-questions doctrine and raises "serious constitutional doubts" under the nondelegation doctrine. An interpretation of Section 301 that allowed USTR to rely on economic platitudes in blunderbuss fashion, combined with USTR's capacious authority to "modify" any initial Section 301 action by orders of magnitude under Section 307, *see HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1251-1253 (Fed. Cir. 2025), would empower USTR to impose an unprecedented global tariff regime "unconstrained by *** significant procedural limitations," *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 244 (2026) (Opinion of Roberts, C.J.), and denuded of an "intelligible principle" to curb limitless taxes on

American commerce. *See* MJAR 22-23.[2] As *Learning Resources* makes clear, Defendants' plea for deference to the Executive Branch's "foreign relations" powers, Resp. 19, 33-35, has little purchase when it comes to Congress's carefully circumscribed delegation of tariff authority. Cato Br. 12-14, 19-20. And as the principal Administration draftsman of Section 301 and other former officials explain: "It is not at all credible that Congress *** conferred, by implication, an unlimited tariff power through Section 301, administered by a cabinet official, without any indication in the statute or legislative history that it intended to do so." U.S. Trade Officials Br. 2-3.

**B. USTR Failed To Make Section 301's Required Country-By-Country Findings**

USTR's failure to make the economy-specific determinations required by Section 301 infects each of the statute's three critical determinations. Obviously the problem is not about being insufficiently "verbose," making findings "in 60 separate documents rather than one," or similar form-over-substance strawmen. Resp. 24-25. It is about USTR's fundamental failure to make the country-by-country findings Congress mandated.

***1. Burden on U.S. Commerce***

Defendants effectively concede that USTR never analyzed, on a country-specific basis, whether the alleged failure of *each* Targeted Economy to effectively enforce a forced-labor import ban individually "burdens" U.S. commerce. Instead, USTR merely posited a "likely" burden from all 60 economies based on "generally applicable economic principles and common sense." Resp. 40, 43; *see* PR-6 at 35, 37, 41, 47, 50-51, 53-54 (many times over asserting burden based on what is "likely"); *id.* at 36-37 (viewing 60 economies "as a whole" and "[i]n general" despite recognizing that "forced labor inputs may vary across these economies"); *id.* at 38 (relying on

[2] Defendants suggest that this argument is "legally foreclosed by the Federal Circuit's recent decision in *HMTX*." Resp. 32. But *HMTX* did not confront an interpretation of Section 301 at all, let alone one that would permit USTR to impose a global tariff regime based on conclusory findings and abstract theories untethered to the circumstances of any particular economy.

"case studies" "*suggesting* that U.S. exports have *possibly* been adversely impacted" (emphasis added)). But it is hardly a matter of "common sense" that the absence of an express forced-labor import ban in each and every targeted economy, no matter the volume/type/nature of trade or other country-specific variables, individually imposes a discernible burden on U.S. commerce.

Section 301 moreover requires more than an assumption of a "likely" or "possible" burden. *See* 19 U.S.C. § 2411(b)(1). As Plaintiffs explained (MJAR 27), the statute directs USTR to find that a foreign act, policy, or practice "burdens or restricts United States commerce," and it does so in the present tense. 19 U.S.C. § 2411(b)(1). That does not mean that the burden on U.S. commerce must be precisely "quantified," and Plaintiffs have never claimed as much. *Contra* Resp. 29. But it does mean USTR must identify some *actual* (*i.e.*, present and non-trivial) burden on U.S. commerce attributable to *each* Targeted Economy. *See* MJAR 24-27. USTR's generic conjecture based on "basic economics, data, case studies, and common sense," Resp. 29, falls well short of that requirement.

### *2. Unreasonable Practice*

Defendants' defense of USTR's determination that it is unreasonable for all 60 Targeted Economies not to enact or to effectively enforce a forced-labor import ban fares no better. Defendants now seek to distance themselves from Section 301(d)'s requirement that USTR determine whether a challenged forced-labor practice is "inconsistent with the level of economic development of the foreign country" before deeming it unreasonable. 19 U.S.C. § 2411(d)(3)(B)-(C); *see* MJAR 29. Although Defendants call it "irrelevant," Resp. 31, it was USTR that invoked Section 301(d)(3)(B) in the first place. *See* PR-6 at 5 (highlighting that Section 301(d)(3)(B)(iii)(III) "specifically recognizes as unreasonable" any "persistent pattern of conduct that *** permits any form of forced or compulsory labor" (ellipsis in original)).

Defendants instead fall back on Section 301's residual "unreasonable" standard. But Defendants cannot ignore Congress's decision to identify as "unreasonable" (subject to express limitations) just two categories of forced-labor practices: a foreign country's toleration of forced labor within its own economy and its failure to enforce a reciprocal-agreement commitment. 19 U.S.C. § 2411(d)(3)(B)(iii)(III), (iv). That deliberate treatment indicates that Congress did not intend USTR to invoke Section 301's residual "unreasonable" standard to condemn other unenumerated forced-labor-related practices. Meyer & Shaffer Br. 9-10; *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (Where a statute contains "a general authorization and a more limited, specific authorization *** side-by-side[,]" "[t]he terms of the specific authorization must be complied with.").[3]

### *3. Appropriate Action*

Defendants insist that USTR made individualized determinations as to (i) whether action against each Targeted Economy was "appropriate" and (ii) "what action, if any," would be "appropriate and feasible *** to obtain the elimination of that [economy's] act, policy, or practice." 19 U.S.C. §§ 2411(b)(2), 2414(a)(1)(B), (c). But the principal support they identify is a series of boilerplate statements repeated, virtually verbatim, across multiple pages of the Federal Register: "The Trade Representative has determined, in accordance with the specific direction of the President, that the tariff rate to be applied, and the scope of tariffs and exemptions are appropriate

[3] It is unsurprising that Congress excluded from Section 301's enumeration the lack of a categorical ban on forced-labor imports or that the vast majority of countries have not enacted one (instead addressing the problem in other ways, *see* pp. 13-14, *infra*). Such bans raise the risk of conflict with WTO obligations, including GATT Article IX's prohibition on import/export quotas—a prohibition whose exception for "prison labor" implies no broader exception for all forced-labor imports. *See* Jennifer Hillman et al., *International Forced Labor Import Bans: A Case for WTO Compatibility*, 55 GEO. J. INT'L L. 619, 664-665 (2024).

to obtain the elimination of the acts, policies, and practices determined to be actionable in the investigation." PR-768, 91 Fed. Reg. at 47,321-47,328; *see* Resp. 30.

Mere repetition of that formula, whether or not blindly following "the specific direction of the President" (*see* pp. 14-16, *infra*), does not establish that USTR made the individualized determinations Section 301 requires. The agency's approach consisted of assigning one of just two tariff rates based on a single consideration: whether an economy had adopted an express forced-labor import ban. Nothing in the determination suggests that USTR assessed whether the selected action was "appropriate" to secure the "elimination" of a *particular* economy's practice in light of that economy's specific characteristics, such as its scale, its capacity to enforce a forced-labor import ban, the volume or composition of its exports to the United States, or the nature of its relationship with the United States. *See* U.S. Trade Officials Br. 8 ("While the statute permits the imposition of tariffs, these must be 'appropriate and feasible,' *i.e.*, calibrated to the individual circumstances of the foreign country involved to increase the political pressure on it to address U.S. trade demands, while minimizing costs to U.S. stakeholders."). Rather than tailoring its remedy to the circumstances of each Targeted Economy, USTR divided all 60 into one of two uniform categories and simply declared that approach "appropriate."

## III. THE GLOBAL SECTION 301 TARIFFS VIOLATE OTHER APA REQUIREMENTS

### A. The Global Section 301 Tariffs Are Arbitrary And Capricious

USTR's reasoning cannot sustain any of the three determinations that Section 301 requires. The agency failed to compile anything close to the sort of record necessary to support its

unprecedented global tariff action. Such unsupported rulemaking is the definition of "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).[4]

### *1. Burden on U.S. Commerce*

Defendants admit that USTR's burden determination rests on little more than abstract economic theory. According to Defendants, USTR needed only to identify an "overlap" between a Targeted Economy's imports of goods "at risk" of being produced with forced labor and that economy's imports of the same goods from the United States. Resp. 39. That overlap, Defendants argue, is sufficient evidence "*standing alone*" when backed by "generally applicable economic principles and common sense." *Id.* at 40 (emphasis added). But agency action cannot be sustained by such theorizing untethered to evidence demonstrating that the theory holds in the real world.

The D.C. Circuit's decision in *Arizona Public Service Co. v. United States*, 742 F.2d 644 (D.C. Cir. 1984), is on point. There, the Interstate Commerce Commission ("ICC") relied on a single factual predicate (the availability of a relatively small amount of oil from alternative sources), coupled with an "abstract economic[]" theory (that such availability would "cause a sufficient long-term loss to the railroad that it would be deterred from raising prices above a

[4] Defendants contend that the "substantial evidence" standard of 5 U.S.C. § 706(2)(E) does not apply to USTR's rulemaking. Resp. 19. That is irrelevant because USTR's action fails under the APA whether the question is if "a rational connection exists between the agency's fact-findings and its ultimate action" or instead if "a reasonable fact finder could have arrived at the agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). It is also incorrect. The Federal Circuit has explained that the substantial-evidence standard applies "in view of the plenary nature of the record before" the reviewing court. *Id.* at 1314. By its terms, the standard governs where an agency's decision is "reviewed on the record of an agency hearing provided by statute." *Id.* at 1313-1314 (quoting 5 U.S.C. § 706(2)(E)); *see id.* at 1314-1315 (finding *Chrysler Corp. v. DOT*, 472 F.2d 659 (6th Cir. 1972), an "informal rulemaking" case, "instructive" on this point). Section 301 directs USTR to provide interested persons an opportunity to present their views, including through a public hearing (which USTR in fact conducted). 19 U.S.C. § 2414(b)(1)(A) ("Before making the determinations required under subsection (a)(1), the Trade Representative *** shall provide *** a public *hearing*." (emphasis added)).

competitive level"), to conclude that geographic competition existed among railroads with respect to oil sourcing. *Id*. at 654. The court rejected the ICC's reasoning, explaining that "[e]ven if this proposition were true as a matter of abstract economics, it could not be *presumed* true in every case." *Id*. Because the agency had offered only a theoretical mechanism for competition, rather than meaningful evidence that the mechanism actually operated in the markets at issue, its conclusion could not stand. *Id*.

The same defect pervades USTR's analysis. USTR offers a "hypothetical argument" that competitive harm "*could* exist" because of a failure to enforce an explicit ban on forced-labor imports, *Arizona Pub. Serv. Co.*, 742 F.2d at 654, but fails to provide any evidence that the theory holds for any given economy (let alone all 60). Defendants acknowledge that USTR surmised only that unfair competition was "likely" across the 60 Targeted Economies. Resp. 43 (quoting PR-6 at 37). Speculation about what *might* occur, however, cannot substitute for evidence of what does occur, particularly when USTR cannot deny that its own data frequently show U.S. exports outperforming the very forced-labor imports purportedly burdening U.S. commerce. *See* MJAR 35-36; *see also* Resp. 42 (protesting that "[t]he fact that trends may not be monotonic or the correlation may not be consistent over time does not render USTR's conclusion irrational").

The evidence that Defendants do point to is remarkably thin.[5] Although USTR provides charts purporting to show imports of goods "at risk" of being produced with forced labor for the Targeted Economies, *see, e.g.*, PR-6, Appx. B-C, it cannot identify even "a single shipment of goods verifiably made with the use of forced labor passing through a listed economy's Customs

[5] USTR's claim that data on forced-labor imports is difficult to acquire because of its illicit nature is belied by USTR's 2018 report on Chinese intellectual property and technology policy. The acts and policies described therein were likewise illicit, yet after a seven-month investigation, USTR was able to describe them in detail. *See* Gresser Br. 3-4.

service and into its consumer markets or production chains," much less provide any "estimate of the scale of importation of forced labor goods for any of the" Targeted Economies. Gresser Br. 5. Worse yet, USTR's charts do not even purport to address the question that matters. After all, the issue is not whether a Targeted Economy's imports of forced-labor goods could burden U.S. commerce; it is whether that economy's failure to enact or enforce an express ban on such imports—the unreasonable practice identified by USTR—does burden U.S. commerce. The charts provide no evidence on that point.

USTR's case studies do not fill the void. Defendants acknowledge that those studies are intended merely to "illustrate generally applicable economic principles and common sense," not to demonstrate actual competitive harm to U.S. exports from a Targeted Economy's forced-labor imports. Resp. 40 (emphasis omitted). In any event, the studies suffer from serious flaws. As Plaintiffs explained, and Defendants leave unrebutted, they "conflate[] correlation with causation" and fail to account for confounding variables that substantially undermine any inference of causation. MJAR 33-36; *see* Economists Br. 2-6 (finding on aggregate "worldwide" basis, "even under extreme assumptions," minimal impact on U.S. commerce).

Defendants' authorities do not excuse those shortcomings. *Contra* Resp. 41-42. The Federal Circuit's decision in *Jilin Forest Industries Jinqiao Flooring Group Co. v. United States* concerned whether an agency could rely on a rebuttable presumption of government control in a non-market economy. 145 F.4th 1308, 1312 (Fed. Cir. 2025). The court upheld that approach in part based on "a general statutory recognition of [the] close correlation between a nonmarket economy and government control of prices." *Id.* at 1311 (internal quotation marks omitted). Section 301 contains no comparable recognition of a close relationship between an economy's importation of forced-labor goods and burdens on U.S. commerce, much less between a failure to

enact or adequately enforce an express forced-labor import ban and such burdens. *See* 19 U.S.C. § 2411(d)(3)(B)-(C) (recognizing only that domestic forced labor may, in certain circumstances, constitute an "unreasonable" practice).

USTR also has not provided data showing that its putative correlative trends hold "overall," with only minor "inconsistencies." *Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1339 (CIT 2001); *see Nucor Corp. v. United States*, 675 F. Supp. 2d 1340, 1352 (CIT 2010) (accepting correlation data as probative where the relevant correlation coefficients "each exceeded .98"). Instead, USTR cherry-picked favorable examples while omitting contrary ones, thereby avoiding addressing whether goods allegedly benefiting from forced labor generally outperform competing U.S. exports. *Nippon Steel*, 182 F. Supp. 2d at 1339. A complete review of USTR's own case-study data demonstrates that the answer is far from obvious. As Plaintiffs explained, U.S. exports more often outperformed than underperformed Malawian tobacco and Burmese rice. *See* MJAR 35-36. The government cannot wave away that problem by asserting, without support, that "[e]ven where American tobacco outsells Malawian tobacco, it is likely that without forced labor being used for making Malawian tobacco, American tobacco would have outperformed Malawian tobacco to an even greater degree." Resp. 43; *see Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) ("mere speculation" is "not adequate grounds upon which to sustain an agency's action"). For similar reasons, this Court should not defer to USTR's "predictive judgments" or blanket extrapolation, Resp. 43-44, particularly when USTR is seeking to establish existing burdens and when the limited data USTR offers largely undercuts its central thesis.

Defendants' cursory defense of USTR's circumvention theory fares no better. Rather than respond to the myriad flaws Plaintiffs identified in USTR's cotton and polysilicon case studies,

MJAR 37-41, Defendants retreat to the proposition that USTR need only rely on the "generally applicable economic principle" that circumvention is "likely" whenever an economy imports at-risk goods and exports downstream derivatives to the United States, Resp. 44-45. Indeed, the government quickly gives up the ghost, asserting feebly that "because USTR demonstrated harm to U.S. exports, any alleged flaws (there are none) in USTR's circumvention analysis are of no moment." Resp. 44. And tellingly, Defendants do not spend a single word defending USTR's third burden theory concerning the displacement of U.S. goods in the U.S. market. *See* MJAR 41.

Section 301's burden requirement cannot be satisfied by "pil[ing] inference upon inference," *United States v. Lopez*, 514 U.S. 549, 567 (1995)—*i.e.*, that for each and every country, the lack of an explicit ban on forced-labor imports *may* have resulted in such imports, their price *may* have been artificially depressed, and their volume *may* have been sufficient to displace U.S. exports or otherwise harm U.S. manufacturing—none of which USTR actually demonstrated. At bottom, USTR's problem is not that the agency failed to support its "generally applicable economic principles" with "data from every product from every economy." Resp. 40. It is that USTR failed to support its abstract economic theorizing with *any* relevant data for *any* product in *any* economy. The APA (not to mention Section 301) requires more.

***2. Unreasonable Practice***

Defendants likewise fail to justify USTR's sweeping determination that all 60 Targeted Economies unreasonably lack an effectively enforced forced-labor import prohibition. Several countries, such as Brazil and Egypt, represented during the investigation that, although they lacked a single express forced-labor import ban, "certain of their laws, when taken together, amount to a forced labor import prohibition." PR-6 at 25; *see* MJAR 42. Yet USTR never really engaged with the argument. The sum-total of its response was that it "reviewed the instruments cited by these economies, but was unable to find any *express* prohibition on the importation of goods produced

with forced labor in those instruments." PR-6 at 25 (emphasis added). Contrary to Defendants' contention, USTR never "explained why [those countries'] indirect measures do not effectively or directly target forced labor imports." Resp. 37. Instead, on the pages of the Report that Defendants cite, USTR merely repeated that the relevant countries' "provisions do not forbid legally the importation of goods produced wholly or in part by forced labor," PR-6 at 61, or "do[] not appear to contain a legal prohibition on the importation of goods produced with forced labor," *id.* at 64.

Unable to defend the reasoning USTR actually provided, Defendants offer new rationales. For instance, Defendants point to Brazil's and Egypt's alleged importation of goods at risk of being produced with forced labor, the purported ineffectiveness of domestic forced-labor prohibitions and supply-chain restrictions, and the continued presence of forced-labor goods in international commerce. Resp. 37. But USTR did not rely on those considerations in rejecting the countries' submissions. *See* PR-6 at 25, 61, 64. As such, Defendants' argument reduces to an impermissible request to uphold USTR's determination based on "counsel's *post hoc* rational[izations]." *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 685 n.22 (1980) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Regardless, none of these newly minted rationales addresses the key point that USTR's reasons for finding "unreasonable" the absence of an express forced-labor import "hinge[] on an alleged practical effect of allowing forced-labor goods into a Targeted Economy"—an effect equally preventable by the "functional equivalent" of an express forced-labor import ban as by an express ban itself. MJAR 42 (quoting PR-6 at 64).

***3. Appropriate Action***

In arguing USTR's tariff actions were "appropriate" to obtain the elimination of the practices of 60 diverse economies, Defendants lean almost exclusively on the President's direction. *See* Resp. 45-50. In so doing, the government contends the Supreme Court's recent emergency-

docket decision in *Trump v. Orr,* 146 S. Ct. 44 (2025), "squarely forecloses plaintiffs' challenge" to USTR's appropriateness determination. *Id.* at 46. Not so.

*Orr* involved a fundamentally different statutory scheme. There, Congress authorized the Secretary of State to issue passports only "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. Unlike Section 301, the statute at issue in *Orr* left no role whatsoever for the Secretary of State to prescribe rules governing passports. No surprise, then, that challengers were unlikely "to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Orr*, 146 S. Ct. at 46.

By contrast, Section 301 expressly contemplates a role for USTR to "determine[]" both *whether* action is appropriate as against each targeted economy and, if so, *what* action would be appropriate. 19 U.S.C. § 2411(b)(2). While the "specific direction, if any, of the President regarding any such action" is relevant in making that latter determination, it is not relevant to the former—and regardless, Section 301 delegates "authority to take final action" to USTR, not the President. *HMTX Indus.*, 156 F.4th at 1243, 1250; *see also* H. Rep. No. 100-576, at 551 (1988) (explaining that 1988 amendment to Section 301 "transfer[red] to the USTR the authority to decide and implement any section 301 action," and rejected language that would have had the President "retain[] the authority to decide and implement action"); MJAR 30-31. Defendants admit as much when they explain that "*USTR* determined that action was appropriate in each investigation." Resp. 30 (emphasis added) (citing PR-768, 91 Fed. Reg. at 47,320). Indeed, if a President directed a tariff remedy explicitly designed to punish a country rather than eliminate its offending practice, surely USTR's unflinching adoption of that remedy would not insulate it from a violation of law.

In relying so heavily on presidential direction here, USTR thus disregarded its own obligations under the APA. *See* MJAR 44-48.

**B. The Government's Pretextual Inquiry Underscores USTR's Violations**

For all the pages Defendants devote to denying that the Global Section 301 Tariffs were pretextual, they do not (and cannot) contest that as soon as the Supreme Court invalidated the IEEPA tariffs, USTR publicly announced that Section 301 would be used "to ensure continuity in reaching" President Trump's goals of "reducing the U.S. global trade deficit in goods, reversing the lack of reciprocity by our foreign trading partners, and incentivizing the reshoring of production to the United States." PR-132, Press Release, Office of the USTR, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026); *see also* MJAR 7-9 (detailing numerous Administration statements likewise indicating intent to use Section 301 to recreate IEEPA tariffs); States Br. 5-8 (same).[6] Defendants likewise do not (and cannot) dispute that USTR timed implementation of the Global Section 301 Tariffs down to the minute, ensuring that the Administration's global tariff wall remained continuously in place just as USTR had promised. And despite invoking the "moral and economic imperative" of combating forced labor,

[6] To be clear, this Court is free to consider the uncontroverted public statements cited by Plaintiffs and amici. *Contra* Resp. 51; *see* States Br. 12-14. It may do so by relying on those statements as extra-record evidence, as the Supreme Court did in *Department of Commerce v. New York*, 588 U.S. 752, 782 (2019) ("We accordingly review the District Court's ruling on pretext in light of all the evidence in the record before the court, including the extra-record discovery."). It may do so by taking judicial notice of the relevant statements, whose accuracy is not subject to reasonable dispute. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1378 (Fed. Cir. 2017) (court may take judicial notice where fact is "either 'generally known' or 'accurately and readily [discernible] from sources whose accuracy cannot reasonably be questioned'" (quoting FED. R. EVID. 201(b)) (alteration in original)). Or, if necessary, it may order the completion or supplementation of the agency record. *See Department of Com.*, 588 U.S. at 765 (observing that district court granted request to "complete" the record to include omitted material that had been before the agency); *University of Colo. Health at Mem'l Hosp. v. Burwell,* 151 F. Supp. 3d 1, 13 (D.D.C. 2015) (courts may "supplement" the record with "extra-judicial evidence that was not initially before the agency").

Resp. 1, Defendants acknowledge (Resp. 54) that USTR exempted Brazilian frozen beef—one of only three products it highlighted as prime examples of forced-labor imports—just as the Administration had done with the IEEPA tariffs. *See* MJAR 13; *see also* Burlap & Barrel Br. 15 (explaining how "[t]he exclusions in the Section 301 Action mirror the" prior global tariff exclusions, "rather than reflecting any forced-labor-specific analysis").

Unable to refute the Global Section 301 Tariffs' obvious endgame of reconstructing the Global IEEPA Tariffs, Defendants try to identify marginal differences between the two. Defendants contend that the Section 301 tariffs are less global than the IEEPA tariffs because they apply to products from only 60 economies. Resp. 50 n.4. But those economies account for *99.4%* of all U.S. imports. *E.g.*, PR-6 at 1. Defendants' reliance on supposed differences in tariff rates (Resp. 50 n.4) is similarly misplaced. As Plaintiffs explained (MJAR 5-6), the Global IEEPA Tariffs were imposed in two stages: first through a baseline tariff of 10%, and then through additional rate increases targeting particular trading partners. USTR has adopted the same structure here, with the Global Section 301 Tariffs establishing the baseline and the threat of additional Section 301 tariffs to follow.[7]

In effect, Defendants ask this Court to "exhibit a naiveté from which ordinary citizens are free." *Department of Com.*, 588 U.S. at 785. The Supreme Court in *Department of Commerce* found "a significant mismatch between the decision [an agency] made and the rationale [it]

[7] *See Initiation of Section 301 Investigations: Acts, Policies, and Practices of Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors*, 91 Fed. Reg. 12,886 (Mar. 17, 2026). For example, reports indicate Administration plans to impose an additional 7.5% tariff on China that would result in new Section 301 duties totaling 20% to match the IEEPA duties on China. Lucille Liu & Jenny Leonard, *US Eyes China Overcapacity Tariffs of 7.5% Before Xi Visits*, BLOOMBERG LAW (Aug. 24, 2026), https://news.bloomberglaw.com/international-trade/us-eyes-china-overcapacity-tariffs-of-7-5-before-xi-visits-1.

provided." 588 U.S. at 783. The same is true here. MJAR 48-51; *see* States Br. 5-7. Defendants rely on the Federal Circuit's decision in *CAADES v. United States,* 32 F.4th 1130 (Fed. Cir. 2022), which recognized that political considerations may play a role in agency policymaking. *Id.* at 1141. Plaintiffs' claim, however, does not rest on mere political influence. The Global Section 301 Tariffs violate the APA because USTR's "sole stated reason" for acting, *Department of Com.*, 588 U.S. at 784—*i.e.*, "only for the purpose of obtaining the elimination" of the Targeted Economies' forced-labor import practices "and not for any other purpose," Resp. 51 (quoting PR-768, 91 Fed. Reg. at 47,335)—is manifestly pretextual. Invoking forced-labor import practices was a convenient means for reimposing the President's tariff agenda, not the end itself.

## IV. VACATUR IS THE ONLY PROPER REMEDY HERE

Defendants expend significant energy arguing that the "normal" remedy for an APA violation—vacatur of the unlawful agency action—should not apply here. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). But their arguments are inconsistent with precedent and principle.

First, vacatur (not remand *without vacatur*) is warranted where the agency's error is *not* just a failure to adequately explain its reasoning, but a failure to compile a record sufficient to support its conclusions in the first place. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (If an agency's determination "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration."). The APA accordingly directs courts to "hold unlawful and *set aside* agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added). Specifically, "Section 706(2)(A) provides that a 'reviewing court' faced with an arbitrary and capricious agency decision 'shall'—*not may*—'hold unlawful and set aside' the

agency action"—and "[s]etting aside means vacating." *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (opinion of Randolph, J.).

Vacatur is particularly appropriate where, as here, an agency's action rests on "abstract speculation that has no foundation in the record." *Arizona Pub. Serv. Co.*, 742 F.2d at 655; *see American Sec. Ass'n v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025) (Vacatur "appropriate when 'the court determines that the agency lacked the authority to issue the rule, the agency omitted a critical procedural safeguard, or the agency failed to address an issue that was central to its decision to issue the rule.'" (quoting KRISTIN E. HICKMAN & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 20.3 (7th ed. 2025))). In those circumstances, there is no deficiency that can be cured through further "elaborat[ion]" of the existing record. *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (where elaboration is not sufficient, agency "'deal[s] with the problem afresh' by taking new agency action *** [in] compl[iance] with the procedural requirements for new agency action"); *compare HMTX Indus.*, 156 F.4th at 1258 (approving remand without vacatur where agency failed to respond to comments); *National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.,* 260 F.3d 1365, 1380 (Fed. Cir. 2001) (remanding without vacatur where agency might still "provide a reasonable explanation for its decision"). For similar reasons, vacatur is likewise warranted because the Global Section 301 Tariffs are pretextual. *See Department of Com.*, 588 U.S. at 766, 785 (affirming in relevant part district court's vacatur of pretextual agency action). In both cases, the agency's error can be fixed only by reopening the record and conducting new factfinding.

Swinging for the fences, Defendants nonetheless ask this Court to endorse a sea change and hold that "the APA does not authorize vacatur as a remedy" under *any* circumstance. Resp. 56 (formatting omitted). That argument would, if accepted, "revolutionize long-settled

administrative law." *Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 827 (2024) (Kavanaugh, J., concurring). Nor is it supported by the APA's text or decades of precedent. Federal courts have long understood that the APA's command for courts to "set aside" unlawful agency action authorizes vacatur, and in fact have treated vacatur as the ordinary remedy. *See, e.g., National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Sierra Club v. United States EPA*, 972 F.3d 290, 309 (3d Cir. 2020); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *Sierra Club v. United States EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023); *American Sec. Ass'n*, 147 F.4th at 1278. The Supreme Court has repeatedly affirmed judgments granting that relief. *See Corner Post*, 603 U.S. at 831 (Kavanaugh, J., concurring) (collecting cases).[8]

Defendants' fallback proposal of "party-specific" vacatur, while certainly preferable to a remand without any vacatur, is likewise unsupported. Defendants cite no case adopting such a remedy. Resp. 58. To the contrary, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *National Mining Ass'n*, 145 F.3d at 1409 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (alteration omitted)).[9]

It is worth pausing to consider the remarkable result Defendants' contrary position would produce. Section 301 requires USTR to make specified findings *before* imposing trade measures against an investigated country. *See* 19 U.S.C. § 2414(c). Yet Defendants ask this Court to permit

[8] Despite Defendants' heavy reliance on *Trump v. CASA, Inc.*, *see, e.g.*, Resp. 58-59, the Court there expressly declined to "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action," and thereby did not disturb the existing judicial consensus. 606 U.S. 831, 847 n.10 (2025).

[9] At a minimum, any "party-specific" vacatur should also cover all plaintiffs in the stayed cases.

USTR to bypass Section 301's prerequisites, impose tariffs unsupported by the required findings, and then attempt to justify them through a *post hoc* investigation conducted only after the tariffs have cost taxpayers billions of dollars *while those tariffs remain in effect*. Neither Section 301 nor the APA authorizes agencies to tariff first and justify later. Where, as here, the requisite findings were never made and the administrative record cannot sustain the agency's action, vacatur is the only appropriate remedy.

Not content with challenging the availability of the APA's standard remedy, Defendants advance a second novel proposition: that Plaintiffs must satisfy the requirements for a permanent injunction to obtain vacatur. *See* Resp. 61. But "the vacatur or set aside of agency action under the APA is a distinct remedy from an injunction." *National TPS All. v. Noem*, 166 F.4th 739, 760 (9th Cir. 2026). That distinction follows directly from the text. A court "set[s] aside" agency action by "cancel[ing], annul[ling], or revok[ing]" it; an injunction, by contrast, is an order directing a party to act or refrain from acting. *Id.* The Supreme Court has thus recognized that a court should not enter a permanent injunction where the "less drastic remedy" of vacatur affords relief. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see id.* at 156, 159-166 (holding that plaintiffs did not satisfy the four-factor permanent injunction test but not disturbing district court's vacatur order).[10]

[10] *PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004), is not to the contrary. Instead, like *Monsanto*, it confirms that a court should not perform an equitable inquiry into injunctive relief where vacatur is available. In that bid-protest case, the Federal Circuit held that the jurisdictional statute before it, 28 U.S.C. § 1491(b)(4), "only incorporate[d] the arbitrary or capricious standard of review of section 706(2)(A) [of the APA,]" rather than Section 706's direction that a court "must set aside any action it finds arbitrary or capricious without consideration of the relative harms of such action." *Id.* at 1225-1226. Exactly because it did not incorporate Section 706's "set aside" power, the statute "d[id] not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate." *Id.* The plaintiff's request for an order requiring the party awarded a disputed contract to "stop[] performance" was thus

* * * * *

Despite the inevitable need for further review of this Court's merits decision, a remand without vacatur could thwart an immediate appeal. *See N.A.A.C.P., Jefferson Cnty. Branch v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996) ("A remand order usually is not a final decision."). If Defendants are concerned about the consequences of vacatur, they are of course free to seek a stay of any vacatur order, whether "universal" or "party-specific," just as they have sought stays of injunctive relief in both the IEEPA and Section 122 tariff litigation. But the Court should decline Defendants' invitation to rewrite settled APA remedial principles just so they can avoid bearing the burden that accompanies seeking a stay—or forestall an appeal altogether.

Dated: September 18, 2026

Respectfully submitted,

*/s/* Pratik A. Shah

Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Kristen E. Loveland (*admission application pending*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*

"tantamount to a request for injunctive relief" and subject to the four-factor test governing permanent injunctions. *Id.* at 1227-1228.

**CERTIFICATE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1) and Standard Procedural and Scheduling Order No. 26-01, I certify that this Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Agency Record, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, counsel's signature blocks, this certificate, and the proposed order) complies with the word limitation requirement set forth in Standard Procedural and Scheduling Order No. 26-01. The word count for this submission, as computed by the word processing system used to prepare the brief, is 6,977 words.

*/s/* Pratik A. Shah
Pratik A. Shah

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*