# ATTACHMENT A

# DECLARATION OF RICHARD WOLDENBERG

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-03555 |
| LEARNING RESOURCES, INC.; HAND2MIND, INC.; HMTX INDUSTRIES LLC; HALSTEAD NEW ENGLAND CORPORATION; METROFLOR CORPORATION; SHANNON SPECIALTY FLOORS LLC; AND SHOPHMTX LLC,<br>*Plaintiffs*,<br>v.<br>THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; JAMIESON GREER, in his official capacity as United States Trade Representative,<br>*Defendants*. | Court No. 26-03347 |

**DECLARATION OF RICHARD WOLDENBERG**

I, Richard Woldenberg, declare as follows:

1. My name is Richard Woldenberg, and I am the CEO of Learning Resources, Inc. and hand2mind, Inc. (collectively, "LR/h2m" or the "Companies"). I am over the age of eighteen, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2. LR/h2m are part of a private, family-owned group of companies which develop, market, and sell educational products, educational toys, and pet toys. We market our products under brands such as LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND and BRIGHTKINS. Learning Resources and hand2mind are related legal entities under common ownership, common control, and common management with various corporate functions managed as "shared services" for the benefit of both companies. The Companies share more than 100 employees, including certain senior officers and managers such as myself, share a single line of credit, and operate with a common supply chain department.

3. Our family business is now in its fourth generation and dates back to a company purchased by my grandfather more than 100 years ago. LR/h2m is a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries. We have more than 450 U.S. employees and full-time equivalents today. Our products are predominantly developed in the United States, but we rely on factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India, to manufacture most of our products. We also perform some of our manufacturing and assembly in the United States. Our companies have offices around the country: in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. We also have employees that work remotely in other states. We ship from our warehouses in Vernon Hills, Illinois.

4. I am providing this declaration in connection with the Companies' challenge to the global tariff regime imposed under Section 301 of the Trade Act on goods imported from China, Taiwan, Korea, Vietnam, Thailand, India, and other countries from which we import, nominally because those countries fail to impose and/or effectively enforce a prohibition on the importation of goods produced with forced labor. Notice of this tariff action, which applied to 60 economies reflecting

86 countries, was published in the Federal Register as *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 47318 (July 28, 2026). I will refer to these tariffs as the Global Section 301 Tariffs.

5. LR/h2m directly import from China, Taiwan, Korea, Vietnam, Thailand, India, and other countries subject to the Global Section 301 Tariffs, and both companies pay duties and tariffs on imports directly as importers of record. Through September 8, 2026, LR/h2m have already paid over $700,000 in additional duties pursuant to the Global Section 301 Tariffs on imports from China, Taiwan, Korea, Vietnam, Thailand, and India. LR/h2m currently have open orders of merchandise believed to be subject to the Global Section 301 Tariffs from those same countries as well as from Cyprus, which is a member state of the European Union. As importers, LR/h2M expect to pay duties pursuant to the Global Section 301 Tariffs upon importation of the purchased merchandise. LR/h2m imported merchandise from Australia earlier this year before the effective date of the Global Section 301 Tariffs. We expect to place additional orders of merchandise from Australia in 2027 and expect to pay duties pursuant to the Global Section 301 Tariffs on those products too.

6. We purchase and take title to the products in the foreign country and thus own the merchandise at the time of importation. We sell our products to brick-and-mortar retailers, online marketplaces and web merchants, school suppliers and other resellers, schools, teachers, and consumers. We also export our products to customers in other countries.

7. The Global Section 301 Tariffs covers countries accounting for 99.4% of U.S. imports, as explained by the USTR in its report. The tariffs, which are taxes paid by importers into the U.S.

like our companies, are an unsustainable burden and threaten our ability to continue our international trade because we are not able to absorb the additional tariff costs without changing our pricing radically.

8. More than 70% of the products we sell or consume as components (by cost) are manufactured outside the United States, and such products represent a similar percentage of our revenue. Effective July 24, 2026, because of the Global Section 301 Tariffs, we are now responsible to pay at least 10% or 12.5% in duty and tariffs, depending on the country of origin, on the vast majority of our products made outside the U.S. which we import. Certain of our products are now subject to total duties and tariffs of 35% or more taking into account the pre-existing additional 25% Section 301 China tariff plus general rate of duty, if applicable. Based on public promises by senior officials in the Trump Administration to reimpose tariffs equivalent to the recently-invalidated IEEPA tariffs, I expect that Section 301 duties, including the Global Section 301 Tariffs, will cost our companies $10 million per year or more and may prevent the importation of some of our items. Absent price increases and significant cost-cutting measures, the imposition of the Global Section 301 Tariffs would largely, if not entirely, result in the elimination of the Companies' expected profits.

9. We currently believe that an "apples-apples" estimate for 2026 duties and tariffs based on our 2026 full-year budget (unadjusted for on-hand inventory or any possible economic disruption) would be $10 million in cash expenditures or more, versus the $2.3 million in duties and tariffs we paid in 2024, before the President first imposed a global tariff regime, relying on authority claimed under the International Emergency Economic Powers Act ("IEEPA"). In other words, given the ever-changing situation with tariffs imposed by President Trump under various statutes or Executive Orders, considerable uncertainty about future economic conditions and trade rules, and

the as-yet-unknown decisions we will make to manage our finances under these evolving conditions, I currently project that we would experience at least a four-fold increase in annual duties and tariffs since 2024 using our 2026 plan as the base case and, based on Trump Administration public statements, expect to pay even more Section 301 tariffs in future years. Additionally, we are incurring significant unrecoverable costs and expenses, not to mention time lost, dealing with tariff rate changes and disruptions in our supply chain, business relations, and business operations.

10. After a long and painful 2025 and 2026 featuring on-again-off-again IEEPA tariffs and tariffs imposed under Section 122 of the Trade Act of 1974 plus inflation caused by the Iran war and the threat of more Section 301 tariff actions by the Administration, there is no way to fully offset the costs of the Global Section 301 Tariffs through vendor concessions or expense reduction—factories are not willing or able to pay this tax in whole or in part for U.S. importers. Quite the contrary, virtually every factory we work with is currently asking for price increases ranging as high as 20% to recover their losses from the many market disruptions caused by the continuing tariff churn and burden. Notably, I expect the combined total tax burden of Federal income tax plus State income tax plus duties and tariffs under Section 122 and Section 301 to nearly equal or even exceed our annual 2026 operating income. LR/h2m may be forced to raise prices once again to avoid a slow liquidation of our companies over time into the pocket of the government. This level of cost inflation is very destabilizing to our business relations and disruptive to our operations.

11. These tariffs will severely and irreparably harm LR/h2m. The widely reported shifting consumer buying habits owing to persistent price inflation caused by tariffs and the Iran War is driving business away. The sales of our products are very price-sensitive, so we are very reluctant

to raise prices in the face of a weakened consumer base exhausted by persistent inflation. Consequently, we may have to absorb a combined tax bill that exceeds our operating earnings. We have been notified by certain customers that they will not take any direct import shipments from outside the U.S. so they can avoid paying tariffs, which places all financial risk on our companies. The weakened consumer has also incentivized retailers to order later and from U.S. inventories (rather than take more risk and import their inventory directly), forcing us to build up our inventory using debt financing to save sales revenue. We know that our customers are fearful of future price shocks from tariffs but treat the problems caused by tariffs to be on us, their suppliers. Future conflicts with our retailers seem inevitable.

12. Tariffs have been a shocking turn of events for our companies, which were consistently growing faster than the overall toy industry in the period 2019-2024. As expected, our growth reversed in 2025 under the heavy burden of IEEPA tariffs, and the resulting inflation has driven consumers into a shell, dampening demand for our products in 2026. With the new Global Section 301 Tariffs, I believe tariffs have likely ended our record of exceptional growth and replaced it with an expectation of a continuing struggle to raise our sales revenues as we suffer under the heavy weight of tariff taxes imposed on us by the Executive Branch.

13. To address the financial impact of the sudden, unbudgeted and massive IEEPA tariff costs in 2025, we sharply cut our operating expenses throughout the 2025 fiscal year and are facing the troubling question of whether to cut those expenses again because of the Global Section 301 Tariffs. Cutting expenses does not promote growth; it is intended to protect our financial strength during times of trouble. Our cost-cutting focus would be on cash expenditures like advertising, CapEx, and hiring, each an important category of investment in our corporate future. We have also considered reducing service levels (such as by increasing delivery times) to lower costs, which

would intentionally degrade our operational performance and hurt our brand reputation in a market that expects fast delivery and excellent service. We want to do everything in our power to save the jobs of our associates. Both Companies have been named a Top Workplace by the Chicago Tribune in each of the last six years. We are committed to our team, and having to lay people off would be devastating to us.

14. Even considering the remote possibility of vendor concessions and expense reductions, our only options to address the increase in costs caused by the Global Section 301 Tariffs are (a) to pass the tariff cost to our customers in the form of higher prices for our goods or (b) reducing the costs by making and selling cheaper, lower-quality products. Both options would cause LR/h2m substantial harm. With the Trump Administration's stated aim or promise to "restore" IEEPA tariffs rates of 10%-50% (depending on the economy in question), we cannot attempt to recover these costs in price increases for fear of alienating dealers and consumers who are ill-prepared for the expected coming deluge of tariff-driven price increases, particularly in light of the persistently high inflation of the past several years, which was exacerbated by prior tariff actions. Reducing quality is an unthinkable option for premium brands like ours and is practically infeasible, as it would require us to change the design and/or production of more than 2,000 products at once. Nor is it realistic to avoid the tariffs by shifting our supply chain for more than 2,000 products. Either process would take years and cost millions of dollars out of pocket that we cannot spare. And the Global Section 301 Tariffs cover countries accounting for almost 100% of U.S. imports and include all the main manufacturing centers for toys, educational products and pet toys. Thus, the only way to avoid these tariffs would be to shift production to the United States, but years of searching for new U.S.-based suppliers who are willing and able to produce even just a portion of our products have been fruitless. In any event, the Trump Administration has a track record of

rapidly changing policy and policy initiatives with little or no advance warning, so it is impossible to know where to move production to achieve sustainable cost savings. Given this reality, we may need to consider discontinuing the import and sale of certain educational products entirely in the United States and pause certain orders and shipments. For a company built on a high-service model, this erosion in our operating standards exposes our brands to an uncertain future and the prospect of declining sales and reputation as sales and service levels worsen.

**Passing the tariff costs to our customers will cause the Companies to lose profits, lose sales, and damage their reputation.**

15. If LR/h2m attempts to pass along all, or substantially all, of the cost of the Global Section 301 Tariffs to their customers in the form of increased prices, we will certainly sell materially fewer goods. This is because, when LR/h2m materially increases the price of goods they sell, consumers demand fewer of those goods. Our customers are very price-sensitive and will not accept a massive price increase on toys and educational products and are expected to be even more price-sensitive during the current sustained period of high inflation in the United States. School accounts are already showing a significant reluctance to place orders because of funding uncertainty and limited budgets, a factor certain to be exacerbated by large price increases. Our dealer partners, which resell our products, will be squeezed by a sudden price increase and are highly likely to resist price changes notwithstanding our urgent need to recoup these expenses. I expect that, after sudden substantial price increases, our dealers will drop, adjust, or reduce the product ranges they offer to preserve their limited capital, thus shrinking our market and increasing the risk that our brands will be marginalized. We will also be exposed to potential credit losses on receivables from our customers as their businesses struggle in difficult conditions exacerbated by the tariffs.

16. I know that the impact of the Global Section 301 Tariffs will be severe because previous price disruptions such as the IEEPA tariffs last year have harmed the Companies. Mid-year price changes are rarely imposed in our business because they are received so negatively by our dealers—they are always a last resort. We have issued unscheduled price increases only a few times in our history, and each time we faced significant customer revolts. We have seen examples of customers reconfiguring their buys when dealing with limited budgets. We have some customers who do not accept price increases easily. We have experienced certain key customers refusing to trade for weeks or months, sometimes not replying to our emails or even calling us back, because of price increases of less than 2%. Obviously, we would need to increase prices by much more than that to preserve profitability while subject to the new Global Section 301 Tariffs. Some customers have dropped products to resist pricing in the past or to address declining margins or sought substitutions from competitors. We are very concerned about retailers removing big sellers from store shelves because our prices crossed a boundary or were deemed likely to take all the steam out of demand for those products. Compared to our largest customers, which have far more market power than LR/h2m and source only a small percent of their merchandise from us, we have little negotiating or marketing leverage. I believe a big price increase will cause our recent gains in the mass market to be put at substantial risk. In my experience, toy consumers will trim their buying based on economic conditions and prospects. In the past consumers have migrated to lower price toys when money is tight as in inflationary periods or during a recession.

17. When our customers buy fewer products or buy in lower quantities, the Companies' total profits shrink. Based on my experience, including my experience with the IEEPA tariffs, even if LR/h2m were to receive a retroactive duty refund from the federal government for the unlawful tariffs it had to remit, that refund would not also be able to cover our lost profits in addition to the

unlawful tariffs, leaving LR/h2m in a substantially worse financial position than if the challenged tariffs were never imposed.

18. Given the scale of the increase in duties and tariffs, the Companies will likely face reduced borrowing capacity which will further diminish our growth rate. To meet holiday season demand and to preserve our high-service model, we must build up our inventory over a period of months in advance. This creates a situation where we would incur extraordinarily large duty and tariff expenses on imports months before we expect to sell the inventory to recoup those expenses. We pay our bills (such as import duties and tariffs) by borrowing under our revolving line of credit, and we repay our line of credit from receivables collected later from our customers. The cash-to-cash cycle of our business can be six months or longer and the substantial new tariffs may lead to far greater peaks in our loan balances. Rising loan balances will raise our interest costs and can be expected to make obtaining financing more difficult. The Companies' ability to renegotiate its line of credit cannot be evaluated because of the unique circumstances of the new tariffs and the resulting economic uncertainty.

19. Separately, if LR/h2m raises prices on goods to pass along the cost of the challenged tariffs, it will harm the goodwill and brand reputation that it has built with its dealers, schools, teachers, and consumers over decades. Our brands are considered "premium" brands with a strong reputation for excellent quality, content, and value pricing. Since our products are intended as educational tools, we have always priced our products to be good values and accessible to all children and all families. Sharply higher prices would be perceived as a breach of our brand promise by many consumers. Some customers may stop purchasing from LR/h2m in favor of substitutes or alternatives if our prices rise suddenly or if we stop selling cherished products. If the Global Section 301 Tariffs are collected for a prolonged period, customers who leave while they

are in place may not return to buy from the Companies, even if those tariffs are eventually declared unlawful.

**Offsetting increased costs from the Global Section 301 Tariffs by using cheaper alternatives will harm the Companies' profits, sales, and brand reputation, and there is no available domestic "reshoring" manufacturing option.**

20. To fully offset the increased costs caused by the Global Section 301 Tariffs, I have considered whether LR/h2m could reduce quality, eliminate product features or sell products with fewer components. These less expensive alternatives, however, would substantially harm LR/h2m's reputation because the quality of the products would disappoint our customers and breach the brand promise. Lower quality products will result in fewer sales as well as substantial harm to customer goodwill and to our corporate reputation. Our industry is subject to strict regulation for toy safety, so in many cases, a downgrade in product quality is not even an option. In any event, as I mentioned earlier, we have no practical ability to redesign our many products overnight and relocate production to destinations unknown without it taking years and costing millions of dollars.

21. I am certain that LR/h2m cannot source or manufacture its products domestically as a practical matter. Despite strong market and financial incentives to find local manufacturing for our products during a sustained period of high tariffs on virtually all imported goods in our product categories, our resourcing efforts to date (over many years) have failed to yield even one qualified and willing U.S. vendor capable of making our non-print products. No new viable U.S. outsource partner even emerged during the IEEPA tariff crisis of 2025. There are many reasons for this: (a) our products are typically made in short runs (production runs of small quantities or durations of only a few days), which is too inefficient for U.S. manufacturers operating in expensive facilities using scarce, high-priced labor; (b) our products typically require assembly and complex packaging, which is very labor-intensive (again, labor is expensive and in short supply in the

United States); (c) we require a very high finish and many of our products require many different manufacturing functions under one roof that are not often found in the United States; (d) the U.S. market is unprepared and ill-equipped to make our thousands of different products requiring specialized facilities, equipment, and fixtures; and (e) a geographically concentrated manufacturing hub does not exist to serve the myriad needs and inputs required for efficient manufacturing of our products in the United States. Despite our years-long experience with sophisticated operational software systems and automated material handling equipment (including warehouse robots), we have searched for and failed to identify any viable automation or technology option to solve the cost problem posed by domestic manufacturing. There is simply no cost-competitive manufacturing market anywhere that can replace China, Vietnam or India for everyone all at once—at least without years of advance notice and massive capital investment. Consequently, the effects of the tariffs on global supply chains will devastate small and medium-sized businesses like ours over time.

22. Other anticipated negative consequences for our Companies directly traceable to the new Global Section 301 Tariffs include: (a) potential widespread job losses if we are unable to make a profit with a transformed business model; (b) an impaired ability to plan and run our business efficiently in an ever-changing environment of oscillating tariffs and changing terms for international trade; (c) a destabilized manufacturing base may force many suppliers into bankruptcy leaving us without critical suppliers or essential manufacturing capacity for a long period of time, thereby triggering further losses; (d) a possible synchronized bankruptcy crisis faced by many factories simultaneously triggered by the Global Section 301 Tariffs may cause a "rush for the door" by U.S. importers, leading to manufacturing gridlock lasting years because of the limited ability of alternative markets to absorb the new demand; (e) mounting port congestion

resulting from orders disrupted by the tariffs could lead to a major spike in ocean freight rates as happened in the pandemic; (f) a combination of these problems could lead to a chain reaction that cannot be stopped causing massive economic damage that cannot be recouped or addressed for many years (such as synchronized bankruptcies of many factories and their U.S. importer customers at the same time); (g) supply chain disruptions could lead to massive business interruption claims on insurance policies and widespread defaults under lines of credit issued by American banks; (h) relief from tariffs may never come from much-hyped rising domestic manufacturing (reshoring) if companies fear that the tariff regime might later be reversed thereby rendering their big reshoring investments obsolete; (i) capital destruction from extraordinary expenses and loss of business is likely permanent and not recoverable; and (j) foreign markets may reduce access to products or services sold by American companies, whether made in the U.S. or not, leading to further business contraction and profit loss.

**The Companies cannot absorb the tariffs pending the final outcome of this litigation and a subsequent refund action.**

23. It is not an option for LR/h2m to sell manufactured goods to its customers at the same price prevailing before the challenged Global Section 301 Tariffs. If LR/h2m were to maintain its prices, then the Companies' financial condition could degrade to the point that they might not be able to service their bank debt and mortgages and fall into default. The Companies cannot absorb losses during the pendency of this litigation, which will take many months if not years. And if we are successful, it would take even longer to receive refunds of our debt-financed Global Section 301 Tariffs. For example, although I generally applaud Customs and Border Protection's efforts to refund IEEPA duties after those tariffs had been declared unlawful, as of September 1, the government still owes refunds on more than $1 million in IEEPA duties paid by the Companies. That is a meaningful amount of money for our Companies. We therefore know that even when the

litigation concludes, refunds will not be immediate if the Global Section 301 Tariffs are struck down.

24. If the tariffs remain in place throughout this litigation, I believe we may be forced to take drastic steps like: sharply raising prices; sharply reducing spending; refinancing loans on unfavorable terms; significantly scaling back operations and/or product offerings; closing facilities; laying off employees; or even selling the Companies after more than 100 years as a family business. These are all enormously harmful to the Companies' long-term financial and corporate health—indeed, their very existence. We are trying to avoid as many of these measures as possible for as long as possible, but each day that the Global Section 301 Tariffs remain in place will cause further irreparable harm to the Companies and brings us closer to having to adopt such drastic measures. If tariffs are kept at current levels without relief, we face a future with far dimmer prospects, like all other similarly situated small and medium-sized companies who depend on foreign manufacturing hubs.

***

I, Richard Woldenberg, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: September 15, 2026.

Richard Woldenberg