**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**
**THE HONORABLE TIMOTHY M. REIF**
**THE HONORABLE LISA W. WANG**

| | |
|---|---|
| IN RE SECTION 301 FORCED LABOR CASES | Court No. 26-cv-3555-3JP |

**PLAINTIFFS' RESPONSE TO SUPPLEMENTAL BRIEFING ORDER**

## TABLE OF AUTHORITIES

**CASES:**

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) .......... 6

*American Sec. Ass'n v. SEC*,
147 F.4th 1264 (11th Cir. 2025) .......... 1

*Amgen Inc. v. Apotex Inc.*,
827 F.3d 1052 (Fed. Cir. 2016) .......... 8

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
273 F.3d 1229 (9th Cir. 2001) .......... 12

*Asiana Airlines v. FAA*,
134 F.3d 393 (D.C. Cir. 1998) .......... 9

*Bufkin v. Collins*,
604 U.S. 369 (2025) .......... 8

*Burgess v. United States*,
553 U.S. 124 (2008) .......... 3

*Charleston Area Med. Ctr., Inc. v. United States*,
940 F.3d 1362 (Fed. Cir. 2019) .......... 3

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 9

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 13

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 1, 4, 11

*Kentucky Mun. Energy Agency v. FERC*,
45 F.4th 162 (D.C. Cir. 2022) .......... 8

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9, 10

*N.L.R.B. v. Yeshiva Univ.*,
444 U.S. 672 (1980) .......... 5

*Nasdaq Stock Mkt. LLC v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022) ............ 13

*National Ass'n of Broadcasters v. FCC*,
39 F.4th 817 (D.C. Cir. 2022) ............ 4

*National Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ............ 13

*Norwest Bank Minn. Nat'l Ass'n v. F.D.I.C.*,
312 F.3d 447 (D.C. Cir. 2002) ............ 5

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ............ 5

*Novedades y Servicios, Inc. v. Financial Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) ............ 13

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ............ 5, 6

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............ 4, 5

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
188 F.4th 359 (5th Cir. 2026) ............ 13

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............ 13

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ............ 9

*Union Mechling Corp. v. United States*,
566 F.2d 722 (D.C. Cir. 1977) ............ 8

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001) ............ 3

**STATUTES:**

5 U.S.C.
§ 702 ............ 12
§ 706 ............ 5
§ 706(2) ............ 13

19 U.S.C.
§ 2411(b)(1) ..........3
§ 2411(d) ..........3
§ 2411(d)(3)(A) .......... *passim*
§ 2411(d)(3)(B) .......... *passim*
§ 2411(d)(3)(B)(iii) ..........7
§ 2411(d)(3)(B)(iii)(III) ..........3
§ 2411(d)(3)(C) ..........9
§ 2411(d)(3)(C)(i) ..........8, 9

**<u>OTHER AUTHORITIES</u>:**

H.R. Rep. No. 100-576 (1988) ..........6

PR-1, Decision Memorandum on Initiating Section 301 Investigations Into the Failure of Various Economies to Impose and Effectively Enforce Forced Labor Import Bans from Deputy General Counsel Juan Millán to USTR Jamieson Greer 5 (Mar. 12, 2026) ..........10

PR-6, UNITED STATES TRADE REPRESENTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (June 2, 2026) ..........2, 4, 7, 10

PR-378, Letter from the Ministry of Industry and Trade of the Socialist Republic of Vietnam to USTR General Counsel (Apr. 14, 2026) ..........10

PR-2287, Indonesia Comments on the Findings of the Section 301 Investigation on Forced Labor Import Prohibition (July 6, 2026) ..........10

PR-2437, Supplementary Post-Hearing Submission of the Government of the Republic of South Africa (July 16, 2026) ..........10

S. Rep. No. 100-71 (1987) ..........6, 7

The questions posed by the Court in its October 2 post-argument Order expose core defects in the Final Determination that USTR cannot paper over at this late juncture. After its investigation (or 60 investigations), a 90-page Report incorporated into its final rulemaking, a 20,000-word merits brief, and two-plus hours of oral argument, USTR could not even tell this Court under which of two relevant statutory provisions it had acted in deciding that the practices of 60 different economies were unreasonable. Indeed, no less than nine times, USTR avowed that it had acted under *neither* definitional provision. Tr. of Oral Arg. at 56-73 (Sept. 30, 2026), ECF No. 58 ("Tr."). And USTR conceded that it had not considered a country's level of economic development when making the unreasonable practice determination because, in its view, USTR "may completely ignore that prong." Tr. 70.

Whatever new theories or revisions counsel for USTR may belatedly devise in response to the Court's questions, they cannot substitute for determinations the agency itself failed to make when it issued the Final Determination. *See* Reply 18-22; *see, e.g.*, *Department of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20-21 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action" and in order to "provide new ones" the agency must take "*new* agency action." (internal quotation marks omitted)); *American Sec. Ass'n v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025) (vacatur "appropriate when *** the agency failed to address an issue that was central to its decision"). And *post hoc* rationales certainly cannot remedy the fatal flaw arising from USTR's manifest failure to satisfy the statute's separate country-specific burden requirement; that defect alone compels vacatur independent of the statutory issues probed in the Court's post-argument Order. Because any and all of those failures are fundamental and incurable through

further extra-record explanation, the Court should vacate the Final Determination—at least as applied to the economies from which plaintiffs undisputedly import goods subject to the Global Section 301 Tariffs.

Plaintiffs provide the following response to the specific questions posed in the Court's Order.

**1. Under which statutory provision did the Office of the U.S. Trade Representative ("USTR") make its unreasonableness determination and why?**

In its Report, USTR cited both Section 301(d)(3)(A) and (d)(3)(B), but it did not specify under which provision it was acting. *See* PR-6, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 4-5 (June 2, 2026) ("Report"). At oral argument, USTR steadfastly insisted—no less than nine times—that the Global Section 301 Tariffs did not rest on, and did not need to rest on, *either* provision. *See, e.g.*, Tr. 57-58 (Judge Reif: "You have to be under one of them." Mr. Hamilton: "I disagree."). USTR was wrong. Its determination that the forced-labor importation practices of each of the 60 economies were unreasonable had to rest on one of the definitional provisions in Section 301(d)(3)(A) or (B)—not on "neither." Tr. 57. And because USTR was attempting to address worker-rights practices specifically, the statutory structure required USTR to proceed under (B)—even though USTR "has not taken a position" (Tr. 60) on that critical issue in its Report or rulemaking.

a. USTR's conceded failure to anchor the Global Section 301 Tariffs in either Section 301(d)(3)(A) or (B) is alone a statutory violation requiring vacatur. Section 301(b) authorizes

USTR to act only upon determining that a foreign country's policy or practice is, among other things, "unreasonable." 19 U.S.C. § 2411(b)(1). Section 301(d) then defines "[f]or purposes of this subchapter" what may qualify as "unreasonable." *Id.* § 2411(d). Section 301(d)(3)(B) identifies specific categories of unreasonable worker-rights practices, including "a persistent pattern of conduct that *** permits any form of forced or compulsory labor." *Id.* § 2411(d)(3)(B)(iii)(III) ("Subsection (B)"). Section 301(d)(3)(A), by contrast, functions as a residual provision covering different practices that, although "not necessarily in violation of, or inconsistent with, the international legal rights of the United States," are "otherwise unfair and inequitable." *Id*. § 2411(d)(3)(A) ("Subsection (A)").

"[S]tatutory definitions control the meaning of statutory words." *Charleston Area Med. Ctr., Inc. v. United States*, 940 F.3d 1362, 1367 (Fed. Cir. 2019) (quoting *Burgess v. United States*, 553 U.S. 124, 129 (2008)). USTR therefore could not disregard the definitions Congress gave to the word "unreasonable" and instead treat "unreasonable" as a source of free-ranging discretion. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 485 (2001) ("The [agency] may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."). Yet that is precisely what USTR did. Rather than grounding its unreasonableness determination in either Subsection (A) or (B), USTR relied on "neither" in favor of its own

conception of the term as used in Section 301(b).[1]

USTR should not be permitted to belatedly assert a new statutory basis for its Global Section 301 Tariffs in its supplemental brief. "An agency must identify statutory authority for any action it takes." *National Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022). But USTR made crystal clear (over and over) that it did not rely on either Subsection (A) or (B) in determining that the practices of 60 separate economies were "unreasonable." USTR's Report does not contend otherwise. And because this Court "must judge the propriety of [agency] action solely by the grounds invoked by the agency" when it took the challenged action, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), USTR cannot cure that failure through *post hoc* litigation positions. *See Regents*, 591 U.S. at 20 ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the

[1] At oral argument, counsel for USTR made clear every time he was asked that the agency was not relying on either Section 301(d)(3)(A) or (B):

- Judge Reif: "Is the government relying entirely on Subsection (A) for your report and your decisions?" Mr. Hamilton: "No, Your Honor. We are relying on unreasonableness, as stated in 301(b)." Tr. 56-57.
- Judge Reif: "Which one are we under, (A) or (B)?" Mr. Hamilton: "It's neither." Tr. 57.
- Judge Reif: "You have to be under one of them." Mr. Hamilton: "I disagree." Tr. 57-58.
- Judge Reif: "You're operating entirely under (A)?" Mr. Hamilton: "I would say we're operating entirely under 301(b)(1)." Tr. 59.
- Judge Reif: "The trade representative has not taken a position in this report *** on whether you're under (3)(B)?" Mr. Hamilton: "That's right." Tr. 60.
- Judge Wang: "I see on Page 5 is you invoking [301](d)." Mr. Hamilton: "So again, our position is we aren't strictly operating under either of the (d) explanatory language." Tr. 63.
- Judge Reif: "So your position now is that the trade representative was operating under Subsection (d)(3)(A)?" Mr. Hamilton: "No, he was still operating under *** that (b)(1) language." Tr. 72.
- Judge Reif: "[S]o your position today is that a trade representative can act solely under 301(b)(1)?" Mr. Hamilton: "Exactly." Tr. 73.
- Judge Reif: "And pay no attention to the definitions that the Congress offered?" Mr. Hamilton: "[T]he way that the Congress wrote the statute, it doesn't mandate consideration of the unfair and inequitable language or the persistent pattern language." Tr. 73.

action." (internal quotation marks omitted)); *N.L.R.B. v. Yeshiva Univ.*, 444 U.S. 672, 685 n.22 (1980) (refusing to "substitute counsel's *post hoc* rationale for the reasoning supplied by the [agency] itself" (citing *Chenery*, 332 U.S. at 196)). USTR's unreasonableness determination therefore lacks any lawful statutory foundation, and that defect alone requires vacatur of the Global Section 301 Tariffs. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017) ("Under the APA, we must 'hold unlawful and set aside agency action *** not in accordance with law'" (ellipsis in original) (quoting 5 U.S.C. § 706)); *see also* Reply 18-20 (explaining that "[s]etting aside means vacating" (alteration in original)).

b. Even if the agency tries to rehabilitate the Final Determination through *post hoc* attorney argument, there are independent reasons why USTR cannot successfully defend its unreasonableness determinations under either Subsection (A) or Subsection (B).

USTR cannot rely on Subsection (A) because Subsection (B) is the exclusive statutory source of authority for treating worker-rights violations—and forced-labor practices in particular—as "unreasonable" practices. Subsection (B) enumerates practices that may be deemed unreasonable and imposes specific limitations on that determination. If USTR could also rely on Subsection (A)'s general catch-all authority to reach the very types of practices addressed in Subsection (B), those limitations would have no operative effect and Subsection (B) would become surplusage. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (Where "a general authorization and a more limited, specific authorization exist side-by-side[,] *** [t]he terms of the specific authorization must be complied with."); *Norwest Bank Minn. Nat'l Ass'n v. F.D.I.C.*, 312 F.3d 447, 451 (D.C. Cir. 2002) ("When both specific and general provisions cover the same subject, the specific provision will control, especially if applying the general provision would render the specific provision superfluous, as it would here."); *see also* Meyer &

Shaffer Br. 9-10; Reply 7. In short, if the relevant category of practice is governed by Subsection (B), it cannot also be governed by Subsection (A).

That conclusion is confirmed by the Senate Report accompanying the 1988 amendment, which explained that the worker-rights practices identified in Section 301(d)(3)(B)(iii) constitute an "*all-inclusive, not illustrative*" list of "the [worker] rights and standards which could be the subject of petitions and potentially actionable under section 301." S. Rep. No. 100-71, at 88 (1987) (emphasis added); *see also* H.R. Rep. No. 100-576, at 568-569 (1988) (Conf. Rep.) ("the House recede[d]" to the Senate's amendment concerning forced labor). USTR therefore cannot invoke Section 301(d)(3)(A)'s residual clause to expand the category of unreasonable worker-rights practices beyond those Congress specifically enumerated in Section 301(d)(3)(B)(iii). *See RadLAX*, 566 U.S. at 645.

Section 301(d)(3)(B)'s statement that unreasonable practices "include, but are not limited to," those enumerated does not alter that conclusion. That language permits USTR to identify additional categories of practices as "unfair and inequitable" under Section 301(d)(3)(A), but only to the extent those practices fall outside the categories already addressed in Section 301(d)(3)(B). It does not authorize USTR to use the residual clause to enlarge the contents of categories expressly identified by Congress. Once Congress specified which worker-rights practices qualify as unreasonable under Section 301(d)(3)(B)'s categories, USTR could not invoke Section 301(d)(3)(A) to sweep in additional conduct that Congress itself chose not to include. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").

Because USTR could not invoke Subsection (A), its only alternative was Subsection (B). Subsection (B)(iii), however, does not identify a country's importation of goods allegedly

produced with forced labor abroad as an unreasonable practice. The provision instead identifies as unreasonable a foreign country's decision to "permit[] any form of forced or compulsory labor." By its terms, that provision addresses labor practices a country allows within its own jurisdiction, not forced-labor inputs incorporated into goods produced elsewhere. Consistent with that understanding, which USTR apparently shares (Resp. 31), Subsection (B) targets a country's "toleration of forced labor *in its own economy*," not its importation of products allegedly made with forced labor abroad. Meyer & Shaffer Br. 5 (emphasis added); *see also* S. Rep. No. 100-71, at 88 (1987) (describing Section 301(d)(3)(B) as targeting "the competitive advantage in international trade that some countries derive from the systematic denial to *their* workers of basic internationally recognized worker rights" (emphasis added)). In other words, Congress already specified an "all-inclusive" category of worker-rights practices it wanted to make actionable under Section 301—and a failure to impose a ban on importation of forced-labor goods was not among them.

Even if USTR could in principle have relied on Subsection (B) to ground its unreasonableness determination initially, it is now too late for USTR to do so. As explained next, Subsection (B)(iii) required USTR to consider each country's level of economic development as part of its unreasonableness analysis—but USTR admitted that it failed to do so. *See* Resp. to Question 2, *infra*; Tr. 70-72 (justifying Report's lack of consideration of economic development on ground that USTR "may completely ignore that prong").

**2. Is USTR required to consider the level of economic development as part of an unreasonableness determination under 19 U.S.C. § 2411(d)(3)(B)(iii), pursuant to the statute or the Administrative Procedure Act?**

To the extent USTR was permitted to determine a country's failure to impose a ban on importation of forced-labor goods was "unreasonable"—*but see* Resp. to Question 1, *supra*—USTR was required to consider a country's level of economic development, pursuant to Section

301(d)(3)(C)(i). That requirement follows from the statute's text and, in any case, from the Administrative Procedure Act ("APA").

Section 301(d)(3)(C)(i) provides that acts, policies, and practices described in Subsection (B)(iii) "shall not be treated as being unreasonable if the Trade Representative determines that *** [they] are not inconsistent with the level of economic development of the foreign country." 19 U.S.C. § 2411(d)(3)(C)(i). Congress obviously regarded a country's level of economic development as central to assessing the reasonableness of its labor practices. Indeed, Congress made that factor so important that it expressly prohibited USTR from treating practices that were consistent with economic development as unreasonable. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command."); *Amgen Inc. v. Apotex Inc.*, 827 F.3d 1052, 1061 (Fed. Cir. 2016) ("The word 'shall' generally indicates that the directive is mandatory.").

USTR nonetheless contended that it has unfettered discretion to decide whether to consider economic development at all, even when proceeding under Subsection (B)(iii). *See, e.g.,* Tr. 71 (Mr. Hamilton: "[T]here's no mandate on the trade representative to consider that exception language."). USTR leans on the "if" clause as imparting optionality whether to conduct the inquiry in the first place. That interpretation cannot be squared with the statute. Although USTR retains ordinary agency discretion over the ultimate determination (*i.e.*, whether or not the practice is "inconsistent with the level of economic development of the foreign country"), it must at least consider the level of economic development before acting—*i.e.*, it must "actually exercise its discretion." *Union Mechling Corp. v. United States*, 566 F.2d 722, 724-725 (D.C. Cir. 1977); *see also Kentucky Mun. Energy Agency v. FERC*, 45 F.4th 162, 186 (D.C. Cir. 2022) ("A grant of discretion to an agency does not, of course, authorize it to make an unprincipled decision." (citation

and alteration omitted)). Otherwise, Section 301(d)(3)(C)'s "express exception would be rendered insignificant, if not wholly superfluous," despite courts' "reluctan[ce] to treat statutory terms as surplusage in any setting." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted); *see Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of [statutory] interpretation requires us to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant." (internal quotation marks omitted)). USTR could effectively nullify Section 301(d)(3)(C)(i)'s mandate by declining ever to even consider economic development as a factor.

At a minimum, because USTR was attempting to address worker-rights issues specifically, the APA independently required USTR to consider a country's level of economic development (whether the agency relied on Subsection (A) or (B)). An agency acts arbitrarily and capriciously when it "*entirely fail*[*s*] to consider an *important* aspect of the problem" or ignores "the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphases added); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). That bedrock APA requirement is wholly distinct from any failure to respond to comments. By identifying economic development as a consideration bearing on whether a foreign country's labor practices are "unreasonable"—directly when USTR proceeds under (B)(iii) or indirectly when USTR proceeds under (A) (assuming *arguendo* it ever could use (A) for forced-labor practices, *but see* pp. 5-6, *supra*)—Congress made that factor relevant to the agency's analysis and USTR therefore could not lawfully disregard it altogether.

Although a member of USTR's Advisory Committee urged USTR to "consider the developmental status of economies," and multiple countries—including South Africa, Indonesia,

and Vietnam—emphasized development and capacity constraints in their comments,[2] the Report never once mentioned the level of economic development of any of the 60 Targeted Economies. *See* MJAR 29, 45. USTR never suggested that it had weighed economic development as a factor but found it inapplicable to any or all 60 economies. To the contrary, USTR acknowledged at oral argument that it had not considered the issue at all because it believed it was not acting under either Subsection (A) or (B). *See* Tr. 72 (stating that USTR "never g[o]t to the economic development exception language" and instead made only "the Subsection [301(b)] determinations[:] unreasonableness, burden, inappropriate action"). Its conceded failure to consider the affected countries' levels of economic development—which Congress obviously considered "an important aspect of the problem" when it comes to workers' rights, *State Farm*, 463 U.S. at 43—rendered its unreasonableness determinations arbitrary and capricious under the APA.

**3. How does USTR's reliance on 19 U.S.C. §§ 2411(d)(3)(A) or (B) affect vacatur?**

Whether USTR now purports to rely on Section 301(d)(3)(A) or (B) (or neither, as it unequivocally asserted at oral argument), the Final Determination must be vacated because further *post hoc* explanation cannot cure (1) its failure to anchor the Global Section 301 Tariffs in either Section 301(d)(3)(A) or (B) at the time of the agency action; (2) the fact that neither Subsection (A) nor (B) authorizes USTR to treat the importation of forced-labor goods as an "unreasonable" practice; and/or (3) USTR's wholesale failure to consider economic development, whether that

---

[2] *See* PR-1, Decision Memorandum on Initiating Section 301 Investigations Into the Failure of Various Economies to Impose and Effectively Enforce Forced Labor Import Bans from Deputy General Counsel Juan Millán to USTR Jamieson Greer 5 (Mar. 12, 2026); PR-378, Letter from the Ministry of Industry and Trade of the Socialist Republic of Vietnam to USTR General Counsel (Apr. 14, 2026), https://comments.ustr.gov/s/commentdetails?rid=3VCCB928HK; PR-2437, Supplementary Post-Hearing Submission of the Government of the Republic of South Africa 10 (July 16, 2026), https://comments.ustr.gov/s/commentdetails?rid=Q44PQYTTHV; PR-2287, Indonesia Comments on the Findings of the Section 301 Investigation on Forced Labor Import Prohibition 2 (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=M7MWJP4XVX.

obligation arose from Section 301 itself or independently from the APA, *before* imposing tariffs on any of the 60 economies.

A remand without vacatur may be appropriate where an agency can provide "a fuller explanation of [its] reasoning *at the time of the agency action*." *Regents*, 591 U.S. at 20. But that principle has no application here. As an initial matter, USTR's action was "not in accordance with law" because it was not authorized by either Subsection (A) or (B); no amount of explanation on remand could cure that statutory problem. *See* pp. 5-7, *supra*. At the time of its action, moreover, USTR neither identified the source of its authority nor considered the level of economic development of the Targeted Economies. *See* pp. 2-4, 9-10, *supra*. Because the agency wholly failed to consider the factors that Section 301 and/or the APA made relevant to its decision, the defect requires vacatur. *See, e.g.*, *Regents*, 591 U.S. at 21 (where further explanation will not suffice, agency must "'deal with the problem afresh' by taking *new* agency action *** [in] compl[iance] with the procedural requirements for new agency action" (citation omitted)).

Of course, the Court need find only one ground for vacatur. Regardless of the fundamental defects in USTR's unreasonableness determination, USTR independently failed to satisfy the statutory requirement that it demonstrate that *each* (or indeed any) Targeted Economy's alleged failure to effectively enforce an express forced-labor import ban individually "burdens" U.S. commerce. MJAR 24-27; Reply 5-6. Nor is there any prospect that the agency could remedy that deficiency on remand. Consistent with its merits briefing, which eschewed any need to conduct a country-by-country burden and causation analysis beyond reliance on general "economic principles," "common sense," and raw numbers on the value of select imports/exports by country (Resp. 39-40), USTR effectively conceded at oral argument that the administrative record contains no additional country-specific evidence beyond what it has already identified. *See* Tr. 91-92.

When Judge Choe-Groves asked whether "there's more information on the record that would have been helpful in giving more complete country-by-country responses," USTR's counsel answered: "No. No, no." *Id*. That concession confirms that the requisite country-specific showing is absent from the administrative record itself. While USTR is perfectly free to re-open the record and compile adequate country-specific evidence to "follow from what the Court identifie[s] in its analysis," *id*. at 92, it cannot do so on a remand *without vacatur*. Because USTR failed to establish the statutory burden requirement, that separate defect alone requires vacatur (subject to certain limitations on scope and a potential stay pending appeal, as discussed next).

**4. In the context of this In Re proceeding, do plaintiffs have standing to challenge the entirety of USTR's final actions or do plaintiffs have standing only with respect to specific countries? Should the State plaintiffs' standing be considered at the same time as the private party plaintiffs? To what extent does the Court's scheduling order bear on this issue? To the extent the private and State plaintiffs collectively do not [import] from all the countries and/or economies subject to USTR's determination, does the Court have jurisdiction over those remaining countries from which no parties [import] goods?**

Sample-case Plaintiffs plainly have standing to challenge USTR's Final Determination. To establish standing under the APA, a plaintiff need show only that it has "suffer[ed] legal wrong because of agency action" or that it has been "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. It need not show that it has been injured by each subsidiary component of the challenged action. For example, in *Arizona Cattle Growers' Association v. U.S. Fish and Wildlife*, the Ninth Circuit held that a plaintiff had standing "to sue for injuries relating to *all* allotments affected by [a] Biological Opinion and not just those allotments" that directly impacted the plaintiff's members. 273 F.3d 1229, 1235 (9th Cir. 2001) (emphasis added). Here, there is no legitimate dispute that Plaintiffs have suffered concrete injury as a result of USTR's Final Determination. *See* Reply 2; Attach. A to Reply ¶¶ 5-24; Attach. B to Reply ¶¶ 7-16. That is all Article III and the APA require.

Any question about the scope of this Court's vacatur order in terms of specific countries is a question of remedy, not of standing to challenge the Final Determination or this Court's jurisdiction to adjudicate it. As to remedial scope, the issue is whether the Court may "sever and set aside an offending portion" of the Final Determination as to certain countries "while keeping intact the rest of the order." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022); *see* Resp. 59-60 (discussing Final Determination's severability clause). Courts typically vacate unlawful agency actions in their entirety. *See, e.g.*, *National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).[3]

To the extent this Court elects to narrow its remedial order, vacatur should cover at least the countries from which all private and State plaintiffs directly import and thus pay the challenged tariffs. *See* Reply 2-3 n.1, 20 n.9. The sample-case procedure, which is designed to "allow[] the Court to consider all claims raised by the various plaintiffs" in an "efficient" manner, contemplates such relief so as to avoid prejudicing the other private and State plaintiffs whose cases were stayed. ECF No. 1, at 4.[4]

---

[3] As explained in our prior briefing (Reply 19-21 & n.8), and contrary to the Government's suggestion, the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025), did not disturb the APA's traditional vacatur remedy. Since *CASA*, circuits across the country have continued to apply vacatur broadly to unlawful agency action. *See, e.g., Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 188 F.4th 359, 371 (5th Cir. 2026) (universally vacating rule and observing that the APA "does not embrace a too-big-to-vacate principle"), *petition for cert. filed* (U.S. Oct. 14, 2026) (No. 26-491); *Novedades y Servicios, Inc. v. Financial Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (The APA "grants federal courts the authority to 'hold unlawful and set aside agency action[s]' on a nationwide basis when the challenged action is held unlawful." (alteration in original) (quoting 5 U.S.C. 706(2)) (citing *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring))).

[4] According to the other private plaintiffs' complaint, they import goods from at least the following 27 countries (22 economies) subject to the Global Section 301 Tariffs: Afghanistan, Argentina, Austria, Barbados, Canada, Colombia, Costa Rica, Denmark, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, the Netherlands, Nigeria, Peru,

At a minimum, the Court may start by granting relief as to the economies from which the sample-case Plaintiffs indisputably import goods: Cambodia, China, the European Union,[5] India, South Korea, Taiwan, Thailand, and Vietnam. *See* Attach. A to Reply ¶¶ 4-5; Attach. B to Reply ¶ 7. There should be zero doubt about the propriety of such a narrowly tailored vacatur, whether as a matter of Article III standing or APA law. In that event, the Court should lift the stay on cases brought by the other plaintiffs so they can seek to extend relief to additional countries. None of this would affect the Government's ability to seek a stay pending appeal from a vacatur order, whatever its scope. *See* Reply 22.

Dated: October 16, 2026

Respectfully submitted,

*/s/* Pratik A. Shah
Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*

Spain, Sri Lanka, Switzerland, Tanzania, Turkey, United Kingdom, Vietnam. Compl. ¶¶ 12-13, *Burlap & Barrel, Inc. v. Greer*, No. 26-cv-03345 (CIT July 24, 2026).

[5] Because USTR treats the European Union as one "economy" for purposes of the Section 301 Global Tariffs, Plaintiffs' imports from any individual EU country warrants vacatur of the Final Determination as to the EU.

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1), I certify that this Supplemental Brief, including headings, footnotes, and quotations (but excluding table of contents, table of authorities, counsel's signature blocks, and this certificate) complies with the word limitation requirement set forth in the Court's October 2, 2026, Order. The word count for this submission, as computed by the word processing system used to prepare the brief, is 4,419 words.

*/s/* Pratik A. Shah
Pratik A. Shah

*Counsel for Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and shopHMTX LLC*